UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| HARLEY KELCHNER, an individual, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRST EXPEDITED, INC., CRST SPECIALIZED TRANSPORTATION, INC., CRST LINCOLN SALES, INC. and JOHN SMITH, an individual<br><br>Defendants. | Case No. 1:24-cv-00082-CJW-KEM<br><br>Honorable Judge C.J. Williams |

**DECLARATION OF THOMAS MCKERR**

I, Tom McKerr, declare as follows:

1. I am the Vice President of Operations for CRST Specialized Transportation, Inc. (CRST Specialized). I have worked in that role for CRST Specialized or its predecessor companies since 2006. Unless otherwise stated, the facts set forth herein are based on my own personal knowledge and experience with CRST Specialized, a review of CRST Specialized's business records, and/or information available to me in my capacity as Vice President of Operations. If I were called upon to testify to such facts, I could and would competently do so.

2. CRST Specialized is an Indiana corporation doing business as CRST Specialized Solutions, Inc.

3. CRST Specialized's headquarters and base of operations are located in Fort Wayne, Indiana. All its physical facilities are also located in Fort Wayne.

4. CRST Specialized is a for-hire motor carrier authorized by the Federal Motor Carrier Safety Administration (FMCSA), an agency of the U.S. Department of Transportation

(DOT) transport freight in interstate commerce. The company specializes in the movement of high-value freight and logistics and delivers goods throughout the United States.

5. CRST Specialized is the successor entity of a 2011 acquisition of the Indiana-based company Specialized Transportation, Inc., which was previously the high-value products and logistics division of North American Van Lines, Inc.

6. CRST Expedited, Inc. (CRST Expedited) and CRST Lincoln Sales, Inc. (Lincoln Sales) are two of CRST Specialized's sister companies; neither company has an ownership interest in CRST Specialized.

7. CRST Specialized does not have a physical presence in Iowa.

8. CRST Specialized employs its own personnel, including its leadership team, fleet managers (*i.e.*, dispatchers), and other operational and support staff, who live in and work out of the greater Fort Wayne, Indiana area. CRST Specialized also has employees that work out of corporate distribution centers in Laurel, Maryland; Bolingbrook, Illinois; Columbus, Ohio; and Milpitas, California.

9. CRST Specialized has its own motor carrier authority from the FMCSA; it does not share it with CRST Expedited, Inc. or other sister companies.

10. CRST Specialized does not have any employee drivers. Instead, to meet its customers' needs, CRST Specialized partners with independent contractors who execute Independent Contractor Operating Agreements (ICOAs).

11. Before beginning to provide transportation services, new contractors must be qualified under the Federal Motor Carrier Safety Regulations and attend a one-week onboarding program at CRST Specialized's headquarters in Fort Wayne.

12. During the one-week of onboarding, new contractors review and sign their ICOAs in-person if they decide to contract with CRST Specialized.

13. Under their ICOAs, CRST Specialized's contractors agree to provide the equipment necessary to perform delivery services and to lease that equipment to CRST Specialized within the meaning of the Federal Leasing Regulations, 49 CFR Part 376.

14. Approximately 40 percent of CRST Specialized's new contractors own their own truck or otherwise choose to lease equipment from a third-party. The remaining new contractors elect to lease equipment through CRST Specialized's sister company, Lincoln Sales.

15. During the onboarding process, CRST Specialized's new contractors that do choose to lease equipment through Lincoln Sales have the opportunity to inspect and select from several different trucks. The equipment available to the new contractors is all located on-site at CRST Specialized's facilities in Fort Wayne.

16. The trailers that CRST Specialized's contractors haul are not traditional dry van trailers; in particular, the trailers are built to specifically accommodate the unique types of freight that CRST Specialized's contractors deliver.

17. During CRST Specialized's onboarding process, once a contractor selects the equipment to be leased, the contractor reviews and executes a Lease Purchase Agreement (LPA) and takes possession of the truck before departing Fort Wayne to begin performing any work.

18. Harley Kelchner is a current independent contractor with CRST Specialized.

19. In early 2022, Kelchner contacted CRST Specialized about becoming an owner-operator. A CRST Specialized recruiter who lives in and works out of her home in North Carolina contacted Kelchner about his interest in working for CRST Specialized.

20. Based on my review of CRST Specialized's records kept in the ordinary course of business, in March 2022, Kelchner traveled to Fort Wayne to attend CRST Specialized's onboarding program for new contractors and to formalize his relationship with CRST Specialized.

21. Based on my review of CRST Specialized's records kept in the ordinary course of

business, during the onboarding process, Kelchner executed an ICOA with CRST Specialized. A true and correct copy of Kelchner's signed ICOA is attached as Exhibit A.

22. Based on my review of CRST Specialized's records kept in the ordinary course of business, during the onboarding process, Kelchner also had the opportunity to inspect and select from several different trucks available for lease by Lincoln Sales. Before departing Fort Wayne to begin performing services under his ICOA, Kelchner selected a truck, executed a LPA, and took possession of the truck. He did not lease a trailer.

23. Based on my review of CRST Specialized's records kept in the ordinary course of business, after completing the onboarding program for new contractors, Kelchner began performing services over-the-road throughout the United States.

24. Contractors for CRST Specialized, have day-to-day contact with their fleet managers (*i.e.*, dispatchers), who are based in Fort Wayne.

25. To get paid for the transportation services they provide, CRST Specialized contractors must submit paperwork to CRST Specialized's offices in Fort Wayne, Indiana for each load they deliver. This is the process Kelchner followed to be paid for the transportation services he provided.

I declare under penalty of perjury under the laws of the United States of America and the State of Indiana that the foregoing is true and correct.

Dated: October 17, 2024

_____
Thomas McKerr

# EXHIBIT A

# CRST SPECIALIZED TRANSPORTATION, INC.

# INDEPENDENT CONTRACTOR
# OPERATING AGREEMENT

# HARLEY KELCHNER
# L890 - 105170

*THIS AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, WHICH ARE HIGHLIGHTED IN* **<u>BOLDFACED UNDERLINED TYPE</u>**.

Rev.
10/02/2013

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 6 of 57

# CRST SPECIALIZED TRANSPORTATION, INC.
## INDEPENDENT CONTRACTOR OPERATING AGREEMENT

### TABLE OF CONTENTS

Section                                                                                 Page

1.     CONTRACTOR'S EQUIPMENT AND SERVICES .......... 1
        1(A)   Provision of Equipment and Services .......... 1
        1(B)   Reserved For Future Use .......... 1
        1(C)   No Limitations on Contractor's Use of Equipment .......... 1
        1(D)   Exclusive Possession, Control, and Use .......... 1
        1(E)   Subleases and Other Alternative Uses of Equipment .......... 1

2.     GROSS COMPENSATION .......... 3

3.     SETTLEMENT PERIOD AND DOCUMENTATION .......... 4
        3(A)   Settlement .......... 4
        3(B)   Documentation .......... 4

4.     COMPLIANCE WITH LEGAL AND CUSTOMER REQUIREMENTS .......... 4
        4(A)   Maintenance and Inspection .......... 4
        4(B)   Equipment Identification .......... 4
        4(C)   Lawful and Safe Operations .......... 5
        4(D)   Drivers .......... 6
        4(E)   Driver Records .......... 7
        4(F)   Passenger Authorization .......... 7
        4(G)   Paperwork Requirements .......... 7
        4(H)   Customer Requirements .......... 7

5.     CONTRACTOR'S RESPONSIBILITIES .......... 7
        5(A)   Workers .......... 7
        5(B)   Equipment .......... 7
        5(C)   Routes and Completion of Performance .......... 8
        5(D)   Loading .......... 8
        5(E)   Use of Communications Equipment .......... 8
        5(F)   Operating Expenses .......... 8
        5(G)   Base Plates and Permits .......... 9

6.     CHARGE-BACKS .......... 9
        6(A)   Deductions Table .......... 9
        6(B)   Information Regarding Deductions .......... 9
        6(C)   Changes in Existing Deduction Items .......... 9
        6(D)   No Required Purchases from Carrier .......... 10

7.     INDEMNIFICATION AND HOLD HARMLESS .......... 10
        7(A)   In General .......... 10
        7(B)   Indemnity Limits .......... 10
        7(C)   Carrier's Coverage .......... 10
        7(D)   Claims by Contractor or other Contractors .......... 11
        7(E)   Reclassification .......... 11
        7(F)   Indemnification by Carrier .......... 11

8.     ESCROW FUND .......... 11
        8(A)   Principal .......... 11
        8(B)   Specific Items to Which Escrow Fund May Be Applied .......... 11
        8(C)   Accounting .......... 11
        8(D)   Interest .......... 12
        8(E)   Final Settlement .......... 12
        8(F)   Return Of Escrow Balance .......... 12

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 7 of 57

9. CONTRACTOR NOT EMPLOYEE OF CARRIER ................................................................................ 12
    9(A)   In General ........................................................................................................................ 12
    9(B)   Certification of Status ...................................................................................................... 12
    9(C)   Selection of Equipment, Maintenance, and Routes ........................................................ 12
    9(D)   Contractor's Workers ...................................................................................................... 12
    9(E)   Taxes ............................................................................................................................. 12
    9(F)   The Parties' Financial Obligations If Contractor Is Determined to Be an Employee ......... 13

10. INSURANCE ............................................................................................................................... 13
    10(A)  Carrier's Insurance Obligations ...................................................................................... 13
    10(B)  Contractor's Insurance Obligations ................................................................................ 14
    10(C)  Requirements Applicable To All Of Contractor's Insurance Coverages .......................... 15
    10(D)  Contractor's Liability If Required Coverages Are Not Maintained .................................... 15
    10(E)  Availability Of Insurance Facilitated By Carrier ............................................................... 15
    10(F)  Changes In Cost Or Other Details Of Coverages ........................................................... 16

11. CONTRACTOR COOPERATION ................................................................................................. 16

12. CONTRACTOR'S NONPERFORMANCE ..................................................................................... 16

13. NOTICES .................................................................................................................................... 17

14. DURATION OF AGREEMENT AND TERMINATION ..................................................................... 17
    14(A)  Term ............................................................................................................................... 17
    14(B)  Equipment Receipt ......................................................................................................... 17
    14(C)  Termination .................................................................................................................... 17
    14(D)  Reasons for Unilateral Termination by a Party ............................................................... 17
    14(E)  Survival of Liabilities and Entitlements ........................................................................... 17

15. CONTRACTOR'S OBLIGATIONS UPON TERMINATION .............................................................. 17
    15(A)  Completion of Performance ............................................................................................ 17
    15(B)  Return of Carrier's Property ............................................................................................ 17
    15(C)  Remedies for Failure to Return Carrier's Property .......................................................... 18

16. FORM OF AGREEMENT AND MISCELLANEOUS PROVISIONS ................................................. 18
    16(A)  General .......................................................................................................................... 18
    16(B)  Severability .................................................................................................................... 18
    16(C)  Waiver ............................................................................................................................ 18
    16(D)  Complete Agreement ..................................................................................................... 18
    16(E)  Copies of This Agreement and Statement of Lease ........................................................ 18

17. GOVERNING LAW ...................................................................................................................... 18

18. BINDING EFFECT ...................................................................................................................... 19

19. COLLECTION EXPENSES .......................................................................................................... 19

20. AUTHORITY TO COMPLETE CREDIT CHECK ........................................................................... 19


EQUIPMENT RECEIPT
APPENDIX A – CONTRACTOR ELECTION FORM
SUPPLEMENT 1 – CRST FUEL PURCHASING PROGRAM
QUALCOMM, INC. OMNIVISION™ SYSTEM RECEIPT
APPENDIX B – CONTRACTOR COMPENSATION
APPENDIX C – SUBLEASE OF EQUIPMENT
APPENDIX D – CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS
APPENDIX E – PRIVACY-RELATED DISCLOSURES AND CONSENT FORM
APPENDIX F – BASE PLATE PRECOLLECTION PROGRAM
STATEMENT OF LEASE

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 8 of 57

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT

CRST Specialized Transportation, Inc. ("Carrier"), an authorized for-hire interstate motor carrier registered with the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT") and applicable State and foreign authorities, and the undersigned independent contractor ("Contractor"), together the "Parties," in consideration of the mutual covenants herein contained and pursuant to the Federal Truth-in-Leasing Regulations, 49 C.F.R. Part 376, enter into this Independent Contractor Operating Agreement (the "Agreement").

## 1. CONTRACTOR'S EQUIPMENT AND SERVICES

**1(A). Provision of Equipment and Services.** Contractor warrants that he/she is the "owner" of the equipment set forth in the attached Equipment Receipt and Section 1 of **Appendix A (Contractor Election Form)** or as supplemented in an Addendum ("Equipment") within the meaning of 49 C.F.R. § 376.2(d) and has full authority to contract the Equipment and services to Carrier; and that the Equipment is in good, safe, and efficient operating condition, meets all applicable federal, state, local, foreign requirements, and is in all respects fit and serviceable for the use intended under this Agreement. Contractor hereby provides Carrier with professional truck driving services, other incidental transportation-related services, and the use of the Equipment.

### 1(B). [HELD FOR FUTURE USE]

**1(C). No Limitations on Contractor's Use of Equipment.** Carrier does not agree to make any minimum use of the Equipment, to use the Equipment at any particular time or location, or to furnish any specified number of loads or pounds of freight to Contractor or to guarantee any amount of revenue to Contractor. Contractor is free to accept or reject any specific shipment offered by Carrier. Contractor is not prohibited from entering into separate agreements to provide other equipment and other professional truck drivers, not identified as Equipment above or in an appendix and drivers not used to service this Agreement, to other motor carriers. Nor is Contractor, consistent with Section 1(E) of this Agreement, prohibited from using the Equipment for the pickup, transportation, or delivery of property for more than one common carrier or other person or entity.

**1(D). Exclusive Possession, Control, and Use.** Carrier and Contractor intend to relate to each other entirely as independent contractors, not as employer and employee. Nevertheless, solely to comply with 49 C.F.R. § 376.12(c)(1), Carrier shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement. Contractor may operate the Equipment for another motor carrier during this Agreement only with Carrier's prior written consent (which shall not be unreasonably withheld) and only if done under a sublease between Carrier and the other authorized carrier (including Contractor, if Contractor has the requisite motor carrier registration/operating authority(ies) and insurance) pursuant to 49 C.F.R. § 376.12(c)(2), as applicable and the terms of Subsection E of this Section. Carrier shall not sublease the Equipment to another carrier without Contractor's prior written consent (which consent shall not be unreasonably withheld). Carrier shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement, except when the Equipment is under sublease by Carrier to another authorized carrier. Any such sublease shall state that the sublessee-carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the sublease. The foregoing declarations are made in order to comply with DOT regulations (49 C.F.R. § 376.12(c)) and shall not be used to classify Contractor as an employee of Carrier. As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether Contractor's drivers are independent contractors or employees of Carrier and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements."

**1(E). Subleases and Other Alternative Uses of Equipment.** At Contractor's request, Carrier may, with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of Carrier only under the terms and conditions set forth in this Subsection (E). The other uses may consist of (together, "Alternative Uses of Equipment"): **(i) Sublease** – Carrier subleases the Equipment (including driving services furnished by Contractor) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 *et seq.*, to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; **(ii) Contractor Motor Carriage** – Contractor uses Contractor's own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker), in which event, the provisions of this Subsection (E) relating to CONTRACTOR Motor Carriage shall be deemed to constitute the sublease required by 49 C.F.R. § 376.12(c)(2); and **(iii) Exempt Motor Carriage** – Contractor, lacking motor carrier operating authority of Contractor's own but possessing a validly-issued DOT Number, lawfully provides for-hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier (directly or through a motor freight broker)..

**1(E)(1). Carrier's Authorization and Release.** To obtain Carrier's authorization for each Alternative Use of Equipment, Contractor shall take the following steps **before accepting a trip**:

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 9 of 57

**1(E)(1)(a).** For Alternative Uses of Equipment Involving Subleases. Have the Sublease Carrier complete, sign, date, and then fax, or scan and email, to Carrier a sublease in the form appended as **Appendix C (Sublease)** of this Agreement ("Sublease"), together with the Sublease Carrier's certificate of insurance required by Section 5 of the Sublease;

**1(E)(1)(b).** For Alternative Uses of Equipment Involving Contractor Motor Carriage. Telephone or email Carrier's dispatch and provide it with valid information about Contractor wishing to arrange the Alternative Use of Equipment – name, address, identification number (which shall be the U.S. Department of Transportation number for interstate private carriers, any applicable state number for intrastate private carriers, and the Federal Employer Identification Number for other private carriers and shippers), phone number, email address, and individual contact's name – and about the planned trips (dates, times, and city and state of pickup and delivery). Contractor shall obtain an oral or emailed release from Carrier's dispatch, and Contractor shall display the Carrier release number on the trip sheet submitted to Carrier after the trip; and

**1(E)(1)(c).** For Alternative Uses of Equipment Involving Exempt Motor Carriage. Contractor shall submit to Carrier proof (including in the form of a printout of a search on http://li-public.fmcsa.dot.gov) that it has obtained a validly-issued DOT Number (and the name and State under which DOT has listed the DOT Number) and telephone or email Carrier's dispatch and provide it with valid information about the shipper or private carrier (same information as required in Section 1(E)(1)(b) above) and about the planned trips (dates, times, and city and state of pickup and delivery). Contractor shall obtain an oral or emailed release from Carrier's dispatch, and Contractor shall display the Carrier release number on the trip sheet submitted to Carrier after the trip.

**1(E)(2). Compensation For All Alternative-Use-of-Equipment Operations.** In connection with a Sublease or other Alternative Use of Equipment, Contractor agrees that:

**1(E)(2)(a).** Contractor shall submit any necessary Sublease- or other Alternative Use-related shipping documents to, and obtain settlement compensation directly and exclusively from, Sublease Carrier (in the case of Sublease trips) or the shipper or private carrier (in the case of Contractor Motor Carriage or Exempt Motor Carriage trips). Notwithstanding anything in this Agreement to the contrary, Carrier shall have no responsibility for collecting freight charges or paying settlement compensation to Contractor for any Alternative-Use-of-Equipment trip; and

**1(E)(2)(b).** To avoid any implication that Carrier is subsidizing Contractor's independent business use of the Equipment, Contractor shall pay Carrier the per-trip Alternative-Use-Fee stated in Section 4 of **Appendix A (Contractor Election Form)** to help defray Carrier's administrative, regulatory, state tax, and possible insurance costs in connection with the Alternative-Use-of-Equipment trip.

**1(E)(3). Carrier's Identification.**

**1(E)(3)(a).** Subleases. For the duration of any Sublease, Contractor shall remove or cover up all of Carrier's identification on the Equipment and display instead the Sublease Carrier's identification; and

**1(E)(3)(b).** Contractor Motor Carriage. For any trip under Contractor's own operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier, Contractor shall remove or cover up all of Carrier's identification on the Equipment and display instead Contractor's identification. If Contractor possesses interstate or intrastate operating authority and no other motor carrier booked the shipment, the shipment, even if exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., shall be deemed to be one involving Contractor Motor Carriage.

**1(E)(3)(c).** Exempt Motor Carriage. For any trip by Contractor, lacking Contractor's own operating authority but possessing a validly-issued DOT Number, on which it provides for-hire motor carriage, exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier, Contractor shall remove or cover CARRIER's identification from the Equipment and shall display Contractor's DOT Number and DOT-listed name (or, if applicable, D.B.A. Name) on the Equipment for the duration of each Exempt Motor Carriage trip.

**1(E)(4). Control of and Responsibility for the Equipment.** As required by 49 C.F.R. § 376.12(c)(1), Carrier, except for Sublease and Contractor Motor Carriage trips, shall with respect to the public have exclusive possession, control, and use of the Equipment, and assume complete responsibility for the operation of the Equipment, for the duration of this Agreement. For Sublease trips, Carrier's sublease to Sublease Carrier shall, in accordance with 49 C.F.R. § 376.22(c)(2), provide that Sublease Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of

Case 1:24-cv-00082-CJW-KEM     Document 28-2     Filed 10/17/24     Page 10 of 57

the Sublease. For Contractor Motor Carriage trips, which also constitute subleasing, Contractor shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of trip.

1(E)(5). Insurance. For Alternative-Use-of-Equipment trips, just as for trips performed on behalf of Carrier, Carrier's and Contractor's insurance obligations shall be as set forth in Section 10 of this Agreement, provided that:

1(E)(5)(a). Subleases. As between Sublease Carrier and Carrier, the sublease shall provide that Sublease Carrier's public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage insurance shall cover the Equipment for the duration of the Sublease; be in at least the amounts required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than One Million dollars ($1,000,000), with a deductible no greater than Two Thousand Five Hundred dollars ($2,500), for injury or death to any person or for damage to property in any one occurrence); and be primary to any insurance coverages that Carrier may maintain; and

1(E)(5)(b). Contractor Motor Carriage. With respect to Alternative-Use-of-Equipment trips involving Contractor Motor Carriage (using Contractor's own operating authority), Contractor shall, and hereby warrants that he/she does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least the amounts required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than One Million dollars ($1,000,000), with a deductible no greater than Two Thousand Five Hundred dollars ($2,500), for injury or death to any person or for damage to property in any one occurrence), covering the Equipment for the duration of the Alternative-Use-of-Equipment trips. Contractor shall provide a valid certificate of insurance evidencing such coverages to Carrier before accepting any Alternative-Use-of-Equipment trips involving Contractor Motor Carriage. On such trips, as between Contractor and Carrier, Contractor's public-liability insurance and cargo loss-and-damage insurance policies shall be primary to any insurance coverages that Carrier may maintain.

1(E)(5)(c). Exempt Motor Carriage. Carrier's public liability coverage and cargo loss-and-damage coverage pursuant to Section 10(A)

this Agreement shall apply to Exempt Motor Carriage trips.

1(E)(6). Fuel Tax Reporting and Payment. With respect to fuel tax reporting for all Alternative-Use-of-Equipment trips (including a Sublease, Contractor Motor Carriage, or Exempt Motor Carriage), unless Contractor has elected, pursuant to Section 5(F)(2)(a) of this Agreement, to obtain Contractor's own IFTA Fuel Tax Permit and perform Contractor's own fuel and mileage tax reporting, Carrier shall be deemed the reporting entity with respect to the Equipment and the fuel consumed by the Equipment, and Carrier shall perform (directly or through an outside vendor) all fuel and mileage reporting on Contractor's behalf. Contractor shall provide Carrier promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state. Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement quarterly any amount stated in Section 5(F)(2)(a)(2) of this Agreement.

1(E)(7). International Registration Plan Reporting. With respect to International Registration Plan reporting for all Alternative-Use-of-Equipment trips (including a Sublease, Contractor Motor Carriage, or Exempt Motor Carriage), Carrier shall be responsible for reporting all miles traveled by Contractor's Equipment and in what state(s). Contractor shall provide Carrier promptly with documentation showing all miles traveled by state for each trip.

1(E)(8). Driver Logs. With respect to Sublease trips, Contractor shall submit a copy of all driver logs to both Carrier and Sublease Carrier after each trip. All driver logs should name both Carrier and Sublease Carrier; show all duty time for each 24-hour period of each trip; and the beginning and finishing time (designating a.m. or p.m.) worked for each identified motor carrier. Pursuant to 49 C.F.R. § 395.8(j), before each Sublease trip, Contractor shall provide to Sublease Carrier a signed statement stating the Contractor's total time on duty during the immediately preceding seven days and the time at which Contractor was last relieved from duty prior to beginning work for Carrier.

1(E)(9). Driver Vehicle Inspection Reports and Repair Records. With respect to Sublease and Contractor Motor Carriage trips, Contractor shall prepare and submit to Carrier a written Driver Vehicle Inspection Report complying with the requirements of 49 C.F.R. § 396.11, and Carrier shall obtain and maintain all records relating to repairs of the Equipment.

1(E)(10). Remaining Agreement Terms. In all other respects, the terms of this Agreement shall

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 11 of 57

apply to Contractor's Alternative-Use-of-Equipment operations.

**2. GROSS COMPENSATION.** Contractor's gross compensation shall be as set forth in **Appendix B (Contractor Compensation)**, and such gross compensation shall constitute the total compensation for the use of the Equipment and for everything furnished, provided, done by, or required of Contractor in connection with this Agreement, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services. As indicated in Section 5(F) (Operating Expenses) and Section 6 (Charge-Backs) of this Agreement, Contractor – as an independent contractor, not an employee – agrees to pay all of Contractor's operating expenses (including but not limited to those that Carrier initially advances and later charges back to Contractor) out of the gross compensation provided under this Section and **Appendix B (Contractor Compensation)** and any other Contractor moneys. Under no circumstances shall Carrier be responsible for such operating expenses.

**3. SETTLEMENT PERIOD AND DOCUMENTATION.**

**3(A). Settlement.** Carrier shall settle with Contractor, paying Contractor any Settlement Compensation, as defined in Section 6(A) of this Agreement within fifteen (15) calendar days after submission by Contractor or Contractor's agent, by mail or in person, of properly completed logs required by FMCSA and those documents, in proper form, necessary for Carrier to secure payment from the shipper, including but not limited to trip sheets, delivery receipts, loading/unloading records, bills of lading, and any other receipts for which compensation is to be paid. Contractor shall submit such driver logs and delivery documents to Carrier at its main headquarters or at such other place as Carrier may designate. Payment shall not be made contingent, however, upon submission of a clean bill of lading -- that is, one to which no exceptions have been taken. At each weekly settlement, Carrier shall furnish to Contractor, by the method chosen by Contractor in Section 5 of **Appendix B (Contractor Compensation)**, a statement detailing all debit and credit entries since the preceding statement ("Settlement Statement").

**3(B). Documentation.** If compensation is based on a percentage of the revenue for a shipment, Carrier shall provide Contractor, before or at the time of settlement, with a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. Contractor shall be permitted to examine Carrier's tariffs, or in the case of contract carriage, other documents from which rates and charges are computed, and documents underlying any computer-generated document, at its main headquarters during normal business hours. If rates and charges are computed from a contract, Contractor is entitled to examine only those portions of the contract containing the same information as would appear on a rated freight bill. Carrier may delete the names of shippers and consignees shown on the freight bill or other form of documentation. Carrier has the exclusive right to set the rates and amounts charged to Carrier's customers, shippers, consignors, or consignees, and nothing in this Agreement shall be construed to limit that right.

**4. COMPLIANCE WITH LEGAL AND CUSTOMER REQUIREMENTS.** Neither Contractor nor Carrier shall engage in, or attempt, conspire, or threaten to engage in, any act or omission that would constitute a felony or intentional tort, whether or not relating to or arising out of operations under this Agreement. In addition, Contractor recognizes that Carrier's business of providing motor carrier freight transportation service to the public is subject to the requirements of Carrier's customers and to regulation by the federal government acting through DOT, and by various other federal, state, local, and foreign authorities. Contractor hereby acknowledges that he/she possesses full and complete understanding and knowledge of the applicable requirements of all such authorities, including but not limited to DOT (including the FMCSA's Compliance, Safety, Accountability ("CSA") Program), state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), and of all customer requirements provided to Contractor in writing. Accordingly, Contractor shall adhere to the following provisions of this Agreement to aid Carrier in discharging its legal duties and customer-service responsibilities:

**4(A). Maintenance and Inspection.** Contractor, at its own expense, shall equip the Equipment in accordance with all applicable government regulations including but not limited to ensuring its systematic repair and maintenance and keeping it in compliance with the laws and regulations of federal, state, local, or foreign authorities, and Carrier's safety and equipment maintenance policies. In order to ensure compliance with all such requirements, Contractor shall make the Equipment available for inspection by Carrier, at Carrier's expense, at any time upon reasonable request by Carrier. Contractor also shall have the Equipment inspected, at Contractor's expense, annually in accordance with 49 C.F.R. § 396.17, and also no later than the 180th day following the annual inspection. All inspections shall be performed at either Carrier's maintenance facility or another maintenance facility that Contractor chooses, with Carrier's consent. To facilitate Carrier's compliance with 49 C.F.R. Part 396, Contractor shall keep and maintain, or cause to be kept and maintained, systematic records of the repair and maintenance of the Equipment, and shall, when requested orally or in writing by Carrier, promptly forward to Carrier all inspection, repair, or maintenance records requested.

**4(B). Equipment Identification.** Contractor shall apply, before placing the Equipment in Carrier's service, to the outside of the Equipment such identification as Carrier may designate in accordance with the requirements of all

Case 1:24-cv-00082-CJW-KEM　Document 28-2　Filed 10/17/24　Page 12 of 57

applicable federal, state, local, or foreign authorities, provided that Contractor shall first remove any paint, decals, or other items that, in Carrier's reasonable judgment, would interfere with such identification or be otherwise offensive. Carrier reserves the right to require from time to time the repainting or remarking of the Equipment at Contractor's expense. Upon termination of this Agreement or any other time the Equipment is being operated on behalf of any other carrier pursuant to Section 1(E) of this Agreement, Contractor shall immediately, at Contractor's expense, remove, paint over, or, in the case of operations on behalf of another entity, completely cover over, all of Carrier's identification (see Section 14 of this Agreement for requirements at termination of Agreement) all of Carrier's identification. . At no time during this Agreement shall Contractor place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of Carrier, without Carrier's prior written consent pursuant to Section 1(E) of this Agreement (which consent shall not be unreasonably withheld).

### 4(C). Lawful and Safe Operations.

**4(C)(1). In General.** Contractor shall ensure that he/she and all drivers or other personnel he/she furnishes shall (a) drive or otherwise perform in a safe manner at all times so as to avoid actual or threatened commitment of a felony or intentional tort, endangering the public, the driver, and/or the property being transported; (b) adhere to and perform the terms of this Agreement; the requirements of all Applicable Law, Carrier's operating authorities, and, conditioned only upon Point (a) of this Subsection, all customer requirements (to the extent provided by Subsection (H) of this Section), and Carrier Policies and Procedures[1]; and (C) do not, in Carrier's reasonable judgment, cause, in whole or in part, through negligence, gross negligence, or willful misconduct, an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5.

---

[1] "Carrier Policies and Procedures" comprise the then-current edition of *CRST Specialized Transportation, Inc. Operator's Manual* (which includes Carrier's "Drug and Alcohol Policy," and Carrier's "Passenger Program Policy Statement"), Carrier's then-current edition of Rand McNally MileMaker® computerized mileage guide, and the Federal Motor Carrier Safety Regulations (see "Rules & Regulations" at www.fmcsa.dot.gov). Carrier shall furnish a paper copy of the *Contractor Manual* to Contractor, at no charge, contemporaneously with the start of this Agreement and, during this Agreement, shall make the *Manual* available to Contractor on request for inspection at a Carrier terminal during normal business hours at no charge. Carrier shall furnish a paper copy of any amendments to the *Contractor Manual* to Contractor, at no charge, before the amendments go into effect. Contractor may, at Contractor's expense, inspect, download, and/or print the Federal Motor Carrier Safety Administration Regulations by accessing (including, on request, at any Carrier terminal) FMCSA's "Rules & Regulations" web page indicated above. With respect to Rand McNally MileMaker®, a third-party copyrighted mileage guide, Carrier shall furnish to Contractor upon request and at no charge at any Carrier terminal during normal business hours, prints of a commercially-reasonable number of particular Contractor-requested city-to-city mileage calculations.

**4(C)(2). Compliance, Safety, Accountability Program.** The parties understand that, as discussed in FMCSA's CSA *Carrier Safety Measurement System Methodology* (Feb. 2013, Version 3.0) ("SMS"), as amended from time to time by FMCSA and published online at http://csa.fmcsa.dot.gov/Documents/SMSMethodology.pdf, FMCSA will impose negative points for violations found during roadside inspections under the seven CSA Behavior Analysis Safety Improvement Categories ("BASICs"). Collectively, the negative points accumulated across a carrier's fleet (including the vehicles of all contractors under lease to the carrier), help determine the carrier's CSA rating. Accordingly, Contractor, and any drivers of Contractor, shall at all times meet the CSA Program's safety standards sufficient to enable Carrier to (a) achieve and maintain a "fit" or similar rating that enables Carrier to operate without FMCSA intervention or restriction pertaining to any of the seven safety evaluation areas measured by CSA Program ("BASICs"); (b) obtain insurance coverage without increased costs associated with driver ratings or other such driver measurements or qualifications pertaining to drivers under CSA; and (c) be and remain competitive with similarly situated carriers with regard to quality of driver safety as measured under CSA. As part of the driver qualification process or, for an existing Contractor and such Contractor's already-Carrier-qualified drivers, upon request by Carrier, each of Contractor's drivers (including Contractor, if a driver) shall consent and authorize Carrier to access applicable driver files, SMS safety scores and other data, and FMCSA's Pre-Employment Screening System ("PSP") reports on such driver, both during the qualification process and at any time thereafter by immediately reviewing, signing, and returning to Carrier the "PRIVACY-RELATED DISCLOSURES AND CONSENT FORM," attached as **Appendix E** to the Agreement. Contractor further agrees to notify Carrier in writing within two (2) business days of receiving notification from the FMCSA that Contractor or any of Contractor's drivers have been deemed "unfit" or "marginal" based on their safety, inspection, and compliance performance.

**4(C)(3). Communication System /EOBR.** To help fulfill government highway-safety and other Applicable Law requirements imposed on Contractor's drivers (including Contractor, if a driver) and/or Carrier, including FMCSA's hours-of-service regulations, by monitoring and documenting such drivers' and their Equipment's compliance with highway-safety and other Applicable Law requirements, Contractor shall maintain in an operable condition in each unit of Contractor's Equipment, at Contractor's expense, a communications and electronic onboard recorder system ("Communication System/EOBR") that constitutes the Omnitracs, Inc. model then-currently designated by Carrier.

**4(C)(3)(a). Furnishing of Communication System/EOBR.** Except with respect to units of Equipment leased from Cedar

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 13 of 57

Capital, LLC, (1) Contractor may elect to, , obtain, install in the Equipment, and maintain the above Communication System/EOBR, by initialing OPTION 1 in Section 3 of **Appendix A (Contractor Election Form)** or (2) Contractor may elect, by initialing OPTION 2 in Section 3 of **Appendix A**, to have Carrier arrange to have installed, in the Equipment the approved Communication System/EOBR Contractor selects. In either event, Contractor authorizes Carrier to deduct from Contractor's settlement compensation the (Omnitracs) weekly rent in the amounts set forth in the Deductions Table of Section 4 of **Appendix A**. For units of Equipment leased from Cedar Capital, LLC, which will have the Omnitracs Communication System/EOBR installed in them, Contractor authorizes Carrier to deduct from Contractor's settlement compensation the full-system weekly rent in the amount set forth in the Deductions Table of Section 4 of **Appendix A**. In all units of the Equipment, Contractor agrees to keep the Communication System/EOBR in an operable and functioning condition at all times that the Equipment is being operated in Carrier's service.

**4(C)(3)(b).** Network Charge. Whether the Communication System/EOBR is Contractor's or Carrier's, Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement a network charge in the amounts indicated in **Appendix A**.

**4(C)(3)(c).** Re-Installation of Carrier-Furnished Communication System/EOBR. In the event Contractor shall replace the unit(s) of Equipment (tractor(s)), Carrier shall bear the expense of removal and re-installation of any Carrier-furnished Communication System/EOBR in Contractor's replacement Equipment.

**4(C)(3)(d).** Return of Carrier-Furnished Communication System/EOBR. Contractor shall be responsible for the return of each Carrier-furnished Communication System/EOBR to Carrier immediately upon any request from Carrier or the termination of this Agreement, in accordance with Section 14 of this Agreement. A qualified technician selected by Carrier shall remove the Communication System/EOBR. If the Communication System/EOBR is lost, damaged as a result of Contractor's negligence, or not returned upon request or upon termination of this Agreement, Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement the entire expense incurred by Carrier in repairing or replacing the Communication System/EOBR, together with all collection costs. Carrier shall not be responsible for any loss or damage to Contractor's Equipment arising or resulting from the installation, use, or removal of

the Carrier-furnished Communication System/EOBR.

**4(C)(3)(e).** Privacy-Related Disclosures and Consent Form. The "Privacy-Related Disclosures and Consent Form," which is attached as **Appendix E** of this Agreement, describes the categories of data to be collected through the Communication System/EOBR; the uses to be made of such data by Carrier; and the right of Contractor and any Contractor's driver to review the collected data on request to Carrier, but only data relating to the requesting Contractor (including that Contractor's drivers) or the requesting driver, respectively. The form in **Appendix E** also includes a consent paragraph, as described in Section 4(C)(2) of the Agreement.

**4(D). Drivers.** Contractor shall provide competent professional drivers who meet Carrier's minimum driver qualification standards (part of Carrier's Policies and Procedures) and all Applicable Law. As part of the driver qualification process, Contractor and Contractor's drivers shall authorize Carrier to access applicable driver files. Carrier shall have the right to disqualify any driver provided by Contractor if the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law, in violation of Carrier's minimum qualification standards, or in violation of any requirements of Carrier's customers (to the extent provided in Subsection (H) of this Section). It is agreed that drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet Carrier's minimum qualification standards. Upon a driver's disqualification by Carrier, Contractor shall be obligated to furnish another competent, reliable and qualified professional driver that meets the minimum qualification standards established by Carrier. Contractor shall be free to hire a substitute driver or drivers at any time, who, upon being declared qualified by Carrier under the foregoing driver requirements, may begin operating under Contractor's direction and control in performing some or all of Contractor's obligations under this Agreement.

**4(D)(1). Medical Examinations.** Contractor acknowledges that DOT requires all drivers to undergo a complete medical examination prior to being allowed to drive, in any capacity whatsoever, in Carrier's motor carrier services. Such examination shall be performed and shall include testing for use of controlled substances and alcohol. Drivers may be required to take follow-up examinations, from time to time, in accordance with the requirements of 49 C.F.R. §§ 391.41 *et seq.* Additionally, if in the judgment of Carrier a further medical examination appears warranted, such examination shall be undergone. The expense of medical examinations for all of Contractor's drivers shall be the responsibility of Contractor.

**4(D)(2). Drug and Alcohol Testing.** As required by 49 C.F.R. §§ 382.103 and 382.601, Contractor and Contractor's drivers shall comply with Carrier's Drug and Alcohol Policy, including participation in Carrier's random drug and alcohol

Case 1:24-cv-00082-CJW-KEM          Document 28-2          Filed 10/17/24          Page 14 of 57

testing program, and any addendums or revisions thereto. Violation of Carrier's Drug and Alcohol Policy, or positive tests for prohibited drugs or alcohol, shall immediately disqualify Contractor's driver. Carrier shall bear the expense of all drug and alcohol tests.

**4(D)(3). Disqualification of Drivers.** Carrier shall have the right to disqualify any driver provided by Contractor in the event that the driver is found to be unsafe, unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law, in violation of Carrier's minimum qualification standards, or in violation of any policies of Carrier's customers. Drivers with a recent history of accidents, traffic convictions and/or serious traffic offenses will not meet Carrier's minimum qualification standards. Upon a driver's disqualification by Carrier, Contractor shall, if Contractor so chooses, furnish another competent, reliable, and qualified professional driver who meets Carrier's minimum qualification standards or this Agreement shall terminate immediately.

**4(D)(4). TWIC Requirement.** If a Contractor's driver lacks a Transportation Worker Identification Credential ("TWIC") from the Transportation Security Administration of the U.S. Department of Homeland Security when dispatched by Carrier to make a pickup or delivery at a port and therefore needs a suitably-credentialed escort, Contractor shall pay the fee charged by the escort.

**4(E). Driver Records.** Contractor shall regularly submit to Carrier all properly-completed driver log sheets within, as required by federal regulation (49 C.F.R. § 395.8(i)), ten (10) days following Contractor's completion of each log sheet and supporting documents (including original toll receipts for Carrier's reproduction), lumper (loader/unloader) receipts, trailer washout receipts, medical examination certificates, accident reports, DOT inspection documents, citations, Driver Vehicle Inspection Reports, and any other required data, documents, or reports. Contractor agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of Carrier or as authorized by Carrier, and shall indicate that the property transported is under Carrier's responsibility or that of a carrier to which the Equipment has been subleased.

**4(F). Passenger Authorization.** In accordance with 49 C.F.R. § 392.60(a), Contractor shall not allow any passengers (other than team co-drivers) to ride in the Equipment unless Carrier authorizes it in writing in advance. Before Carrier shall give such authorization, Contractor, Contractor's driver, AND the passenger requesting authorization shall sign and submit to Carrier a fully executed release agreement pursuant to the "CRST Specialized Transportation, Inc. Passenger Program Policy Statement" available on request from Carrier. In addition, Contractor shall first obtain and maintain the passenger insurance coverage required by Section 10(B)(3) of this Agreement. **Contractor agrees not to permit any passenger to operate or be in charge of the Equipment at any time for any purpose whatsoever.**

**4(G). Paperwork Requirements.** Contractor shall submit to Carrier, on a timely basis, all properly completed, accurate, and legible driver logs and supporting documents (including originals or photocopies of toll receipts), physical examination certificates, accident reports, and any other required data, documents or reports, including any documentary evidence that Carrier requests proving Contractor has paid all taxes legally due and owing to any government body. As required by 49 C.F.R. § 376.12(l), Carrier will keep the original of this Agreement with a copy to be maintained by Contractor, and a second copy to be carried in the Equipment during the term of this Agreement.

**4(H). Customer Requirements.** Contractor shall adhere to and perform, with respect to each shipment offered by Carrier under this Agreement, all service standards and other requirements of Carrier's customers that have been furnished to Contractor in writing, in hard-copy or electronic form, in advance of the shipment and that may reasonably be adhered to and performed without violating Applicable Law or endangering the public, the driver, and/or the property being transported. If Carrier's customer conditions Contractor's driver's access to facilities or freight upon the driver's passing the customer's own drug or alcohol tests or upon Contractor's or Contractor's drivers' meeting other personal-equipment or vehicular standards not imposed by Applicable Law, this Agreement, or Carrier Policies and Procedures, Contractor shall be free, and shall incur no Carrier sanction as a result, to reject the tests and/or standards and to refuse Carrier's offer of the customer's shipment.

**5. CONTRACTOR'S RESPONSIBILITIES.** Carrier and Contractor both recognize their relationship as one of Carrier and Contractor and not of Employer and Employee, respectively. Subject only to regulatory mandates, related Carrier policies, and customer requirements, it shall be the sole responsibility of Contractor to determine the manner and means of performing all of Contractor's services under this Agreement, including, but not limited to:

**5(A). Workers.** Selecting, setting the compensation, hours, and working conditions, adjusting any grievances, and supervising, training, disciplining, and firing all drivers, drivers' helpers, and other workers necessary for the performance of Contractor's obligations under this Agreement, provided that Contractor shall ensure that all such drivers and other workers comply with the terms of this Agreement, including the requirements of safe operations and compliance with Carrier's safety policies and procedures while operating the Equipment on Contractor's behalf. No person Contractor may engage shall be considered Carrier's employee. Contractor alone shall pay any employment expenses for Contractor's workers, including but not limited to worker's compensation insurance, employment taxes, and all other benefits and pensions for the Contractor and Contractor's drivers, drivers' helpers, and other workers.

**5(B). Equipment.** Selecting, purchasing, and financing, and the Equipment and deciding when, where, and how maintenance and repairs are to be performed on

the Equipment. Contractor shall be free to substitute a different vehicle for the one constituting the Equipment, if each of the Contractor requirements of Section 1(A) of this Agreement is met and Carrier furnishes Contractor a new receipt covering the vehicle. The substitute vehicle shall thereupon constitute the Equipment under this Agreement

**5(C). Routes and Completion of Performance.** Selecting all routes and refueling stops, provided that to meet customers' demands, Contractor agrees to make timely and safe deliveries of all loads, to notify Carrier when delivery has been made or when delivery will be delayed for any reason. , and to be subject to Carrier's remedies for Contractor's nonperformance provided in Section 12 of this Agreement.

**5(D). Loading.** Loading and unloading freight onto and from the Equipment (if the shipper or consignee does not assume such responsibilities), with no additional compensation for this service except as provided in **Appendix B (Contractor Compensation).**

**5(E). Use of Communications Equipment.** Ensuring that Contractor's drivers do not operate the voice, data, texting, or other features (other than hands-free features that are easily and safely accessible to the drivers) of any mobile phone or other communications device or system while driving, except in a health, safety, or security emergency.

**5(F). Operating Expenses.** Paying all operating expenses, including, but not limited to, all expenses for fuel, oil, tires and other spare parts, supplies, and equipment necessary for the safe, efficient, and lawful operation and maintenance of the Equipment; road taxes, mileage taxes, fuel taxes, Federal heavy vehicle use tax, and state or local property or indefinite situs taxes; fines for parking, moving, or weight violations resulting, at least in part, from Contractor's acts or omissions; any C.O.D. freight revenue collected by Contractor from shippers or others under this Agreement and not remitted to Carrier; towing; empty mileage; registration fees, base plates, licenses (and any unused portions of such fees, plates, or licenses),and permits of all types (except as set forth in **Appendix B (Contractor Compensation)**); Contractors' drivers' or other workers' wages, employee benefits, insurance, pensions, employment taxes, advances, and any other levies or assessments based upon the operation of Contractor's equipment for Carrier; with the following exceptions:

**5(F)(1). Detention and Accessorial Expense.** Contractor is responsible to submit a properly documented and completed CRST Specialized Transportation, Inc. - Form 365 for detention expense and accessorial services expense. Carrier will bill and collect these expenses from the customer, in which event Carrier shall pay Contractor the percentage of such amounts specified in **Appendix B (Contractor Compensation)**;

**5(F)(2). Fuel and Mileage Tax Reporting.** Contractor is responsible for all state mileage and/or fuel taxes.

**5(F)(2)(a).** If Contractor elects, by initialing Option 1 in Section 2 of **Appendix A (Contractor Election Form)** or an addendum to this Agreement, to obtain Contractor's own IFTA Fuel Tax Permit and perform Contractor's own fuel and mileage tax reporting, Contractor shall be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; **and shall indemnify, defend, and hold Carrier harmless against all claims arising out of or relating to such fuel tax reporting and payment.** If Contractor instead elects, by initialing Option 2 in Section 2(B)(2) of Appendix A, to have Carrier perform (directly or through an outside vendor) all fuel and mileage reporting on Contractor's behalf, Contractor hereby agrees that:

**5(F)(2)(a)(1).** To facilitate the parties' compliance with the various states' tax reporting and payment requirements (which generally hold the motor carrier liable if an independent vehicle operator performing transportation services on the carrier's behalf fails to make the required tax payments), Carrier shall be deemed to be the reporting entity with respect to the Equipment and the fuel consumed by said Equipment. In such event, Carrier shall settle with Contractor quarterly and submit quarterly, in Contractor's name as indicated herein, as to all the applicable reports and payments of fuel taxes required of it by the taxing bodies and authorities of the appropriate states, provinces, and other governmental bodies with respect to the Equipment operated under this Agreement. To assist in Carrier's computing and payment of fuel taxes, it shall issue Contractor an advance card for each of Contractor's drivers that may be used for fuel purchases ("CRST Advance Card"). Contractor and Contractor's drivers are free not to use Carrier's Advance Card but, to the extent they choose not to, Contractor shall provide Carrier promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding trip sheet indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state. In addition, Contractor shall submit to Carrier for each trip a full-size trip sheet (obtainable at the Fort Wayne, Indiana, offices of CRST Specialized Transportation, Inc.) listing origin, destination, states, routes, and miles traveled. Making quarterly computations,

**5(F)(2)(a)(2).** Carrier shall submit, in its own name, all required reports and payments of fuel and mileage taxes owed with respect to the Equipment under this Agreement and shall (a) deduct from

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 16 of 57

Contractor's settlements any net fuel or mileage tax owed at that time with respect to Contractor's operations in all taxing jurisdictions combined or (b) credit to Contractor's next settlement any net fuel or mileage tax credit or refund due Contractor at that time with respect to Contractor's operations in all taxing jurisdictions combined. Carrier shall provide Contractor with at least quarterly summaries of credits and debits for fuel and mileage taxes on a state-by-state basis either on Contractor's settlement sheets or through separate accountings, at Carrier's option.

**5(F)(2)(a)(3).** Ordinarily Carrier shall compute Contractor's fuel use and mileage taxes on a fleetwide average basis. If, however, Contractor fails to provide Carrier complete and accurate fuel-tax-related records, as required by the fourth sentence of Section 5(f)(2)(a)(1) of this Agreement, in time for Carrier's computation, on the seventh (7th) day of each month, of Carrier's fuel and mileage tax reports and payments for the preceding month, Carrier shall compute Contractor's fuel use taxes based on total miles dispatched by Carrier at a rate of five (5) miles-per-gallon.

**5(F)(3). Overweight and Over-Dimensional Fines.** Carrier shall reimburse Contractor for any overweight or over-dimension fine or any fine resulting from improperly permitted over-dimension or overweight load, when said fine is paid by Contractor with respect to pre-loaded, sealed, or containerized loads or where the trailer, container, or lading was outside the control of Contractor, provided that, Contractor checked the weight on all axles of the load at the shipper's location (submitting to Carrier a shipper-produced scale ticket) or at the first reasonably-available government-certified scale (submitting to Carrier a government-certified scale ticket), checked the dimensions of the load and Equipment prior to transport, and informed Carrier dispatch of any discovered overweight or over-dimension violations.

**5(G). Base Plates and Permits.**

**5(G)(1). Base Plates.** Obtaining, and properly displaying on the Equipment, the license base plates necessary to operate the Equipment lawfully on Carrier's behalf. If Contractor chooses to have Carrier obtain the base plates and deduct or otherwise recover pursuant to Section 6(A) of this Agreement the expense from Contractor's settlement compensation in accordance with Appendix F, Contractor shall so indicate in Section 2(A) of **Appendix A (Contractor Election Form)**.

**5(G)(2). Permits.** Ensuring that all permits and licenses necessary for him/her to operate

the Equipment lawfully on Carrier's behalf have been obtained.

## 6. CHARGE-BACKS.

**6(A). Deductions Table.** Contractor hereby authorizes Carrier to charge back or deduct – from Contractor's gross compensation under Section 2 of this Agreement, from Contractor's Escrow Fund (to the extent provided under Section 8 of this Agreement), or from other amounts Carrier owes to Contractor at the time of settlement with Contractor – amounts that, under this Agreement or any addendum, Contractor owes to Carrier, as set forth in the Deductions Table in Section 4 of **Appendix A (Contractor Election Form)** of this Agreement, resulting in a net amount, if any, to be remitted to Contractor ("Settlement Compensation"). If Contractor's settlement compensation proves insufficient, Contractor hereby authorizes Carrier to deduct such items from Contractor's General Escrow Fund established under Section 8 of this Agreement. Where no dollar figure is listed in the Deductions Table, the deductions will vary in amount and shall be computed as indicated in the column headed "Amount of Deduction or Method of Computation" or in Section 4 of **Appendix A (Contractor Election Form)** or in an addendum to this Agreement. Except as otherwise indicated in that column, (a) Carrier shall charge Contractor no administrative ("admin.") fee or markup and (b) Carrier shall credit Contractor with all rebates, discounts, credits, or refunds that correspond to particular charge-backs or deductions and that Carrier receives while this Agreement is in effect or, in the case of taxes and fees, even after this Agreement is terminated. **Instead of or in addition to making the deductions authorized by this Section or other provisions of this Agreement and any addendum, Carrier shall have a right to recover, through collection agencies, the right of setoff, and all other available legal means, any such amounts Contractor owes, or comes to owe, Carrier under this Agreement.**

**6(B). Information Regarding Deductions.** Carrier shall provide Contractor with a written explanation and itemization of any deductions for cargo or property damage before making them. With respect to all charge-backs and deductions, Carrier shall make available to Contractor, upon request, copies of those documents that are necessary to determine the validity of the charge-back or deduction.

**6(C). Changes in Existing Deduction Items.** If any deduction item, amount, or method of computation on the Deductions Table in Section 4 of **Appendix A (Contractor Election Form)** will be changing, whether at Contractor's request or on Carrier's initiative, Contractor shall be so notified by personal delivery, fax, other written notice, or, if the parties have both signed **Appendix D (Consent to Conduct Business by Electronic Methods)**, by appropriate electronic means outlined in that Appendix. **Such modified items, amounts, or methods shall replace and supersede those shown in the Deductions Table in Section 4 of Appendix A (Contractor Election Form). A change shall not take effect until twenty (20) days after the notice is deemed given under Section 13**

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 17 of 57

of this Agreement or such later time as is stated on the notice. Contractor's failure, by the end of 20-days after such notice, to notify Carrier of any objection to the change shall constitute Contractor's express consent and authorization to Carrier to implement the change and modify accordingly the amount deducted or otherwise recovered from Contractor pursuant to Subsection (A) of this Section or the Deductions Table in Section 4 of Appendix A (Contractor Election Form), beginning immediately after the 20-day period. If Contractor fails to notify Carrier of an objection within the 20 day period – or if Contractor notifies Carrier in writing of any objection within the 20-day period stated in Section 13 of this Agreement and the parties are then unable to resolve the matter, the change shall be rescinded as to Contractor back to its effective date (with any necessary credit or deduction made on Contractor's next settlement sheet) and the parties shall each have the right to terminate this Agreement immediately thereafter. Even after the twenty-day period, Contractor retains Contractor's right to terminate this Agreement in accordance with the procedures set forth in Section 14 of this Agreement, although Contractor shall remain subject to the change from the effective date of the change until the effective date and time of the termination of this Agreement.

**6(D).** **No Required Purchases from Carrier.** Contractor is not required to purchase or rent any products, equipment, or services from Carrier or its affiliates as a condition of entering into this Agreement.

## 7. INDEMNIFICATION AND HOLD HARMLESS.

**7(A).** In General. Except to the extent Contractor's acts or omissions are covered under the parties' respective insurance policies as set forth in Section 10 of this Agreement and Appendix A (Contractor Election Form) with no expense to Carrier, Contractor agrees to defend, indemnify, and hold Carrier harmless from any claim of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that Carrier pays or otherwise incurs arising out of or in connection with Contractor's (including Contractor's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement any amounts due Carrier under Paragraph 1 of this Subsection. Carrier shall furnish Contractor with a written explanation and itemization of any deduction for cargo or property damage before the deduction is made. If Contractor operates the Equipment for any purpose other than the carriage of Carrier's lading, Contractor shall hold Carrier harmless and indemnify Carrier for any damage (including attorneys' fees) arising from such use. This Subsection shall remain in full force and effect both during and after the termination of this Agreement.

**7(B).** Indemnity Limits. Contractor's indemnity obligations under Subsection (A) of this Section shall be limited as follows:

**7(B)(1).** With respect to claims of personal injury (including death) or damage to the property of third-parties, Contractor shall have no indemnity obligation to Carrier under Section 7(A).

**7(B)(2).** With respect to claims of cargo loss, damage, or delay, Contractor's indemnity obligation under Section 7(A) shall be limited to a maximum of One Thousand Five Hundred Dollars ($1,500) of the total amount in Damages Carrier paid or otherwise incurred per occurrence.

**7(B)(3).** With respect to claims of loss of or damage to Carrier's Trailer or other Carrier property, Contractor's indemnity obligation under Section 7(A) shall be limited to a maximum of One Thousand Five Hundred Dollars ($1,500) of the total amount in Damages that Carrier paid or otherwise incurred per occurrence.

**7(B)(4).** The amounts specified above shall include the expense of any defense thereof up to the maximum liability amount as set forth in each case herein.

**7(B)(5).** The above indemnity limits set forth in Paragraphs 1, 2, and 3 of this Subsection shall not apply to Subsections D or E of this Section or to:

**7(B)(5)(a).** Loss or damage resulting from accidents or other causes whenever the Equipment is not being operated on behalf of Carrier.

**7(B)(5)(b).** Loss or damage resulting from injuries to Contractor or any of Contractor's drivers, drivers' helpers, or other workers whenever the Equipment either is, or is not, being operated on behalf of Carrier.

**7(B)(5)(c).** Loss or damage to the Equipment or Contractor's other property whenever the Equipment either is, or is not, being operated on behalf of Carrier.

**7(C).** Carrier's Coverage. Carrier has secured certain insurance policies and coverages directly relevant to certain risks and liabilities for which Contractor has agreed to indemnify Carrier under this Subsection (for example, automobile liability, general liability, and cargo liability arising out of or in connection with Contractor's (including Contractor's agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions). Such policies are expressly for the benefit of Carrier and incidentally may benefit Contractor. Terms of such policies may change (for example, higher or lower

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 18 of 57

deductibles, length of coverage, UM/UIM waivers or limitations, or insurance underwriters). Contractor has neither any obligations under the policies nor any right to change the terms of coverages.

**7(D).** Claims by Contractor or Other Contractors. Notwithstanding Subsection A of this Section and not subject to the limits of Subsection B of this Section, Contractor agrees to defend, indemnify, and hold Carrier harmless from any claim by Contractor of loss of or damage to the Equipment or Contractor's other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of Contractor or any other contractor of Carrier (including agents or employees of Contractor or any other contractor of Carrier, respectively); and from any claim by any other contractor of Carrier of loss of or damage to such other contractor's truck, tractor, trailer, or other property (and any related fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation) due to the negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions of Contractor (including Contractor 's agents or employees).

**7(E).** Reclassification. SECTION 9(F) AND OTHER PROVISIONS OF THIS AGREEMENT REFLECT THAT CONTRACTOR IS, AND BOTH CONTRACTOR AND CARRIER INTEND CONTRACTOR TO BE, AN INDEPENDENT CONTRACTOR, NOT AN EMPLOYEE OF CARRIER. IN LIGHT OF THIS FACT AND INTENT: Notwithstanding Subsection A of this Section and not subject to the limits of Subsection B of this Section, Contractor agrees to indemnify and hold Carrier harmless from all reasonable attorney's fees and litigation expenses Carrier incurs in defending against any claims, suits, actions, or administrative proceedings brought by Contractor, Contractor's owner (if any), or any employees or other personnel engaged by Contractor to perform services under this Agreement – or, at Contractor's instance or with Contractor's consent, by any union or other private organization or member of the public – that allege that Contractor or any of Contractor's workers is an employee of Carrier, but fail to result in any final (upon completion of all appeals or the running of all applicable appeal periods) judicial or administrative decision holding the allegation to be true.

**7(F).** Indemnification by Carrier. Carrier agrees to defend, indemnify, and hold Contractor harmless from any claim (including any for which Contractor is not indemnified by Carrier's insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that Contractor pays or otherwise incurs arising out of or in connection with Carrier's (including Carrier's agents' or employees') negligence, gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. This indemnification shall not apply to any claim of loss or damage to the Equipment or to Contractor 's other property or to any claim arising out of or in connection with Contractor 's operation of the Equipment for any purpose other than the performance of Contractor's obligations under this Agreement. Contractor shall furnish Carrier with a written explanation and itemization of any claim for cargo or property damage. Carrier's indemnity obligation under this Subsection (F) shall, if involving Carrier's (including Carrier's agents' or employees') negligence, be limited to a maximum of One Thousand Five Hundred Dollars ($1,500) of the total amount in Damages that Contractor paid or otherwise incurred per occurrence. This dollar limit shall not apply to Damages arising out of or in connection with such claims if involving Carrier's (including Carrier's agents' or employees') gross negligence, willful misconduct, material breach of this Agreement, or other culpable acts or omissions. Carrier shall credit to Contractor's next Settlement Compensation any amounts due Contractor under this Section from Carrier. This Section shall remain in full force and effect both during and after the termination of this Agreement.

**8. ESCROW FUND.** Contractor authorizes Carrier, and Carrier agrees to establish and administer, as a required escrow fund, a General Escrow Fund, which Contractor and Carrier agree shall be governed by the following terms and conditions.

**8(A).** Principal. As the minimum principal to be held in the General Escrow Fund, Carrier shall deduct from Contractor's settlement compensation and deposit in this Fund the Principal Amount stated in Section 7(A) of **Appendix A (Contractor Election Form)**, at the flat weekly rate stated therein, beginning the third week of services provided by Contractor under this Agreement. If, at any time, the balance in the General Escrow Fund falls below the Principal Amount, Contractor authorizes Carrier to resume the weekly deductions until the full principal amount is replenished.

**8(B).** Specific Items to Which Escrow Fund May Be Applied. The General Escrow Fund shall be held by Carrier to guarantee the performance of Contractor's obligations under this Agreement (including any addendum). The specific items to which the General Escrow Fund shall apply are all advances, expenses, taxes, fees, fines, penalties, damages, losses, or other amounts paid, owed, or incurred by Carrier, or owed by Contractor to a third party under a purchase or rental contract, that are Contractor's responsibility under this Agreement -- specifically, the charge-back and deduction items set forth in Section 6(A) of this Agreement, including all deduction items set forth in the Deductions Table in Section 4 of **Appendix A (Contractor Election Form)**, and any addendum (hereafter "Escrow Items") -- to the extent that the amounts owed by Contractor for such Escrow Items exceed Contractor's earned and payable compensation at the time of any settlement or final accounting.

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 19 of 57

**8(C). Accountings.** While the General Escrow Fund is under Carrier's control, Carrier shall provide an accounting to Contractor, no less frequently than monthly on Contractor's settlement sheets or separately, of all transactions involving the General Escrow Fund, including the amount and description of any deduction from or addition to the General Escrow Fund. In addition, upon Contractor's request at any time, Carrier shall provide Contractor with an accounting of any transactions involving the General Escrow Fund.

**8(D). Interest.** Carrier shall pay interest to Contractor on the General Escrow Fund on a quarterly basis ("interest period") beginning with receipt of the first Contractor contribution of principal. The interest rate shall be established on the date the interest period begins and shall be equal to the average yield, or the equivalent coupon issue yield, whichever is lower, of 91-day, 13-week U.S. Treasury bills, as established in the weekly auction by the Department of the Treasury.

**8(E). Final Settlement.** At the time of the return of any remaining balance in the General Escrow Fund, Carrier may deduct monies for all Escrow Items. Such deductions shall be limited to amounts Carrier actually spends, incurs, or owes to a third party, or that Contractor owes to Carrier or a third party under a purchase or rental contract, before termination of this Agreement or, with respect to any Contractor obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by Carrier in seeking the return of its identification devices and other property, all amounts Carrier actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter. Carrier shall not make deductions from the General Escrow Fund for items for which, by the end of forty-five (45) days after termination, neither Contractor nor Carrier has yet made an expenditure or incurred a quantified, legally binding obligation to pay. Carrier shall provide a final accounting to Contractor of all such final deductions made from the General Escrow Fund within forty-five (45) days from the date of termination of this Agreement.

**8(F). Return of Escrow Balance.** In no event shall the General Escrow Fund, less any final deductions pursuant to Subsection 8(E) of this Section, be returned to Contractor later than forty-five (45) days from the date of termination of this Agreement. Carrier's use, or post-termination return to Contractor, of any balance in the General Escrow Fund shall not constitute a waiver of Carrier's right to recover, through any available lawful means, any additional amounts Contractor owes, or comes to owe, Carrier under this Agreement.

## 9. CONTRACTOR NOT EMPLOYEE OF CARRIER.

**9(A). In General.** It is understood and agreed that Contractor is an independent contractor for the Equipment and driver services provided pursuant to this Agreement.

**9(B). Certification of Status.** Contractor shall provide necessary documentation and apply for certification of Contractor's independent-contractor status where mandated by applicable state law, including but not limited to, the State of South Dakota (where, if Contractor is domiciled in that State, Contractor shall successfully complete and submit to the proper authorities an Independent Contractor Verification Application, SD E-Form 1658).

**9(C). Selection of Equipment, Maintenance, and Routes.** Subject only to all Applicable Law and safety considerations, it shall be the sole financial responsibility of Contractor to select, purchase or lease, and finance the Equipment; to decide when, where, and how maintenance and repairs are to be performed on the Equipment; and to select all routes and decide all meal, rest, and refueling stops, provided that to meet Carrier's customers' demands, Contractor agrees to make timely and safe deliveries of all loads, and also agrees to notify Carrier when delivery has been made or when delivery will be delayed for any reason.

**9(D). Contractor's Workers.** Subject again only to all Applicable Law and safety considerations, Contractor hereby assumes full control and responsibility for the selection, training, hiring, setting of grooming and dress standards, disciplining, discharging, setting of hours, meal and rest breaks, wages, and salaries, providing for unemployment insurance, state and federal taxes, fringe benefits, workers' compensation insurance (or, if Contractor prefers, occupational accident insurance where both state law allows and Carrier approves), adjustment of grievances, all acts and omissions, and all other matters relating to or arising out of Contractor's use or employment of drivers, drivers' helpers, and other personnel to perform any aspect of this Agreement. No person Contractor may engage shall be considered Carrier's employee. Contractor shall be solely responsible for complying with any and all state, federal, local, and foreign laws applicable to the terms and conditions of employment of Contractor's employees or applicants for employment, including, without limitation, compliance with the Federal Fair Credit Reporting Act; verification of immigration and naturalization status; proof of proper taxpayer identification number; proof of highway use tax being currently paid when the Contractor purchases a license; proof of payment of income; unemployment; Medicare and other state and federal payroll taxes; and, other required withholdings for Contractor's employees. Contractor's performance of these responsibilities shall be considered proof of Contractor's status as an independent contractor in fact.

**9(E). Taxes.**

**9(E)(1). Contractor's Form of Business and Agreement to File Returns and Pay Taxes.** As an independent contractor, Contractor is free to choose the form in which to operate Contractor's business. Contractor shall file all federal, state, local, and foreign income, withholding, employment, and federal heavy vehicle use tax forms and returns that Contractor may be required by law to file, on account of Contractor and all drivers, drivers' helpers, and other workers used by Contractor in the performance of this Agreement at the time and place that may be specified in the applicable

Case 1:24-cv-00082-CJW-KEM     Document 28-2     Filed 10/17/24     Page 20 of 57

federal, state, local, and foreign laws, and to pay when due all taxes and contributions reported in such forms and returns. In that regard, Contractor knows:

9(E)(1)(a). Of Contractor's responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from Carrier;

9(E)(1)(b). That the social security tax Contractor must pay is higher than the social security tax the individual would pay if he or she were an employee; and

9(E)(1)(c). That the service provided by Contractor to Carrier pursuant to the Agreement is not work covered by the unemployment compensation laws of any state, including Georgia; provided, however, that should Contractor employ or use drivers, helpers, or other workers to fulfill Contractor's obligations under the Agreement, and such drivers, helpers, or other workers are covered by the unemployment laws of any state, including Georgia, Contractor is solely responsible for providing unemployment insurance for such drivers, helpers, or other workers.

9(E)(2). Access to Contractor's Tax Records. Contractor agrees to furnish Carrier such evidence of compliance with the foregoing as Carrier shall reasonably require, including but not limited to proof of income and payroll taxes currently paid by Contractor (including as provided in Paragraph 2 of this Subsection) or withheld by Contractor from the wages of Contractor's drivers and other workers.

9(E)(3). Carrier's Filing of IRS Form 1099. Carrier shall, itself or through an agent, file federal income tax IRS Form 1099s with the Internal Revenue Service with respect to Contractor if the amount of compensation Carrier pays Contractor during a calendar year reaches the level at which federal law requires such forms to be filed.

9(F). The Parties' Financial Obligations If Contractor Is Determined to Be an Employee. If, whether on Contractor's initiative or not, Contractor is declared to be an employee of Carrier by any federal, state, local, or foreign court, administrative agency, or other governmental body ("Reclassification Decision"), Contractor and Carrier hereby agree that this Agreement shall be rescinded back to the time of its formation and that both parties shall be returned to their respective positions before this Agreement was signed. Specifically, Contractor and Carrier agree that notwithstanding any other provision of this Agreement:

9(F)(1). Contractor shall, upon the Reclassification Decision becoming final and no longer appealable, immediately (a) owe Carrier, for each week or other period this Agreement was in effect, all gross compensation under Section 2 of this Agreement and Appendix B, less any charge-backs under Section 6(A) of this Agreement, previously paid to Contractor by Carrier; (b) shall relinquish all rights in any balances escrow funds then under Carrier administration that are traceable to compensation previously paid to Contractor by Carrier; and (c) shall owe Carrier any cash advances provided by Carrier to Contractor that Contractor used for personal, household, or other expenses not in performance of Contractor's obligations under this Agreement or that Contractor retained unspent. Contractor shall be entitled to deduct from these amounts any expenses (including, for Equipment, other equipment, or tools used in performing work for Carrier, any actual rent or installment-purchase payments made by Contractor or, if none, payments that would equal fair-market rent for items of similar kind, age, and condition) Contractor incurred in performance of Contractor's obligations under this Agreement that were not covered by charge-backs or paid by Carrier;

9(F)(2). Carrier shall, upon the Reclassification Decision becoming final and no longer appealable, immediately owe Contractor, for all work activities during each week or other period this Agreement was in effect (including any activities for which Carrier has not yet paid Contractor), only the then-applicable federal minimum hourly wage or, if higher, a State's then-applicable minimum hourly wage but only to the extent Contractor's wage-earning activities occurred in that State, multiplied by Contractor's total hours actually performing on-duty work for Carrier, consisting of both driving and non-driving time, under the FMCSA Hours of Service Regulations, 49 C.F.R. Part 395, or under a State's hours of service regulations to the extent applicable. The total hours worked shall be computed based on any relevant, reliable evidence, which may include estimates or projections based on Settlement Statements, driver logs, shipment and/or vehicle tracking data, bills of lading, fuel receipts, toll receipts, and testimony; and

9(F)(3). Because reclassification of Contractor's status from independent contractor to employee would fundamentally change the parties' contracting assumptions and expectations, either party may, immediately upon initial issuance (even if appealed or appealable) of a Reclassification Decision, terminate this Agreement on one day's notice to the other. The provisions of this Subsection shall be deemed to survive any termination of this Agreement.

10. INSURANCE.

10(A). Carrier's Insurance Obligations. Pursuant to FMCSA regulations (49 C.F.R. Part 387) promulgated under 49 U.S.C. § 13906 and applicable

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 21 of 57

state laws, Carrier shall maintain public liability insurance (personal-injury/property-damage coverage and environmental restoration coverage) and cargo insurance in at least such amounts as are required by, covering the Equipment at all times the Equipment is being operated on behalf of Carrier. **Carrier's possession of such insurance, however, shall in no way restrict its rights of indemnification against Contractor as provided for in Section 7 of this Agreement.**

**10(B).** Contractor's Insurance Obligations. Contractor shall maintain, at its sole expense, the following minimum insurance coverages during this Agreement:

**10(B)(1). Non-Trucking (Bobtail) Liability Insurance.** Contractor shall procure, carry, and maintain public liability and property damage insurance which shall provide coverage to Contractor whenever the Equipment is not being operated on behalf of Carrier in a combined single limit of not less than five hundred thousand dollars ($500,000), with a deductible no greater than two thousand five hundred dollars ($ 2500), for injury or death to any person or for damages to property in any one occurrence. Such coverage shall be no less comprehensive than the coverage Carrier shall facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 5 of **Appendix A (Contractor Election Form)**. In addition, the required coverage shall be primary to any other insurance that may be available from Carrier. Contractor shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

**10(B)(2). Workers' Compensation/ Occupational Accident Insurance.**

**10(B)(2)(a).** Workers' Compensation Coverage. If domiciled in one of the following states: Colorado, Massachusetts, Nevada, New Hampshire, New Jersey, New York, North Carolina, and South Carolina or any state that requires such coverage, Contractor shall provide workers' compensation insurance coverage on Contractor and shall provide Workers' Compensation Coverage in all states on those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state. In lieu of Workers' Compensation Coverage, Carrier may accept Occupational Accident Coverage for any Contractor who lives in the above outlined states; however, approval of such coverage shall be on a case-by-case basis and at the sole discretion of Carrier.

**10(B)(2)(b).** Kansas, Mississippi, and Utah.

**10(B)(2)(b)(1). Kansas and Mississippi.** If domiciled in Kansas or Mississippi, Contractor shall provide occupational accident insurance coverage of at least $1 million on Contractor and workers' compensation insurance coverage on those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state.

**10(B)(2)(b)(2). Utah.** If Contractor is domiciled in Utah and is the sole owner (as that term is defined in 49 C.F.R. § 376.2(d)) and exclusive driver of the Equipment, Contractor shall provide Carrier with evidence, in the form required by Subsection C of this Section, of occupational accident insurance coverage and a copy of a valid Workers' Compensation Coverage Waiver ("WCCW") issued by the Industrial Accidents Division of the Utah Labor Commission (through Contractor's application online at https://webaccess.laborcommission.utah.gov/ wccoveragewaivers). If Contractor is domiciled in Utah and is not the sole owner and exclusive driver of the Equipment, Contractor shall provide evidence, in the form required by Subsection C of this Section, of workers' compensation insurance coverage on both Contractor (unless Contractor has provided Carrier with a copy of a valid WCCW) and those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of Utah.

**10(B)(2)(c).** Other States. If domiciled in any other state, Contractor shall provide workers' compensation insurance coverage for those of Contractor's drivers, employees, agents, and other persons required to be principally covered under the worker's compensation law of the domicile state.

**10(B)(2)(d).** Worker's Compensation Coverage Details. Workers' compensation coverage, where required by the above paragraphs, shall be in amounts not less than the statutory limits required by the applicable state's law. The worker's compensation insurance policy shall provide principal coverage in Iowa and, if different, the state in which Contractor is domiciled (which state, if Contractor is a resident of North Carolina, shall be deemed to be North Carolina), and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming. If Contractor is domiciled in any of the four foregoing states, Contractor shall have state-fund coverage. As evidence of such coverage, Contractor shall provide Carrier with a copy of the insurance policy declarations page for Carrier's verification before operating the Equipment under this Agreement.

**10(B)(2)(e).** Occupational Accident Coverage. Occupational accident insurance policy,

Case 1:24-cv-00082-CJW-KEM     Document 28-2     Filed 10/17/24     Page 22 of 57

where required or permitted by the above paragraphs, shall include either an endorsement or a separate policy provision whereby an admitted insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by Contractor alleging employee status. The occupational accident insurance coverage must be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses, as provided in the Certificate of Insurance in Section 6 of **Appendix A (Contractor Election Form)**, and only if Carrier approves the coverage.

**10(B)(3).** Passenger Insurance. If Contractor wishes to carry passengers ten years old or older in the Equipment (subject to Carrier so authorizing in advance pursuant to Section 4(F) of this Agreement), Contractor shall first procure, carry, and maintain passenger liability insurance that shall provide coverage to Contractor whenever the Equipment is being operated (whether or not on behalf of Carrier) for injury or death to any person riding as a passenger in the Equipment in a combined single limit of not less than fifty thousand dollars ($50,000) benefit for accidental death, dismemberment, and paralysis for children ages ten through seventeen years old and not less than one hundred thousand dollars ($100,000) for individuals more than seventeen years old; not less than one hundred thousand dollars ($100,000) for accident medical benefit over a 52-week benefit period; not less than one hundred fifty dollars ($150) per tooth and one thousand dollars ($1,000) maximum per accident dental benefit; and not less than five hundred thousand dollars ($500,000) aggregate limit of liability per occurrence, and with no deductible. Such coverage shall be no less comprehensive than the coverage Carrier may facilitate on Contractor's behalf if Contractor so chooses, as provided in the "CRST Passenger Accident Program Enrollment Form and Certificate of Insurance" available upon request from Carrier. In addition, such coverage shall be primary to any other insurance that may be available from Carrier. Contractor shall be responsible for any loss or damage in excess of the policy limits.

**10(B)(4).** Other Insurance. In addition to the insurance coverages required under this Agreement, it is solely Contractor's responsibility to procure, carry, and maintain any fire, theft, uninsured and/or underinsured motorist, physical damage (collision), or other insurance coverage that Contractor may desire for the Equipment, for any satellite equipment Contractor leases from Carrier, or for Contractor's health care or other needs. **As provided in Section 7 of this Agreement, Contractor holds Carrier harmless with respect to loss of or damage to Contractor's Equipment, trailer, or other property, and Carrier has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to Contractor's Equipment, trailer, or other property. Contractor acknowledges that Carrier may, and Contractor hereby authorizes Carrier to, waive and reject no-fault, uninsured, and**

**underinsured motorist coverage from Carrier's insurance policies to the extent allowed under Iowa law (or such other state law where the Equipment is principally garaged), and Contractor shall cooperate in the completion of all necessary documentation for such waiver, election, or rejection.**

**10(C).** Requirements Applicable To All Of Contractor's Insurance Coverages. Contractor shall procure insurance policies providing the above-described required coverages solely from properly-licensed insurance carriers that are A.M. Best "A"-rated (or of equivalent financial strength in the commercially-reasonable judgment of Carrier), and Contractor shall not operate the Equipment under this Agreement unless and until Carrier has determined that the policies are acceptable (Carrier's approval shall not be unreasonably withheld). Contractor shall furnish to Carrier written certificates obtained from Contractor's insurance carrier or carriers showing that all coverages required by this Agreement have been procured from such insurance carriers, that the coverages are being properly maintained, and that the premiums thereof are paid. Each insurance certificate shall specify the name of the insurance carrier, the policy number, the effective date and expiration date, and the amounts and types of coverage; list Carrier as an additional insured with primary coverage, and show that written notice of cancellation or modification of the policy shall be given to Carrier at least thirty (30) days prior to such cancellation or modification. If a certificate of insurance provided to Carrier under this Subsection does not show that written notice of cancellation or modification of the policy shall be given to Carrier at least thirty (30) days prior to such cancellation or modification, Contractor shall provide such notice, or cause its insurance carrier to provide such notice, to Carrier.

**10(D).** Contractor's Liability If Required Coverages Are Not Maintained. **In addition to Contractor's indemnity obligations to Carrier under Section 7 of this Agreement, Contractor agrees to defend, indemnify, and hold Carrier harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that Carrier may incur arising out of or in connection with Contractor's failure to maintain the insurance coverages required by this Agreement. In addition, Contractor, on behalf of Contractor's insurer, expressly waives all subrogation rights against Carrier, and, in the event of a subrogation action brought by Contractor's insurer, Contractor agrees to defend, indemnify, and hold Carrier harmless from such claim.**

**10(E).** Availability Of Insurance Facilitated By Carrier.

**10(E)(1).** Contractor May Opt for Insurance Facilitated by Carrier. Contractor may, if he/she so chooses by initialing one or more boxes in the right-hand column of the "CERTIFICATE OF INSURANCE" table in Section 6 of **Appendix A (Contractor Election Form)** (or, for passenger liability

coverage, by completing a "CRST International Passenger Accident Program Enrollment Form and Certificate of Insurance") authorize Carrier to facilitate on Contractor's behalf the insurance coverages required or made optional by this Agreement. In any such case, Carrier shall deduct or otherwise recover pursuant to Section 6 of this Agreement the cost of such coverage (which includes a mark-up earned by Carrier's affiliated insurance company and amounts for administrative services), as indicated in the attached Certificate of Insurance and/or on the "Insurance coverages" row in the Deductions Table in Section 4 of **Appendix A (Contractor Election Form)** (and under any notice and revised Certificate of Insurance pursuant to Section 10(F) of this Agreement).

**10(E)(2). Automatic Authorization If Required Coverages Are Not Maintained.** If Contractor fails to provide proper evidence of the purchase or maintenance of the insurance required above, Carrier is authorized but not required to obtain such insurance at Contractor's expense and deduct or otherwise recover pursuant to Section 6(A) of this Agreement amounts reflecting all of Carrier's expense in obtaining and administering such coverage, as indicated in the attached Certificate of Insurance and in Section 6 of this Agreement.

**10(E)(3). Carrier is Not in Business of Selling Insurance.** Contractor recognizes that Carrier is not in the business of selling insurance, and any insurance coverage requested by Contractor from Carrier is subject to all of the terms, conditions, and exclusions of the actual policy issued by the insurance underwriter if such coverage has been obtained pursuant to Subsections 10(E)(1) and (2) of this Agreement above.

**10(E)(4). Certificate of Insurance.** Carrier shall ensure that Contractor is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy for the operation of the Equipment under which Contractor has authorized Carrier to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to Contractor for each type of coverage, and the deductible amount for each type of coverage for which Contractor may be liable), and Carrier shall provide Contractor with a copy of each policy upon request.

**10(F). Changes In Cost Or Other Details Of Coverages.** If Carrier is facilitating any insurance coverages for Contractor pursuant to Section 10(E) of this Agreement and the cost to Contractor for, or other details of, a coverage changes from the information listed in the "CERTIFICATE OF INSURANCE" in Section 5 of **Appendix A (Contractor Election Form)** of this Agreement, Contractor shall be so notified by Qualcomm® transmission, fax, or other written notice. In any event, Contractor shall not be subject to any such change until twenty (20) calendar

days after such notice or such later time as is set forth in the notice. **Contractor's failure, by the end of twenty (20) calendar days after such notice, to notify Carrier of any objection to the change shall constitute Contractor's express consent and authorization to Carrier to implement the change and modify accordingly the deductions from Contractor's settlement compensation, beginning immediately after the 20-day period. Such modified amounts shall replace and supersede those shown in the Deductions Table in Section 4 of Appendix A (Contractor Election Form) .** Carrier shall thereupon provide Contractor with a revised certificate of insurance, required by Section 10(E)(4) of this Agreement, reflecting the change (such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to Contractor for each type of coverage, and the deductible amount for each type of coverage for which Contractor may be liable) and, upon request by Contractor, a copy of the corresponding insurance policy. If Contractor fails to notify Carrier of any objection within the 20-day period -- or if Contractor notifies Carrier of Contractor's objection within the 20-day period and Contractor and Carrier are then unable to resolve the matter to their mutual satisfaction -- Contractor and Carrier shall each have the right to terminate this Agreement effective immediately upon the change becoming effective (although Contractor shall remain subject to the change until Contractor's termination's effective date and time).

**11. CONTRACTOR COOPERATION.** Upon the happening of an occurrence, accident, or incident involving equipment covered by and within this Agreement, Contractor, and any driver operating the Equipment, pursuant to DOT rules and regulations, shall report this occurrence, accident, or incident to Carrier or its designee immediately by the first available means. Such report shall be completed as to the time, place, parties involved, and circumstances of the occurrence. Contractor and Contractor's driver, at Carrier's expense, shall cooperate with Carrier and/or its representative in the investigation of the occurrence and in any subsequent legal action, including the giving of sworn testimony in a deposition, or testifying during an administrative proceeding or at a trial in a court of law. Carrier shall retain the exclusive right to determine the disposition of any such proceeding by way of settlement, satisfaction of judgment, or appeal through the appropriate administrative agency and/or court.

**12. CONTRACTOR'S NONPERFORMANCE.** If, for any reason, Contractor or Contractor's driver fails to complete the transportation of commodities in transit in a timely manner (including Contractor's dropping a load at a facility Carrier operates or utilizes rather than at the consignee's location), or abandons the shipment, or otherwise subjects Carrier to liabilities from shippers, consignees, or governmental agencies on account of the acts or omissions of Contractor or Contractor's driver en route, Contractor agrees that Carrier shall have the right, without sending notice of breach to Contractor as provided in Section 14(D) of this Agreement, to complete performance through another contractor or other person, and then refrain from paying Contractor some or all of the

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 24 of 57

compensation that Contractor would otherwise have earned for the trip and hold Contractor liable for any additional expense (beyond Contractor's forgone compensation) entailed in completing performance and, subject to Contractor's indemnity limits under Section 7(B)(2) of this Agreement, for any damages that Carrier pays to shippers or consignees arising out of the failure to make timely delivery of the shipment by Contractor. Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6 of this Agreement all such additional expense and damages.

**13. NOTICES.** All notices and notifications required or permitted by this Agreement shall be in writing (unless permitted elsewhere in this Agreement to be oral) and deemed to have been fully given (unless otherwise specified in this Agreement) upon personal delivery; or when faxed to the other party at the fax number shown at the end of this Agreement; or when sent by Qualcomm transmission by Carrier to the Equipment or by Contractor to Carrier; or the next business day after being deposited with an overnight delivery company with the express charges prepaid and properly addressed to the other party at the address shown at the end of this Agreement; or three business days after being deposited in the United States Mail with first class postage prepaid and properly addressed to the other party at the address shown at the end of this Agreement. Carrier and Contractor shall be under a continuing duty to provide a correct address and telephone number to the other party, and Carrier and Contractor (if the latter has a fax machine) to provide a correct fax number to the other. Notice of an address, telephone-number, or fax-number change shall be given in writing.

**14. DURATION OF AGREEMENT AND TERMINATION.**

**14(A).**<u>Term.</u> This Agreement shall begin on the Effective Date and end on the Termination Date in the "In Witness Whereof" paragraph just above the signature block below.

**14(B).**<u>Equipment Receipt.</u> Upon taking possession of the Equipment, Carrier shall furnish Contractor with a receipt, in the form attached hereto, identifying the Equipment and stating the date and time when possession is taken by Carrier. The receipts required by this Section may be transmitted to Contractor by hand, mail, overnight delivery, fax, or other means of communication. Carrier shall maintain those records regarding the Equipment required by 49 C.F.R. § 376.11(d).

**14(C).**<u>Termination.</u> Either party may terminate this Agreement immediately, in accordance with the procedures in Subsection (D) of this Section, for any of the reasons set forth in that Subsection. In addition, this Agreement may be terminated at any time for any reason upon twenty (20) days' prior written notice to that effect to the other party personally, by mail, by fax machine at the address or fax number shown at the end of this Agreement, or, if both parties have signed **Appendix D (Consent to Conduct Business by Electronic Methods)**, by the electronic means specified in that appendix. The effective date and time of termination shall be as set forth in the written notice given by either party, or on the receipt for the Equipment if one is issued by Contractor to Carrier, or at the date and time when, as a practical matter, possession of the Equipment by Carrier pursuant to 49 C.F.R. § 376.11(b)(2) ends, whichever of these three dates/times is earliest.

**14(D).**<u>Reasons for Unilateral Termination by a Party.</u> Notwithstanding anything to the contrary in this Agreement, in the event of (1) a party's engaging in, or attempting, conspiring, or threatening to engage in, any act or omission that would constitute a felony or intentional tort, pursuant to Section 4 of this Agreement; (2) the insolvency or filing of bankruptcy of either party; (3) Contractor's violation of, or failure to fully adhere to and perform, the requirements of (a) any customer of Carrier to the extent provided by Section 4(H) of this Agreement, (b) any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"), (c) Carrier's operating authorities; or (d) Carrier Policies and Procedures, all pursuant to Section 4(C) of this Agreement; (4) Contractor's causing, in whole or in part, an "accident," as that term is defined by FMCSA in 49 C.F.R. § 390.5, pursuant to Section 4(C) of this Agreement; or (5) any other material breach of this Agreement by either party, the other party may terminate this Agreement by giving immediate oral (but only if the other party is reachable in person or by telephone), followed by written, notice of termination to the breaching party. In addition, Section 9(F)(3) of this Agreement provides, among other things, that either party may unilaterally terminate this Agreement on one day's notice if and when an initial decision is issued by a court or administrative agency reclassifying Contractor from independent-contractor to employee status.

**14(E).**<u>Survival of Liabilities and Entitlements.</u> If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of Contractor or Carrier under this Agreement, such liability or entitlement shall continue, notwithstanding the termination of this Agreement, until such liability or entitlement is satisfied in full.

**15. CONTRACTOR'S OBLIGATIONS UPON TERMINATION.** Upon termination of this Agreement:

**15(A).** <u>Completion of Performance.</u> Contractor shall, unless otherwise instructed by Carrier, complete performance of all transportation and other services required by Carrier and any bills of lading pertaining to any shipment or shipments that Contractor may be engaged in hauling at the time of termination. Contractor shall receive no compensation for any shipment with respect to which he/she has failed to complete all required transportation and other services. In the event Carrier instructs Contractor not to complete performance of transportation or other services that Contractor is willing and able to perform, Carrier shall pay Contractor compensation determined in accordance with **Appendix B (Contractor Compensation)** for the

Case 1:24-cv-00082-CJW-KEM     Document 28-2     Filed 10/17/24     Page 25 of 57

portion of such services that Contractor performed prior to termination.

**15(B).Return of Carrier's Property.** Contractor shall, immediately upon termination of this Agreement or the completion of the transportation or other services provided for herein, whichever occurs later, both remove all of Carrier's identification devices from the Equipment and, except in the case of identification painted directly on the Equipment, return them to Carrier via prepaid hand-delivery, overnight delivery, or certified mail (provided that if the identification device has been lost or stolen, a written notice (letter) certifying its removal shall satisfy this requirement); return all of Carrier's property, including trailers, base plates, permits, and other paperwork, Qualcomm® communications equipment, tire chains, load-securement equipment if not fully paid (unless Contractor immediately pays the balance due on the load-securement equipment loan), and freight, to Carrier's facility in Fort Wayne, Indiana, or to any closer location Carrier designates; and pay Carrier all amounts Contractor owes Carrier at that time under this Agreement.

**15(C).Remedies for Failure to Return Carrier's Property.** If Contractor fails to return Carrier's property or freight to Carrier or remove and return all of Carrier's identification from the Equipment upon termination of this Agreement, Contractor shall pay Carrier all expenses (including reasonable attorneys' fees) Carrier incurs in seeking the return of such items, and Carrier may pursue other remedies allowed by law or authorized in this Agreement against Contractor. Such remedies include withholding Contractor's last settlement payment until he/she removes and, except in the case of identification painted directly on the Equipment, returns all of Carrier's identification devices or delivers to Carrier a letter certifying that such devices have been removed, and making deductions from any remaining balances in Contractor's General Escrow Fund for the replacement value of Carrier's unreturned property and for other amounts Contractor owes Carrier, as provided by Section 8 of this Agreement.

**16. FORM OF AGREEMENT AND MISCELLANEOUS PROVISIONS.**

**16(A).General.** The subject headings of the sections and subsections of this Agreement are included for purposes of convenience only and shall not affect the construction or interpretation of any of its provisions. References in this Agreement to "he/she," "him/her," and "his/hers" shall be read as "it" and "its," respectively, if Contractor is a corporation, limited liability company, partnership, or other entity, rather than a natural person.

**16(B).Severability.** If any provision (including any sentence or part of a sentence) of this Agreement (including its appendixes and addendums) is deemed invalid for any reason whatsoever, this Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions that shall be as close to the parties' original intent as permitted under applicable law.

**16(C).Waiver.** The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right. Original, faxed, otherwise imaged, or electronic signatures shall be equally valid.

**16(D).Complete Agreement.** Immediately upon this Agreement's becoming effective:

**16(D)(1). Complete Agreement.** This Agreement (including the attached Appendices and any addendums) constitute the entire Agreement between Carrier and Contractor – and fully replaces and supersedes any CRST Specialized Transportation, Inc. or Specialized Transportation Agent Group. Inc. or Specialized Transportation, Inc. Independent Contractor Operating Agreement or other prior or contemporaneous agreements, representations, and understandings – pertaining to the subject matter contained herein.

**16(D)(2). Credits and Debits Under Previous Agreement Between Parties.** Any Contractor escrow fund balances under any written agreement between the Parties that this Agreement replaces shall be credited to Contractor's General Escrow Fund under this Agreement. All compensation and other amounts due Contractor from Carrier, and all advances and other amounts due Carrier from Contractor, pursuant to any such predecessor agreement, shall remain due and payable. The amounts of compensation for trips started, and the amounts of advances and other amounts due Carrier, before the effective date of this Agreement shall be determined under the predecessor agreement; the payment procedures shall be determined under this Agreement; and the payment timing shall be determined under the predecessor agreement or this Agreement, whichever requires payment earlier.

**16(D)(3). Amendments.** No supplement, modification, or amendment to this Agreement shall be binding unless in writing and signed (either manually or electronically) by both Carrier and Contractor, except as otherwise provided with respect to charge-backs and other deductions in Section 6 of this Agreement and insurance deductions in Section 6 of **Appendix A**. No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be deemed effective or binding upon the Contractor unless executed in writing by the party making the waiver.

**16(E). Copies of This Agreement and Statement of Lease.** Carrier shall, as set forth in 49 C.F.R. § 376.12(*l*), keep the original of this Agreement, with a copy to be retained by Contractor. Pursuant to 49 C.F.R. § 376.11(c)(2), a "Statement of Lease" shall be carried on the

Case 1:24-cv-00082-CJW-KEM     Document 28-2     Filed 10/17/24     Page 26 of 57

Equipment for those periods that the Equipment is operated by or for Carrier under this Agreement.

**17. GOVERNING LAW.** This Agreement shall be interpreted in accordance with, and governed by, the laws of the United States and, except as otherwise provided herein, of the State of Iowa, without regard to the choice-of-law rules of such State or any other jurisdiction. **THE PARTIES FURTHER AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING ALLEN COUNTY, INDIANA. THE PARTIES HEREBY CONSENT TO THE JURISDICTION AND VENUE OF THE STATE AND FEDERAL COURTS SERVING ALLEN COUNTY, INDIANA.**

**18. BINDING EFFECT.** This Agreement shall be binding on and inure to the benefit of Carrier and Contractor and their respective successors, assigns, heirs, personal representatives, and administrators. Contractor may not assign or subcontract all or any portion of Contractor's obligations under this Agreement to another person without Carrier's prior written consent.

**19. COLLECTION EXPENSES.** Contractor hereby authorizes Carrier to deduct or otherwise recover pursuant to Section 6(A) of this Agreement a finance charge of one and a half percent (1.5%) per month (eighteen percent (18%) annually), or the maximum allowed by law if less, to Contractor on balances over thirty (30) days' past due. Contractor further agrees that if he/she defaults in the payment of any amount due and, to assist in collecting the amount due, Carrier engages the services of a collection agency, Contractor shall pay Carrier for all costs involved in such collection, including attorneys' fees, except to the extent otherwise determined by law.

**20. AUTHORITY TO COMPLETE CREDIT CHECK.** Carrier shall have the authority to obtain a credit report on Contractor from any national credit-reporting agency at any time during this Agreement and for as long (not exceeding one hundred eighty (180) days) after its termination as Contractor owes money to Carrier. Carrier may report Contractor's performance under this Agreement to credit-reporting agencies, including Contractor's failure to make payments on time. If Contractor wishes to know the names of the agencies Carrier has contacted, Contractor should so notify Carrier, and Carrier shall promptly provide them to him/her. If Contractor thinks Carrier reported erroneous information to a credit-reporting agency, Contractor should so notify Carrier. Carrier shall then promptly investigate the matter and, if Carrier's investigation shows Contractor was correct, Carrier shall contact each credit-reporting agency to which it reported the information and shall request that the agency correct the report. If Carrier disagrees with Contractor after Carrier's investigation, Carrier shall notify Contractor in writing and instruct Contractor how to submit a statement of Contractor's position to those agencies. Contractor's statement shall become a part of Contractor's credit record with the agencies.

**IN WITNESS WHEREOF, Carrier and Contractor hereby execute this Agreement.** This Agreement shall begin at 12:01 a.m. Eastern Time on the ___3rd of March 2020___ ("Effective Date") and end at 11:59 p.m. Eastern Time on November 1, 2026 ("Termination Date").

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 27 of 57

*By signing below, Contractor acknowledges that, as reflected in the terms of this Agreement:*

- *Contractor is NOT an employee of Carrier, and all aspects of the relationship between Contractor and Carrier are based on Contractor's status as an independent contractor;*

- *Contractor has agreed to be responsible for the operating expenses incurred in connection with his/her business operations;*

- *Contractor's agreement to take responsibility for his/her expenses is an indispensable term of this Agreement but for which Carrier would not have agreed to pay the gross compensation stated above or entered into this Agreement;*

- *The gross compensation Carrier agrees to pay is not intended to ensure that Contractor covers his/her operating expenses, but instead to provide the amount of revenue sufficient, in the relevant market for such services, to convince a contractor-business both to provide, maintain, fuel, legally-credential, and otherwise operate suitable and dependable Equipment and to provide and pay a qualified professional driver or drivers to drive that Equipment; and*

- *The gross compensation paid to Contractor is MORE than Carrier would pay an employee to perform professional driving services, which reflects the reality of the marketplace, in that Carrier cannot attract contractors willing to take the entrepreneurial risk of funding and running their own businesses by paying merely the personal-services wage that they could get as employees.*

Carrier: CRST SPECIALIZED TRANSPORTATION, INC.

By: _Cammy Smith_
SAFETY

CAMMY SMITH/MANAGER
Printed Name and Title

_3.3.2022_
Date

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

CONTRACTOR: **HARLEY KELCHNER**
*Check one:*
- ☐ Corporation
- ☐ Limited Liability Company
- ☐ Partnership
- ☑ Sole Proprietorship

*Organized in State of:* _____
*With Employer ID No.:* _____
*OR Social Security No. (last 4 digits)* <u>3001</u>

By: _Harley B Kelchner_
Signature

**HARLEY KELCHNER**
Authorized Rep.'s Name (Typed or Printed)

<u>OWNER OPERATOR</u>
Title

<u>33350 SW DEGGELLER COURT</u>
Address (Street, P.O. Box)

<u>PALM CITY FL 34990</u>
City, State & Zip Code

<u>772-521-3863</u>
Mobile Telephone Number

_harbek2000@ Gmail.com_
Email Address

_3/2/22_
Date

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 28 of 57

# EQUIPMENT RECEIPT

**RECEIVED FROM:** <u>HARLEY KELCHNER</u> ("Contractor") the following
Printed Name of Contractor

Equipment:

| Equipment Type (Specify Tractor or Trailer) | Hauler # | Owner ID | Year | Make | Model | Serial (VIN) # | Carrier Unit # |
|---|---|---|---|---|---|---|---|
| TRACTOR | L890 | 0936 | 2019 | FRT | CASCADIA | 3AKJGLDR3KDKG6332 | 105170 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

covered by the Independent Contractor Operating Agreement between Contractor and Carrier dated <u>3.3.2022</u> Carrier hereby accepts receipt of the above-identified equipment at 12:01 A.M. Eastern Time on the <u>3rd of March 2022</u>, at Specialized Transportation, Inc. Fort Wayne, IN

**Carrier: CRST SPECIALIZED TRANSPORTATION, INC.**

By: _Cammy Smith_
SAFETY

<u>CAMMY SMITH/MANAGER</u>
Printed Name and Title

<u>3.3.2022</u>
Date

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

CRST Specialized Transportation, Inc. ICOA     Rev. 10/02/13
EQUIPMENT RECEIPT
Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 29 of 57

## CONTRACTOR ELECTION FORM (NNM)

1. **EQUIPMENT.** The commercial motor vehicle equipment ("Equipment") governed by this Agreement consists of:

| Equipment Type (Specify Tractor or Trailer) | Hauler # | Owner ID | Year | Make | Model | Serial (VIN) # | Carrier Unit # |
|---|---|---|---|---|---|---|---|
| TRACTOR | L890 | 0936 | 2019 | FRT | CASCADIA | 3AKJGLDR3KDKG6332 | 105170 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

2. **BASE PLATES AND PERMITS.**

**2(A).** **Base Plates.** If Contractor so elects (by initialing OPTION 1, "Carrier shall obtain base plate...," below), Carrier shall pay the amount owed to the issuing jurisdiction for the base plate(s) and deduct or otherwise recover pursuant to Section 6(A) and Appendix F of this Agreement that expense, plus an administrative fee to Carrier. If this Agreement is terminated prior to Contractor's complete reimbursement of Carrier's expense, Carrier is hereby authorized to deduct or otherwise recover pursuant to Section 6(A) of this Agreement any remaining amount. If Contractor removes and returns the base plate(s) to Carrier upon the termination of this Agreement and if Carrier then receives a refund or credit for the base plate(s) or resells the plate(s) to another contractor, Carrier shall refund to Contractor a prorated share of the amount received by Carrier, less any transfer or replacement fees owed to the plating jurisdictions. *CONTRACTOR SHOULD INITIAL ONE OPTION UNDER TRACTOR AND ONE OPTION UNDER TRAILER:*

**TRACTOR –**

_____ **OPTION 1:** Carrier shall obtain a State-specific International Registration Plan base plate for Contractor's tractor and shall charge the cost to Contractor through deductions beginning in or around November of the year preceding the renewal period for the base plate. The annual cost shall consist of the amount Carrier paid the issuing State for the plate (estimated initially and then adjusted up or down to match the actual amount billed to Carrier by the specific State).

_____ **OPTION 2:** Contractor shall obtain own base plate for tractor.

**TRAILER (If One is Listed in the table in Section 1 above) –**

_____ **OPTION 1:** Carrier shall obtain base plate for Contractor's trailer and charge the annual cost (amount paid to the specific State) back to Contractor.

_____ **OPTION 2:** Contractor shall obtain own base plate for trailer.

**2(B).** **Permits.** Certain governmental permits and licenses, which are the financial responsibility of Contractor under Sections 5(F) and (G) of this Agreement, must be maintained to authorize Contractor to provide services to Carrier legally.

**2(B)(1).** Unified Carrier Registration Fee. In 2005, Congress enacted the Unified Carrier Registration ("UCR") fee as a replacement for numerous states' Single-State Registration System ("SSRS") fees, effective with the 2007 calendar year. The UCR fee is assessed against a motor carrier based on the number of trucks in the carrier's fleet.

**2(B)(2).** <u>IFTA Permit and Fuel Tax Reporting</u>. Under the International Fuel Tax Agreement ("IFTA"), an annual fuel tax permit must be obtained, and quarterly fuel taxes must be reported and paid to the IFTA base state, for the Equipment's operations nationwide. Contractor may, by initialing the line to the left of OPTION 1 below, elect to obtain the IFTA permit and perform (or have a third-party vendor perform) all fuel tax reporting with respect to the Equipment, in accordance with Section 5(F)(2)(a) of this Agreement. Alternatively, Contractor may, by initialing the line to the left of OPTION 2 below, elect to have Carrier obtain the IFTA permit and perform all fuel tax reporting with respect to the Equipment, in accordance with Section 5(F)(2)(b)

**CONTRACTOR SHOULD <mark>INITIAL</mark> ONE OF THESE TWO OPTIONS:**

_____ **OPTION 1:** Contractor shall obtain the IFTA permit, and perform all fuel tax reporting services, with respect to the Equipment at Contractor's expense.

 **<mark>OPTION 2:</mark>** Carrier shall obtain the IFTA permit, and perform all fuel tax reporting services, with respect to the Equipment, and shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement any additional fuel tax that Contractor may owe.

**2(B)(3).** <u>Return of Permits</u>. All permits and licenses issued in Carrier's name shall be returned to Carrier upon termination of this Agreement. No refund shall be made to Contractor by Carrier of the permit costs upon termination of this Agreement, even if returned permits are reused by Carrier. Contractor shall be liable to Carrier for all expenses incurred by Carrier due to Contractor's failure to return all such permits.

**2(C).** <u>Settlement Deductions.</u> Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement the total cost of base plate(s), that Contractor may owe) under this Appendix until the costs are fully paid in accordance with Appendix F of this Agreement. The deductions shall begin immediately for current Contractors and the third full week after a Contractor first enters into this Agreement for new Contractors.

**2(D).** <u>Itemization Available.</u> Contractor may, upon request, obtain an itemization of the base plate and/or permit fees Carrier has advanced for Contractor pursuant to this Appendix, the portion of the total already paid by Contractor and the portion remaining.

**3. COMMUNICATION SYSTEM/EOBR.**

*<u>CONTRACTOR SHALL <mark>INITIAL</mark> ONE OF THESE TWO OPTIONS:</u>*

_____ **OPTION 1:** Contractor shall furnish and install Contractor's own unit of the Carrier-designed Omnitracs /EOBR in the Equipment.

<mark>**OPTION 2:**</mark> Carrier shall arrange, at its expense, to have a Communication System/EOBR installed in the Equipment and shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement the charges set forth in the new row, "Communication System/EOBR," in the Deductions Table of **Appendix A** of the Agreement.

<u>Under either OPTION 1 or OPTION 2</u>, Carrier shall deduct or otherwise recover pursuant to Section 6(A) of this Agreement the network charge set forth in the new row, "Communication System/EOBR," in the Deductions Table of this **Appendix A**.

**4. DEDUCTIONS TABLE.** Pursuant to Section 6(A) of this Agreement, Contractor hereby authorizes Carrier to charge back or deduct – from Contractor's gross compensation under Section 2 of this Agreement, from Contractor's General Escrow Fund, or from other amounts Carrier owes to Contractor at the time of settlement with Contractor – amounts that, under this Agreement or any addendum, Contractor owes to Carrier, as set forth in the Deductions Table immediately below:

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | | |
| FC | **Alternative Use of Equipment Fee** to help defray Carrier's administrative, regulatory, state tax, and possible insurance costs in connection with each Alternative-Use-of-Equipment trip. | For Exempt Motor Carriage, a $250-per-trip Alternative-Use Fee. For all other Alterative Uses of Equipment, a $150-per-trip Alternative-Use Fee |
| CL, AP | **Cash-on-Delivery freight revenue** from shippers, sublease carriers, or others that was not collected, or was collected but not remitted, by Contractor to Carrier when such actions were required by this Agreement. | Amount of freight revenue not collected, or collected but not remitted, to Carrier in violation of this Agreement. |
| AB | **Collection costs** | Amount Carrier pays a collection agency to collect past-due amounts under § 19 of Agreement. |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | **Communication System/EOBR** | Omnitracs network charge of $20 per week beginning first week for weekly usage fee. |
| AC, A1, A2, A3, A4 CC, C2, C3, C4 | **Damages, losses,** fines, penalties, court costs, attorneys' fees, and other expenses (together "Damages") Carrier incurs in connection with Contractor's obligations under this Agreement or breach thereof **arising out of Contractor's negligence, gross negligence, willful misconduct, or other culpable acts or omissions** under this Agreement, pursuant to § 7 of Agreement, subject to indemnity limits set forth in §§ 7(B)(1)-(2) of Agreement. | To extent the Damages are subject to the indemnity limits set forth in §§ 7(B)(1)-(2) of Agreement, Carrier shall deduct or otherwise recover pursuant to § 6(A) of Agreement up to $100 per week, until fully paid, for the up-to-$1,000 in Damages owed by Contractor for each accident claim (AC, A1, A2, A3, A4); for up-to- $1,000 in Damages owed by Contractor for each non-accident claim (CC, C2, C3, C4). If the Damages are governed instead by § 7(B)(3) of Agreement, the full amount of the Damages may be deducted immediately or on whatever schedule Carrier sets. |
| AH, AR | **Deficit payment:** Amounts deducted to retire debt to Carrier from previous settlement(s) | Amount Contractor owes Carrier, plus interest at a rate of 1.5% per month (18% per annum), unless applicable state law requires a lower rate. |
| 2F, ER | **Detention, accessorial, and other customer-charge revenue** not collected by Carrier from its customer because of Contractor's failure to transmit to Carrier the necessary documentation supplied by the shipper or consignee | Amount Carrier was unable to collect from customer as a result of Contractor's failure to transmit to Carrier the necessary documentation supplied by the customer, provided that no charge-back shall be made to Contractor if he/she contacted Carrier's dispatch regarding issue prior to departure from customer (consignor or consignee) location |
| EY, EC, EW | **Earnings Correction** - Credit to, or deduction from, Contractor's settlement compensation to reflect difference between the amount originally billed to the shipper and the amount ultimately collected from the shipper after correction of any errors on the bill. | Amount credited or deducted shall be determined by applying Contractor's compensation rate(s) from **Appendix B (Contractor Compensation)** to the difference between the amount originally billed to the shipper and the amount ultimately collected from the shipper after correction of any errors on the bill |
| XI, X2, X3, Z6, NY RY, MY, RZ, MW, MT, RU | **Equipment lease payments** if Contractor elects, by executing the Equipment Lease Charges Addendum and the Equipment Lease appended to it, to lease the Equipment from CRST Lincoln Sales Inc. | *See* the Equipment Lease Charges Addendum. |
| | | |
| PO | **Express mail** or other package delivery services if Contractor charges them to Carrier's account with the delivery service vendor | Amount Carrier paid to U.S. Postal Service or other package delivery service vendor. |
| FN | **Fines, penalties,** including traffic tickets and related court costs, attorneys' fees, and other legal expenses that § 5(F)(3) of Agreement makes Contractor responsible for | Amount Carrier paid or otherwise incurred. |
| TX | **Fuel and mileage taxes** | In connection with quarterly computation and submission of fuel and mileage tax reports and payments to the various taxing jurisdictions, any net fuel or mileage tax owed at that time with respect to Contractor's operations in all taxing jurisdictions combined shall be quarterly. |
| AF | **Fuel purchases** | 1. When Contractor elects to purchase fuel from third-party vendors using the credit-card feature of the CRST Advance Card, Carrier shall deduct – and show on Contractor's settlement statement – or otherwise recover pursuant to § 6(A) of Agreement an amount no greater than the price posted at the fuel vendor's pump (plus the Card-issuer's transaction fee in certain instances – *see* Item 3 below). The amount deducted or otherwise recovered, if less than the cash (pump) price, is the result of a cents-off-retail discount to Contractor that Carrier has negotiated with the fuel vendor. Discount amounts available to Contractor are |

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| | | as indicated in Supplement 1 ("CRST Fuel Purchasing Program") to this Appendix. Carrier shall deduct or otherwise recover pursuant to § 6(A) of Agreement the cents-off-retail discount price (that is, the price posted at the fuel vendor's pump, less the cents-per-gallon discount negotiated by Carrier, at time of Contractor's purchase). In the event of any changes in Supplement 1, Carrier shall provide Contractor with an updated version before the changes take effect.<br><br>2. If Carrier receives any discount on Contractor's fuel purchases or if the fuel purchases of all Carrier's contractors combined reach certain volumes resulting in Carrier's receiving rebates from some fuel vendors, Carrier shall retain all such discounts and rebates and NOT share them with Contractor or other contractors.<br><br>3. If Contractor elects to purchase fuel, using the CRST Advance Card, at a truck stop that is not listed in Supplement 1 to this Appendix and thus does <u>not</u> offer Carrier's contractors a cents-off-retail discount, Contractor will be charged back whatever transaction fee the Advance Card issuer charges to Carrier.<br><br>4. Contractor is under no obligation to use the CRST Advance Card for fuel or other purchases, and may instead use cash, checks, or other credit or charge cards. |
| ZA, ZB, ZC, ZD, ZE, ZF (etc.), GA, Z2, Z2 | **Garnishment orders** (including but not limited to child-support orders) by courts and tax liens against Contractor or Carrier compensation | $100 per week or the amount Carrier paid in compliance with any lawfully issued order or lien, a copy of which Carrier shall supply to Contractor at or before the first deduction relating to it, to Carrier (the amount to be determined by the law of the jurisdiction issuing the order or lien, or, if such state does not address admin. fees, the law of the State of Indiana). After termination of, but not during, this Agreement, Carrier shall deduct from Contractor's General Escrow Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in Contractor's Settlement Compensation |
| BD | **General Escrow Fund** contributions by Contractor | *See* **Appendix A (Contractor Election Form)**, § 7 |
| 7A | **Inspections of Equipment** to the extent the financial responsibility of Contractor under Agreement, § 4(A) | Amount Carrier paid outside vendor. |
| BT, 7S, DP, PJ, PP, IB, PK, ID, 9N, AG, OP | **Insurance coverages** Contractor elects, via the CERTIFICATE OF INSURANCE in § 6(A) of **Appendix A (Contractor Election Form)** and/or by executing a CRST International "Passenger Accident Program Enrollment Form," to have Carrier facilitate or that Carrier maintains at its expense because Contractor failed to provide proper evidence of the purchase or maintenance of the required coverages under § 10(E) of Agreement | *See* **Appendix A (Contractor Election Form)**, § 5. The costs stated in **Appendix A (Contractor Election Form)**, § 5, are amounts the insurer(s) charged for the required and optional coverages Contractor selected (and for those required coverages with respect to which Contractor failed to provide Carrier proper evidence of Contractor's purchase and maintenance of them), including, where indicated, a mark-up to Carrier's affiliated insurance company and/or an admin. fee to Carrier. The costs are subject to possible increases (*see* § 10(F) of Agreement). |
| LI, LE | **Licensing (base plate fees)**, if Contractor elected, by so indicating in § 2 of **Appendix A (Contractor Election Form)** or an Addendum, to have Carrier pay the fees in advance | *See* **Appendix A (Contractor Election Form)**, § 2(A), or an Addendum, regarding partial refunds of base plate fees Carrier shall provide Contractor under certain circumstances. |
| LI, LE | **Licensing (permit fees)** under § 7(B) Agreement and § 2 of **Appendix A** or an Addendum, but not including over dimensional permit fees | *See* **Appendix A (Contractor Election Form)**, § 2(B) or an addendum. |

Case 1:24-cv-00082-CJW-KEM     Document 28-2     Filed 10/17/24     Page 33 of 57

| CODE | CHARGE-BACK OR OTHER DEDUCTION ITEM | AMOUNT OF DEDUCTION OR METHOD OF COMPUTATION |
|---|---|---|
| IL, I2, I3, I4 | **Loan payments** if Contractor elects, by so indicating on Loan Addendum to borrow an amount over $1,500 from Carrier to cover cost of maintenance, repairs, or other expenses | Weekly payments based on principal and interest agreed to by Contractor and Carrier, as reflected in Loan Addendum. |
| DU | **Logo Store clothing and other items** that Contractor elects to purchase at Carrier's store | Contracts are given a yearly allotment of $100 for uniforms. Amount Carrier incurred over the $100 will be charged back to the drivers weekly commission statement. |
| RH, P9, RT, RJ, SG, SJ, SH, PZ, M2, ML, RG, RI, RK, RL | **Maintenance, repairs, parts, and tires** that Contractor elects, and Carrier each time agrees, to have Carrier advance funds for the purchase from third-party maintenance providers and charge Contractor back for it | Amount Carrier paid maintenance provider. If Contractor elects to obtain products or services from Carrier's third-party maintenance provider, the amount Carrier incurred for parts and labor, plus an administrative fee based on the maintenance provider's current service fee schedule, which is available upon request. |
| AP, CR, CL | **Operating expenses not otherwise listed** in this table for which Contractor is responsible under this Agreement and regarding which Carrier receives a purchase order or invoice is otherwise requested by Contractor to make an expenditure in the first instance. | Amount Carrier paid or otherwise incurred. |
| SU, U2 QD, QE, 6U, IY, IS, 4S, 5S | **Personal Insurance Program,** including medical, dental, vision, critical illness, disability, and permanent life coverages. | *See* the Personal Insurance Program Addendum. |
| PY | **Physical examinations** for Contractor's drivers | Amount Carrier paid outside vendor |
| FC | **Sublease payments** to Carrier if Contractor elects to use the Equipment to handle trip-leased loads pursuant to § 1(E)(2)(b) of Agreement | *See* § 1(E)(2)(b) of Agreement. |
| EP, E2 | **Securement equipment** if Contractor elects to purchase chains, big reds, escort dollies, or other such equipment from Carrier pursuant to Securement Equipment Addendum to this Agreement | *See* Securement Equipment Addendum |
| ___ | **Travel cost** (bus, air, taxi, or other passenger fares) if Contractor needs to travel due to an accident or for other Carrier-approved trips. | Amount Carrier paid outside vendor. |
| ___ | **Termination-related expenses** pursuant to § 14 of Agreement, including without limitation reasonable attorneys' fees, involved in seeking the return of, replacing, or having to forego refunds, credits, or sale proceeds relating to Carrier's base plates, permits, identification, and other property, including trailers, paperwork, satellite, Qualcomm®, and other electronic communications equipment, chains, and freight | Amount Carrier paid or otherwise incurred. |
| ___ | **Trip-completion additional expense and/or damages,** pursuant to § 12 of Agreement | Amount Carrier paid or otherwise incurred beyond the amount of Contractor's forgone compensation pursuant to § 12 of Agreement |
| P2, PN | **Weigh station bypass charges** if Contractor elects to use PrePass or other weigh station bypass services by signing a Weigh Station Bypass Addendum to this Agreement. | $ 13.78 per month per unit of Tractor Equipment (comprising amount Carrier paid to bypass service vendor and admin. fee to Carrier) for unlimited use, deducted once a month from Contractor's compensation upon receipt of invoice from bypass service. |

**5.  CERTIFICATE OF INSURANCE.**  Contractor hereby requests Carrier, through Carrier's insurer, to facilitate on Contractor's behalf (if they are available) the insurance coverages Contractor has selected by placing Contractor's initials in the right-hand column below:

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **1. Non-Trucking (Bobtail) Liability Insurance / Non-Trucking Bobtail "Plus" Liability Insurance (additional coverage for uninsured motor vehicles):**<br><br>*Name of Insurer:*  Great Plains Casualty, Inc.<br><br>*Policy No:* GPIN033<br><br>*Effective Date(s) of Coverage:*  From the effective date (below) of this Certificate of Insurance through the next succeeding June 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* $1,000,000 combined single limit<br><br>*Current Cost to Contractor (including a mark-up to Carrier's affiliated insurance company):* **$ 35 ($45 for "Plus" Option)** per Unit of Equipment per month<br><br>*Deductible for Which Contractor Is Liable:* $1000 per occurrence<br><br>If Contractor domiciled in Michigan:<br><br>*Name of Insurer:* Lloyds of London<br><br>*Policy No:* 4F18TS07-07-NT<br><br>*Effective Date(s) of Coverage:*  From the effective date (below) of this Certificate of Insurance through the next succeeding October 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* $500,000 combined single limit<br><br>*Current Cost to Contractor (including a mark-up to Carrier's affiliated insurance company):* **$53.17 ($79.76 for "Plus" Option) per** Unit of Equipment per month<br><br>*Deductible for Which Contractor Is Liable:* $1,000 per occurrence | _*JES*_ YES<br><br>_____ NO |
| **2. Workers' Compensation Insurance** *(CONTRACTOR SHOULD INITIAL "YES" IN THE COLUMN TO THE RIGHT OF <u>ONLY ONE</u> OF THE FOLLOWING TWO OPTIONS -- A OR B):*<br><br>A.  By initialing "YES" in the column to the right, **CONTRACTOR ELECTS TO PURCHASE WORKERS' COMPENSATION COVERAGE FOR HIMSELF/HERSELF AND CONTRACTOR'S DRIVERS OR OTHER EMPLOYEES (IF ANY) FROM AN INDEPENDENT SOURCE <u>NOT</u> FACILITATED BY CARRIER.  CONTRACTOR HAS PROVIDED CARRIER WITH A COPY OF THE INSURANCE POLICY DECLARATIONS PAGE EVIDENCING SUCH COVERAGE IN ACCORDANCE WITH SECTION 10(B)(2)(d) OF THIS AGREEMENT.** | _____ YES |
| B.  By initialing "YES" in the column to the right, Contractor attests that **HE/SHE HAS NO EMPLOYEES AND THAT he/she is <u>NOT</u> a resident of, and the work is <u>NOT</u> principally localized in, KANSAS or any state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator, and CONTRACTOR HAS ELECTED <u>NOT</u> TO OBTAIN WORKERS' COMPENSATION COVERAGE FOR HIMSELF/HERSELF INDEPENDENTLY.** | _*JES*_ YES |

| TYPE OF COVERAGE | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **3.** <u>**Occupational Accident Insurance**</u> (*WHERE STATE LAW ALLOWS AND CARRIER APPROVES*):<br><br>*Name of Insurer:* Zurich Insurance<br><br>*Policy No. OCA546503*<br><br>*Effective Date(s) of Coverage:* From the effective date (below) of this Certificate of Insurance through the next succeeding November 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* Up to $1,000,000 per occurrence based on schedule of benefits available to Contractor upon request (benefits are reduced for individuals over 70 years old)<br><br>*Current Cost to Contractor:* $177.00 per covered individual per month<br><br>*Deductible for Which Contractor Is Liable:* $0 | _YES_ ___ YES<br><br>_____ NO |
| **4.** <u>**Physical Damage Insurance:**</u><br><br>*Name of Insurer:* Great Plains Casualty, Inc.<br><br>*Policy No:* GPIN030 ($1000 deductible)<br><br>*Policy No:* GPIN0312 ($2500 deductible)<br><br>*Effective Date(s) of Coverage:* From the effective date (below) of this Certificate of Insurance through the next succeeding September 1, and each subsequent annual renewal period, subject to Contractor's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* Contractor-specified value of Unit of power-unit Equipment of $85,400.00 (any Tractor Equipment claims, however, shall be paid at only the actual cash value of insured Tractor Equipment at time of occurrence, in accordance with insurance policy)<br><br>*Current Cost to Contractor (including a mark-up to Carrier's affiliated insurance company and an administrative fee to Carrier):* Under the $1000 Deductible, the rate is calculated by multiplying .002916 by the Contractor-specified value of Equipment, with a $50.00 monthly minimum for a power-unit and a $25.00 monthly minimum for a trailer deducted monthly. Under the $2500 Deductible, the rate is calculated by multiplying .002458 by the Contractor-specified value of Equipment, with a $50.00 monthly minimum for a power-unit and a $25.00 monthly minimum for a trailer, deducted monthly.<br><br>*Deductible for Which Contractor Is Liable:* $1,000 or $2500 per occurrence | _YES_ ___ YES<br><br>_____ NO |

**6.   CERTIFICATE OF WORKERS' COMPENSATION INSURANCE  (If Contractor Elects <u>NOT</u> To Have Coverage Facilitated By Carrier)**

**If Contractor has elected NOT to have Carrier facilitate workers' compensation (or, where permitted, occupational accident) insurance coverage,** Contractor hereby certifies that the statement below, to the left of which Contractor's undersigned authorized representative has inscribed Contractor's initials, is true and correct (**Contractor SHOULD INITIAL ONLY ONE BOX**):

| CONTRACTOR: Please Initial ONE Box Below If Statement Is TRUE | STATEMENT |
|---|---|
| _____ | 1. Contractor has NO employees; and he/she IS domiciled in a state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. Accordingly, as REQUIRED by Section 10(B)(2) of this Agreement, **Contractor HAS purchased workers' compensation insurance coverage for himself/herself**. <u>Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy, showing principal coverage in Iowa and in the state in which the work will be principally localized (as required by Sections 10(B)(2) and 10(C) of this Agreement is attached hereto</u>; **OR** |
| _____ | 2. Contractor has NO employees; and he/she IS domiciled in Kansas, Mississippi, or Utah. Accordingly, as REQUIRED by Section 10(B)(2) of this Agreement, **Contractor HAS purchased workers' compensation insurance coverage or occupational accident insurance coverage for himself/herself**. <u>The certificate of insurance and declarations page from Contractor's insurance policy (as required by Section 10(C) of this Agreement) is attached hereto</u>; **OR** |
| _____ | 3. Contractor has NO employees; and he/she IS NOT domiciled in Kansas, Mississippi, Utah, or any state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. **Contractor has elected NOT to purchase workers' compensation insurance coverage for himself/herself**. <u>NOTE</u>: In some states (consult Carrier as to which ones), workers' compensation coverage under this Agreement shall be mandatory if Contractor is a corporation or limited liability company; **OR** |
| _____ | 4. Contractor has NO employees; and he/she IS NOT domiciled in a state whose statutes, regulations, or case law Carrier interprets to deem owner-operators to be employees absent worker's compensation coverage secured by the owner-operator. **Contractor has nonetheless elected to purchase workers' compensation insurance coverage for himself/herself**. <u>Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy</u>; **OR** |
| _____ | 5. Contractor has **[insert number]____** employees and, as REQUIRED by Section 10(B)(2) of this Agreement, **HAS purchased workers' compensation insurance coverage (or occupational accident insurance coverage where both state law allows and Carrier approves) for himself/herself (if Contractor is a natural person) and those of Contractor's drivers, employees, agents, and other persons required to be covered** under the workers' compensation law of any state that is reasonably likely to have jurisdiction over Contractor's business operations. <u>Attached hereto is the certificate of insurance, and the declarations page from Contractor's workers' compensation insurance policy, showing principal coverage in Iowa and in the state in which the work will be principally localized (as required by Sections 10(B)(2) and 10(C) of this Agreement)</u>. |

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 37 of 57

**7. PRINCIPAL IN GENERAL ESCROW FUND.** The Principal Amount in the General Escrow Fund shall be Three Thousand Dollars ($ 3,000), to be deducted, pursuant to Agreement § 8(A)(1), at fifty dollars ($50) per week.

THIS APPENDIX A, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at 12:01 a.m. Eastern Time on the _3rd of March 2022_ .

Contractor: <u>HARLEY KELCHNER</u>

By: _Harley B. Kell_
<mark>Signature</mark>

<u>HARLEY KELCHNER</u>
Authorized Representative's Name (Typed or Printed)

<u>OWNER OPERATOR</u>
Title

_____
Driver's Name if Different

_3/2/22_
<mark>Date</mark>

<u>105170</u>
Tractor No.

Carrier: CRST SPECIALIZED TRANSPORTATION, INC.

By: _Cammy Smith_
SAFETY

<u>CAMMY SMITH/MANAGER</u>
Printed Name and Title

_3.3.2022_
Date

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

## QUALCOMM INC. OMNITRACS™ SYSTEM RECEIPT

Contractor hereby acknowledges that the following items of Qualcomm Inc. Omnitracs™ System satellite communications equipment have been received by him/her from, and installed in Contractor's Equipment (truck tractor) indicated below, by Carrier:

### Each Qualcomm Inc. OmniTracs™ System Unit:

| | |
|---|---|
| 1 | Communications Unit (Black Box) |
| 1 | Display Unit (Keyboard and Screen) |

**Equipment (Tractor) #**
105170

**Contractor: HARLEY KELCHNER**

By: _____
Signature

**HARLEY KELCHNER**
Authorized Representative's Name (Typed or Printed)

OWNER OPERATOR        _____
Title                              Driver's Name if Different

3/2/22                           105170
Date                            Tractor No.

## CRST FUEL PURCHASING PROGRAM

CRST Specialized Transportation, Inc. ("CRST") is committed to giving you options for reducing your operating costs, by offering you discount-purchase programs. By operating with CRST, you can choose to take advantage of our volume buying power, though always remaining free to make different purchases using cash or personal credit cards. When you use your CRST Advance/Fuel card, you qualify for a fuel discount below **cash** (pump price in the amounts indicated at the nationwide fuel chains listed below. These discounts apply only when you use your CRST Advance/Fuel card.



www.loves.com
**18 cents off cash price per gallon**



www.pilotflyingj.com
**18 cents off cash price per gallon**



www.petrotruckstops.com
**18 cents off cash price per gallon**



www.pilotflyingj.com
**18 cents off cash price per gallon**



www.tatravelcenters.com
**18 cents off cash price per gallon**

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 40 of 57

## CONTRACTOR COMPENSATION

**1. CONTRACTOR'S GROSS COMPENSATION.** As the total gross compensation for the use of the Equipment and for everything furnished, provided, done by, or required of Contractor in connection with this Agreement, including but not limited to driving of the Equipment and all non-driving activities such as conducting pre- and post-trip inspections of the Equipment, waiting to load or unload (detention), loading or unloading if required, fueling, repairing and maintaining the Equipment, hooking and unhooking empty trailers, preparing logbooks and other paperwork, and other activities and services, Carrier shall pay Contractor Base Compensation plus Additional Compensation as follows:

**1(A). Base Compensation.**

**1(A)(1). Applicable Rates**

**CONTRACTOR'S COMPENSATION**

SERVICES/REVENUE
**TRANSPORTATION SERVICES – CRST SPECIALIZED**           **Mileage Rate**
**TRANSPORTATION SHIPMENTS**

| | |
|---|---|
| **A. General Service Shipments – Single Driver** | |
| 1. Mileage Rate – Single Driver | $0.87 |
| 2. Fuel Surcharge | Per Schedule |
| 3. Liability Insurance Surcharge | N/A |
| **B. General Service Shipments – Double Operation** | |
| 1. Mileage Rate – Double Operation | $1.06 |
| 2. Fuel Surcharge | Per Schedule |
| 3. Liability Insurance Surcharge | N/A |
| **C. Truckload Solutions Shipments – Single Driver** | |
| 1. Mileage Rate – Single Driver | $1.06 |
| 2. Fuel Surcharge | Per Schedule |
| 3. Liability Insurance Surcharge | N/A |
| **D. Truckload Solutions Shipments – Double Operation (Team- must be 2 drivers)** | |
| 1. Mileage Rate – Double Operation | $1.14 |
| 2. Fuel Surcharge | Per Schedule |
| 3. Liability Insurance Surcharge | N/A |
| | |
| | |
| | |
| | |

**1(A)(2). Definitions.** Throughout this Agreement –

**1(A)(2)(a).** <u>Mileage Determinations</u> shall be determined by reference to the most current edition of the Household Carriers' Bureau Mileage Guide that has been published, or the most current edition of the replacement or substitute mileage guide utilized by Carrier in the event the Household Goods Carriers' Bureau Mileage Guide is discontinued.

**1(A)(2)(b).**  <u>Intra-City Mileage</u> **shall** be compensated at the applicable mileage rate for actual miles traveled, while making multiple pick-ups or deliveries within the corporate limits of the following cities:

| | | | |
|---|---|---|---|
| Albuquerque | Detroit | Milwaukee | Pittsburgh |
| Atlanta | El Paso | Minneapolis | Portland |
| Baltimore | Fort Worth | Montreal | San Antonio |
| Birmingham | Houston | Nashville | San Diego |
| Boston | Indianapolis | New Orleans | San Francisco |
| Buffalo | Jacksonville | New York City | San Jose |
| Chicago | Kansas City | (5 boroughs) | Saint Louis |
| Cincinnati | Las Vegas | Oklahoma City | Seattle |
| Cleveland | Louisville | Omaha | Toledo |
| Columbus | Los Angeles | Orlando | Toronto |
| Dallas | Memphis | Philadelphia | Tulsa |
| Denver | Miami | Phoenix | Washington D.C. |

Contractor shall also be compensated at the applicable mileage rate for actual miles traveled while making extra stops on a single shipment within any one city or town. Any Intracity Mileage claimed by Contractor must be noted by Contractor on the mileage voucher and reference the applicable contract number before Contractor shall be compensated for Intracity mileage.

**1(A)(2)(c).**  <u>Authorized Out-of-Route Mileage</u> will be reimbursed to Contractor for authorized out-of-route mileage caused by or related to highway detours, weather conditions, equipment repairs or transfers, only after consulting with Carrier's representatives prior to traveling out-of-route.

## 1(B).  Additional Compensation.

**1(B)(1).**  <u>Fuel-Related</u> **See** Fuel Table Attached.

**1(B)(2).**  <u>Weight/Scale Tickets</u> shall be reimbursed to the Contractor at the actual cost of necessary scale weight tickets, when the scale tickets are properly dated and accompany the shipping papers and the weigh-master's charge is indicated on the applicable bill of lading.

**1(B)(3).**  <u>Trailer Wash</u> shall be reimbursed to the Contractor up to $50.00 for each trailer wash (maximum of $650.00 per calendar year), provided proper documentation is submitted within ninety (90) days of the date the washing cost is incurred by Contractor.

**1(B)(4).**  <u>Promotional Allowance</u> At the option of the Carrier, Carrier shall make available to Contractor an annual promotional allowance of $150.00 worth of merchandise each, such as uniforms, business cards and other items bearing Carrier's trade name or logo, to be used in promoting the name of the Carrier.

**1(B)(5).**  <u>Telephone Expenses</u> shall be reimbursed to Contractor at a flat rate of $50 per calendar month up to a maximum of $600 per calendar year for telephone communication expenses. Contractor must be in service during the month to receive the reimbursement.

**1(B)(6).**  <u>Accessorial Charges</u> shall be reimbursed based on the following Accessorial Services Table:

| ADDITIONAL OR ACCESSORIAL SERVICES - | |
|---|---|
| **A.  General Service Shipments** | |
| 1.        Full Service at customer location - | $1.50 cwt |
| 2.        Dock to dock at customer location | $1.00 cwt |
| 3.        Corporate Distribution Center, Carrier Agent Location or Van to Van | $1.00 cwt |
| 4.        Dropping or Pickup of a loaded trailer per activity (regardless of weight) | $35.00 |
| | |

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 42 of 57

| B. Truckload Blanketwrap Shipments | |
|---|---|
| 1. Full Service at customer location - | $0.60 cwt |
| 2. Corporate Distribution Center, Carrier Agent Location | $0.20 cwt |
| 3. Van to Van | $0.40 cwt |
| 4. Shipper Load/Unload Tariff 303 Section 4 | $0.60 cwt loading<br>$0.85 cwt unloading |
| 5. Shipper Load/Unload Tariff 30795 Section 2 (broker loads) | $0.00 cwt |
| 6. Dropping or Pickup of a loaded trailer per activity (regardless of weight) | $45.00 |

| C. Shipments unrelated to Rate Tariff Document H302 | |
|---|---|

Billable Services - paid on billed accessorial rates for the applicable service listed below when Properly Authorized and Documented

| | |
|---|---|
| On Site Services | 80% |
| Extra Labor | 80% |
| Auxiliary Service | 80% |
| Overtime | 80% |
| Layover | 80% |
| Waiting time | 80% |
| Stair Carry | 80% |
| Extra Stops | 80% |
| Driver Detention | 80% |
| Long Carry | 80% |
| Elevator Carry | 80% |
| Debris Removal | 80% |
| Driver Detention | 80% |
| Extra Pickups or Deliveries paid at billed rate | 67% |

| D. Shipments related to Rate Tariff Document H302 | |
|---|---|

Billable Services - paid on billed accessorial rates for the applicable service listed below when Properly Authorized and Documented

| | |
|---|---|
| On Site Services | 80% |
| Extra Labor | 80% |
| Auxiliary Service | 80% |
| Overtime | 80% |
| Layover | 80% |
| Waiting time | 80% |
| Stair Carry | 80% |
| Extra Stops | 80% |
| Driver Detention | 80% |
| Long Carry | 80% |
| Elevator Carry | 80% |
| Debris Removal | 80% |
| Driver Detention | 80% |
| Long Carry | 80% |
| Elevator Carry | 80% |
| Debris Removal | 80% |
| Driver Detention | 80% |

| Extra Pickups or Deliveries paid at billed rate | 67% |
|---|---|

**2. CHANGES IN COMPENSATION.**

**2(A). Temporary Change.** Carrier and Contractor may make a temporary change in Contractor's compensation to be paid for one or more services relating to a shipment or shipments under this Agreement by both parties' signing (either manually or, as indicated in Section 2(B) of this Appendix, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply. Contractor shall be under no obligation to accept the change in compensation by signing such an addendum, and Carrier shall not terminate this Agreement for Contractor's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in such event, Carrier are hereby authorized not to assign you loads covered by such change in the meantime. Such temporary change shall not be effective for more than twenty (20) calendar days.

**2(B). Ongoing Change.** If any aspect of Contractor's compensation set forth in this **Appendix B** will be changing on an ongoing basis, Contractor shall be provided a proposed addendum containing the change at least twenty (20) calendar days in advance by hand, fax, overnight delivery, or, if the parties have agreed to such forms of communication by both signing **Appendix D (Consent to Conduct Business by Electronic Methods)** of, or a similar addendum to, this Agreement, by the electronic means specified in that appendix. If Contractor wishes to continue operating on behalf of Carrier, he/she shall, by the effective date and time shown on the addendum, **EITHER** manually sign the addendum and deliver it to Carrier by hand, fax, or overnight delivery **OR**, if both parties have signed **Appendix D** of, or a similar addendum to, this Agreement, by signing the addendum by the electronic means specified in that appendix. If Contractor does not take one of these actions consenting to the change within the time indicated on the addendum,, the addendum shall operate as a notice of termination under Section 14 of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum, provided that, in such event, Contractor shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

**3. LONGEVITY COMPENSATION.** Contractors will be given additional monies for longevity. The additional compensation will be adjusted at the beginning of each calendar year for those that meet the requirements by 12/31 of the previous year. This additional compensation will be applicable for both the loaded and empty mileage rates listed above in Compensation Section 1(A). These rates apply for consecutive years with CRST Specialized Transportation, Inc. See table below.

| 2-4 years | .02 cpm |
|---|---|
| 5-9 years | .03 cpm |
| 10+ years | .05 cpm |

**4. EARNINGS ADJUSTMENTS.**

**4(A). Billing Error.** If Carrier discovers and corrects an error in, or in Carrier's sole judgment decides to retroactively increase or decrease, the amount of any item billed to Carrier's customer on a shipment that Contractor hauled and for which Contractor was compensated pursuant to a percentage of Adjusted Gross Revenue, Carrier shall credit to, or deduct from, Contractor's gross compensation at the next settlement a share – corresponding to the percentage of such revenue normally payable to Contractor for the shipment – of the additional amount Carrier actually collects or refunds in remedying the error, provided that Carrier shall not deduct from Contractor's gross compensation a share of the amount Carrier refunds if the amount to be deducted from Contractor's compensation is $25.00 or less. Carrier shall provide Contractor, before or at the time of settlement, with a copy of the amended rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill, and shall otherwise meet the requirements of Section 4(b) of this Agreement with respect to the shipment.

**4(B). Billed Amount Uncollectible.** If, after making a commercially reasonable effort to do so, Carrier is unable to collect from a customer the full amount of any item billed to the customer for a shipment that Contractor hauled and for which Contractor was compensated pursuant to a percentage of Adjusted Gross Revenue, Carrier shall deduct from Contractor's gross compensation at the next settlement a share of the unpaid amount that corresponds to the percentage of such revenue normally payable to Contractor for the shipment. Carrier shall give Contractor, before or at the time of settlement, a written explanation of Carrier's efforts to collect from its customer and the computation of the amount being deducted from Contractor's gross compensation, General Escrow Fund, and any other amounts due Contractor from Carrier.

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 44 of 57

**5. METHOD OF DISBURSEMENT OF SETTLEMENT COMPENSATION.** Carrier shall pay Contractor any net settlement compensation due through the **OPTION** specified by Contractor below (with no administrative fee to Carrier).

**Contractor SHOULD INITIAL ONLY ONE OF THESE THREE OPTIONS (on the line to the left):**

_____ **OPTION 1:** Carrier shall pay settlement compensation by issuing Contractor Comcheks, the Contractor is responsible for all fees associated with cashing the Comcheks.

_____ **OPTION 2 (Weekly Payments via Carrier Bank Check – Mailed):** Carrier shall pay settlement compensation by sending a bank check by U.S. First Class Mail to the address required by Section 13 (Notices) of this Agreement or, if Contractor chooses the following different address, to:

_____
Address (Street, P.O. Box)

_____
City, State & Zip Code

_____ **OPTION 3 (Weekly Payments via Direct deposit):** Carrier shall pay any Settlement Compensation by depositing the compensation into Contractors designated bank account.

**6. METHOD OF DELIVERY OF SETTLEMENT STATEMENT.** Carrier shall deliver Settlement Statements, including any attachments, to Contractor online. Carrier shall post the Settlement Statements on the password-protected webpage, accessible only to Carrier and Contractor, identified in **Appendix D** of this Agreement if the parties have agreed to online communication by both parties so indicating in and then signing **Appendix D**.

THIS APPENDIX B, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at 12:01 a.m. Eastern Time on the _____.

Contractor: HARLEY KELCHNER

By: _____
Signature

**HARLEY KELCHNER**
Authorized Representative's Name (Typed or Printed)

OWNER_____    _____
Title                     Driver's Name if Different

3/1/22_____         105170
Date                      Tractor No.

Carrier: CRST SPECIALIZED TRANSPORTATION, INC.

By: _____
SAFETY

**CAMMY SMITH/MANAGER**
Printed Name and Title

3.3.2022_____
Date

5001 US Hwy 30 West
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

<u>APPENDIX C</u>

## SUBLEASE OF EQUIPMENT LEASED TO

Through this agreement and pursuant to 49 C.F.R. § 376.12(c)(2) ("Sublease"), the undersigned _____ ("Sublease Carrier") agrees to lease from CRST Specialized Transportation, Inc.. ("Carrier"), and Carrier to lease to Sublease Carrier, the following commercial motor vehicle equipment ("Equipment"), currently under lease from _____ ("Contractor"):

| CONTRACTOR'S EQUIPMENT | CARRIER UNIT # | YEAR | MAKE | MODEL | SERIAL (VIN) # | BASE PLATE # |
|---|---|---|---|---|---|---|
| Tractor | | | | | | |

1. **TERM.** Absent default, this Sublease shall begin at the time(s) set forth on completed EQUIPMENT Receipt(s), in the form attached hereto, that Sublease Carrier shall furnish to Carrier ("Effective Date"), and end when possession of the Equipment is returned to Carrier. This Sublease may be terminated at any time for any reason by either party on oral, followed by written, notice of termination to the other party. If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of Sublease Carrier or Carrier under this Sublease, such liability or entitlement shall continue, notwithstanding the termination of this Sublease, until such liability or entitlement is satisfied in full.

2. **IDENTIFICATION OF EQUIPMENT.** Sublease Carrier shall ensure that for the duration of the Sublease, the identification of equipment requirements in 49 C.F.R. § 376.11(c) are complied with by removing or covering up all of Carrier's identification on the Equipment and displaying instead Sublease Carrier's identification.

3. **CONTROL AND RESPONSIBILITY.** Sublease Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the Sublease from the time possession is taken by the Sublease Carrier and the receipt required under 49 C.F.R. § 376.11(b) is given to Carrier until possession of the Equipment is returned to Carrier. The foregoing declarations are made in order to comply with FMCSA regulations (49 C.F.R. § 376.12(c)(1)) and shall not be used to classify Contractor as an employee of Sublease Carrier or Carrier. As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether Contractor and Contractor's drivers are independent contractors or employees of Sublease Carrier or Carrier and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements".

4. <u>**INDEMNIFICATION. Sublease Carrier shall defend, indemnify, and hold harmless Carrier from any claim (including any for which Carrier not indemnified by Carrier's insurance and any claim of loss of or damage to the Equipment or to Carrier's other property) of loss, damage, delay, fine, civil penalty, or expense, including reasonable attorney's fees and costs of litigation (together "Damages") that Carrier pays or otherwise incurs arising out of or in connection with the Sublease Carrier's or Contractor's (including their respective agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions.**</u>

5. **INSURANCE.** Sublease Carrier agrees to, and warrants that Sublease Carrier does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least the amounts required by Federal Motor Carrier Safety Administration regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, covering the Equipment for the duration of this Sublease. These insurance coverages shall be primary, as between Sublease Carrier and Carrier, to any insurance coverages that Carrier may maintain. Sublease Carrier shall evidence the insurance coverages by furnishing to Carrier, along with this executed Sublease, a valid certificate of insurance.

6. **SUBLEASE CARRIER'S COMPENSATION OF CONTRACTOR.** Sublease Carrier shall enter into an independent contractor operating agreement with Contractor regarding compensation (including the sublease payments owed to Carrier pursuant to Section 7 of this Appendix) and other terms that complies with the Federal Truth-in-Leasing Regulations, 49 C.F.R. Part 376, and shall pay Contractor the agreed compensation, within (fifteen) 15 calendar days after Contractor submits to Sublease Carrier the driver log books required by the U.S. Department of Transportation and those documents necessary for Sublease Carrier to secure payment of freight charges from the shipper (together "Sublease Trip Documents").

7. **SUBLEASE PAYMENTS.** As consideration for this Sublease, Sublease Carrier shall remit to Contractor at the same time Sublease Carrier pays compensation to Contractor for a trip, and Contractor has agreed to remit the same amount to Carrier, a $150-per-trip Alternative Use Fee.

Case 1:24-cv-00082-CJW-KEM    Document 28-2    Filed 10/17/24    Page 46 of 57

8.      **DRIVER LOGS.**  Sublease Carrier shall obtain from Contractor a copy of all driver logs after each trip.  All driver logs should name both Carrier and Sublease Carrier; show all duty time for each 24-hour period of each trip; and the beginning and finishing time (designating a.m. or p.m.) worked for each identified motor carrier.  Pursuant to 49 C.F.R. § 395.8(j), before each Sublease trip, Contractor shall provide to Sublease Carrier a signed statement stating the Contractor's total time on duty during the immediately preceding seven days and the time at which Contractor was last relieved from duty prior to beginning work for CARRIER.

9.      **CONTROLLED SUBSTANCES TESTING PROGRAM.**  Sublease Carrier shall obtain from Carrier at least once every six months thereafter (if subleasing is continuing even intermittently) the following information relating to Carrier's controlled substances testing program: the name and address of the program; a verification that Contractor participates or participated in the program; a verification that the program conforms to 49 C.F.R. Part 40; a verification that Contractor is qualified under 49 C.F.R. Part 382, including that Contractor has not refused to be tested for controlled substances; the date Contractor was last tested for controlled substances; and the results of any tests taken within the previous six months and any other violations of Subpart B of 49 C.F.R. Part 382.  If Sublease Carrier cannot verify that Contractor is participating in a controlled substances testing program in accordance with 49 C.F.R. Parts 40 and 382, Sublease Carrier shall administer an initial controlled substances test to Contractor.

10.      **QUALIFICATION CERTIFICATE.**  By executing, along with Contractor, the attached "Qualification Certificate", Carrier hereby certifies that Contractor is fully qualified to drive a commercial motor vehicle under the rules in 49 C.F.R. Part 391.  Pursuant to 49 C.F.R. § 391.65(b)(1), Sublease Carrier and Carrier agree that Sublease Carrier has verified the validity of the Qualification Certificate.  Sublease Carrier agrees to maintain the Qualification Certificate for a period of three years from the Effective Date of this Sublease.

11.      **DRIVER VEHICLE INSPECTION REPORTS AND REPAIR RECORDS.**  For the term of this Sublease, Carrier shall require Contractor to prepare and submit a written Driver Vehicle Inspection Report complying with the requirements of 49 C.F.R. § 396.11, and Carrier shall obtain from Contractor and maintain all records relating to repairs of the Equipment.

12.      **INTERNATIONAL REGISTRATION PLAN REPORTING.**  With respect to International Registration Plan reporting, Sublease Carrier shall be responsible for reporting all miles traveled by Contractor's Equipment and in what state(s).  Sublease Carrier shall provide Carrier promptly with documentation showing all miles traveled by state for each trip.

13.      **INDEPENDENT CONTRACTOR RELATIONSHIP.**  It is the intent of the parties to this Sublease that Sublease Carrier, Carrier, and Contractor shall all be independent contractors.

14.      **COPY OF SUBLEASE.**  Sublease Carrier shall ensure that a copy of the Sublease is carried in the Equipment for the duration of the Sublease.

15.      **GENERAL.**  If any provision (including any sentence or part of a sentence) of this Sublease (including its appendices and addendums) is deemed invalid for any reason whatsoever, the Sublease shall be void only as to such provision, and this Sublease shall remain otherwise binding between the parties.  This Sublease (including the appendices and any addendums) constitute the entire Sublease between Carrier and Sublease Carrier pertaining to the subject matter contained herein and fully replaces and supersedes all prior and contemporaneous agreements, representations, and understandings.  No supplement, modification, or amendment to this Sublease shall be binding unless in writing and signed by both parties. Original, faxed, or otherwise imaged signatures shall be equally valid.

16.      **GOVERNING LAW AND FORUM.**  This Sublease shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of Iowa, without regard to the choice-of-law rules of Iowa or any other jurisdiction.  THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS SUBLEASE, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING ALLEN COUNTY, INDIANA, CARRIER AND SUBLEASE CARRIER HEREBY CONSENT TO THE JURISDICTION AND VENUE OF SUCH COURTS.

IN WITNESS WHEREOF, the parties hereby execute this Sublease on this _____ day of _____, 20__.

CARRIER: CRST SPECIALIZED TRANSPORTATION, INC.   SUBLEASE CARRIER:_____

Fed. Taxpayer ID No. _____

By: _____
      Signature

By: _____
      Signature

_____
Authorized Rep.'s Name (Typed or Printed)

_____
Authorized Rep.'s Name (Typed or Printed)

_____
Title

_____
Title

5001 U.S. Hwy 30 West
Fort Wayne. IN 46818
Tel. 260-429-1848
Fax 260-429-3679

_____
Address (Street, P.O. Box)

_____
City, State & Zip Code

_____    _____
Mobile Telephone Number       Fax Number

_____
Email Address

Case 1:24-cv-00082-CJW-KEM   Document 28-2   Filed 10/17/24   Page 48 of 57

## QUALIFICATION CERTIFICATE

Pursuant to 49 C.F.R. § 391.65, CRST Specialized Transportation, Inc. ("Carrier") certifies that the undersigned independent contractor ("Contractor"), as defined in 49 C.F.R. § 390.5, is regularly driving a commercial motor vehicle operated by CARRIER and is fully qualified under 49 C.F.R. Part 391. His current medical examiner's certificate expires on 3/26/2023. This Qualification Certificate expires on 3/26/2023 (a date not later than the expiration of the medical examiner's certificate).

Issued on 3/26/2021 by:

**CONTRACTOR:** HARLEY KELCHNER
*Check one:*
☐ Corporation
☐ Limited Liability Company
☐ Partnership
☑ Sole Proprietorship

*Organized in State of:* _____

*With Employer ID No.:* _____

*OR Social Security No. (last 4 digits):* 3001

By: _____
Signature

**HARLEY KELCHNER**
Authorized Rep.'s Name (Typed or Printed)

OWNER OPERATOR
Title

33350 SW DEGGELLER COURT
Address (Street, P.O. Box)

PALM CITY FL 34990
City, State & Zip Code

772-521-3863
Mobile Telephone Number

harbek2000@gmail.com
Email Address

3/2/22
Date

**Carrier: CRST SPECIALIZED TRANSPORTATION, INC.**

By: _____
SAFETY

CAMMY SMITH/MANAGER
Printed Name and Title

3.3.2022
Date

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

<u>APPENDIX D</u>

## CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS

1. Pursuant to Regulatory Guidance Concerning Electronic Signatures and Documents, 74 Fed. Reg. 411 (Jan. 4, 2011), issued by the Federal Motor Carrier Safety Administration ("FMCSA"), CRST Specialized Transportation,, Inc. ("Carrier") and the contractor who completes the signature block below ("Contractor") hereby consent and agree to conduct business using one or more of the following methods:

1(A). **Captured Image Method.** Under the Captured Image Method, an image of a scripted name or legal mark is created using a stylus on an electronic pad, and that image is then used to populate an electronic version of the document to be signed electronically by Carrier, Contractor, or both, as authorized by FMCSA in its guidance in response to Question 6 at 74 Fed. Reg. 411, 413.

1(B). **Communications Equipment Method.** Under the Communications Equipment Method, electronic signatures are effected via the Communications Equipment System installed in the Equipment as described in Section 5 of this Agreement, if any, in a manner that identifies and authenticates Contractor as the user of the System and the source of the electronic communication (i.e., by Contractor's logging onto the System with Contractor's unique Driver Number and Owner Number and electronically signing messages by appending to the electronic communication the last four digits of Contractor's Social Security Number or another form of identification known only to Contractor).

1(C). **Web-Portal Method.** Under the Web-Portal Method, electronic signatures are accomplished via a web portal in a manner that identifies and authenticates Contractor as the source of the electronic communication transmitted through the web portal (i.e., by Contractor's logging onto the web portal using unique credentials) and indicates Contractor's approval of the information contained in the electronic communication (i.e., by Contractor's clicking on an "I Accept" dialog box after reviewing electronic communications on the web portal).

2. This consent encompasses the use of electronic methods to accomplish the signature of any document, including, without limitation, any supplement, modification, addendum, amendment, notice, consent and/or waiver, required by this Agreement or required by FMCSA regulations to be generated and maintained (or exchanged by private parties), including, without limitation, applications, driver histories and other qualification records, leases formed under 49 C.F.R. Part 376, driver-vehicle inspection reports, and records of duty status.

3. The parties agree that when Contractor uses any of the above electronic methods described in Section 1 of this Appendix to accomplish electronic signatures, the method: (1) identifies and authenticates Contractor as the source of the electronic communication; (2) indicates Contractor's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature.

4. The parties agree that when Carrier uses any of the above electronic methods described in Section 1 of this Appendix to accomplish electronic signatures, the method: (1) identifies and authenticates Carrier as the source of the electronic communication; (2) indicates Carrier's approval of the information contained in the electronic communication; and (3) produces an electronic document with the same integrity, accuracy, and accessibility as a paper document or handwritten signature.

5. Either party may elect, with respect to any document, to use a manual/hardcopy signature, provided that such election shall not preclude the other party from applying an electronic signature, of the above-specified kind, to the same document.

**THIS APPENDIX D is agreed to by the undersigned parties as of the latest date set forth below.**

Contractor: <u>HARLEY KELCHNER</u>
               Name (Typed or Printed)

If Sole Proprietor:   <u>3001</u>
               Social Security No. (last 4 digits)

If Corp., Prtnrship, or LLC:    _____
               Fed. Taxpayer ID No.

By: _____
    Signature

<u>HARLEY KELCHNER</u>
Authorized Representative's Name (Typed or Printed)

<u>OWNER OPERATOR</u>
Title

<u>33350 SW DEGGELLER COURT</u>
Address (Street, P.O. Box)

<u>PALM CITY, FL 34990</u>
City, State & Zip Code

<u>772-521-3863</u>
Telephone Number

_____
Email Address

_____
Date

Carrier: **CRST SPECIALIZED TRANSPORTATION, INC.**

By: _____
       SAFETY

<u>CAMMY SMITH/MANAGER</u>
Printed Name and Title

5.3.2022
_____
Date

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

CRST Specialized Transportation, Inc. ICOA         Rev. 10/02/13
CONSENT TO CONDUCT BUSINESS USING ELECTRONIC METHODS – Page D-2
Case 1:24-cv-00082-CJW-KEM   Document 28-2   Filed 10/17/24   Page 51 of 57

**APPENDIX E**

**PRIVACY-RELATED DISCLOSURES AND CONSENT FORM**

***SIGNATURE NEEDED FROM CONTRACTOR OR, IF DIFFERENT, CONTRACTOR'S DRIVER***

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

**TO ALL CURRENT AND NEW CRST SPECIALIZED TRANSPORTATION, INC. CONTRACTORS AND THEIR DRIVERS:**

<u>EOBR Requirement and Its Purposes.</u>  All Contractors that enter into an Independent Contractor Operating Agreement ("Agreement") with CRST Specialized Transportation, Inc. ("Carrier") have, under the Agreement, agreed to maintain in each unit of Equipment (as defined in Section 1(A) of the Agreement) a compliant and functioning Electronic On-Board Recorder (referred to in the Agreement and this Form as "Communication System/EOBR" or simply "EOBR")), also sometimes referred to as an Electronic Logging Device ("ELD").  The principal purpose of this new requirement is to assist Contractor's drivers and Carrier in complying with Federal Motor Carrier Safety Administration's ("FMCSA") Hours of Service regulations and other Applicable Law (as defined in Section 4 of the Agreement) and in avoiding adverse safety scores and FMCSA interventions under FMCSA's Compliance, Safety, Accountability ("CSA") Program.  The EOBR may also assist in providing load dispatching and tracking services to meet the requirements of Carrier's customers.

<u>Categories of Electronic Information Collected by EOBR.</u>  The EOBR is capable of collecting various categories of data regarding the Equipment and its operation, including but not limited to (collectively "Electronic Information"):

- Name of the driver and any co-driver(s), and corresponding driver identification information
- Duty status (that is, "Off Duty," "Sleeper Berth," "Driving," and "On-Duty Not Driving")
- Date and time the Equipment is in operation
- Location of the Equipment (as determined by satellite or terrestrial sources)
- Distance travelled (including when the Equipment crosses state lines)
- Name and U.S. Department of Transportation number of Carrier
- 24-hour period starting time
- Multiday basis used by Carrier to compute cumulative duty hours and driving time
- Hours in each duty status for the 24-hour period, and total hours
- Equipment number
- Load information, such as shipping document number(s), or name of shipper and commodity(ies)
- Fuel use, including when the Equipment is refuelled
- Speed of the Equipment
- Hard-braking events
- Power-on self-tests and diagnostic error codes.

The Electronic Information is transmitted from your Equipment to the third-party vendor of the EOBR (*see below*) and then from the vendor to Carrier. Carrier may from time to time access certain categories of the Electronic Information in furtherance of its efforts to comply with Applicable Law, including FMCSA's Hours of Service regulations, or to meet customer requirements.

<u>Carrier Uses of the Electronic Information.</u>  The third-party vendor – Omnitracs, Inc. (formerly Qualcomm) is responsible for the collection and storage of the Electronic Information.  Carrier does not collect or store the Electronic Information, but has access to the Electronic Information and reserves the right to request that the third-party vendor collect and store the Electronic Information for as long as the Equipment with the EOBR installed operates under lease to Carrier, and for a reasonable time thereafter.  If Contractors or their drivers have questions about the safeguards those companies have put in place to protect against the loss, unauthorized access, use, destruction, or improper disclosure of the Electronic Information may contact Omnitracs, Inc. at http://www.omnitracs.com Carrier has reasonable safeguards in place to secure the Electronic Information it receives from the third-party vendors, and limits access to the Electronic Information to authorized individuals who need to know the information in order to comply with Applicable Law, including the Hours of Service Regulations.

Right to Review Electronic Information. Contractor and any Contractor's driver shall have the right, on written request to Carrier, to review the collected Electronic Information that Carrier itself continues to have access to, but only Electronic Information relating to the requesting Contractor (including that Contractor's drivers') or the requesting driver, respectively. A written request for such a review should be addressed to me by email or U.S. Mail.

Signing This Form. By signing below, the listed Contractor (whether or not a driver) and Driver (if any, employed by Contractor) represents that he/she has read and understood the privacy-related disclosures described above.

CONSENT TO CARRIER'S ACCESSING CERTAIN SAFETY-PERFORMANCE DATA OF DRIVERS. In addition, by signing below, the listed Contractor (if a driver) and Driver (if any, employed by Contractor) authorize Carrier to access applicable driver files, FMCSA Safety Measurement System ("SMS") safety scores and other data, and FMCSA's Pre-Employment Screening System ("PSP") reports on such driver, both during the qualification process and at any time thereafter.

If you have questions regarding the Electronic Information collected through the EOBR or how the Electronic Information is accessed and used by Carrier, please feel free to contact me. Thank you.

Perry Moser
Vice President, Driver Safety & Success
CRST Specialized Transportation, Inc
Tel 800-736-2778

| If you are a Contractor (or authorized officer, partner, member, or proprietor of one) for CRST Specialized Transportation, Inc., please complete this signature block: | OR, if you are a professional truck driver employed by such a Contractor, please complete this signature block: |
|---|---|
| **CONTRACTOR** (Print Name): <br><br> **HARLEY KELCHNER** <br><br> Employer ID No.: _____ <br><br> OR Soc. Sec. No. (last 4 digits only): 3001 <br><br> By: _~signature~_ <br> <mark>Signature</mark> <br><br> **HARLEY KELCHNER** <br> Printed Name of Authorized Rep., if any <br><br> OWNER OPERATOR <br> Title <br><br> 772-521-3863 <br> Mobile Telephone Number <br><br> 3/2/22 <br> <mark>Date</mark> | **DRIVER** (Print Name): _____ <br> Soc. Sec. No. (last 4 digits only): _____ <br> Employed by CONTRACTOR (Print Name): <br><br> _____ <br><br> By: _____ <br> Signature <br><br> _____ <br> Mobile Telephone Number <br><br> _____ <br> Date |

## APPENDIX F

### BASE PLATE PRECOLLECTION PROGRAM

1.   Carrier will implement the Precollection program in phases based upon the Contractor's ICOA status with Carrier as defined above.

(a)  Established Contractor:

(i)     Projected Base Plate Renewal Costs will be precollected in 52 weekly charges to the Contractors commission statement beginning the first week of January and ending the last week of December for each of the applicable precollection cycle years.

(ii)    Immediately following the date upon which the Base Plate is renewed, Carrier shall reconcile the funds precollected for the applicable Base Plate costs with any non collected or excess costs being charged or credited to the Contractor's commission statement at that time. After the precollection amounts have been initially determined, if the Contractor makes changes to his vehicle or operations which impacts his current Base Plate, such costs will be funded by Contractor immediately.  If such changes impact the Projected Base Plate Renewal Cost, the amount of funds being precollected shall be adjusted for the change in the Renewal Cost.

(b)  New Contractor: The precollection program will begin immediately with the signing of this addendum by the Contractor according to the following schedule.

(i)     The base plate costs paid in the current year and the Projected Base Plate Renewal Cost payable in the following year will be collected in the number of weeks between the date on which the new Contractor signs the COA and the second week of February of the following year by charging the Contractor's commission statement.

(ii)    The Projected Base Plate Renewal Cost to be paid in the third year of the Contractor being under a continuous COA with Carrier will be precollected in 46 weekly charges to the Contractor's commission statement beginning with the third week of February and ending the last week of December.

(iii)   The subsequent precollection year cycles will be the same as the Established Contractor in 52 weekly charges to the Contractor's commission statement beginning the first week of January and ending the last week of December.

(iv)    Immediately following the date upon which the Base Plate is renewed, Carrier shall reconcile the funds precollected for the applicable Base Plate costs with any non collected or excess costs being charged or credited to the Contractor's commission statement at that time.  After the precollection amounts have been initially determined, if the Contractor makes changes to his vehicle or operations which impacts his current Base Plate costs, such costs will be funded by Contractor immediately.  If such changes impact the Projected Base Plate Renewal Cost, the amount of funds being precollected shall be adjusted for the change in the Renewal Cost.

2.   Carrier shall track Contractor's Base Plate Precollection funds and Carrier shall pay interest on Contractor's Precollection funds in the same manner as Carrier pays interest on Contractor's "reserve fund" as defined in the COA.

3.   Contractor must submit a request in writing to Carrier if said Contractor does not want to participate in the Precollection program and such written notification must also stipulate that Contractor agrees to pay Carrier the projected base plate costs in accordance with Carrier's written notification of specific dates for such payments. Failure of Contractor to make such payments may result in Carrier's temporary disqualification of Contractor until such payments are made.

4.   In the event of termination of the ICOA, Carrier agrees to credit the Contractor's commission statement for the current balance in the Contractor's Base Plate Precollection Fund minus any amount owed for the current year base plate within forty five (45) days following termination.

THIS APPENDIX F, which completely replaces and supersedes any earlier appendix or addendum or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective at 12:01 a.m. Eastern Time on the _3rd of March 2022_ .

Contractor: HARLEY KELCHNER

By: _Harley Kell_
Signature

**HARLEY KELCHNER**
Authorized Representative's Name (Typed or Printed)

OWNER OPERATOR
Title

_3/2/22_
Date

Driver's Name if Different

105170
Tractor No.

Carrier: CRST SPECIALIZED TRANSPORTATION, INC.

By: _Cammy Smith_
SAFETY

CAMMY SMITH/MANAGER
Printed Name and Title

_3.3. 2022_
Date

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655

**CRST SPECIALIZED TRANSPORTATION, INC.**

**STATEMENT OF LEASE**

To the extent provided by the Independent Contractor Operating Agreement entered into between <u>HARLEY KELCHNER</u> and CRST Specialized Transportation, Inc. ("Carrier") on _3.3.2023_ ("COA" or "lease"), this Equipment is being operated by the undersigned Carrier. Contractor is the Equipment's "owner," as the latter term is defined by 49 C.F.R. § 376.2(d). The ICOA is for a term commencing at 12:01 a.m. Eastern Time on the _3rd of March 2022_, and ending at 11:59 p.m. Eastern Time on November 1, 2026, unless sooner terminated by either party pursuant to Section 14 of this Agreement and includes no restrictions relative to the commodities to be transported. The original of the ICOA is kept by Carrier at its headquarters address, shown below.

Pursuant to 49 C.F.R. § 376.11(c)(2), **A COPY OF THIS "STATEMENT OF LEASE" IS TO BE CARRIED ON THE EQUIPMENT DURING ALL PERIODS THAT, PURSUANT TO THE ICOA, THE EQUIPMENT IS BEING OPERATED BY OR ON BEHALF OF CARRIER.**

**Carrier: CRST SPECIALIZED TRANSPORTATION, INC.**

By: _Cammy Smith_
SAFETY

<u>CAMMY SMITH/MANAGER</u>
Printed Name and Title

_3.3.2022_
Date

5001 US Hwy 30 West Ste 101
Fort Wayne. IN 46818
Tel. 800-381-7709
Fax 260-470-8655