# EXHIBIT M

# FINDINGS ON
# COMMON LEASING ARRANGEMENTS
# AVAILABLE TO DRIVERS OF
# COMMERCIAL MOTOR VEHICLES
# INCLUDING LEASE-PURCHASE AGREEMENTS

## REPORT TO CONGRESS
### AND
## U.S. SECRETARIES OF TRANSPORTATION
### AND LABOR

A report pursuant to Section 23009(d) of the
Infrastructure Investment and Jobs Act (IIJA), Pub. L. 117-58,
also known as the Bipartisan Infrastructure Law (BIL)

Submitted by the Truck Leasing Task Force
Steve Rush, Chair
Tamara Brock
Paul Cullen, Esq.
Jim Jefferson
Joshua Krause
Kaitlyn Long
Lesley Tse, Esq.
Steve Viscelli, PhD

In Consultation with Emma Oppenheim, Ryan Kelly, and Theodore Wegner
of the Consumer Financial Protection Bureau

January 2025

## Introduction

The negative impact of inequitable truck lease-purchase programs offered and managed by motor carriers and related companies is a problem with which truck drivers and other industry stakeholders have struggled for decades. The negative impacts of inequitable lease-purchase programs affect individual drivers (especially new drivers), the trucking workforce, the health of the industry, and roadway safety. Enumerable drivers report serious financial, professional, and psychological harms due to these programs.

In contrast, a few firms and the industry associations representing those firms argue that lease-purchase programs are a pathway for many truck drivers who lack capital and business experience to buy a truck and ultimately become a successful small-business owner.

The Truck Leasing Task Force (TLTF or the Task Force) began with a range of perspectives on lease-purchase programs, including members who believed lease-purchase programs could provide an important avenue to truck and small business ownership. Over the last year and half, however, the comments drivers and non-driver industry stakeholders provided in public meetings and submitted to the public docket, as well as data reviewed by TLTF, told a consistent and increasingly troubling story: lease-purchase programs cause widespread harm without offering meaningful scale opportunities for truck and small business ownership.

TLTF's findings are clear. It formed a consensus to recommend that such arrangements, whereby a motor carrier controls the work, compensation, and debts of the driver, should be prohibited. Lease-purchase programs are regularly established to enrich motor carriers at the expense of drivers. These programs promote a race-to-the-bottom in driver compensation and treatment, pushing qualified drivers out of the profession. Currently there are no effective checks on these programs or remedies for drivers harmed by them. Litigation, currently the only avenue for relief, can provide some remedy for the drivers involved, but has not led to reform of these programs.

Accordingly, the federal government must act in order to protect drivers. The Task Force agrees unanimously that the costs and harms of lease-purchase programs are so great that these programs should not be permitted. If lease-purchase programs are allowed to continue, they should be subject to a number of conditions that mitigate the inherent power imbalance of motor carriers over drivers and ensure that drivers understand the likely outcomes of the contracts they will be signing. Detailed recommendations and conclusions can be found later in the document.

## The American Truck Driver is Essential to the US Economy

Trucking is the backbone of American commerce. Trucks moved over 67% of United States (US) domestic freight by weight in 2023.[1] That is the largest share by far compared to any other link in the US domestic supply chain. The second-largest mode by volume, pipeline, transported just over 19% of US domestic freight by weight in 2023. You could double all other modes for transporting goods in the US, and still trucking would be the largest. In its profound way,

---

[1] See Table 4 "2021-2023 Weight of Freight Shipped within the US by Mode" in Appendix 4.

January 2025

trucking supports every mile of the US domestic supply chain across various industries, including agriculture, manufacturing, retail, construction, and consumer goods.

Despite the essential link trucking represents, the value of trucking is often overlooked. In 2023 trucking added an impressive $260 billion in economic value to the US Gross Domestic Product (GDP), about 1% of all US economic activity.[2] This relatively small value-added is a testament to the sometimes-cruel efficiency of US trucking, which transports approximately 53% of the US's GDP, $14.7 trillion worth of freight, every year.[3] Measured by value, trucking is responsible for 74% of US domestic freight, a higher share than by weight.[4]

The American truck driver is the keystone of the trucking industry. These essential workers are responsible for hauling goods day and night across the country. Without these skilled professionals, more than half of the US's GDP could not get from seller to buyer. Drivers work long days, away from family and friends, and in dangerous conditions to pick up and deliver the goods that support the American way of life.

Approximately 3.5 million commercial motor vehicle (CMV) drivers operate in US interstate commerce for active, registered carriers.[5] An estimated 5% of all interstate CMV drivers have been affected by legal challenges to inequitable lease-purchase agreements.[6] Experts on the Task Force estimate the total number of drivers affected is much larger. This is due to the reality that most drivers do not complete these programs and leave the trucking industry in deep debt and with a sense of failure despite promises of financial independence. There is no agency or organization monitoring these programs to collect data about them.

Intermodal CMV drivers were not highlighted in this report but are also affected by inequitable lease-purchase agreements and misclassification. An estimated 500,000 intermodal CMV drivers operate in the US outside of interstate commerce.[7] In the intermodal industry, thousands of drivers have come forward to fight misclassification as independent operators instead of as employee drivers.

## Lease-Purchase Programs Defined

The lease-purchase programs subject to TLTF's work are the arrangements between a motor carrier (or an affiliated company) and a truck driver. The truck driver obtains a truck through a financing arrangement with the motor carrier, then signs another agreement to work for the motor carrier, all with the promise that they will earn the income needed to meet the financial obligations under the truck financing agreement, including payments for the truck and most or all of the expenses and repairs associated with its operation. These drivers are almost always

---

[2] Data sources: U.S. Bureau of Economic Analysis, "Value Added by Industry" and "Value added by Industry as a Percentage of Gross Domestic Product" (accessed Saturday, October 26, 2024).
[3] See Table 6 "Value of Freight Shipped within the US by Mode in Appendix 4.
[4] *Ibid.*
[5] See Table 8 "Number of Interstate CDL Drivers sorted by carrier fleet size" in Appendix 4.
[6] Public court records considered by the Task Force documented predatory lease-purchase programs affecting over 200,000 interstate drivers. When compared to the 3.5 million interstate CDL drivers in the US, this is approximately 5.7%.
[7] See Table 10 "Number of Intermodal CDL Drivers for Non-Interstate Carriers sorted by carrier fleet size" in Appendix 4.

Case 1:24-cv-00082-CJW-KEM     Document 76-15     Filed 06/02/25     Page 4 of 52

Kelchner03501

classified by the motor carrier as an independent contractor despite the fact that the carrier has near or total control over the driver and their operation.

Lease-purchase programs are most often found in the for-hire truckload and drayage segments of the industry. Drivers enter lease-purchase agreements because they are promised truck ownership, greater control over their work, and more money. Some may see it as a step toward becoming an independent owner-operator trucker. The Task Force found no evidence that lease-purchase programs benefit drivers in these ways. The Task Force's analysis does not concern truck leasing or financing businesses that are independent of motor carriers and who operate under traditional underwriting and commercial terms. These third-party lease-purchase programs are not the subject of this report.

Lease-purchase contracts are typically intended to last 3-5 years, though few drivers survive financially until the end of a lease-purchase contract term. The lease-purchase contract can be for a new truck or a used truck that the motor carrier has been operating in their fleet. Drivers in a lease-purchase contract must sign a second agreement called an Independent Contractor Operating Agreement that sets the terms under which the driver will work exclusively for the carrier.[8] This second agreement is also, confusingly, known as a lease, and while important to TLTF's analysis, that contract is not its focus.

While the term lease-purchase contains the word "purchase," drivers often mistakenly believe that they are accruing equity in the truck. Sometimes a lease may contain language that allows the driver to buy the truck by making a payment at the end of the lease equal to the value of the truck. In the evidence presented to the Task Force, very few drivers make it to the end of the lease-purchase agreement and take possession of a truck. At the (often early) end of their lease-purchase relationship with motor carriers, drivers are often surprised to learn that they have accrued no equity in the truck, or they leave mistakenly believing that they have been forced to give up equity that they had accrued in the truck. If lease-purchase programs are allowed to exist, the Task Force recommends that motor carriers be required to disclose, among other things, how these issues function when the driver is reviewing the contract before signing it.

Under lease-purchase and independent contractor contracts, carriers determine and control all of the key aspects of the relationship. Carriers set all of the key terms, including (among others):

- driver compensation rates;
- truck payments;
- insurance payments;
- fuel surcharges;
- communications equipment;
- electronic logging devices;
- accessory pay for non-mileage work: detention, layover, trailer washouts, extra stops, unloading trailers, extra;
- excess mileage charges;
- the hiring of other drivers;
- maintenance routines;

---

[8] While Lease-purchase agreements may contain language that suggests that drivers can use the truck to work for other carriers, there is no evidence drivers are able to do this regularly.

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 5 of 52

Kelchner03502

- where the driver must purchase parts for and obtain repairs to the truck;
- where the driver must purchase fuel; and
- escrow accounts for maintenance and performance.

There is no evidence of drivers negotiating terms under these contracts. Drivers are presented contracts as "take it or leave it" and are typically not permitted to take the contracts home to review before signing.

Motor carriers easily enforce the driver's financial obligations under these agreements because the carrier assigns the work to the driver and then manages their compensation. Carriers deduct all obligations under both the lease-purchase and independent contractor agreements from the driver's paycheck. By this function, drivers under lease/purchase agreements commonly receive no net compensation and can even receive a negative compensation statement showing that the driver is indebted to the motor carrier for the previous period of work. That debt is then carried over to be deducted from their pay on their next compensation statement.

## Why Do Carriers Use Lease-Purchase Agreements?

Carriers of all sizes use lease-purchase programs as a core business model.[9] Lease-purchase programs provide a tremendous competitive advantage to carriers. The programs create an inequitable power dynamic that carriers exploit for lower-cost manpower. Drivers in these programs are integrated into all the major management system services large carriers provide, including communications, dispatching, and maintenance systems. The work of these drivers is typically indistinguishable from that of W-2 employees. Nonetheless, these programs shift the expense of buying, maintaining and operating tractors to the worker. Carrier lease-purchase programs are designed for motor carrier to obtain greater profits than they would earn from comparably experienced employees in straight independent contractor or driver arrangements.

These are not legitimate vehicle leases, which would include underwriting to assess the risk to the lessor and creditworthiness of the lessee, as well as disclosures of the conditions and prior depreciation of the equipment to be sold or leased. In fact, motor carriers specifically target drivers with low credit ratings who may believe a lease-purchase agreement is their only path toward truck ownership. Ultimately, lease-purchase agreements enable motor carriers to increase profit by paying drivers less for their work.

The American Transportation Research Institute (ATRI) conducts a survey of operational costs of trucking annually. Historically, that survey has shown that driver compensation is the largest cost for motor carriers. In 2024, average driver compensation represented over 42% percent of all

---

[9] In court cases TLTF reviewed (discussed in the Public Courts Data Subcommittee Report) the size of the carriers sued by drivers under an inequitable lease-purchase program range from a fleet of 95 power units to a business where the parent corporation boasts a fleet of over 24,000 power units. Select One, Inc., is a smaller carrier which reports a fleet of 95 trucks and 95 drivers as of 7/30/2024 per FMCSA MCS Form 150. See https://safer.fmcsa.dot.gov/. In the case Brown v. Select One https://www.fmcsa.dot.gov/mission/advisory-committees/tltf/brown-v-select-one the class size was estimated to be 40 drivers. When Swift Transp. Co. merged with Knight Transportation, Inc. the company became the second largest for-hire fleet in the US. Knight-Swift's combined fleet totals over 24,000 power units as reported in the company's 2023 10-K https://www.sec.gov/Archives/edgar/data/1492691/000149269124000015/knx-20231231.htm.

January 2025

4

Kelchner03503

costs for carriers per mile.[10] Driver wages were $0.779 per mile (34%) and benefits were $0.188 per mile (8%).[11] Average Owner-Operator pay per mile was $2.10 per mile.[12]

One class action lawsuit TLTF reviewed (Roberts v. TransAm)[13] evidenced the tremendous benefit to carriers from lease-purchase programs in the important cost categories. On average, TransAm's total costs as a percentage of revenue for lease-purchase driver labor in that case was just 11.3%. One named plaintiff in that case worked for over two and half years for the carrier. His truck generated $686,210.04 in revenue for the carrier. After expenses, he took home just $82,207.20 or 12.0% of the revenue he generated. Below is a table reproduced from the public court docket in the case, showing the labor savings this carrier enjoyed from its lease-purchase program.

| Table 1. Labor Cost Comparison TransAm Lease Drivers and Industry Employees | | | | |
|---|---|---|---|---|
| **TransAm Lease Driver Compensation as % of <u>Revenue</u>** | | | | **11.3%** |
| ATRI Average Driver Compensation as % of <u>Costs</u> (Inc. Wages and Benefits) | | | | 42% |
| **TransAm Lease Driver Average Compensation Per Mile** | | | | **$.227** |
| ATRI Average Driver Compensation Per Mile (Large Fleet Average, Inc. Wages and Benefits) | | | | $.709 |
| **Drivers with Sufficient Data to Compare Compensation Costs** | | | | |
| | Total Revenue Generated For TransAm | Total Compensation (Mileage + Bonus) | Compensation % of TransAm Revenue | Total Compensation per mile |
| Otis | $22,436.89 | $1,579.20 | 7.0% | 0.147 |
| McRoberts | $28,929.01 | $3,262.28 | 11.3% | 0.211 |
| Wright | $57,711.17 | $7,424.15 | 12.9% | 0.302 |
| Colvin-Williams | $52,343.36 | $4,602.00 | 8.8% | 0.165 |
| Roberts | $123,072.00 | $16,296.67 | 13.2% | 0.259 |
| Salmon | $109,427.00 | $15,655.22 | 14.3% | 0.279 |
| Jarmon | $105,916.18 | $11,708.99 | 11.1% | 0.207 |
| Truitt | $686,210.04 | $84,932.00 | 12.4% | 0.252 |

Lease-purchase drivers in this case earned less than 1/3 of the *average* per mile compensation in the industry. To be clear, that is not less than 1/3 of the compensation of the best paid employees, that is 1/3 of the *average*.

## Why Do Drivers Enter Lease-Purchase Programs?

Frequent motor carrier advertising promising attractive professional opportunities, compensation, and benefits lures drivers into lease-purchase programs. Drivers are enticed by the promise of owning their own truck, being their own boss, and receiving generous compensation. Often these promises are part of elaborate recruiting and orientation presentations designed to mislead

---

[10] "An Analysis of the Operational Costs of Trucking: 2024 Update." June 2024. *American Transportation Research Institute (ATRI)*. https://truckingresearch.org/wp-content/uploads/2024/06/ATRI-Operational-Cost-of-Trucking-06-2024.pdf
[11] *Ibid.*
[12] *Ibid.* p 22-23.
[13] Roberts v. TransAm (https://www.fmcsa.dot.gov/mission/advisory-committees/tltf/roberts-v-transam)

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 7 of 52
Kelchner03504

drivers. TLTF has observed that few, if any, of these opportunities are realized under lease-purchase programs.

Carriers offer aspiring drivers enrollment in training programs to obtain their Commercial Driver's Licenses (CDL). Carriers help these drivers complete the paperwork to become purported business entities, then register them for lease/purchase programs to put them behind the wheel of what they are told is their truck. Some motor carriers sign new truck drivers to the burden of multi-year leases during their initial training. These companies typically indebt workers for the cost of their training, then offer debt forgiveness if new drivers take on the greater liability of a truck lease. Other leasing programs may require a driver to first get 6 months' experience driving as an employee, then recruit their own and their competitors' drivers into their lease-purchase programs.

In *Brant vs. Schneider National*,[14] the carrier required drivers interested in leasing a truck from its leasing arm, Schneider Finance, to meet with "business advisors" from a third-party vendor called American Trucking Business Services (ATBS). ATBS provided the drivers with what the drivers thought were personalized business plans (including estimates of revenue, mileage, and net earnings) that vastly overstated the compensation drivers could actually expect. ATBS prepared identical "profit and loss" estimates for the named plaintiffs based on projected average revenues to them from hauling Schneider loads of $3,500 a week.[15] These plans were created in 2016 and 2017. Documents produced in the case show that Schneider's total per truck weekly revenue in 2016 averaged $3,488.[16] However, leased operators for Schneider were paid at most 65% of the carrier's load revenue. In other words, if an owner-operator generated typical revenue for the firm, they would generate around $2,267 per week on average or about $63,492 less per year than ATBS' business plan. Since many of the costs lease-purchase drivers incur are fixed, like truck payments and insurance, this means that drivers were going into these lease-purchase programs with figures that likely suggested take-home earnings more than twice what the average truck in Schneider's lease-purchase program could produce.

## Inequitable Lease-Purchase Programs Harm Drivers

Drivers under lease-purchase programs exercise little or no discretion in the operation of the truck hauling freight for the carrier or the maintenance and operation of the truck under the lease-purchase contract. As a result, they are usually misclassified as independent contractors. Although the contracts may declare the driver to be an independent contractor, they realistically have no discretion to make decisions to operate like a business. Carriers save money when they misclassify drivers as independent contractors, avoiding contributions to government programs that benefit workers, such as Medicare, Social Security, unemployment insurance, and workers' compensation. Carriers achieve additional savings by failing to provide other benefits, such as retirement and health care plans and contributions. The rest of the savings comes from lower take-home pay for drivers after deducting all the truck costs charged by the carriers from the drivers' earnings. Drivers can work most or all days in a week but, due to lots of unpaid waiting time, weather, breakdowns and other challenges, and rolled over debt for previous weeks, they

---

[14] https://www.fmcsa.dot.gov/mission/advisory-committees/tltf/brandt-v-schneider
[15] See, e.g., SN_Brant_0032972.
[16] Statistica. https://www.statista.com/statistics/915673/schneider-national-truckload-revenue-per-truck-per-week/. Accessed 5.14.24.

may not earn enough revenue to cover their expenses. In these cases, drivers will receive a "negative" paycheck. This is so common in lease-purchase programs that drivers all understand the industry term "going in the hole."

In one class action lawsuit, *Cervantes v. CRST*,[17] a driver manager testified about how the economics structured by the carrier left margins so thin that drivers had to work as trainers to drive enough miles to earn positive paychecks consistently. The carrier had set up its program to ensure lease-purchase drivers would have to team drive, even if they did not want to do so.

> Question: And during that period that somebody was driving solo, was it your understanding that the expectation was that they would not be successful during that week that they drove solo?
> Answer: Yeah—well, successful—well, we pretty much wouldn't expect them to make any good money. If—if they did make money, they were usually considered lucky to making it above break even.
> Question: Can you explain that to me? What do you mean by break even?
> Answer: So after—after their fuel costs are taken into consideration, after their maintenance, mileage is taken into consideration, basically all the costs that they have to pay and the upkeep of their truck between the lease, maintenance, gas, so on and so forth. So once all that's paid for and then still being able to make little bit past that, would be considered break even.
> Question: I see. So were there instances where drivers that you managed didn't break even?
> Answer: It was—paydays were our most stressful days. It was common in office culture to dread Tuesdays and Thursdays because most driver managers would be assuming that they would be having difficult conversations with their drivers regarding negative paychecks.
> Question: And what do you mean by negative paycheck?
> Answer: As in they owed the company money.
> Question: I see. And so was that a regular occurrence every Tuesday and Thursday you expected to get calls from drivers in that situation?
> Answer: Every Tuesday and Thursday
> Question: And so on -- so if you had 20 drivers, how many drivers do you think would be in that situation in a typical week?
> Answer: So I was fortunate in that many of my drivers did not have to regularly worry about that. On a personal basis I would say I'd be having one of those conversations at a minimum once per week. And anywhere up to possibly even half of my fleet could have gone negative on any given payday. I remember it was significant enough that on one particular pay period I sent an e-mail to both my boss and his boss celebrating the fact that not a single one of my drivers had gotten anything less than a positive paycheck. And that statement was significant enough that my boss's boss went in, dug through the system, and looked at every single one of my drivers because he was expecting to see someone that had not gotten a positive paycheck. And then he came and spoke with me and, you were right. Every single one of your drivers got a positive paycheck this week. Good job.

---

[17] Cervantes v. CRST (https://www.fmcsa.dot.gov/mission/advisory-committees/tltf/cervantes-v-crst)

Case 1:24-cv-00082-CJW-KEM     Document 76-15     Filed 06/02/25     Page 9 of 52
Kelchner03506

## Even "Successful" Lease-Purchase Drivers are Worse Off

*Roberts vs TransAm* reveals that lease-purchase drivers at TransAm had no chance to earn good incomes relative to what they could have earned elsewhere. The most successful lease-purchase driver with data in the case was Mr. Nassir Truitt. Mr. Truitt completed five consecutive leases successfully with TransAm. Despite herculean efforts, he made a fraction of what he could have made elsewhere.

Mr. Truitt was an extremely productive driver. In 2021, TransAm trucks generated an average of about $3,640 per week in revenue. When Mr. Truitt worked at TransAm, the carrier had a $4,000 per truck per week revenue goal. In 2019, Mr. Truitt generated $254,339 in revenue for TransAm of about $4,890 per week. The case does not have the same data for every year but assuming the revenue per truck was comparable in 2019, Mr. Truitt was roughly 34% more productive than that the average truck driver.

Despite his productivity, Mr. Truitt earned just $33,126 after expenses in 2019, including all of his mileage pay, bonuses, and advances from TransAm. That is before considering the cost of additional self-employment taxes. The median earnings of an employee in refrigerated trucking that year was about $67,600 according to the American Trucking Associations (ATA) – twice what Mr. Truitt was earning. ATA found that a new employee in the refrigerated segment made $.42 per mile that year, while Mr. Truitt was earning just $.24 per mile.

It is worth noting that better paying jobs in trucking are likely to include employer contributions to health and retirement benefits – equivalent to almost an additional 1/3 of employee salaries according to the ATRI data cited above. Mr. Truitt did not receive those benefits. Despite his well-above average productivity and success at completing leases, Mr. Truitt earned 23% less than student drivers at TransAm. In fact, at points, he worked for months without ever digging himself out of the hole, surviving on $150-500 a week in advances and loans from the carrier. The following are tables reproduced from expert analysis of Mr. Truitt and other named plaintiffs' productivity and earnings in the case.

| Table 2. Weekly Productivity of TransAm Lease Drivers (In Average Weekly Revenue) | | | |
|---|---|---|---|
| **TransAm Lease Driver Plaintiff Weekly Average Revenue** | | | **$4,386** |
| 2021 TransAm Long Haul per Truck Weekly Revenue Goal 2021 | | | $4,000 |
| 2021 TransAm Long Haul per Truck Weekly Average Revenue | | | $3,642 |
| **Drivers with Data Available to Compare Productivity** | | | |
| | Total Revenue Generated For TransAm | Approx. Weeks Worked | Revenue per Week for TransAm |
| Otis | $22,436.89 | 6 | $3,740.00 |
| McRoberts | $28,929.01 | 7 | $4,133.00 |
| Wright | $57,711.17 | 10 | $5,771.00 |
| Colvin-Williams | $52,343.36 | 15 | $3,490.00 |
| Roberts | $123,072.00 | 26 | $4,733.00 |
| Salmon | $109,427.00 | 26 | $4,209.00 |
| Jarmon | $105,916.18 | 29 | $3,652.00 |
| Truitt | $686,210.04 | 128 | $5,361.00 |

If carriers structure lease-purchase contracts so that drivers have no meaningful ability to control costs or to choose or price work and thus control revenue, the only way drivers can earn more is

January 2025                                                                                           8

Kelchner03507

by working more hours in the day or taking fewer days off. This can put significant pressure on drivers to violate hours-of-service rules and drive less safely.

| Table 3. Mileage Rate Comparison<br>TransAm Lease Driver Pay Per Mile (2018-2021) to TransAm New Employees (2019)<br>and Inexperienced Drivers in Refrigerated Segment (2019) | | | | |
|---|---|---|---|---|
| **TransAm Lease Driver Plaintiff Average** | | | | **$0.18** |
| TransAm Student Driver Pay Rate | | | | $0.31 |
| TransAm New Employee Pay Rate | | | | $0.32 |
| ATA Refrigerated Segment New Employee | | | | $0.45 |
| **Drivers with Sufficient Data to Calculate a Mileage Rate** | | | | |
| | Approximate Weeks Worked | Total Miles Driven | Total Mileage Pay | Mileage Rate Per Mile |
| Otis | 6 | 10,738 | $1,200.72 | **$0.11** |
| McRoberts | 7 | 15,490 | $3,089.49 | **$0.20** |
| Wright | 10 | 24,621 | $4,676.15 | **$0.19** |
| Colvin-Williams | 15 | 27,809 | $2,504.75 | **$0.09** |
| Roberts | 26 | 62,877 | $13,306.67 | **$0.21** |
| Salmon | 26 | 56,190 | $12,090.22 | **$0.22** |
| Jarmon | 29 | 56,515 | $8,798.99 | **$0.16** |
| Truitt | 128 | 336,526 | $79,547.10 | **$0.24** |

## Lease-Purchase Programs Are Not a Path to Truck and Small Business Ownership

The Task Force heard no evidence that lease-purchase arrangements were an important means for drivers to achieve truck ownership or to become small business owners. In fact, all the comments and data TLTF saw suggested that driver success is rare enough that programs seem designed to ensure failure for the overwhelming majority of drivers. Lease-purchase contracts appear to be drafted with only the motor carrier's profitability and mitigation-of-risk in mind.

Only one carrier provided data to TLTF to bolster claims that lease-purchase was an important pathway to truck or small business ownership. Don Oren, Chairman of Dart Transit Company, submitted a letter to a Task Force committee member reporting the successful buyouts of tractors by drivers in its lease-purchase program. Though Dart has in recent years had a fleet of approximately 1,500 owner-operators, it has averaged about 34 truck buyouts per year over the last two decades.[18] While Mr. Oren did not provide data on the number of drivers participating in Dart's program,[19] what was provided is consistent with other data TLTF collected that suggests that less than 1 in 100 drivers who participate in a lease-purchase end up owning the truck.

In recruitment and advertising, carriers use language suggesting that many drivers succeed, and that success is likely. In fact, while it is rare for concrete turnover data to be produced in cases, that which has been produced and the number of class members in cases reveal astounding rates of turnover.

---

[18] Letter from Donald G. Oren to Steve Viscelli August 24, 2024, and attachments.

[19] Dart Transit Company has a record of employees complaining of unpaid wages. The company used contractual mandatory arbitration to get one unpaid wages case moved out of court.

January 2025

9

The available evidence in lawsuits TLTF reviewed confirms that drivers rarely succeed in lease-purchase programs. In Blakley vs Celadon Group,[20] Celadon's Vice President of Operations Matthew Douglass testified that he did not know how many drivers successfully completed the carrier's lease program:[21]

Q I agree, I don't want you to guess. I mean
Celadon's attorney is not wrong about that. I
don't -- it doesn't mean I don't want you to
estimate. But if you have no idea whatsoever, the
attorneys absolutely right to tell you that's what
you should tell me. But I just want to be clear on
that because I find it surprising. As the vice
president of operations at Celadon, you have no
idea, even a ballpark, of how many drivers
successfully complete the lease-purchase program?
MR. ECKHART: Can you clarify your
instruction then? What's ballpark versus --
Q Give me any parameters. So I have no idea. For me
it could be 100 percent, it could be zero percent,
no clue. But if you can move those parameters
anywhere, I want you to do so.
A Five to 10 percent.
Q Okay. Do you know why the success rate is so low?
A Personal finance management.

Q How many of the 90 to 95 percent who fail the
program end in debt to Celadon?
MR. ECKHART: Objection. Assumes facts not
in evidence.
A Without accurate understanding, 50 percent.

Other documents in this case suggest that Mr. Douglass's 5-10% estimated success rate grossly overestimates the actual success rate. Celadon's internal management reports with data for the 3rd and 4th quarters of 2016 reported remarkable annualized turnover rates for contractors of 245% and 328%.[22] The data indicates that as many 3,000 drivers may have cycled through Celadon's program in 2016. As Mr. Douglass' testimony shows, many drivers end up indebted to the carrier after they fail to complete leases.

Other cases suggest that Celadon's program was not exceptional. For instance, in *Roberts v. TransAm*,[23] Russell McElliot, President of TransAm Trucking, testified that TransAm had a fleet of about 560 trucks, about 140-160 of which were lease-purchase trucks. From approximately February 2018 until September 2021, 4,481 drivers cycled through TransAm's contractor fleet,

---

[20] Link to Blakely v. Celadon (https://www.fmcsa.dot.gov/mission/advisory-committees/tltf/blakley-v-celadon)
[21] Douglass Deposition p.76-77.
[22] Expert report on Celadon (https://www.fmcsa.dot.gov/mission/advisory-committees/tltf/viscelli-blakley-v-celadon-expert-report)
[23] https://www.fmcsa.dot.gov/mission/advisory-committees/tltf/roberts-v-transam

January 2025

10

the vast majority of them through its lease-purchase program. These numbers suggest a turnover rate far in excess of that of Celadon.

Turnover rates in programs like these, with leases that require drivers to pay on a truck for 3-5 years and then make a balloon payment, imply that the number of drivers who complete leases and then actually buy the truck are more likely to be 1 in 1,000 rather than 1 in 100. Remarkably, this turnover does not seem to prompt change. At TransAm, it appears the carrier leased out some of the same trucks repeatedly yet charged the same weekly payment to successive drivers of those trucks. Even as trucks depreciated, aged, gained mileage, accumulated wear and tear, and went from driver to driver, the company still charged the same weekly payment for the truck. This strategy ignores all commercially reasonable practices that account for equipment depreciation and disclose such information in the sale, financing, or leasing of such equipment.

## Legal Remedies for Drivers Under Bad Lease-Purchase Agreements

Challenges via lawsuits and arbitration constitute the only significant avenue available to drivers to seek damages from the practice of motor carriers under lease-purchase contracts. Some common claims brought by drivers against carriers include:

- Violations of the Truth in Leasing Act;
- Fraud and misrepresentation;
- Employee misclassification;
- Unenforceable contract; and
- Forced labor.

### Litigation

The effect, however, of litigation on the use of truck lease-purchase agreements is minimal. It is most uncommon for drivers who have been victimized by a predatory lease-purchase arrangement to pursue litigation against their motor carriers. When a typical driver ends their truck-lease relationship with a motor carrier, they are poorer for the effort and often in debt to the motor carrier, as described above. In most cases, they do not have the funds to afford lawyers and are discouraged thoroughly by their efforts and by the carrier's treatment of them. For those who can find support to pursue litigation through a contingency/class action arrangement or the support of an advocacy organization, the best result is typically partial monetary remuneration for their efforts. Rarely does a driver obtain injunctive relief or impose a sufficiently meaningful financial impact on the carrier that would cause a motor carrier to curb their unfair, predatory, and unlawful practices.

Litigation has numerous shortcomings, including but not limited to:

1. **Settling out of court.** Upwards of 90% of cases settle out of court. This means that while there is limited relief, usually monetary, for the drivers involved in the lawsuit, there is usually no finding by the court of wrongdoing by carriers. Thus, carriers do not have to change their bad practices, and precedent is not set that would serve as a warning to other carriers or that would make such litigation easier for other truck drivers.

2. **Limited coverage.** A lawsuit covers a very limited number of drivers who work for a single carrier. This means that many drivers will never have the chance to assert their claims and that many carriers will never be held accountable for their wrongdoing.

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 13 of 52
Kelchner03510

Further, a lawsuit covers a limited period of time. Even if a driver recovers some money, there may be many years of harm from which they will never recover.

3. **Drivers must come forward.** Litigation depends on drivers being willing and able to bring claims against powerful carriers, risking retaliation, future employment, and, sometimes, even their safety. Not many drivers are willing to step forward.

4. **Backward looking.** A lawsuit can be brought only once the harm has already been done; it does not prevent the harm from occurring in the first place. Often it is hard to remedy harm fully once it has already occurred. This is especially true of harm to a worker's career, since debt owed to an employer creates a disincentive for the worker to advocate for themselves or leave a bad work situation, and creates an incentive for the employer to push past legal limits in safety and other areas.

In the vast majority of instances, however, individuals harmed by lease-purchase programs simply walk away from the trucking industry, believing they have failed to achieve the American Dream. They have no interest in giving trucking another try and have neither the resources nor spirit to litigate with the carrier.

### Forced Arbitration

An important issue faced by drivers trying to assert their rights in litigation is forced arbitration. While the Federal Arbitration Act exempts transportation workers in interstate commerce, including truck drivers, from mandatory arbitration under the Act, most leases and contracts require arbitration under state arbitration acts that often do not contain such an exemption. The legal question of whether the transportation worker exception in federal arbitration law preempts inconsistent state arbitration law is a developing but unresolved issue in the courts.

Forced arbitration discourages drivers from taking action against a motor carrier for many reasons. Provisions usually require that drivers and carriers resolve any issues in private arbitration rather than in court. This means that proceedings happen behind closed doors and there will be no public record of the proceedings.

Most arbitration provisions require that drivers bring their claims individually, which is prohibitively expensive. This means that drivers cannot band together and pool their collective resources to bring their claims against a motor carrier. Similarly, single drivers are less likely to initiate individual arbitration actions because the cost of attorneys' time and resources would typically far exceed the amount they could seek in such action, and attorneys are likely to recover less in fees.

Arbitration provisions often have numerous other conditions that disadvantage drivers, including cost-splitting, shortening the statute of limitations (the time period in which a lawsuit can be brough against a carrier), and waiving the right of the driver to recover attorneys' fees if the driver wins. In the trucking industry, arbitration is employed primarily to discourage driver litigation.

## Recommendations

TLTF's findings are clear. The current lease-purchase system harms drivers and creates an economic advantage for individual carriers at the expense of the health of the industry and

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 14 of 52

Kelchner03511

highway safety. Undoubtedly, action is needed and long overdue. All stakeholders, i.e., the government, carriers, drivers, and advocacy groups, have a responsibility to protect drivers from these predatory programs.

The Task Force makes the following recommendations:

**I. Statutory Prohibition**
    A. Congress should ban CMV lease-purchase agreements as irredeemable tools of fraud and driver oppression that threaten a safe national transportation system and diminish the number of truck drivers attracted to and who stay in the trucking industry. Such a prohibition would be the most efficient and effective remedy to stop the damage created by lease-purchase programs.

    B. If lease-purchase programs are not prohibited, the recommendations below would help mitigate the harm that these programs cause individuals, the trucking industry, and our nation's transportation system.

**II. Congressional Oversight**
    If lease-purchase agreements are allowed to continue, Congress should:
    A. Appropriate sufficient funds and provide whatever additional authority is necessary (if any) for FMCSA, DOL, the Federal Trade Commission (FTC), and CFPB to oversee truck-leasing programs described below.

    B. Hold hearings on lease-purchase practices and their impact on drivers, highway safety and government programs and expenditures, such as subsidies for truck driver training.

    c. Enact whistleblower protection legislation for drivers reporting lease purchase programs to FMCSA, CFPB, and DOL.

**III. FMCSA Oversight**
    A. FMCSA should mandate that motor carriers and their affiliates offering lease-purchase programs keep accurate records of the experience of individuals who signed such agreements, including the following:
      1. Take-home pay per week;
      2. Average mileage driven per week;
      3. Average days on the road per week;
      4. The total number of drivers per year entering into the arrangement;
      5. The number of drivers who complete the lease term;
      6. The number of drivers who buy out a truck; and
      7. Average for each deduction category in settlements, for example:
        a. Fuel;
        b. Insurance;
        c. Registration;
        d. Maintenance; and
        e. Escrow.

    B. FMCSA should create educational materials for use in driver training about how lease-purchase programs should work to comply with the law and treat drivers fairly. These

Case 1:24-cv-00082-CJW-KEM   Document 76-15   Filed 06/02/25   Page 15 of 52

Kelchner03512

materials should include carrier provided data on driver pay and experiences in lease-purchase programs.

C. FMCSA should develop a Model or Required Disclosure Form for lease-purchase agreements that contains:
    1. A table of costs and benefits of 1099 vs W-2 employee; and
    2. The information required in section A above.

D. FMCSA should develop a Model or Required Set of Contract Provisions for Lease-Purchase Agreements.

E. FMCSA should use existing data collection efforts and required carrier filings, e.g., the MCS-150, to collect data on the following and impose financial penalties and other consequences for false information:
    1. The number of unique drivers employed each year;
    2. The number of unique drivers participating in lease-purchase programs; and
    3. Driver demographics, turnover, and earnings.

F. FMCSA should promote the use of its existing driver coercion hotline or develop a new hotline to collect driver reports of direct and indirect safety-related issues with lease-purchases, investigate these complaints, and make the results of those investigations public.

G. FMCSA should consider the presence of inequitable lease-purchase programs without required disclosures and contract provisions in renewing motor carrier authorities and audit truck-leasing program data for accuracy.

## IV. Department of Labor Enforcement
A. DOL should:
    1. Conduct targeted audits and enforcement of companies deploying lease-purchase programs to ensure compliance with DOL regulations concerning misclassification and independent contractor status.
    2. Publish guidance targeted at drivers to educate them on arrangements which may violate DOL regulation.
    3. Pursue back wages and overtime for drivers who have been misclassified.

B. DOL should support National Labor Relations Board actions that support unions in the trucking industry.
    1. Continue to restrict companies from holding captive audience meetings to discourage unionization.
    2. Continue to allow for card-check unionization.

## V. Mandatory Disclosures, Conditions, and Prohibitions for Providing Lease-Purchase Programs
If motor carriers are allowed to lease or lease-to-own, or finance a driver's acquisition of a vehicle, the following requirements would protect drivers:
    A. Worker Classification – Classify the driver as a W-2 employee

    B. Underwriting and pre-contract activities

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 16 of 52

Kelchner03513

1. Require minimum levels of driver experience;
2. Provide an FMCSA developed course, as described above, that explains lease-purchase programs to drivers and requires the motor carrier to incorporate actual performance data from that carrier's lease-purchase program; and
3. Allow the driver to have at least 5 business days to take home any agreement and consult with any person they want about the agreement before signing it.

C. Mandatory or Prohibited Contractual Provisions
1. The form of the agreement shall adhere to all applicable consumer regulations related to financial products and services, including mandatory disclosures, that govern the particular type of financial arrangement involved (i.e., lease, lease-to-own, truck financing, or rental).
2. Provide separate payments to that driver for their work and for the use of the vehicle, i.e., a two-check payment system.
3. The motor carrier may make no deductions from the driver's compensation for their work driving the truck for any obligation related to the rental, lease, lease-to-own, or financing of the truck, including the maintenance, operation, or upkeep of that vehicle.
4. Carriers must use a third party to hold driver escrow funds in trust.
5. Carriers must retain for 7 years all driver-related records of pay, hours of service logs, and contracts.
6. Carriers must hold a special bond to cover potential damages suffered by drivers related to a lease-purchase program.

D. Mandatory Disclosures
1. Disclose the exact type of financing agreement embodied in the contract (whether it is a lease, lease-to-own, equipment financing (a loan), or rental), the effective interest rate, and whether and how much the driver will come to possess any equity in the equipment during or at the end of the term of the agreement.
2. Disclose the data required by FMCSA (see above in recommendation III.B.) regarding the historical experience of drivers under the motor carrier's lease-purchase program.
3. Disclose whether and under what conditions the driver will own the truck at the end of the agreement or will be given the option of purchasing the truck at the end of the agreements.
4. Disclose the history of ownership and repairs made to the vehicle.

VI. **Consumer Financial Protection Bureau Enforcement**
The Task Force believes that lease-purchase programs should fall under the authority of the CFPB because they do not create actual business entities (See Appendix 3 for more information). If lease-purchase programs are to continue, CFPB should exercise its authority to enforce its regulations governing financial products and services to lease-purchase programs in trucking including the Truth in Lending Act. To the extent that CFPB authority does not apply, FTC should:
A. Prohibit deceptive practices and require disclosures about lease-purchase programs (as they do for franchisers including the information in whatever bullet point that is) and

January 2025

15

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 17 of 52
Kelchner03514

B. Determine whether lease-purchase programs create an unfair payment and conditions that give carriers competitive advantage that damages competition.

## VII. Veterans Affairs, Department of Labor, and Others Providing Training Grants

Determine the impact of lease-purchase programs on training grants and programs, such as registered apprenticeships for veterans, trade-affected workers, Workforce Innovation and Opportunity Act and other training grant recipients seeking a career in trucking.

A. Issue guidance on the impact of misrepresentation in the advertising of training programs using grants that are linked to lease-purchase programs.

B. Investigate misrepresentation in recruitment of veterans and new workers to schools linked to lease-purchase programs.

## VIII. State and Local Law Enforcement

If federal law does not address lease-purchase programs, TLTF encourages state and local agencies to review such contracts and agreements operating within their borders to determine whether state rules apply to address fraudulent or oppressive contracts and take any enforcement action necessary under those laws.

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 18 of 52

Kelchner03515

## APPENDIX 1 - GLOSSARY

**Brokerage** – A business that arranges freight transportation by motor carriers but does not transport freight itself or take legal possession of freight.

**Commercial Driver's License (CDL)** – The license required to operate a commercial motor vehicle. For the purposes of this report, CDL refers to a Class A license, the license required to drive tractor-trailers weighing more than 26,000 pounds.

**Commercial Motor Vehicle (CMV)** – A motor vehicle used on a highway in interstate commerce to transport property or passengers.

**Consumer Financial Protection Bureau (CFPB)** – A federal agency dedicated to ensuring individuals are treated fairly by banks, lenders and other financial institutions.

**Drayage** – The movement of containers to and from rail or ports facilities.

**Federal Motor Carrier Safety Administration (FMCSA)** – The federal agency within the U.S. Department of Transportation responsible for motor carrier regulation.

**For-Hire Motor Carrier (For-hire Carrier)** – An individual or firm with an operating authority to offer freight transportation services to the public for a fee.

**Hours of Service (HOS)** – The federally mandated rules set by FMCSA that regulate, among other things, how many hours drivers may drive during a work shift, or drive after being on-duty during the work shift or work week.

**Independent Contractor Owner-Operator Agreement** – An agreement between a motor carrier and an independent owner-operator that creates a business relationship whereby the independent owner-operator works for the motor carrier.

**Independent Owner-Operator** – The owner of a for-hire motor carrier who also works driving equipment they control. Independent owner-operators are responsible for all of the fixed and variable expenses of their operation and operate under their own legal authority to provide freight services to customers (which could include shippers, freight brokers or other motor carriers). Owner-Operators can operate under their own federal motor carrier authority or under the authority of a motor carrier.

**Leased-operator** – A driver who is responsible for a large portion of the fixed and operating expenses of their tractor and works under contract for a motor carrier. Lease-operators may own trailers, but typically do not. Lease-operators operate under the authority of a motor carrier which typically finds and prices all of the loads hauled by the lease-operator. A lease-operator may own a tractor, finance or lease it from an entity other than the motor carrier they work for or engage in a lease-purchase program.

**Lease-purchase agreement or contract** – A financial contract by which a driver obtains a truck from a motor carrier (or a firm affiliated with that motor carrier) to haul freight while driving for the same motor carrier under a separate contract. Although the term "lease-purchase" is commonly used in the trucking industry, the term is a misnomer because leases are usually an

January 2025

arrangement to pay for the use of a certain amount of a vehicle's depreciation and does not necessary provide for the purchase of the vehicle. The term illustrates the confusion of truck drivers about such agreements because they often mistakenly think that they are accruing equity in the truck towards its eventual purchase, and neither may be true under the contract.

**Lease-purchase program** – The term used in this report to describe the broader framework of a motor carrier-driver relationship, including the lease-purchase agreement, the contract for the driver's work for the motor carrier, and the motor carrier's practices in implementing these contracts but not provided in the contract. This would include the motor carrier's recruitment practices, operations practices, and tax and finance practices.

**Less-than-truckload (LTL)** – Freight service moving shipments less than 10,000 pounds. These services often consolidate multiple shipments into a single truckload size shipment for long-distance transport and then break consolidated shipments down again for final delivery. Consolidating and breaking down of LTL shipments often happens at motor carrier-controlled terminals.

**Live Load/Live Unload** – When a driver must wait while freight is loaded into or unloaded from the trailer attached to their tractor.

**Local** – Freight services less than 150 miles from origin to destination.

**Motor Carrier** – A firm operating one or more CMVs transporting freight or passengers. In common usage the term means a motor carrier with operating authority issued by FMCSA.

**Operating Authority** – The federally-mandated license required for a motor carrier to provide for-hire interstate freight services.

**Over-the-road (OTR) or Long-haul** – Any freight services that transport freight more than 150 miles from origin to destination.

**Refrigerated (also Reefer or Temperature-Controlled)** – Used to refer to freight that must be transported at a particular temperature. It can also refer to van trailers used to haul that freight or firms that haul it (Refrigerated Carriers). Refrigerated vans (a.k.a. reefers) are often used to carry dry freight.

**Segment (or Industry Segment)** – A portion of the trucking industry distinguished by freight or service type. There are numerous recognized segments based on whether carriers are private or for-hire, size of shipments, distance goods are moved, the type of trailer required, etc. The most common segment distinctions would include, among others: private/for-hire, truckload/less-than-truckload, OTR/local. Within the OTR for-hire truckload segment are segments defined by the type of trailer used to haul freight (e.g., dry van, refrigerated, flatbed, tanker, etc.). Segments sometimes have distinct business models for firms and different labor market and operational characteristics relative to drivers.

**Truckload (TL)** – For-hire freight service that moves shipments larger than 10,000 pounds, large enough to fill a truck to capacity either based on legal allowable weight or trailer volume. Truckload freight moves "point-to-point" from shipper to consignee (receiver) without passing through a motor carrier facility.

January 2025

Kelchner03517

## APPENDIX 2 – COMMON DRIVER CLAIMS BROUGHT AGAINST CARRIERS

**Lease-Purchase Agreements and Carrier Practices Violate the Truth in Leasing Act**

To operate a truck in interstate commerce, an individual or company is required to have federal motor carrier operating authority, which requires substantial financial and regulatory responsibilities. Individuals who own and operate a truck are permitted to operate in interstate commerce without federal operating authority by entering into an independent contractor agreement with motor carriers who do. The Truth in Leasing rules (TIL)[24] govern those independent contractor agreements.

TIL rules require motor carriers to use written independent contractor leases with owner-operators. Those agreements must make certain disclosures and assign specific responsibilities for some areas of costs and operation to one of the parties. The rules then command motor carriers to comply with those leases and the rules. TIL regulations were put in place to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.[25] [26] These regulations were designed to "promote ... a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties," and to "eliminate or reduce opportunities for skimming and other illegal or inequitable practices."[27]

For the purpose of analyzing and considering potential policy changes, it is important to distinguish these independent contractor leases from truck lease-purchase contracts, the Task Force's focus, which are for the individual's acquisition of a truck. Motor carriers offer truck lease-purchase contracts to individuals in conjunction with independent contractor lease agreements promising that the arrangement will make them small business owner-operators who then lease their truck and their driving services to the motor carrier under independent contractor agreements.

Independent contractor leases are regulated by the rules, and truck lease-purchase contracts are not regulated by the rules, except to the extent that a lease-purchase contract 1) conflicts with the

---

[24] TIL is authorized by 49 U.S.C. § 14704 and implemented at 49 CFR Part 376.

[25] 43 Fed. Reg. at 29812; see also Brant v. *Schneider Nat'l, Inc.*, 43 F.4th 656, 662.

[26] In Carter v. *Paschall Truck Lines, Inc.*, 2023 U.S. Dist. LEXIS 10989 the Court explained that: "In 1973, truckers declared a nationwide strike to 'protest a host of economic problems' caused by 'questionable industry practices.' *Global Van Lines, Inc. v. Interstate Commerce Commission*, 627 F.2d 546, 547-48, 201 U.S. App. D.C. 87 (D.C. Cir. 1980); see also *In re Arctic Express Inc.*, 636 F.3d 781, 795 (6th Cir. 2011) (quotation omitted). After this "winter of discontent," Congress and the Interstate Commerce Commission commenced hearings regarding the problems faced by independent truckers. *In re Arctic Express Inc.*, 636 F.3d at 795. The ICC then promulgated the Truth in Leasing regulations, now 49 C.F.R. Part 376, in order to "protect [the] owner-operators" who drove the trucks. *In re Arctic Express*, 636 F.3d at 795 (quotations omitted). These regulations were designed to "promote ... a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties," and to "eliminate or reduce opportunities for skimming and other illegal or inequitable practices." Id. at 796 (quotation omitted). After Congress dissolved the ICC in 1995, Congress enacted 49 U.S.C. § 14704(a), which enables owner-operators to bring private lawsuits under the regulations against motor carriers registered with the Department of Transportation. See *Owner Operator Independent Drivers Ass'n, Inc. v. Swift Transp. Co.*, 367 F.3d 1108, 1110 (9th Cir. 2004) (discussing this regulatory history)."

[27] *In re Arctic Express*, 636 F.3d at 796.

January 2025

TIL rules, permits the motor carrier to engage in conduct that conflicts with the TIL rules, or otherwise gives the motor carrier more opportunities to violate the TIL rules.

Truck lease-purchase agreements give motor carriers more opportunities to violate the TIL rules because they give those motor carriers more control over the driver's decisions and compensation. For example, many leases require maintenance on a driver's leased truck to only be performed by vendors pre-approved by the carrier, thereby constituting a forced purchase. Drivers may also be required to purchase truck supplies and fuel only from specific vendors. Then through the control of a driver's work, the motor carrier can control a driver's compensation. And with control over a driver's compensation, motor carriers make deductions from driver compensation for the driver's obligations under the truck lease-purchase agreement. Drivers have alleged in litigation that carriers force drivers to default on their lease-purchase agreement by reducing their work, and therefore their compensation, under the independent contractor lease agreement.

The TIL rules also permit motor carriers to collect and maintain escrow funds on behalf of the driver, but the carrier must disclose the purpose of the escrow in their contract and limit withdrawals from the escrow to those purposes. The motor carrier must maintain escrow funds in an interest-bearing account, provide to the driver documentary proof of each expenditure for any deductions made from the escrow account, provide an accounting of the escrow fund upon request, and upon termination of the relationship, provide a final accounting of the escrow plus a return to the driver of any remaining escrow funds plus interest. Escrow funds are routinely collected as deductions from driver compensation and are, therefore, the driver's money. Under the Truth in Leasing rules, escrow accounts have been found to be constructive federal trusts.

Truck lease-purchase arrangements give motor carriers more opportunities to make deductions from drivers' escrow accounts. And as drivers in the reported litigation allege, motor carriers concoct phantom costs to deduct from driver escrow, without providing proof of such expenditures to the driver. Such activity is particularly acute at the end of driver/carrier relationships under truck lease-purchase agreements. Rather than return escrows, drivers have found motor carriers to routinely create false charges related to truck repairs (after they turned in the truck or had it taken away) and other obligations under the truck lease-purchase agreement to justify more escrow deductions that equal the amount of escrow the carrier was required to return to the driver. And prior litigation shows that motor carriers routinely refuse to provide drivers with documents showing the legitimacy of such charges.

Litigation by drivers attempting to enforce Truth in Leasing rules in truck lease-purchase agreements illustrates not only violations of the TIL rules, but much of the unfairness of lease-purchase agreements. This litigation also exposes the unfair and oppressive practices of motor carriers using truck lease-purchase programs. The limits of this litigation cases to address problems with independent contractor lease agreements demonstrates the need for additional action by policymakers to address the problems with lease-purchase programs.

### Fraud/Misrepresentation
As noted above, carriers often present only the most attractive aspects of the lease-purchase program to drivers, withhold critical information from drivers, and/or actively provide misinformation to drivers when recruiting them to the program. Drivers rely on carriers' representations and then are harmed because the representations are not true.

January 2025

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 22 of 52

Kelchner03519

## Misclassification/Minimum Wage

An aspect of a typical lease-purchase program is the independent contractor contract. In practice, drivers do not control enough business to be a true independent contractor. The motor carrier contracts and practices under those contracts exert control over all of the important aspects of drivers' work as is typical under employer-employee relationships. Thus, the classification of lease-purchase drivers as independent contractors rather than employees is often a misclassification.

Another inequitable advantage for motor carriers using independent contractor agreements is that the carriers can shift the cost of operation (hauling loads, fuel, truck maintenance and repair, insurance, tolls). With independent contractors, motor carriers can also shift the risk of downturns in the market onto drivers – by being able to terminate the contract of independent contractors rather than bear the cost of employee benefits and equipment payments and maintenance when those trucks sit idle due to fewer loads in a typical freight industry downturn.

As set forth in the Why Do Carriers Use Inequitable Lease-Purchase Agreements section, this often leads to drivers who should be treated as employees making below the minimum wage, and sometimes even making negative paychecks, in violation of the federal Fair Labor Standards Act[28] and its analog state laws. The Fair Labor Standards Act, which is a federal minimum wage law, provides: "Every employer shall pay to each of his employees who in any workweek is engaged in commerce" the federal minimum wage, which is now $7.25 per hour.[29] Drivers are harmed by being paid sub-minimum wages and not receiving benefits that they would if properly classified as employees, such as unemployment and workers compensation insurances, health and retirement benefits and paid time off.

## Unenforceable Contract

Work contracts and equipment leases are unenforceable because they are both procedurally and substantively unconscionable. They are procedurally unconscionable because carriers present the contracts and leases to drivers on a "take-it-or-leave-it" basis with no opportunity for drivers to negotiate any of their terms. Carriers then rush drivers through the signing of the contracts and leases, which are filled with legalese and fine print. Drivers are often not permitted to take copies of the documents off-site for more careful review by the drivers or others (e.g., family members, attorneys).

---

[28] 29 U.S.C. § 201 et seq. and its implementing regulations.

[29] See 29 U.S.C. § 206(a). See *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 664-665: "The Supreme Court noted in 1947 that these definitions in the FLSA are broad and do not clarify how to address "problems as to the limits of the employer-employee relationship under the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947); see also *United States v. Rosenwasser*, 323 U.S. 360, 362, 65 S. Ct. 295, 89 L. Ed. 301 (1945) ("A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame."). The common law also provides only limited guidance in marking the outer reaches of the FLSA's coverage. The Act was designed to reach working relationships that would not have qualified as employer-employee under the common law. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51, 67 S. Ct. 639, 91 L. Ed. 809 (1947). Congress designed the FLSA to reshape the economy to avoid the economic and social ills caused by low pay and long hours for workers, and the Act requires a different interpretation of its broader terms. See Fair Labor Standards Act of 1938, Pub. L. No. 75-718, § 2(a), 52 Stat. 1060, 1060; *Rutherford Food*, 331 U.S. at 727."

January 2025

Kelchner03520

The contracts and leases are substantively unconscionable because their terms are so oppressive, one-sided, and unlawful that no reasonable person would make them and no person with the time and ability to understand them would accept them.

**Forced Labor**

Motor carriers devise their lease-purchase contracts to permit the motor carrier to call the driver in default of the contract for any small violation or infraction, triggering draconian consequences, such as:

1. the acceleration of all remaining lease payments (which can total over $100k) to be immediately due;
2. immediate repossession of the truck; and
3. a negative entry on a driver's DAC report (an employment history consumer report frequently used in the trucking industry), which can jeopardize future employment.

Failure to make lease payments is considered a default of the lease. Termination of the contract with the carrier is often considered to be a default of the lease. These consequences for default, at the motor carrier's discretion, give the carrier enormous power to compel drivers to keep hauling for carriers under exploitative working conditions. Thus, carriers obtain labor from drivers by using threats of serious financial and professional harm, in violation of federal forced labor statutes.[30]

---

[30] 18 U.S.C. §§ 1589 and 1595 and its implementing regulations.

January 2025

Kelchner03521

## APPENDIX 3: EXISTING CONSUMER PROTECTION LEGAL AUTHORITIES SHOULD APPLY TO MOTOR CARRIER CONTRACTS FOR EQUIPMENT WITH SINGLE INDIVIDUALS

CFPB should use its existing authorities, specifically the Unfair Deceptive and Abusive Acts and Practices (UDAAP) (Section 1031 of the Dodd-Frank Act) and regulations M and Z (Consumer Leasing and Truth in Lending, respectively) under Section 5 of the Federal Trade Commission Act (FTC), and states' deceptive practice statutes that protect individuals from unfair or unscrupulous practices of more sophisticated parties, to protect individuals enticed into the agreements for the lease or purchase of equipment from motor carriers (or their affiliated companies). The following factors support this recommendation:

**Motor carriers recruit individuals who meet no underwriting standards, have no business experience, and sometimes have no trucking experience into abusive contracts.**
The Task Force did not observe motor carriers using any underwriting standard when recruiting individuals for their lease-purchase agreements. Accordingly, the terms and conditions of these leases often resemble those used by other finance companies with little or no underwriting, such as buy-here pay-here auto dealers and payday lenders. Motor carriers target individuals with little or no business experience or education. Some motor carriers recruit individuals without a CDL and promise to teach them how to pass the CDL test, lease them a truck, help them sign paperwork that purports to make them a business entity, and then promise them the work to make their truck payments and other financial obligations under the truck lease agreement. These practices take unreasonable advantage of drivers' inability to protect their interests when selecting the product and their reasonable reliance on the promises made by motor carrier to act in their interest. Such individuals enter into lease-purchase agreements with no greater level of sophistication in business as the average consumer.

**Lease-purchase agreements are deceptive and the product of unequal bargaining power.**
The lack of education, experience and sophistication of individuals targeted by motor carriers puts those individuals in the same posture as consumers seeking financial products or services – vulnerable to deceptive promises of wealth and success and unable to review or understand complex multi-page contracts before signing them. The absence of reasonable disclosures or the inclusion of potentially misleading disclosures represent material misstatements or omissions that would deceive any reasonable person and are even more likely to be especially deceptive to unsophisticated individuals. Motor carriers use their dominant bargaining position to create one-sided, often unconscionable lease-purchase contracts that give the carrier every advantage and deny the individual any real opportunity to operate as a business or succeed.

**Lease-purchase agreements do not turn individuals into businesses.**
Instead of performing any underwriting for the financial services they are providing, motor carriers use their unequal bargaining power to create one-sided contracts to mitigate their risks of hiring unqualified individuals. Under these lease-purchase contracts, motor carriers assume and maintain complete control over the individual's work and compensation. Carriers then use that control to make automatic deductions from driver compensation to pay for any financial obligations under the truck lease-purchase contract, including the truck payment and the maintenance and repair of the truck. As a result, individuals have no real discretion to make

January 2025

decisions that would lower their costs or increase their profitability. In other words, despite the name of the agreement or the paperwork filed to create a business form, the vast majority of lease-purchase contracts provide no opportunity for an individual to operate a business. A business is not created by these contracts or how the parties operate under them. Furthermore, given that drivers often live out of the trucks, truck lease-purchase contracts are fundamentally personal in a way that is not true of traditional small business financing.

**Lease-purchase agreements adhere to no reasonable commercial or regulatory standard.** So-called lease-purchase programs follow little or no standards or discipline for financial services agreements. The agreements are not clear whether they are leases under which the driver accrues no equity in the equipment (whereby the individual takes possession of the vehicle for a certain period of its depreciation, and then either returns the vehicle or is given the option to purchase it at its remaining value) or an equipment financing loan, whereby the driver accrue equity in the vehicle. The CFPB observed lease-purchase contracts that freely used terms appropriate for one or the other type of arrangement in the same contract and that are missing many of terms and disclosure required in one or the other type of contract. Individuals signing these contracts do not recognize this confusion and often believe that they are accruing equity in the equipment under the lease when they are not.

Although the trucking industry presents a different factual setting from that of other industries that provide financial products and services, the onerous, fraudulent, and unconscionable contracts and practices connected to such services in the trucking industry are neither novel nor unique.

January 2025

Kelchner03523

## APPENDIX 4 – PUBLIC COURTS DATA SUBCOMMITTEE TABLES

**Table 4. Weight of Freight Shipped within the United States by Mode (in Millions of Tons), 2021-2023**

| Mode | 2021 | 2022 | 2023 |
|---|---|---|---|
| Truck | 11,780 | 11,717 | 12,015 |
| Rail | 1,072 | 1,068 | 1,113 |
| Water | 615 | 618 | 644 |
| Air* | 2 | 2 | 2 |
| Multiple Modes and Mail | 508 | 509 | 526 |
| Pipeline | 3,292 | 3,422 | 3,490 |
| Other and Unknown | 78 | 80 | 77 |
| **Total** | **17,346** | **17,415** | **17,867** |

**Table 5. Percent of Total Weight Moved by Mode, 2021-2023**

| Mode | 2021 | 2022 | 2023 |
|---|---|---|---|
| Truck | 67.9% | 67.3% | 67.2% |
| Rail | 6.2% | 6.1% | 6.2% |
| Water | 3.5% | 3.5% | 3.6% |
| Air* | 0.0% | 0.0% | 0.0% |
| Multiple Modes and Mail | 2.9% | 2.9% | 2.9% |
| Pipeline | 19.0% | 19.6% | 19.5% |
| Other and Unknown | 0.4% | 0.5% | 0.4% |
| **Total** | **100.0%** | **100.0%** | **100.0%** |

**Table 6. Value of Freight Shipped within the United States by Mode (in billions of US dollars), 2021-2023**

| Mode | 2021 | 2022 | 2023 |
|---|---|---|---|
| Truck | 12,808 | 15,053 | 14,667 |
| Rail | 268 | 330 | 311 |
| Water | 229 | 323 | 274 |
| Air* | 162 | 171 | 183 |
| Multiple Modes and Mail | 2,605 | 2,885 | 2,938 |
| Pipeline | 1,154 | 1,756 | 1,398 |
| Other and Unknown | 2 | 2 | 2 |
| **Total** | **17,227** | **20,520** | **19,773** |

**Table 7. Percent of Total Value of Freight Moved by Mode, 2021-2023**

| Mode | 2021 | 2022 | 2023 |
|---|---|---|---|
| Truck | 74.3% | 73.4% | 74.2% |
| Rail | 1.6% | 1.6% | 1.6% |
| Water | 1.3% | 1.6% | 1.4% |
| Air* | 0.9% | 0.8% | 0.9% |
| Multiple Modes and Mail | 15.1% | 14.1% | 14.9% |
| Pipeline | 6.7% | 8.6% | 7.1% |
| Other and Unknown | 0.0% | 0.0% | 0.0% |
| **Total** | **100.0%** | **100.0%** | **100.0%** |

*Includes air and truck-air.

Notes: Data do not include imports and exports that pass through the United States from a foreign origin to a foreign destination by any mode. Data in this version are not comparable to similar data in previous years because of updates to the Freight Analysis Framework. All truck, rail, water, and pipeline movements that involve more than one mode, including exports and imports that change mode at international gateways, are included in Multiple Modes and Mail to avoid double counting. As a consequence, Rail and Water totals in this table are less than other published sources.

January 2025

Data Source: USDOT, Bureau of Transportation Statistics and Federal Highway Administration, Freight Analysis Framework, version 5.3, 2024, https://www.bts.gov/faf.

**Table 8. Number of Interstate CDL Drivers sorted by carrier fleet size**
Active, US-Only, For-Hire Interstate Carriers from 10/28/2024 MCMIS Snapshot

| Number of power units reported by carrier | CDL Drivers |
|---|---|
| 1 Power Unit | 345,602 |
| 2 Power Units | 159,868 |
| 3–10 Power Units | 534,139 |
| 11–100 Power Units | 917,303 |
| >100 Power Units | 1,741,798 |
| No Power Units/Unreported | 7,530 |
| **Total** | **3,706,240** |

**Table 9. Number of Intermodal CDL Drivers sorted by carrier fleet size**
Active, US-Only, For-Hire Interstate Carriers from 10/28/2024 MCMIS Snapshot

| Number of power units reported by carrier | CDL Drivers |
|---|---|
| 1 Power Unit | 150,607 |
| 2 Power Units | 183,845 |
| 3–10 Power Units | 224,219 |
| 11–100 Power Units | 68,980 |
| >100 Power Units | 400,250 |
| No Power Units/Unreported | 4,759 |
| **Total** | **1,032,660** |

**Table 10. Number of Intermodal CDL Drivers for Non-Interstate Carriers sorted by carrier fleet size**
Active, US-Only, For-Hire Interstate Carriers from 10/28/2024 MCMIS Snapshot

| Number of power units reported by carrier | CDL Drivers |
|---|---|
| 1 Power Unit | 70,417 |
| 2 Power Units | 177,584 |
| 3–10 Power Units | 203,753 |
| 11–100 Power Units | 4,603 |
| >100 Power Units | 100,942 |
| No Power Units/Unreported | 3,163 |
| **Total** | **560,462** |

January 2025

Kelchner03525

Case 1:24-cv-00082-CJW-KEM   Document 76-15   Filed 06/02/25   Page 29 of 52

**Table 11. Public court cases with estimated size of drivers impacted by predatory lease-purchase programs**

| Case | Class Date Ranges | Number of Possible or Actual Plaintiffs |
|---|---|---|
| Atkinson v. SuperEgo, 22-cv-4127 (N.D. Ill.) | 2016 - Present | Several thousand, possibly as many as 10,000+ class members |
| Beissel v. Western Flyer Express | 12/2017 - 03/2021 | 2,670 (Settlement Agreement) |
| Blakely v. Celadon | 2013 - 2017 | 6,786 (Statement of Facts for Class Cert.) |
| Brant v. Schneider | 12/1/2013 - Present | Estimated approximately 4,000 drivers |
| Brown v. Select One | 2/1/2014 - Present | Over 40 delivery drivers. |
| Canava v. RDS | 3/4/2015 - 10/21/2022 | 452 class members participated and 32 opted out prior to settlement above the 452 |
| Carter v. Paschall | | 4,659 lessees (Motion for Rule 23b3 Class Cert, 10) |
| Cervantes v. CRST | 10/23/2017 - Present | 3,696 drivers |
| Cilluffo v. Central Refrigerated | 6/1/2009 - 8/2017 | 3,456 drivers |
| Crosby v. Byland Transportation | 2012 - Present | 82 class members |
| Davis v. Colonial | | Hundreds (Motion to Cert Class, 25) |
| Dawkins v. NR 1 Transport | | Over 100 company drivers not paid one or more of their final paychecks (Complaint, 6) |
| Elmy v. Western Express | 2014 - 12/3/2021 | 6,289 drivers |
| Fox v. TransAm | 11/2/2008 - 2015 | 3,000+ |
| Gadson v. Stelle Corp., 23-cv-2977 (N.D. Ill.) | 2013 - Present | Estimated 100-500 class members |
| Huckaby v. CRST Expedited | 8/9/2017 - 4/10/2023 | Over 4,350 prospective class members (Memo in support of Class Cert, 1). |
| Malone v. ASAP Trans Corp., 22-cv-3572 (N.D. Ill.) | 2012 - Present | Estimated at 400 class members |
| Mervyn v. Atlas Van Lines, Inc. | | Thousands in Plaintiff Class (Complaint, 4). |
| New Prime v. Oliveira | 10/2/2012 - 5/8/2020 | 40,000 |
| OOIDA v. CR England--D Utah | 6/1998 - 5/2006 | 7,893 |
| Roberts v. CR England | 2007 - 2017 | ~17,000 |
| Stewart v. Interland, 23-cv-3306 (N.D. Ill.) | 2020 - 2023 | Estimated 500 class members |
| Van Dusen v. Swift Transportation Co., Inc. et al. | 12/22/1999 - 1/1/2019 | 19,955 drivers |
| OOIDA v. Arctic Express--SD OHIO | Approx. 4 years from 1993 - 6/1997 | 2,818 class members (13 opted out) |
| OOIDA v. Landstar | 11/1/1998 through end (2006 settlement) | At least 26,000 |
| OOIDA v. New Prime--WD Missouri | 10/1/2012 through end (2021 settlement) | Over 40,000 |
| OOIDA v. Swift | 6/1998 - 5/2003. Class not granted. | Estimated as many as 5,500. |

Note: Data collected from publicly available court documents and interviews with the plaintiffs' attorneys.

January 2025

Kelchner03526

## APPENDIX 5 – MEETING DISCUSSION NOTES

**Task 23-1: Information and Data Needs for Examining the Terms, Conditions, and Equitability of Common Truck Leasing Arrangements**

*Task 23-1: The Truck Leasing Task Force (TLTF) will provide a report to the Agency regarding TLTF's examination of the terms, conditions, and equitability of common truck leasing arrangements, particularly as they impact owner-operators and trucking businesses subject to such agreements. This task focuses primarily on information and data TLTF members believe the need to support their work as they plan their meeting schedule.*

### I. Assess the BIL language establishing the task force and the required topics to include in the final report.

A. Define the different types of owner operation. These include:
  1. Owner-operators under lease-purchase program.
  2. Owner-operators who have their own equipment that they service while operating under motor carrier authority (one contract).
  3. Owner-operators who operates under their own authority.
  4. Clarify and define truck leasing agreements in a uniform nationwide standard.

B. Reduce and revise carrier lease contracts.
  1. Language forcing drivers to waive their rights was noted in litigation. This can be exploitative of drivers.
  2. Carriers and companies skirting regulations need to be addressed.

C. Determine the standards and language used by different carriers in contracts. Understanding common industry practices will inform future recommendations.

D. Regulations governing traditional owner-operators differ from a driver who enters a "lease-purchase" program with a carrier.
  1. The rules regarding lease-purchase programs lack robustness.
     a. Familiarize members with the truth in leasing law (49 CFR Part 376).
     b. Have truth in leasing regulations worked in the trucking industry? Clarify the current impact of the truth in leasing laws.
     c. Lack of enforcement undercuts regulations and their adoption.
  2. Establish different rules and oversight for owner-operators versus "lease-purchase" drivers.
  3. Identify how language, either in current regulations or proposed changes, impacts long-haul vs short-haul drivers.
  4. Differences exist between "normal" equipment leasing agreements and truck leasing agreements.
     a. A large truck is a unique piece of equipment. If equipment fails, drivers absorb the costs.
     b. If a driver encounters mechanical troubles and must vacate the vehicle, they can be forced to use a truck supplied by their company, resulting in potential loss of pay and operational liberty.
  5. Clarification of the owner-operator definition is necessary. Also clarify whether leasing agreements provide a differentiation between an employee and an official owner-operator.

January 2025

Kelchner03527

6. Carriers currently hold outsized power over leasing agreements. This potentially erodes safety standards. Carriers can prevent drivers from making final payments on their leased equipment. Equity may be lost, and drivers potentially left with nothing.
7. Carriers should not own a driver's debt for a lease agreement.
8. Why do people get involved in lease-purchase contracts? Is it lack of credit and capital, along with the promise of ownership and improving financially?

**II. Data Needs**
A. Collect and analyze settlement sheets.
1. A review of final accounts could demonstrate the financial impact of leased vehicles for the lessor and provide oversight into potential bad behavior.
2. Examine the typical weekly take-home pay of drivers after leasing company deductions. Identify the percentage of agreements that conclude with drivers keeping the truck.
B. Determine what percentage of drivers participate in lease agreements.
C. Define lease purchase agreement and owner-operator lease agreements.
D. Predatory leasing agreements create a negative perception of the industry and harm drivers.
E. Request wage data from the Bureau of Labor Statistics for drivers in lease-purchase agreements.
F. Research the role of the broker/carrier in load brokering to determine how much a driver typically receives.
1. Investigate crash rates of companies using lease agreements.
2. Determine how drivers are getting trained, who is paying for it, and if there is a correlation between certain training models and drivers entering predatory lease agreements.
G. Obtain data on "bad actors" as well as those lessors who adhere to the regulations.
1. Determine if current regulations carry enough weight to address industry issues.
2. The fuel surcharge serves as an historical example of an attempt to control bad actors.
H. Determine the recruiting tactics used by companies and which groups of people statistically enter into predatory agreements.
I. Compile complaints against trucking businesses.

**III. Identify terms, conditions, and equitability of common truck leasing arrangements as they impact owner-operators subject to those agreements.**
A. Determine expectations, requirements, and flexibility of operations in the agreements and contracts held by drivers.
B. Effectively communicate with drivers who speak English as a second language.
C. The industry and public frequently misuse and mischaracterize the term "owner- operator."
D. Examine successful and unsuccessful owner-operator models.
E. Lease-purchase program conditions must meet a driver's logical expectations in terms of business hours, compensation, and operational freedom.
1. How can industry changes ensure drivers can access the owner-operator model fairly and equitably?
2. Standardize the process for drivers to progress into owner-operators.
3. Low load demand can result in drivers struggling to finish putting equity into their vehicle.
F. Determine criteria for entering into a leasing agreement and highlight problem areas for drivers.

January 2025

Kelchner03528

G. Establish underwriting standards across the industry and determine areas for improvement and best practices.
   1. Who is being put into the trucks after signing a lease agreement?
   2. Are these drivers ready technically and professionally?
H. Predatory lease agreements impact drivers' quality of life by creating professional and financial roadblocks.
   1. Financial constraints lead to deferred retirement and diminished quality of life.
   2. Determine retirement rates for average company drivers versus that of owner- operator.
I. Technological upgrades lead to mechanical concerns for drivers. Mechanical maintenance is typically not included in leasing agreements.
J. Determine the number of Commercial Driver's License (CDL) holders compared to current drivers.
K. In lease agreements, carriers require repairs to be completed at a preferred company, possibly associated with the carrier. This restricts drivers from access to the free market for repairs and maintenance. Require the disclosure of repair records to drivers entering into lease-purchase agreements.
L. Provide lessees with a record of the lease history for each vehicle.
M. Develop best practices for entering into a lease agreement for new, current, and potential owner-operators.
N. Determine and leverage organizations and associations that provide data to support reducing predatory leasing.
O. When considering load assignments, create recommendations that help drivers and address the needs of the operating companies.

## IV. Identify terms, conditions, and equitability of common truck leasing arrangements as they impact trucking businesses subject to those agreements.

A. Trucking businesses write the leases that favor the carriers. Individuals have limited options to negotiate or change terms.
B. Address motor carrier authority and clarify who controls equipment under operation.
C. Define the difference between equipment leases and service leases.
D. Targeting scams will help drivers and raise industry standards. Carriers sometimes take advantage of potential lessees with less experience.
E. Develop a list of best practices for carriers and share at truck stops, on social media and in modern communication channels accessed by drivers.
F. Post-pandemic economic disruption, recovery and transformation experienced by the industry makes leased vehicles more appealing to carriers. Potential regulations that might impact the supply chain require extra consideration.
G. Business incentives for exemptions to existing regulations diminish national roadway safety.
H. Determine how companies enforce leasing rules and whether new regulations would be limited by potential lack of enforcement.
I. For carriers with lease-agreement programs, determine if they have sustainable "freight rates."

## V. Identify organizations/experts that could provide presentations or briefings in upcoming meetings.

A. Hear from a variety of groups that can share perspectives, issues, and important topics for consideration.

January 2025

Kelchner03529

1. Real Women in Trucking.
2. North American Punjabi Trucking Association.
3. Lone Mountain Truck Leasing
4. Various trucking organizations could provide insight from both a driver and industry perspective on lease-to-purchase agreements.

B. Leverage FMCSA's Consumer Complaint Database for data requests and supply them with lease-agreement contracts for their opinions on compliance with current rules that could be enforced.

C. Determine whether the Federal Trade Commission (FTC) can hold carriers accountable for non-compliance. Request an overview of rules they enforce that could benefit task force initiatives.

D. Consider testimony from drivers who have experience with predatory-leasing agreements.

E. The Owner-Operator Independent Drivers Association (OOIDA) uses a robust communications platform.

F. Determine the impact of carriers that simultaneously operate as a mechanical shop, insurance provider, and other aspects of operations. Expenditures and upfront costs create a steep financial burden for drivers.

G. Solicit perspectives from applicants to TLTF who were not selected as task force members.

## Task 23-2: Common Truck Leasing Agreements Available to Drivers of Commercial Motor Vehicles and the Existence of Inequitable Leasing Agreements and Terms in the Motor Carrier Industry

*FMCSA asks the Truck Leasing Task Force (TLTF) to discuss common truck leasing agreements and ways some providers of such agreements create inequity through inappropriate terms or conditions. TLTF should identify any organizations or experts they believe could provide presentations or briefings to help the task force complete its work.*

### I. Inequitable language and conditions in common truck leasing agreements.
A. Vulnerabilities for drivers
1. Risks from being a non-native English speaker entering into lease agreements.
    a. The proportion of non-native English speakers has grown tremendously, requiring consideration when addressing predatory agreement vulnerabilities.
    b. Ability of non-native English speakers to access legal language in truck leasing agreements.
2. Drivers often lack the time, technical and the financial expertise to adequately review leasing agreements.
    a. Predatory agreements often constrain lessees financially, limiting access to legal assistance.
    b. Young drivers are often pressured to accept leases offered immediately upon completion of their training.
    c. False promises and scare tactics during negotiations pressure drivers to sign a lease.
3. The co-mingling of carriers and leasing companies creates an exploitative environment for drivers.
    a. Carriers can restrict drivers from using the leased vehicle, preventing them from ownership.

January 2025

Kelchner03530

     b. Limited financial opportunities exist for truck drivers who do not want to be company drivers and do not qualify for small business loans. Carriers have filled that void.

B. The absence of leasing agreement terms and procedures for facilitation of the lease often lead to predatory practices.
    1. Lessors frequently deny access to accounting statements, blocking lessees from tracking their process in meeting the financial obligations of the agreement.
    2. Lack of separation between income from transporting freight and income from leasing the truck creates barriers to understanding the driver's proportional income.
    3. Lessees frequently incur responsibilities as an employee that should be performed by the carrier.

C. Lease-to-purchase agreements are especially problematic.
    1. Leased trucks are often overpriced and leased to numerous drivers with no accounting for depreciation.
    2. Many drivers find that making payments on their leases is too great a financial burden, forcing them to seek extensions on leases or ultimately not purchasing the truck as planned.
    3. Agreements cater to individuals who may not meet typical industry underwriting standards.
    4. Predatory practices lead to driver burnout from working long hours to try to earn enough money to meet the obligations of the lease. The industry suffers from driver churn more than a driver shortage.

D. Provisions in leases allow carriers to deduct the cost of the lease and defer them to the lessee.
    1. This violates the leasing rules (49 CFR 376.12), prohibiting drivers from having to purchase anything from the carrier as a provision of the lease.
    2. Carriers deduct from drivers' weekly paycheck and control their escrow accounts.
       a. Carriers can deduct items not specified in the agreement such as penalties for a late delivery or vehicle maintenance.
       b. Drivers deciding to leave their escrow accounts are at risk of depletion by the carrier.
    3. Defaults result often from obligations to the carrier rather than non-payment, such as an escrow balance at the carrier's requested minimum.

E. If a lessee is terminated, a lessor can seize the vehicle despite a history of payments.

F. Carriers with successful and compliant lease-to-purchase programs can help develop industry standards.

G. Considerations for adjusting current lease-to-purchase programs:
    1. Restrict actions of the lessor to deter behaviors that make lease to ownership opportunities difficult for drivers.
    2. Encourage carriers to find additional ways to defer costs to drivers.
    3. Research successful lease-to-purchase agreement models to determine common terms and traits that result in lessees ultimately owning their vehicle.

H. Many lease-purchase agreements contain an irrevocable unconditional net-lease that requires a weekly payment no matter the circumstances.

I. Underwriting standards are necessary to determine if a lessee will earn enough capital to cover the payments and lease requirements.

## II. Creating a buyer beware format in lease agreements

A. There is a need for standardization of disclosures of each motor carrier lease program.

January 2025

Case 1:24-cv-00082-CJW-KEM   Document 76-15   Filed 06/02/25   Page 34 of 52

Kelchner03531

1. Disclosures would address how many drivers have completed the program, acquired a truck, and how much money the average driver took home.
2. Include average earnings for specific positions described in the lease agreement to give the driver context for financial resources and obligations.
B. Use underwriting models employed by the household/commercial real estate industry to determine whether an agreement is financially viable.

### III. Determine how to structure a lease purchaser's contract to include equity in each payment.
A. Clarify what is required in an equipment lease and what the required disclosure is.
B. Consider disclosing the average length of time each lessee was engaged in the lease program. This could assist with determining what percentage of drivers acquired the vehicle.
C. Drivers want to end leases with ownership. Many agreements do not set aside equity so at the end lessees must pay for the vehicle in full.
1. Drivers do not understand this and may stay in the position thinking incorrectly that they are putting equity into the vehicle.
2. Inform drivers clearly whether they are putting equity into the vehicle or they are expected to purchase the vehicle in full at the end of the agreement.

### IV. The types of owner-operators
A. Owner-operators under lease-purchase program. The drivers are employees and should not be responsible for duties/requirements of the employer.
B. Owner-operators who have their own equipment that they service while operating under motor carrier authority.
C. Owner-operators who operate under their own authority.

### V. Organizations and experts that could provide presentations or briefings to assist the task force complete its work.
A. Ask compliant carriers operating with lease-purchase programs to critique program deficiencies. Request insight from carriers of predatory practices they observe.
B. Ask Consumer Financial Protection Bureau (CFPB) to support data collection efforts.
1. Household and commercial real estate underwriting standards that safeguard parties from unfit or unprofitable investments do not exist in trucking.
2. Bad actors do not supply predatory data. Accounting level data is needed Explore measures beyond litigation and discovery to compel carriers to supply this information.
3. Utilize a lease-to-own framework for consumers and businesses to assess lease agreements in the trucking industry. TLTF requests basic legal requirements of a lease to compare with trucking industry standards.
4. Request drivers to volunteer agreements they have entered.
   a. CFPB seeks to review as many of these as possible, as they have been elusive to obtain.
   b. CFPB will redact personal identifiable information (PII).
5. Penalties for failure to follow Truth in Leasing (376.12) laws? Regulations are cumbersome to enforce.
   a. If a lessee can demonstrate damages for the carrier's failure to comply, they can receive amicus or injunctive relief.

January 2025

Kelchner03532

      b. It is difficult to demonstrate damages in court due to lax disclosure rules; the carrier can easily overpower a driver's argument in court.

6. Search dockets of cases brought against carriers for information on lease-purchase agreements.

## VI. Recommendations to deter the inclusion of inequitable terms and conditions in lease agreements.

A. Carriers starting a lease program should have to qualify for the ability to lend. Additionally, determine licensure, authority, and qualifications.

B. No carrier or their subsidiary or related entity should hold the debt of a driver, nor should it be held by a sister or affiliated company.

C. Implement a two-check system: a payment and cost for lease and a payment/cost for time could create a firewall between debt holders and work providers.

D. Categorize and define predatory practices in an existing sample of lease agreements. Provide this list for consideration to rulemaking or enforcement bodies.

E. Provide legal protection for young individuals from predatory leases.

F. External providers should insure leased equipment.

G. Require lessees to drive a predetermined number of miles before qualifying them for lease-to-purchase agreements.

H. Train drivers and prospective lessees on what a lease-purchase agreement entails and create a corresponding certification.

I. Create a flow chart containing different scenarios for entering leases to allow potential lessees to better protect themselves and understand their commitments.

J. Incorporate regulated underwriting standards into truck leasing agreements.

K. Regulate companies in a system like the Safety and Fitness Electronic Records System to understand the treatment of drivers though the leases. Withdraw operating authority if standards are not met.

L. Investigate non-regulatory means to inform drivers of risks before entering lease agreements.

M. Allow more operational freedom for drivers so they have control over where and when they drive.

N. Request information related to predatory lease complaints submitted to the FMCSA Hotline.

O. Investigate the turnover rate of drivers at carriers using lease-to-purchase programs.

P. Require carriers to provide accounting disclosures in an accessible and accurate format to lessees.

    1. Drivers need to understand what they need to do to be financially stable.

    2. Existing Truth in Leasing regulations give drivers the right to see the freight bill. Rarely, if ever, are drivers able to obtain these records without retaliation.

    3. Establish models of accounting. Basic standards are not being met nor do they exist.

Q. Require disclosure of exactly how much is deducted from a lessee's (?) pay based on the average first week of compensation. Every time a driver is dispatched or gets a load, they should be able to see how that will impact their finances and business.

R. Consult lessees who have successfully entered into ownership from a lease-purchase agreement and review ways to replicate their successes on a larger scale.

S. Prohibit the deduction of costs from the lease-purchaser if they are not defined in the lease agreement.

T. Leverage examples of successful representation of owner-operators in contracts.

January 2025

Case 1:24-cv-00082-CJW-KEM   Document 76-15   Filed 06/02/25   Page 36 of 52

Kelchner03533

U. Review the use of two-check systems and replicate documented examples of these contracts.

**Task 24-1: Inequitable Leasing Agreements and Terms in the Motor Carrier Industry and Whether They Affect the Frequency and Quality of Maintenance Performed on Subjected Vehicles**

*FMCSA asks TLTF to review and share inequitable truck leasing agreements and their terms, and discuss whether they affect the frequency and quality of maintenance performed on subjected vehicles.*

## I. Initial Discussion of Task 24-1
A. How inequitable truck leasing agreements affect the frequency and quality of maintenance performed on subjected vehicles.
1. Drivers do not earn enough under the lease to pay for maintenance.
   a. Cannot afford to do regular, preventive maintenance, including larger repairs like brakes or replacing tires.
   b. Cannot save funds to pay for immediate repairs (like a breakdown during a delivery).
   c. Must choose between family needs and maintenance.
   d. The above factors lead drivers to delay maintenance, which may increase costs and damage truck parts.
2. May exacerbate existing challenges in keeping up with maintenance, including lack of savings for unexpected maintenance needs.
3. Carriers often lease older and out-of-warranty trucks requiring more maintenance.
B. Inequitable leases are detrimental to drivers.
1. Carriers often include additional costs lessees must pay.
   a. Electronic logging devices, which measure time and miles driven.
   b. Carrier-mandated insurer may charge above-market rates.
   c. Carrier-mandated fuel supplier may charge above-market rates.
   d. Carrier-mandated repair shops. Carriers may deduct repair costs from driver income and provide little or no documentation on repairs.
2. Leases may include additional fees or expenses.
   a. Advances in pay from motor carrier/lessor.
   b. Late deliveries; no compensation for delays caused by customer.
   c. Use of MacroPoint and other programs used to track trucks.
   d. Late paperwork.
   e. Excess mileage.
   f. Determination of damage when returning a truck at the end of a lease, including tire wear. Carriers decide the amount, which may be excessive.
   g. Residual payments to receive truck titles.
   h. Out-of-service orders for failing roadside inspections due to maintenance issues.
   i. Worn tires or scratches on body of truck when driver leaves carrier without completing the lease. Fees drain remaining maintenance escrow funds that carrier should have returned to the driver.
   j. Forced purchases, which are unlawful to require as a condition of the lease.
3. Drivers may assume additional financial responsibility.
   a. Some carriers require a $1500 bond.

January 2025

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 37 of 52

Kelchner03534

    b. Some require a promissory note in exchange for an auxiliary power unit (APU), wet kit and/or hydraulics.
4. Excessive driving requirements, sometimes to catch up on lease payments, affect safety.
5. Requiring drivers to work exclusively for the carrier that leases them a truck.

C. Some drivers are especially vulnerable to inequitable leasing agreements.
   1. Young, new, and/or less experienced drivers.
     a. Do not understand how to estimate expected income.
     b. Do not know about expenses associated with operations and maintenance, including dispatch fees, insurance, tolls, and federal highway use tax.
   2. Recent immigrants.
   3. Drivers who speak English as a second language.
   4. Anyone without experience with contracts and/or lease agreements who does not see red flags in a lease or does not understand financial terms like non-amortizing loans.

D. Barriers and trends that perpetuate inequitable truck leasing agreements.
   1. Carriers have more access than drivers to:
     a. Financing.
     b. Information related to the transport market, including rates and available demand for loads.
     c. Information about the condition and repair history of their (usually older) fleet.
     d. Carriers have more legal support to add arbitration clauses in leases prejudicial to drivers, and/or to sue drivers who try to walk away from a lease.
   2. Drivers cannot afford to sue, or legal support costs more than what a driver seeks reimbursement for, such as escrow funds.
   3. Drivers who sue lessor/carrier/employer must find a new carrier to work with.
   4. Carriers/lessors may exploit lessees via escrow funds.
     a. Do not use escrow funds to pay for maintenance, which is the purpose of the fund.
     b. Claim escrow funds are insufficient to cover a repair.
     c. Do not specify rules related to escrow funds in the lease. Under Truth-in-Leasing rules, lessor should provide all details about deductions to escrow and pay interest.
     d. Do not pay driver interest on escrow funds.
     e. Do not give driver financial statements to which they have a legal right.
     f. Create paperwork that seems legitimate but hides unfair fees.
   5. Leases do not enumerate all financial obligations of drivers for their trucks in terms of costs (maintenance, tolls, insurance).
   6. Carrier control over leans, leases and drivers' income creates a predatory landscape where drivers end up losing their vehicle.
   7. Carrier offers loads at low rates that drivers cannot refuse given their financial circumstances.
   8. Carriers/lessors profit from lending to people whose expenses consistently outpace income, similar to pay day and title loans.
   9. Carriers falsely advertise high wages and income to potential lessees.
   10. Carriers often control the terms of the agreement.

E. Truck ownership and leasing models.
   1. Carriers may own a new or used truck and lease it.
   2. Carriers often do not own the truck; they finance the truck. Carriers profit by leasing the truck to a driver at a higher interest rate than it pays its own lender.

January 2025

Kelchner03535

3. Not all truck leasing companies are also motor carriers.
4. Different types of business models across the industry may pose barriers for drivers who want to switch carriers.

F. Labor issues and gray areas.
1. Rights of truck drivers who are employees vs. rights of drivers who are independent contractors. How do we ensure fair treatment of independent contractors?
2. Should leases exist between a driver and the carrier who is also their employer?
3. The applicability of Fair Labor Act varies.
4. How does the Federal Arbitration Act apply to leases?

## II. Best practices for creating more equitable truck leasing agreements.
A. Greater transparency and accountability by industry to deter bad actors.
B. Ensure information disclosure that benefits drivers.

## III. Recommendations
A. Create greater transparency for drivers.
1. Carriers provide financial information on escrow accounts.
2. Carriers provide the age and mileage of trucks, and maintenance records, which should match records of maintenance paid for by the prior lessee/driver.

B. Identify alternatives to carrier financing for drivers.
C. Consider whether this leasing model should continue and the consequences of its elimination.
1. Would those drivers become carrier employees?
2. What happens when drivers are paid fairly? This change may lead to a more efficient, safer industry, and/or higher wages may push up freight costs and transport rates.
3. Currently industry shifts some of its costs to drivers, government, and the public, both financially and in terms of safety.

D. Motor carriers should not be leasing companies.
E. Educate drivers before they sign a lease.
1. Provide information in multiple languages that reflect driver demographics.
2. Cover leasing terms, including operating expenses and projected income.
3. Explain financial terminology.
4. Budgeting for maintenance expenditures.

F. Define a framework for leasing agreements that is fair to drivers.
G. Better understand the terms of title loans and how they compare to high cost "payday" and other loans tied to short-term income streams.
H. Leverage forums to gather information from drivers and carriers/lessors.
1. The Mid-America Trucking Show (MATS) in Louisville, KY, March 21-23.
2. Hold a public meeting of TLTF at MATS.
3. Publish a notice in the Federal Register in advance of the meeting requesting that drivers provide specific information and documentation about their leases.
4. Provide a list of questions to gather information from drivers, carriers, and the public.
   a. Lease terms, length, and start and end dates.
   b. Make, model and year of tractor, and mileage at time of the lease.
   c. Down payment, interest rate, and weekly payments.
   d. How well did the driver understand the terms of the lease? If they did not understand, why not?

January 2025

Kelchner03536

e. How long did the driver have to review the leasing contract before signing it?

f. How well did the driver know the history/condition/maintenance needs of the truck they received? Was there an opportunity for an inspection?

g. Did the driver complete the lease-purchase as expected? If not, why not?

h. How much did the driver owe when ending the lease? Does the driver still owe money on the vehicle tied to the lease?

i. Why choose lease purchase over other types of purchase options?

j. How did the driver expect to benefit from the lease?

k. How did expectations compare with the reality of working under that lease?

l. Would the driver make a lease purchase again, knowing what they know now?

m. What information do drivers need before deciding on a lease?

n. What is the most challenging aspect of the driver/carrier relationship? What would the driver change about that relationship?

o. Did the driver understand their financial responsibility in the case of a major breakdown?

p. Was the driver familiar with how the company treats independent contractors vs. company drivers vs. lease-to-purchase drivers when demand slows? Lease-to-purchase drivers may be worse off.

5. Carriers discuss their business model.

a. Successful leasing programs, types of leases, and how carriers determine whether to lease older or newer trucks to drivers.

b. Identify bad actors.

c. Clarify underwriting methods. Do they use consumer credit scores or primarily cash flow when choosing lessees?

## Task 24-2: The Impact of Truck Leasing Agreements on the Net Compensation of Commercial Motor Vehicle (CMV) Drivers, Including Port Drayage Drivers, and Specific Agreements Available to Drayage Drivers at Ports Relating to the Clean Truck Program or Similar Programs to Decrease Emissions from Port Operations

*FMCSA asks TLTF to review truck leasing agreements and their impact on the net compensation of CMV drivers, including port drayage drivers, and specific agreements available to drayage drivers at ports relating to the Clean Truck Program and other programs to decrease emissions from port operations.*

### I. Initial Discussion of Task 24-2

A. How inequitable lease agreements benefit motor carriers at the expense of drivers.

1. Motor carriers/lessors control working conditions and earnings.

2. Motor carriers/lessors deduct lease payments and related fees from earnings.

3. Motor carriers often lease older or poorly maintained trucks.

4. Motor carriers sometimes lease trucks with inaccurate vehicle histories.

5. Many motor carriers require maintenance through proprietary repair shops.

6. Motor carriers sometimes unfairly dictate and deduct maintenance and operational expenses from driver earnings.

7. Motor carriers may not follow the terms of the lease agreement.

B. How inequitable lease agreements reduce driver autonomy and income and affect safety.

January 2025

Kelchner03537

1. Drivers make payments on a truck and pay for fuel, insurance and other costs, yet often fail to gain ownership of the truck after a lease ends.
2. Drivers often must work exclusively for the motor carrier/lessor.
3. Drivers often accept loads that pay a low rate from the motor carrier/lessor because of pressure to meet lease payments.
4. Drivers who refuse a load from the motor carrier/lessor risk retaliation. Motor carriers may offer drivers no loads or fewer loads, making them more likely to fall behind on lease payments.
5. Drivers work long hours to make lease payments. Lack of sleep and an erratic sleep schedule slow driver reaction time, which leads to crashes.
6. Drivers do not have effective or timely recourse to challenge the terms of a lease.
7. Drivers unknowingly may lease an unregistered truck.

C. Additional challenges of being a driver.
1. Lack of access to information about load rates.
2. The high cost of purchasing a truck.
3. Lack of financial education.
4. Some motor carriers post job openings for employees but instead hire drivers as independent contractors.

D. Some factoring companies for trucking have predatory practices. [Factoring companies buy account receivables from drivers at a discount. When done fairly, the practice provides drivers with more predictable cash flow.] Obstacles to finding alternative sources of CMV financing.
1. Some large banks do not market their lending services to drivers.
2. Many drivers may not qualify for a lease because of credit history.
3. Third-party leasing companies also may engage in predatory behavior.
4. Drivers who believe that truck ownership is a key to success will continue to be an easy target for predatory lenders.

E. Obstacles to finding alternative sources of CMV financing.
1. Some large banks do not market their lending services to drivers.
2. Many drivers may not qualify for a lease because of credit history.
3. Third-party leasing companies also may engage in predatory behavior.
4. Drivers who believe that truck ownership is a key to success will continue to be an easy target for predatory lenders.

## II. Information that Could Shed Light on Terms of Inequitable Leases

A. How drivers receive compensation and their cash flow under lease agreements.
B. The amount of compensation that motor carriers promise potential lessees compared with the amount lessees actually receive after working under an inequitable lease.
C. Motor carriers' financial statements.

## III.   Recommendations

A. Create a policy that governs the conduct of lessors.
1. Motor carriers and other leasing companies must provide drivers with accurate estimates about net income rather than gross revenue.
2. Motor carriers and other leasing companies must provide clear information about additional fees and costs tied to leases and truck operation.

January 2025

Case 1:24-cv-00082-CJW-KEM   Document 76-15   Filed 06/02/25   Page 41 of 52

Kelchner03538

3. Financial literacy training for Commercial Driver's License holders may help drivers better understand leasing obligations.
B. Define best practices for fair CMV leasing.
C. Structure leases so drivers can work for the motor carrier of their choice.
D. Structure leases so drivers can gain ownership of the truck by following the contract's terms.
    1. Create model contracts to ensure fair language.
    2. Unions and associations can review contracts and support drivers. The International Brotherhood of Teamsters has experience negotiating contracts for motor carrier employees, other drivers, and owner-operators.
E. Restructure pay so that drivers have autonomy to prioritize a lease payment over other obligations, such as rent or a mortgage, rather than the motor carrier/lessor being paid first by default.
F. Create new CMV financing models.
G. End leasing of trucks by motor carriers.
    1. Drivers would borrow from banks or other lenders independent of the motor carrier industry.
    2. Drivers would be free to work for any motor carrier.
    3. Drivers would be able to choose to work for motor carriers that pay more per load, and offer more work, steadier work, and better working conditions.

**Task 24-3: Whether truck leasing agreements properly incentivize the safe operation of CMVs, including driver compliance with the hours-of-service regulations and laws governing speed and safety generally and resources to assist CMV drivers in assessing the financial impacts of leasing agreements.**

*FMCSA asks its Truck Leasing Task Force (TLTF) to review whether truck leasing agreements properly incentivize the safe operation of CMVs, including driver compliance with the hours-of-service regulations and laws governing speed and safety generally and resources to assist CMV drivers in assessing the financial impacts of leasing agreements.*

**I. Initial Discussion of Task 24-3**
    A. Predatory truck leasing agreements do not incentivize drivers to operate commercial motor vehicles (CMVs) safely.
        1. Drivers often cannot afford regular maintenance.
        2. Drivers are often paid less than minimum wage, which TLTF suggests may result in their driving less safely.
        3. Drivers heavily in debt to their lessor cannot prioritize safety and may take greater risks on the road.
        4. Drivers may develop cumulative fatigue from being continuously on the road.
        5. Drivers often have a stressful work relationship with their motor carrier/lessor; constant stress contributes to crashes.
        6. Drivers often work long hours to deliver loads before their next paycheck.
    B. Predatory truck leasing agreements benefit motor carriers at the expense of drivers and driver safety.
        1. Motor carriers often profit when drivers do not fully understand lease terms.

January 2025

Case 1:24-cv-00082-CJW-KEM    Document 76-15    Filed 06/02/25    Page 42 of 52
Kelchner03539

2. Motor carriers may provide misleading information about leases, luring drivers with the promise of increased wages and enhanced ability to operate independently.
3. Motor carriers pass the costs of truck ownership onto the drivers.
4. Motor carriers often replace drivers who are sick rather than waiting for a driver to recover.
5. Motor carriers know most drivers do not end a lease successfully, which puts them in an advantageous position relative to the driver.
6. Motor carriers profit when drivers fail to complete a predatory lease successfully.
7. Motor carriers know that leasing a truck is a less expensive way for them to keep a truck in operation while often retaining ownership.

C. Resources that would help drivers identify and avoid a predatory lease.
  1. List of warning signs.
     a. The leasing company is the motor carrier or an affiliate of the motor carrier.
     b. Drivers are responsible for all operating costs, including maintenance.
     c. Drivers are not compensated for downtime when there is a required repair.
     d. Drivers cannot reject a load.
     e. Drivers cannot work for a motor carrier other than the lessor.
     f. Drivers do not gain equity in the truck from making lease payments.
     g. The motor carrier/lessor does not check a driver's credit history before offering a lease.
     h. Drivers can end leases only with great difficulty.
  2. List of organizations that provide information to drivers and/or advise drivers regarding leasing contracts. The Federal Trade Commission (FTC) and the National Labor Relations Board (NLRB) may have helpful information.
  3. Explore whether to add information for present and future owner-operators to FMCSA's Safety and Fitness Electronic Records System.

## II.     How to Shed Light on Inequitable Leases

A. Gather data and/or expertise to improve our understanding of predatory leasing.
  1. Publicly available data from lawsuits indicate the estimated default rate of drivers with lease agreements is between 90% and 95%. For comparison, the riskiest consumer loan market segment has a 33% default rate.
  2. Data comparing crash rates of drivers who are employees of motor carriers with those of lessees and owner-operators.
  3. Data illustrating whether some drivers are misclassified as contractors, including tax form data. The goal is to distinguish between drivers with predatory leases and drivers who own their truck and lease their services to a motor carrier.
  4. Data regarding the success rates of drivers who lease from motor carriers compared with success rates among other types of workers in other industries who hold leases. The Small Business Administration may be a possible data source on the success rate of loans under $100,000.
  5. Quantitative research on lease agreements.
  6. Examples of contracts from motor carriers with a successful and equitable leasing model.
  7. Insight from the Consumer Financial Protection Bureau and data from the National Consumer Complaint Database.

B. Explore changes that may address inequities in truck leasing.
  1. Two-check systems that separate wage payments for driving from payments and costs related to truck leasing. A driver receives one check for wages that deducts taxes and

January 2025

Kelchner03540

social security. A second check reflecting payments related to leasing includes deductions for fuel, fuel taxes, maintenance, and other expenses. Such a system would clarify whether a driver benefits from their lease. A downside to the two-check system is that it does not allow for legitimate tax deductions.

    2. Enable drivers to gain ownership of a truck after a determined number of truck payments.

C. Compare business franchising to inequitable truck leasing.

    1. Similar to a franchising company that leases a place of business, a motor carrier leases a truck.

    2. Similar to a franchisee, a driver/lessee operates under the authority of the carrier.

    3. In the same way that a restaurant franchisee must use the franchiser's preferred suppliers, a driver/lessee often must use the motor carrier's preferred suppliers for services.

    4. The regulatory model for franchises may serve as a framework for motor carriers and lessors.

        a. The FTC regulates franchising.

        b. Franchising companies must follow specific disclosure rules.

        c. A franchising company must disclose its affiliates.

        d. A franchising company must disclose the success and failure rates of franchisees.

## III. Recommendations

A. Create a set of disclosures that lessors/motor carriers must provide to potential lessees about the terms of the lease.

    1. Repair history of the truck to be leased.

    2. Specify how a driver can gain ownership of the truck.

    3. Stipulate whether the driver can work for other carriers using the leased truck.

    4. Stipulate whether a driver can reject loads.

    5. Estimated lessee take-home pay.

    6. The percentage of drivers affiliated with the leasing company that have sued the company or filed complaints in court.

B. Motor carriers/lessors must print disclosures on the cover of the leasing contract.

C. Motor carriers must provide drivers adequate time to read and review the contract.

D. Create and centralize resources to help drivers identify and avoid predatory leases.

    1. List of warning signs that a lease is predatory.

    2. Training modules to help drivers in the early stages of their careers.

        a. Describe employment classifications, including the difference between a direct employee and a contractor. Include the types of tax documents they must file.

        b. The pros and cons of different employment classifications.

        c. List trade unions and associations as resources that provide advice to drivers about contracts.

        d. Consider including this information as part of entry-level driver training programs, while recognizing that veteran drivers also sign predatory leases.

    3. Consider incentivizing drivers to educate themselves on leases.

E. Offer government-funded grants or financing to create a path toward truck ownership, using first-time home buyer programs as a model.

F. Create a mentorship program that pairs newer drivers with more experienced owner-operators.

G. Develop programs that encourage mutually beneficial relationships between motor carriers and drivers who own their own trucks.

January 2025

Kelchner03541

H. Assess whether a two-check system would benefit this segment of the industry.
I. Consider franchises as a regulatory framework.
J. End lease purchase agreements. It is never a good time to be a driver with an inequitable lease, even when there is high demand for trucking.

**Task 24-4: The opportunity that equitable leasing agreements provide for drivers to start or expand trucking companies.**

*FMCSA asks its Truck Leasing Task Force (TLTF) to review the opportunity that equitable leasing agreements provide for drivers to start or expand trucking companies.*

**I. Discussion of Task 24-4 and Comments on Consumer Financial Protection Bureau Presentation**
   A. Drivers who fail to complete a lease purchase agreement successfully often are not at fault.
      1. Drivers in lease purchase agreements often earn significantly less than drivers who are motor carrier employees.
      2. Drivers in lease purchase agreements often have little control over their operating costs or revenue.
      3. Drivers almost never say a lease purchase agreement helped them to start or expand their own business. Instead, drivers often say the agreements taught them difficult lessons about the trucking industry.
      4. Most drivers fail to complete lease purchase agreements successfully.
      5. Drivers would benefit from the elimination of lease purchase agreements.
   B. Drivers often enter into multiple lease purchase agreements during their careers.
      1. Drivers often falsely believe they will have greater control over the outcome of their next lease purchase agreement.
      2. Drivers may enter into a new lease purchase agreement despite having been frustrated by the terms of their prior lease agreement.
      3. Drivers who sign consecutive lease purchase agreements may suffer from optimism bias, which is a tendency to overestimate the likelihood of positive future events while underestimating the likelihood of negative future events. Workers who borrow from payday lenders show similar behavior resulting from optimism bias.
   C. Drivers may believe a lease purchase agreement is the best path toward truck ownership or employment.
      1. Drivers may not realize that working as an employee of a motor carrier and saving money can one day enable them to buy a truck.
      2. Drivers may not understand that a lease purchase agreement often is an expensive way to finance a truck.
      3. Drivers may not realize that an average credit score may qualify them for cheaper financing than a lease purchase agreement.
      4. Drivers who are unemployed, lack driving experience, have poor credit history, flawed work history, have recently graduated from training school or are recent immigrants may be more likely to sign a lease purchase agreement.
   D. Motor carriers often misrepresent the terms of lease purchase agreements or pressure drivers to sign one.
      1. Motor carriers may tell drivers they can walk away from the agreement without penalty, which is often false.

January 2025

Kelchner03542

2. Motor carriers often do not describe administrative fees or costs, such as insurance and repairs that a driver will pay for under the agreement.
3. Motor carriers often say drivers will earn a lot of money with a lease purchase agreement. Instead, drivers often earn very little after lease-related costs are deducted from their paychecks.
4. A motor carrier may tell a driver that no company trucks are available and signing a lease purchase agreement is the only way to begin driving right away.
5. Motor carriers often imply a lease purchase agreement will allow a driver to build equity in a truck, though lease payments do not build driver equity in the truck.
6. Motor carriers may offer to forgive driver training fees if a driver signs a lease purchase agreement, saying the deal benefits the driver.
7. Often, motor carriers design lease purchase agreements in a way that guarantees a driver will trigger a default clause. For example, a motor carrier/lessor assigns a driver a load that would force the driver to surpass federally mandated limits on their hours of service behind the wheel. Under the terms of the lease, both the driver who refuses to carry the load and the driver who breaks the mandated limit on driving hours will be in default.

E. Lease purchase agreements harm drivers and the trucking industry.
1. Drivers who are under pressure to meet the financial obligations of a lease purchase agreement may drive less safely.
2. Drivers may lose confidence in their ability to succeed after failure to complete a lease purchase agreement.
3. Drivers may be under pressure to falsify electronic driver logs to meet payments on their lease purchase agreements. Electronic driver logs help ensure drivers do not exceed federal limits on shift hours worked.
4. Motor carriers that do not participate in lease purchase agreements are often at a competitive disadvantage because their wage costs are higher than industry competitors using lease purchase agreements.
5. Motor carriers employing lease purchase agreements often control driver earnings and working conditions. This power dynamic is similar to indentured servitude.
6. Many motor carriers/lessors design lease purchase agreements to profit at the expense of drivers.
7. Many motor carriers that use lease purchase agreements find it more profitable to hire new drivers rather than to retain drivers, contributing to a driver shortage.
8. Transportation that comes at the expense of workers is not good for the economy. Equitable treatment ensures a more stable workforce better able to respond to increased demand.

F. More equitable financing alternatives for drivers.
1. Installment loans can create equity for the driver in a way that lease purchase agreements do not.
2. Lease purchase agreements should be designed to provide drivers with equity in the vehicle. A motor carrier/lessor would have more difficulty declaring a lease in default when a driver has ownership.
3. Lease purchase agreements should guarantee that drivers who make their payments will complete the lease successfully.

January 2025

Kelchner03543

4. Drivers would benefit from information about the interest rate they can access from lenders based on their credit score. Lessors often do not provide this information, setting a rate higher than the driver could get based on credit score and other factors.
5. Lease purchase agreements should include clear disclosures.
6. A two-check system that separates a driver's wages from their lease payments may improve the potential of driver leases to work for the driver.
7. No alternative or adjustment to lease purchase agreements will be equitable if the contracts perpetuate the existing uneven power dynamic between motor carriers/lessors and drivers. When the same entity offers financing to drivers and controls their earnings, drivers cannot speak up about labor issues.

## II. Recommendations
A. End lease purchase agreements that take advantage of drivers and lead to most drivers failing to complete their agreements successfully.
B. Alternatively, establish criteria to ensure lease purchase agreements are equitable for drivers and disclose clear terms prior to signing, including interest rates and driver creditworthiness.
C. Require motor carriers/lessors to provide information to potential lessees about the average length of time it takes to complete a lease purchase agreement.
D. Compare lease purchase agreements to traditional vehicle lending that operates under consumer lending regulations.
E. Require education for drivers about the terms and pitfalls of truck leasing agreements.
F. Clarify the impact of lease purchase agreements on turnover and potential driver shortages.

## Discussion Notes from TLTF Meeting of October 30, 2024

*At this meeting, the Truck Leasing Task Force's Subcommittee on Public Courts Data presented its report.*

## I. Discussion of Subcommittee on Public Courts Data Report
A. Motor carriers/lessors may utilize a consistent set of strategies that make lease purchase agreements profitable at the expense of drivers.
1. Motor carriers may misrepresent the terms of a lease, including potential earnings by a driver/lessee.
2. Motor carriers may tell drivers they cannot work for the carrier unless they sign a lease agreement.
3. Motor carriers/lessors often demand a driver/lessee works only for that motor carrier, controlling a driver's earnings and their ability to complete the lease.
4. Motor carriers often include provisions that allow them to terminate a lease at their discretion by claiming a driver has violated a contract clause, saddling a driver with termination fees and other costs.
5. Motor carriers may change driver pay rates at their discretion under lease agreements.
6. Motor carriers may overcharge drivers for insurance coverage and/or mislead drivers about the level of insurance coverage on a vehicle.
7. Motor carriers often pay wages below the minimum wage after deducting costs related to the lease from paychecks. Drivers/lessees may receive a 'negative' paycheck, which means their debt increased after a workweek.
8. Motor carriers may lend money to a driver/lessee against future paychecks, pushing a driver deeper into debt.

January 2025

Kelchner03544

9. Motor carriers/lessors often pass maintenance, repairs and other operating costs onto drivers, reducing the costs of motor carriers/lessors compared with motor carriers that do not have leasing programs.
10. Motor carriers with lease purchase agreements often have high driver turnover, which may discourage the organization of a union that would demand higher wages.
11. Motor carriers often lease older trucks that have low resale value and high maintenance costs.
12. Motor carriers may use a variety of terms inconsistently to describe a lease.
13. Motor carriers may employ the term 'lease purchase' to suggest a driver/lessee will build equity in a truck by making their lease payments. Instead, motor carriers may include an option to purchase a truck at the end of a lease.

B. Drivers may not understand fully the terms of a lease purchase agreement and its consequences.
1. Drivers may lack education or experience related to contracts.
2. Drivers who are not native English speakers may have difficulty reading a contract.
3. Drivers often receive little time to review the terms of a lease before signing.
4. Drivers may believe that lease payments build equity when that is not the case.
5. Drivers may believe a lease will lead to truck ownership, when in reality even the most productive drivers usually fail to gain ownership of a truck.

C. Litigation is not a remedy for drivers harmed by predatory lease agreements.
1. Motor carriers/lessors who settle claims with drivers/lessees may continue to perpetrate the same abuses.
2. Motor carriers often fight in court to ensure a driver/lessee is classified as an owner-operator instead of an employee.
3. Motor carriers may leverage their resources to test the boundaries of the law to continue to generate profit from inequitable leasing agreements.
4. Motor carriers may frame a lease as a contract between two businesses, implying there is a contract negotiation. However, drivers often have no say over leasing terms.
5. Motor carriers may include clauses in contracts to hamper the pursuit of class action lawsuits, making it more difficult for drivers to secure legal representation.
6. Drivers may have greater difficulty pursuing damages because of forced arbitration clauses, which mandate arbitration to prevent a driver from going to court.
7. Few drivers pursue lawsuits against motor carriers because of the time, money, and effort required.

## II. Discussion of Consumer Financial Protection Bureau (CFPB) Update

A. CFPB found similarities among the lease purchase agreements it reviewed for its upcoming report that analyzes leases submitted to FMCSA and their implications on predatory leasing of trucks to commercial motor vehicle drivers.
1. Leases may include broad provisions that enable a motor carrier to force a driver to default and allow a carrier to pursue the personal assets of a driver to collect damages.
2. Leases may stipulate that driver funds held in escrow for maintenance costs may be used for other purposes.
3. A driver often returns a vehicle without successfully completing a lease, enabling the motor carrier to lease the same vehicle again to a different driver.

B. The final report will include differences between lease purchase agreements and commercial car market leases that require disclosures.

January 2025

Kelchner03545

## III. Recommendations

A. FMCSA should collaborate with non-governmental entities to create educational materials to inform drivers about the pitfalls of lease purchase agreements.
   1. The materials should be accessible to drivers with a high school education and drivers who are not native English speakers.
   2. The materials should familiarize drivers with contract terminology, including forced arbitration, and help drivers recognize clauses that allow a motor carrier to terminate a lease at the motor carrier's discretion.
   3. The materials should warn drivers of the following:
      a. Any lease that allows a motor carrier to make automatic deductions from their paycheck and
      b. Any motor carrier that will not provide information about estimated net income for a driver during a lease.
   4. The materials should distinguish between net and gross earnings.
   5. The materials should provide an estimate of fair wages based on earnings per mile and other metrics and state earnings may fluctuate with transport demand.
   6. The materials should show the difference between classification as an owner-operator and classification as an employee, which includes unemployment, social security, and disability benefits.

B. End lease purchase agreements that enable motor carriers to profit at drivers' expense.

C. Alternatively, consider changes that will ensure drivers receive fair treatment.
   1. Regulate the lease purchase industry effectively.
   2. Allow motor carriers/lessors to lease only to drivers classified as employees.
   3. A driver would be classified as an employee until the successful completion of the lease.
   4. The motor carrier/lessor would provide the driver with a W-2 form to ensure a driver has a clear earnings statement and that the government receives tax payments.
   5. Only after the driver completes the lease and owns the truck would a motor carrier/lessor be able to reclassify the driver as an owner-operator.

D. Protect drivers from financial damages levied by motor carriers terminating contracts.

E. Ensure leasing contracts make clear whether a driver builds equity through payments.

F. Develop model contract language and/or a standard set of contract provisions.

G. Create a standard set of disclosures for both financing agreements and lease purchase agreements.

H. Disclosures would appear at the beginning of a lease purchase agreement.
   1. Disclosures would include the turnover rate of drivers/lessees at a motor carrier; whether a driver/lessee is classified as an independent contractor; and estimate driver/lessee net pay in the first weeks of the agreement.
   2. Disclosures would include information about insurance coverage and the contract would include copies of all related insurance policies.

I. Motor carriers/lessors should not be allowed to lend money to a driver, including loans against future paychecks.

J. Motor carriers should not be allowed to lease to a driver and also demand the driver works for them exclusively.

K. Motor carriers that coerce drivers into violating federal limits on hours of service should face immediate and significant consequences, such as ending their leasing programs.

January 2025

Kelchner03546

## APPENDIX 6 – TLTF MEETING ATTENDANCE

| Truck Leasing Task Force Board Meeting Attendance | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Members | 7/11/23 | 10/17/23 | 1/18/24 | 3/21/24 | 6/13/24 | 7/18/24 | 10/30/24 | 12/3/24 |
| Steve Rush Chair<br>Founder<br>Carbon Express, Inc. | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Tamara Brock<br>Founder/Owner<br>Brock Logistics, LLC | Yes | Yes | Yes | Yes | Yes | Yes | No | No |
| Paul Cullen, Jr.<br>Founding Partner<br>Cullen Law Firm, PLLC | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Troy Hawkins*<br>TTOH Consulting and Logistics, LLC | Yes | No | No | N/A | N/A | N/A | N/A | N/A |
| Jim Jefferson<br>Owner-Operator Independent Drivers Association | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes |
| Joshua Krause<br>OTR Leasing, LLC | Yes | Yes | Yes | Yes | Yes | Yes | No | No |
| Kaitlyn Long<br>Economist<br>International Brotherhood of Teamsters | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes |
| Lesley Tse<br>Attorney<br>Getman, Sweeney, and Dunn, PLLC | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes |
| Steve Viscelli, PhD<br>Associate Professor of Practice<br>University of Pennsylvania | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |

*Resigned 1/18/24.

January 2025

Kelchner03547



**APPENDIX 7 – TLTF STATUATORY LANGUAGE**

SEC. 23009. TRUCK LEASING TASK FORCE.

(a) ESTABLISHMENT. —Not later than 180 days after the date of enactment of this Act, the Secretary, in consultation with the Secretary of Labor, shall establish a task force, to be known as the "Truck Leasing Task Force" (referred to in this section as the "Task Force").

(b) MEMBERSHIP. —

(1) IN GENERAL. —The Secretary shall select not more than 10 individuals to serve as members of the Task Force, including at least 1 representative from each of the following:

(A) Labor organizations.

(B) Motor carriers that provide lease-purchase agreements to owner-operators.

(C) Consumer protection groups.

(D) Members of the legal profession who specialize in consumer finance issues, including experience with lease purchase agreements.

(E) Owner-operators in the trucking industry with experience regarding lease-purchase agreements.

(F) Businesses that provide or are subject to lease purchase agreements in the trucking industry.

(2) COMPENSATION. —A member of the Task Force shall serve without compensation.

(c) DUTIES. —The Task Force shall examine, at a minimum—

(1) common truck leasing arrangements available to commercial motor vehicle drivers, including lease-purchase agreements;

(2) the terms of the leasing agreements described in paragraph (1);

(3)(A) the existence of inequitable leasing agreements and terms in the motor carrier industry;

(B) whether any such inequitable terms and agreements affect the frequency of maintenance performed on vehicles subject to those agreements; and

(C) whether any such inequitable terms and agreements affect whether a vehicle is kept in a general state of good repair;

(4) specific agreements available to drayage drivers at ports relating to the Clean Truck Program or any similar program to decrease emissions from port operations;

(5) the impact of truck leasing agreements on the net compensation of commercial motor vehicle drivers, including port drayage drivers;

(6) whether truck leasing agreements properly incentivize the safe operation of vehicles, including driver compliance with the hours-of-service regulations and laws governing speed and safety generally;

January 2025

(7) resources to assist commercial motor vehicle drivers in assessing the financial impacts of leasing agreements; and

(8)(A) the opportunity that equitable leasing agreements provide for drivers to start or expand trucking companies; and

(B) the history of motor carriers starting from single owner operators.

(d) REPORT. —On completion of the examination under subsection (c), the Task Force shall submit to the Secretary, the Secretary of Labor, and the appropriate committees of Congress a report containing—

(1) the findings of the Task Force with respect to the matters described in subsection (c);

(2) best practices relating to—

(A) assisting a commercial motor vehicle driver in assessing the impacts of leasing agreements prior to entering into such an agreement;

(B) assisting a commercial motor vehicle driver who has entered into a predatory lease agreement; and

(C) preventing coercion and impacts on safety as described in section 31136 of title 49, United States Code; and

(3) recommendations relating to changes to laws (including regulations), as applicable, at the Federal, State, or local level to promote fair leasing agreements under which a commercial motor vehicle driver, including a short haul driver, who is a party to such an agreement is able to earn a rate commensurate with other commercial motor vehicle drivers performing similar duties.

(e) TERMINATION. —Not later than 30 days after the date on which the report under subsection (d) is submitted, the Task Force shall terminate.

January 2025

Kelchner03549