# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| HARLEY KELCHNER, an individual, individually and on behalf of all others similarly situated, | ) ) ) Case No. |
| Plaintiffs, | ) ) CLASS ACTION COMPLAINT |
| vs. | ) ) JURY TRIAL DEMANDED |
| CRST Expedited, Inc., CRST Specialized Transportation, Inc. CRST Lincoln Sales, Inc. and John Smith, an individual | ) ) ) ) ) |
| Defendants. | ) ) ) |

| | |
|---|---|
| HARLEY KELCHNER, ANTHONY HICKS, DANIEL WECHE, individually and on behalf of all others similarly situated, | CASE NO. 1:24-cv-00082-CJW-KEM |
| Plaintiffs, | FIRST AMENDED CLASS ACTION COMPLAINT |
| vs. | JURY TRIAL DEMANDED |
| CRST International Holdings LLC, CRST Expedited, Inc., CRST Specialized Transportation, Inc., CRST Lincoln Sales, Inc., John Smith, an individual, and Michael Gannon, an individual. | |
| Defendants. | |

Plaintiffs, Harley Kelchner, Anthony Hicks, and Daniel Weche (collectively "Plaintiffs"), individually and behalf of all others similarly situated, by and through their attorneys, bring this action against CRST International Holdings LLC, CRST Expedited, Inc., CRST Specialized Transportation, Inc., CRST Lincoln Sales, Inc., John Smith, and Michael Gannon (collectively "Defendants").

**INTRODUCTION**

This class action lawsuit is brought against trucking ~~companies~~company CRST International Holdings LLC ("CRST International") and its affiliates/subsidiaries, CRST Expedited, Inc. ~~(~~("CRST Expedited" a/k/a and d/b/a CRST The Transportation Solution, Inc.) ~~and its affiliate/subsidiary~~and CRST Specialized Transportation, Inc. ("CRST Specialized") (collectively, and to include other CRST ~~Expedited, Inc.~~International affiliates/subsidiaries, "CRST Trucking"), their affiliate CRST Lincoln Sales, Inc. ("CRST Lincoln Sales~~") and their~~"), principal owner and ~~director~~Chairman of the Board of CRST International John Smith ~~(~~("Smith~~)~~"), and President and Chief Executive Officer of CRST International Michael Gannon ("Gannon"). This class action arises out of CRST Trucking's "lease-~~driver~~ purchase" business opportunity program (the "Driving Opportunity")  whereby certain of its truck drivers

1.	_("Drivers") leased trucks from CRST Lincoln Sales and simultaneously agreed to provide driving services to CRST ~~Expedited, Inc or any of its divisions/subsidiaries~~Trucking utilizing such trucks.  Drivers are licensed commercial drivers responsible for safely operating a commercial vehicle and transporting CRST Trucking's customers' cargo.

2.	To be clear, this class lawsuit is intended to challenge all forms of the Driving Opportunity implemented, directly or indirectly ~~implemented,~~ by and at the behest of CRST Trucking and/or Smith and/or Gannon, including Specialized, Expedited, ~~Inc. and/or~~Flatbed, Dry Van, and any other subsidiaries/divisions utilizing the Drivers.

~~Smith including their specialized, flatbed, dry van, and any other subsidiaries/divisions utilizing the Drivers.~~

3. ~~Plaintiff~~Plaintiffs Harley Kelchner (hereinafter, "Kelchner~~"~~")"), Anthony Hicks (hereinafter, "Hicks"), Daniel Weche (hereinafter "Weche"), and the members of the putative Class ("Drivers") are ~~current and~~ former Drivers for CRST Trucking and lessees of CRST Lincoln Sales.

~~2. In connection with the offer, sale, and/or operation of the Driving Opportunity, Defendants violated the Iowa Business Opportunity Promotions Law, Iowa Code Ch. 551A et seq.~~

4. In connection with the offer, sale, and/or operation of the Driving Opportunity, Defendants violated the Iowa Business Opportunity Promotions Law  Iowa Code Ch. 551A et seq. (hereinafter "BOPA"). In enacting this law, the Iowa Legislature expressed an obvious and unequivocally high level of concern about abuse in the sale of business opportunities.[1]  Its reasons were wholly valid.  People looking to improve their economic lot in life can be easy prey for unscrupulous promoters. Moreover,  informational imbalances exist between sellers and purchasers regarding the viability of business opportunities.  To help alleviate those concerns, BOPA requires a fulsome "disclosure statement" to be delivered to purchasers ten days in advance of signing contracts or paying consideration for the business opportunity. Iowa Code § 551A.3. The prospectus must attach all related contracts and further contain information including, *inter alia*, complete statements substantiating any earning claims; training; bankruptcy and felony fraud history of the sellers; risk factors; audited seller financial statements; the number of business opportunities sold; the number of businesses cancelled or terminated (i.e. turnover); and a statement of the number of

---

[1] The Iowa Legislature was so concerned about the potential for abuse in the sale of business opportunities that, in addition to strict liability, it made BOPA's protections unwaivable:  "A waiver of this chapter by a purchaser prior to or at the time of sale is contrary to public policy and is void and unenforceable. An attempt by a seller to have a purchaser waive any rights given in this chapter is a violation of this chapter." Iowa Code § 551A.5.  Further, the Iowa Legislature put the burden on sellers of business opportunities to prove their offerings do not come within the terms of the statute: "In an administrative, civil, or criminal proceeding related to this chapter, the burden of proving an exemption, an exception from a definition, or an exclusion from this chapter is upon the person claiming it." Iowa Code § 551A.4.2.

purchasers who actually earned the represented amount of money in the opportunity. *Id*. The reasons for mandating these disclosures are to prevent fraud in the sale of business opportunities and to ensure that purchasers are provided with sufficient material information before choosing to purchase and participate.

5. Here, Plaintiffs seek to enforce BOPA liability on behalf of themselves and the Class in two major ways. First, the Driving Opportunity in all its forms meets the statutory definition of a "business opportunity" under BOPA. As such, BOPA required (and requires) Defendants to provide the fulsome disclosure document (and all related contracts) to each Driver candidate ten days before executing any contracts. Iowa Code § 551A.3. Defendants did not do so, leaving them strictly liable to Plaintiffs and the Drivers.[2] On this theory, the primary question left for the factfinder is whether Defendants can meet their burden that the Driving Opportunity is not a "Business Opportunity" within the meaning of BOPA. Iowa Code § 551A.4.2.

6. Second, and in addition to strict liability for failing to provide a disclosure document, BOPA contains various anti-fraud provisions that Defendants have violated for the reasons set forth below.[3] Importantly, BOPA is a remedial statute and is therefore not limited to strict concepts of common law fraud. Purchasers injured by a violation of BOPA's anti-fraud provisions have access

---

[2] Defendants' failure to provide Plaintiffs, and others, with the required disclosure document means they are strictly liable: "A person who violates the requirements for disclosure or for the contents of a business opportunity contract pursuant to *section 551A.3* is liable to the purchaser in an action for rescission of the contract, or for recovery of all money or other valuable consideration paid for the business opportunity, and for actual damages together with interest as determined pursuant to *section 668.13* from the date of sale, reasonable attorney fees, and court costs." Iowa Code § 551A.8.1. (emphasis added). The statute thus serves both deterrence and compensation goals.

[3] Specifically, Defendants have violated § 551A.9 of BOPA that provides, in pertinent part: "2. Advertising. A seller shall not, in connection with the offer or sale of a business opportunity in this state, publish, circulate, or use advertising which contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. 3. Misrepresentations, omissions, and misleading conduct. A seller of a business opportunity shall not do any of the following: a. Misrepresent, by failure to disclose or otherwise, the known required total investment for such business opportunity. b. Misrepresent or fail to disclose efforts to sell or establish more business opportunities than it is reasonable to expect the market or market area for the particular business opportunity to sustain. d. Misrepresent the training and management assistance available to the purchaser. e. Misrepresent the amount of profits, net or gross, which the purchaser can expect from the operation of the business opportunity. f. Misrepresent, by failure to disclose or otherwise, the termination, transfer, or renewal provision of a business opportunity contract. m. Misrepresent or omit to state a material fact or create a false or misleading impression in the sale of a business opportunity.

4

to a broad panoply of statutory remedies.[4]

4.7. Kelchner was a Driver from approximately March 2, 2022 ~~to the present. Kelchner seeks~~, to June 3, 2025. Hicks was a Driver from approximately January 13, 2025, to March 21, 2025. Weche was a Driver from approximately May 5, 2025, to August 18, 2025. Plaintiffs seek to certify an appropriate class action under Rule 23 of the Federal Rules of Civil Procedure.

5.8. ~~Kelchner seeks~~Plaintiffs seek the remedies afforded by Iowa Code § 551A.8 including ~~rescission~~return of monies paid into the opportunity, damages, interest, equitable, and injunctive relief, as well as available attorneys' fees and costs on behalf of ~~himself~~themselves and the Drivers.

## JURISDICTION AND VENUE

6.9. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because the aggregated claims of the putative class members exceed the sum value of $5,000,000, exclusive of interests and costs, and this is a class action in which at least one member of the putative Class, on the one hand, and Defendant, on the other, are citizens of different states.

7.10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as CRST Trucking and CRST Lincoln Sales have their headquarters and offices, conduct business, and can be found in the District, and the causes of action set forth herein have arisen and occurred in part in the District. ~~Venue is further proper under 29 U.S.C. § 1132(e)(2) because CRST Trucking has substantial business contacts within the state of Iowa and in this District. Defendant Smith is also a resident of the district.~~ Defendants Smith and Gannon are also residents of the district.

8.11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to ~~Kelchner's~~Plaintiffs' claims occurred in this judicial

---

[4] "In addition to any remedies provided by law, a person injured by a violation of this chapter may bring a civil action and recover damages or obtain other appropriate relief including injunctive or other equitable relief. If the person is the prevailing party, the person shall be awarded court costs, reasonable attorney fees, and expert fees which shall be taxed as part of the costs of the action." Iowa Code § 551A.8.4.

district.

**PARTIES**

3. Plaintiff Harley Kelchner is a resident of the State of Florida.

9.12. Kelchner performed work as a Driver for CRST Trucking from approximately March 2, 2022, to the presentJune 3, 2025. Kelchner regularly engaged in CRST Trucking's business in various locations, including within this judicial district.

13. Kelchner is informed, believes, and thereon alleges that Plaintiff Anthony Hicks is a resident of the State of North Carolina. Hicks performed work as a Driver for CRST Trucking from approximately January 13, 2025, to March 21, 2025. Hicks regularly engaged in CRST Trucking's business in various locations, including within this judicial district.

14. Plaintiff Daniel Weche is a resident of the State of Florida. Weche performed work as a Driver for CRST Trucking from approximately May 5, 2025, to August 18, 2025. Weche regularly engaged in CRST Trucking's business in various locations, including within this judicial district.

15. CRST International Holdings LLC is an Iowa limited liability company with its principal place of business in Cedar Rapids, Iowa. During the relevant time period, CRST International was and is engaged in business throughout the United States, including in Iowa. This Court has personal jurisdiction over CRST International because it is at home in Iowa.

10.16. CRST Expedited, Inc. is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. Dkt. No. 35 (Expedited Citizenship Disclosure). During the relevant time period, CRST Expedited was and is engaged in business throughout the United States, including in Iowa. CRST Trucking'sUpon information and belief, CRST Expedited is a wholly owned subsidiary of CRST International and its primary business consists of providing transportation services to various clients. This Court has personal jurisdiction over CRST Expedited because it is at home in Iowa. In addition, CRST Expedited has consented to the jurisdiction of this Court by appearing and litigating the case without objection.

6

11.17. Kelchner is informed, believes, and thereon alleges that CRST Specialized Transportation, Inc. is an Indiana corporation with its principal place of business in Fort Wayne, Indiana. Dkt. No. 33 (Specialized Citizenship Disclosure). CRST Specialized has been registered to do business in Iowa since at least 2020. Dkt. No. 40-6 (Specialized Cert. of Registration). During the relevant time period, CRST Specialized was and is engaged in business throughout the United States, including in Iowa. Upon information and belief, CRST Specialized is a wholly owned subsidiary of CRST ExpeditedInternational and its primary business consists of providing transportation services to various clients. The Court has personal jurisdiction over CRST Specialized because it consented to jurisdiction in Iowa by registering to do business here. In addition, CRST Specialized maintains the necessary minimum contacts in Iowa for the Court to exercise jurisdiction, as alleged throughout this Complaint, including but not limited to, its operation of a common enterprise with its Iowa-based corporate parent and related entities.

12.18. Kelchner is informed, believes, and thereon alleges that CRST Lincoln Sales, Inc. is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. Dkt. No. 37 (Lincoln Sales Citizenship Disclosure). During the relevant time period, CRST LincolnsLincoln Sales was and is engaged in business throughout the United States, including in Iowa. Upon information and belief, CRST Lincoln Sales is a wholly owned subsidiary of CRST ExpeditedInternational, and its primary business consists of leasing trucks to Drivers. This Court has personal jurisdiction over CRST Lincoln because it is at home in Iowa. In addition, CRST Lincoln Sales has consented to the jurisdiction of this Court by appearing and litigating the case without objection.

13.19. Kelchner is informed, believes, and thereon alleges that John Smith is an Iowa resident with his primary place of business in Cedar Rapids, Iowa. Dkt. No. 27 ¶ 8 (Smith Answer). During the relevant time period, John Smith was and is engaged in business throughout the United States, including in Iowa. Smith is the primarypartial owner and a directorChairman of the Board of CRST International and, as such, is the primary control person of all Defendants.the corporate defendants in

this case. In connection with the matters alleged herein, ~~Defendant John~~ Smith resides or has transacted business in this District. At all times material to this Complaint, acting alone or in concert with others, ~~Defendant John~~ Smith has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the other Defendants, including the acts and practices set forth in this Complaint. ~~Defendant John~~ Smith resides in the District of Iowa, or in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States. This Court has personal jurisdiction over Smith because he is at home in Iowa. In addition, Smith has consented to the jurisdiction of this Court by appearing and litigating the case without objection.

20. Michael Gannon is an Iowa Resident with his primary place of business in Cedar Rapids, Iowa. During the relevant time period, Gannon was and is engaged in business throughout the United States, including in Iowa. Gannon is the President and Chief Executive Officer ("CEO") of CRST International. In connection with the matters alleged herein, Gannon resides or has transacted business in this District. At all times material to this Complaint, acting alone or in concert with others, Gannon has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the other Defendants, including the acts and practices set forth in this Complaint. Gannon resides in the District of Iowa, or in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States. This Court has personal jurisdiction over Gannon because he is at home in Iowa.

**COMMON ENTERPRISE**

21. CRST Expedited, ~~Inc. (D/B/A **CRST The Transportation Solution Inc.)** and CRST~~ CRST Specialized ~~Transportation, Inc. (collectively, "CRST Trucking"), CRST~~, and CRST Lincoln Sales~~, Inc. ("CRST Lincoln Sales")~~ are all closely held companies~~—~~ overseen by parent company, CRST International—that ~~have operated~~operate and ~~functioned~~function as a common enterprise ~~while~~to induce individual commercial drivers to enter a fraudulent business opportunity by engaging in the deceptive acts and practices and other violations of law alleged in this Complaint. ~~They have conducted~~

~~the business practices described below~~Indeed, CRST touts itself to the public as being "comprised of eight operating companies integrated to create complete transportation and supply chain solutions," [5] Michael Gannon Dep., Ex. 1 (May 29, 2025) ("hereinafter "Gannon Dep."), and CRST Expedited, CRST Specialized, and CRST Lincoln Sales' corporate disclosure statements confirm that CRST International wholly owns all the operating companies. *See* Dkt. Nos. 34 (Specialized Corporate Disclosure), 36 (Expedited Corporate Disclosure), 38 (Lincoln Sales Corporate Disclosure). The Corporate Defendants have conducted, and continue to conduct, the business practices described herein as an interrelated network of companies that have common ownership, control, officers, directors, members, managers, office locations, customer databases, and mailing addresses. ~~Also, upon information~~ Each Corporate Defendant is and ~~belief,~~has been an agent of the other in the acts and conduct alleged herein.

22. CRST International is incorporated and headquartered in Iowa, and Smith, Chairman of CRST International's Board, is a citizen of Iowa. Dkt. No. 27 ¶ 8 (Smith Answer). Gannon, President and CEO of CRST International, is also a citizen of Iowa. CRST Expedited and Lincoln Sales are incorporated and headquartered in Iowa. Dkt. No. 35 (Expedited Citizenship Disclosure); Dkt. No. 37 (Lincoln Sales Citizenship Disclosure). While CRST Specialized is incorporated and purportedly headquartered in Indiana, Dkt. No. 33 (Specialized Citizenship Disclosure), it has been registered to do business in Iowa since at least 2020. Dkt. No. 40-6 (Specialized Cert. of Registration).

23. The Corporate Defendants ~~co-mingle funds and~~, including Specialized, all share the same registered agent—Cogency Global Inc. at 100 Court Ave., Des Moines, Iowa—and have common officers and directors (e.g., Chief Financial Officer Brent Mohasci, CEO and Director Michael Gannon, and Corporate Secretary and General Counsel Lisa Stephenson), all of whom are based at CRST International's, Expedited's, and Lincoln Sales' principal office: 3930 16th Ave, SW, Cedar Rapids,

---

[5] Some of these operating companies have since merged into Expedited. Gannon Dep. 41:17-43:6.

Iowa. *See* Dkt. No. 40-9. Stephenson is the head of legal for CRST International and its subsidiaries/affiliates, oversees safety and compliance across all subsidiaries/affiliates, and is involved in drafting/finalizing contracts for the lease purchase program. Gannon Dep. 57:3 – 58:1; LSI002289.

24. CRST Expedited, CRST Specialized, and CRST Lincoln Sales do not observe corporate formalities and do not have their own boards of directors or committees. Gannon Dep. 15:9-16. Only CRST International has a Board which oversees all of the subsidiaries/ affiliates, including CRST Expedited, CRST Specialized, and CRST Lincoln Sales. *See e.g.*, EXPEDITED015269. Smith is Chair of the Board and, as of August 2024, previous CEO and Director of CRST International, Hugh Ekberg, is a Board member.[6] The Board is responsible for company strategy, encompassing all subsidiaries/ affiliates. *See* SPEC009149 at 9153. During Board meetings, the revenue and operating income of CRST International's subsidiaries/affiliates are discussed. *See* SPEC008340 at 8359; EXPEDITED015269 at 15273. Objectives of Board meetings include "Improve Revenue Generation" through establishing quarterly targets for and monthly reporting on the various subsidiaries/affiliates. SPEC008340 at 8360. Board meetings are regularly attended by the Corporate Defendants' common officers and directors, with Mohasci, Stephenson, and Gannon (previously Ekberg) partaking in the Governance and/or Audit Committees and discussions on Compensation and Succession. *See e.g.*, SPEC008966 at 8969; SPEC008340 at 8343; Gannon Dep. 21:17-24.

25. Each affiliate/subsidiary, including Expedited, Specialized, and Lincoln Sales, have their own controllers who report directly to Meredith McDonald, the Vice President of Finance at CRST International, who then reports to Brent Mohasci, Chief Financial Officer ("CFO") of CRST International, and/or other executives employed by CRST International. *See* Gannon Dep. 34:9-35:24. These individuals then report to Gannon. *See id.* 12:7-19. Gannon is Smith's sole direct report, *see id.* 13:11-15; 49:3-7, and is responsible for "oversight of the five CRST business units [Home Solutions,

[6] News Release, CRST, *Mike Gannon Appointed CRST CEO and President* (Aug. 23, 2024), https://www.crst.com/blog/mike-gannon-appointed-crst-ceo-and-president/ [https://perma.cc/3YX6-VVFF]..

Specialized, Expedited, Flatbed, and Dedicated], our safety … and the overall success of the business units." *Id.* 11:19-23 The Corporate Defendants' common officers and directors all report to Gannon. *Id.* 49:8-12.

26. CRST International assesses insurance cost allocation across all subsidiaries/affiliates, including CRST Expedited, CRST Specialized, and CRST Lincoln Sales. EXPEDITED015269 at 15282. The Corporate Defendants—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—all share administrative services, including legal personnel, human resources, information technology infrastructure and support, and safety resources, with the associated costs allocated across the Corporate Defendants. *Id*. In fact, CRST International's affiliates/ subsidiaries do not have any in-house lawyers, relying on common officer and executive Lisa Stephenson. Gannon Dep. 32:7-24.

27. CRST International's executives, and executives for its subsidiaries, including CRST Expedited and CRST Specialized, attend joint strategy and planning meetings to discuss various matters, including plans for the Lease Purchase Program and the content of the Independent Contractor Operating Agreement ("ICOA") that governs the relationship between Drivers and the Defendants. Defendants utilized a shared document management system—crst.sharepoint.com—to store and circulate relevant documents, including drafts of the ICOA.

28. Marketing and advertising services are also shared among CRST International's subsidiaries/affiliates, including recruiting, recruiting-related marketing, and advertising. Jennifer Abernathy is responsible for the oversight of all of CRST International's affiliates/subsidiaries' operating divisions and, in particular, the enterprise-wide recruiting team. Jennifer Abernathy Dep., *Cervantes v CRST Int'l, Inc.*, No. 20-CV-75-CJW-KEM (N.D. Iowa Nov. 18, 2024) (Oct. 28, 2022) (hereinafter "Abernathy *Cervantes* Dep.") at 10:3-12 (EXPEDITED024226). The recruiting team recruits Drivers, including lease purchase operators, for all CRST entities, Michael Gannon Dep., *Cervantes* (Oct. 27, 2022) (hereinafter "Gannon *Cervantes* Dep.") at 22:7-13 (EXPEDITED022174),

and is composed of 10-12 Driver recruiters who report to various managers and supervisors, who then report to Abernathy. Abernathy *Cervantes* Dep. at 12:9-15 (EXPEDITED024226). Recruiting emails to Driver candidates are regularly signed "CRST Driver Recruiting Team."

29. Indeed, the Corporate Defendants rely on a shared method to identify potential customers (e.g~.~., Drivers) through lead referrals, ~~to~~ make Drivers aware of driving positions across all subsidiaries/affiliates, and sell their products ~~and~~, services, and the Driving Opportunity to Drivers through common telemarketing and recruiting staff, with the recruiter determining which subsidiary/affiliate (e.g., Expedited, Specialized, or Flatbed) is a better fit for either the Driver or CRST. *See* SPEC007578; Gannon Dep. 244:1-16.

30. Hires and Driver hiring targets are tracked on an enterprise-wide basis, EXPEDITED005792. Recruiting updates are also provided on an enterprise basis with monthly calls and associated PowerPoints titled "Enterprise Recruiting: Independent Contractor Recruiting" that discuss each affiliate/subsidiaries' advertising Key Performance Indicators and provide staffing updates on enterprise-wide recruiters. *See* EXPEDITED007416. Top sources for contractor recruiting leads are also evaluated on an enterprise-wide basis, EXPEDITED011084, as are instructions for third party recruiting efforts, EXPEDITED013141. Those individuals responsible for overseeing recruiting, such as Abernathy, are historically based in Iowa and report directly to Gannon. Gannon Dep. 74:10-75:24; 76:19-25; 117:8-14.

31. Once Drivers are employed and/or contracted, the Corporate Defendants—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—move Drivers freely among the subsidiaries/affiliates. *See* Gannon Dep. 97:4-22. There is also only one phone number for contractor recruiting leads regardless of what subsidiary/affiliate is involved. EXPEDITED010870.

~~14.~~32. Also, upon information and belief, the Corporate Defendants—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives,

including Gannon and Smith—co-mingle funds, bill customers and Drivers through a common billing department, and handle Driver dispatching and other elements of customer service through a common staff.  Indeed, the budgets for each affiliate/subsidiary are analyzed together. EXPEDITED005803. There is also an enterprise-wide finance team that manages financial accounting across the various CRST entities. Gannon *Cervantes* Dep., at 23:14-23 (EXPEDITED022174). Because these Corporate Defendants have operated as a common enterprise and each is the agent of the other, each of them is jointly and severally liable for the acts and practices described in this Complaint. Furthermore, DefendantDefendants Smith and Gannon, together with the corporate defendants hasCorporate Defendants, have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise and the acts and practices at issue in this Complaint.

### GENERAL ALLEGATIONS

15.33. KelchnerPlaintiffs re-allegesallege and incorporatesincorporate the foregoing paragraphs as though fully set forth herein.

34.   In order to induce Drivers to purchase the Driving Opportunity and defraud them out of their labor and money, CRST Trucking, at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith,  from within Iowa,  directed and implemented a fraudulent business opportunity scheme.  The scheme involved (a) running hundreds of, if not thousands, of false and misleading nation-wide internet ads, across multiple platforms (including online job boards and CRST's own website); (b) utilizing in-house and third-party recruiters to sell available Driving Opportunities to Driver candidates using misleading uniform scripted presentations that omitted material facts; (c) sending Driver candidates false and misleading "Lease Purchase Information Packet[s]" that omitted material facts; and (d) having Driver candidates attend orientation meetings where further false and misleading

13

representations were made and material facts were omitted. As noted in detail below, these activities involved generally false and misleading representations about the profitability and income to be earned in the Driving Opportunity, as well as the success to be had, all while concealing material information about the high turnover, low income, short tenures, and other poor outcomes and metrics suffered by those who purchased the Driving Opportunity. Importantly, the omitted material information and raw data supporting the same is, and has been, within the sole possession of Defendants and undiscoverable by Plaintiffs and the Class.

35. Importantly, and as detailed herein, CRST Trucking's Driver recruiting and advertising available "lease purchase" opportunities. operations were centralized in Iowa and operated on an enterprise-wide basis, including handling, and ensuring adequate staffing for, recruiting for the Driving Opportunity regardless of the division, tracking sources for contractor leads and Driver hiring, and instructing recruiting efforts. *See* EXPEDITED005792; EXPEDITED007416; EXPEDITED011084; EXPEDITED013141. As directed by Abernathy, who reports directly to Gannon, the general recruitment process across all CRST International's affiliates/subsidiaries begins with getting a Driver candidate to contact CRST, often through placement of an advertisement. Abernathy *Cervantes* Dep. at 18:18-24 (EXPEDITED024226).

16.36. For example, attached as Exhibit A is an adadvertisement found on LinkedIn jobs placed by CRST The Transportation Solution, Inc.¹. stating:

> CRST Specialized Solutions is one of the nation's largest transportation companies, providing total transportation solutions and comprehensive logistics services to customers all over North America. We are looking for independent contractors (Lease Purchase) that would enjoy hauling specialty freight across the country.
> • Lease Purchase Positions
> • Solo or Team
> • One-Three weeks out, Home time is up to you
> • Solos earn up to $190,000++$1.79 CPM- fluctuates as fuel surcharge changes
> • $1.79 CPM- fluctuates as fuel surcharge changes
> •
> • Teams earn up to $350,000+
> • $+$1.89 CPM – fluctuates as fuel surcharge changes

- 
  • Up to a $4k Sign on Bonus
  • Manual or Automatic Transmission trucks
  • Freight assistance loading and unloading
  • Tolls are 100% paid

[1] This is a dba of defendant CRST, Expedited, Inc .

17.37. Attached as Exhibit B is another such adadvertisement stating:

Lease purchase

CRST's industry-leading $0 Down Lease Purchase Program supports you at every step of the way from driver to business owner. It's a career overhaul designed to generate profit and get you in the mindset of a small business owner. We're going strong with half a century of success, and we don't intend on slowing down anytime soon. Low payments—no credit check required! Program participants are entitled to:
• Well-maintained, late-model Freightliner Columbia
• Series 60 14.0-liter Detroit engine, Straight 10 transmissions, Jake Brakes, and 72" raised-roof sleepers
• Guaranteed bumper-to-bumper maintenance
• Consistent hometime
• 99% no-touch, 80% drop-and-hook freight
• Zero-charge trailers at a 2:1 trailer-to-tractor ratio
• Best-in-class safety program, including driver-decision shut-down policy

38.    Exhibit C contains another such adadvertisement stating in pertinent part: (emphasis in original):

COMPANY OVERVIEW:

CRST Expedited is Looking for Truck Drivers of All Experience Levels!
• Recent Graduates - Tuition Reimbursement!
• Experienced - Earn more as a Lead Driver and Train your own partner!
• Students - Sponsored Class CDL A with job placement!
• Military Veterans - Earn your Class A CDL with our New Apprenticeship Program!
**Call for details**! 866-735-1375

CRST Expedited, Inc. is the nation's largest team carrier and has been recognized as one of the top dry van companies in America. We are extremely proud of our company's reputation, which exceeds 50 years, and believe that our success can be attributed to the professional drivers we employ and the excellent staff and management team that cares about our drivers. As the largest team carrier in the nation, we offer more miles, more money, and guaranteed hometime! We are committed to hiring qualified individuals who are dedicated to driving safely and meeting the needs of our customers. We have opportunities for experienced teams, experienced OTR driver trainers, Owner Operator teams, Lease Purchase teams, recent school graduates, or those looking for a company sponsored training program.
Drivers are the foundation of CRST. In our Gold Rules culture, we recognize that our drivers are the most important part of our business. Your success is vital to our company's success! We are committed to respecting our drivers,

responding to issues, and resolving problems to the best of our ability.

***

Lease Purchase Program
Are you a professional driver passionate about taking your career to the next level? If you have 6 months recent CDL ~~AverA~~ over the road driving experience, a good work history, and safety record you may qualify for CRST's Lease Purchase program!
~~program!~~
• No Credit Check, No Money Down
• Low truck payments
• Low Deadhead, No Forced Dispatch
• Lucrative percentage pay package - Double your Profits!
• Aggressive fuel discounts
• Guaranteed Hometime
• Currently Leasing Freightliner Columbias & Cascadias 2013-2014

CRST offers 70% of revenue plus 97% fuel surcharge- current fleet earns on average $1.45 per mile to the contractor. CRST offers opportunities for teams, solos, lead drivers, and dedicated lanes in certain markets. As a Lease Purchase driver you can double your miles by training a CRST driving school graduate or hiring a co-driver from our fleet. Call one of our Lease Purchase Specialists with over 25 years of trucking experience! 866-836- 2691

~~18.~~39. ~~In consistent fashion,~~ CRST Trucking advertises its lease purchase program on its website[27] with the following verbatim statements that bring it within ~~the Iowa Business Opportunity Promotions Act~~ BOPA:

YOU'RE IN THE DRIVER'S SEAT AT CRST!
LEASE PURCHASE DRIVERS EARN AN AVERAGE OF $215,000/YEAR
NO CREDIT CHECK; $0 DOWN PAYMENT
GUARANTEED BUMPER-TO-BUMPER MAINTENANCE & REPAIRS
WALK-AWAY LEASES

LEASE PURCHASE

---

[7] Lease Purchase, CRST,  https://crst.com/driving-careers/leasepurchase/
[https://web.archive.org/web/20240304114813/https://crst.com/driving-careers/leasepurchase/]

[2] https://crst.com/driving-careers/leasepurchase/

Experienced, over-the-road Class-A CDL drivers have the opportunity to join our highly profitable CRST Contractors Lease Purchase Program and work towards ownership of your own pre-owned truck.

Average CRST Lease Purchase drivers earn six-figure pay.

When you partner with CRST, you will be supported by all of CRST, including our terminals and shops, tools, and optional benefit programs. If you like the idea of owning your own business, we support and want to partner with you.

WHY LEASE PURCHASE?

$0 money down
 No credit check
 Low truck payments
 Sign-on       bonuses       available

WHAT'S YOUR NEXT HAUL?

At CRST, we offer excellent options for both team and solo drivers with multiple freight types. Find the route right for you and earn record breaking revenue.

Call a recruiter for more information! 866-660-1453.

SPECIALIZED DRIVERS

Our specialized drivers get the opportunity to haul high-value products, such as beautiful museum exhibits, advanced technology and more. Begin in our entry-level High Valued Products Fleet and work your way up to one of our Specialty Fleets. We offer a unique compensation package that combines mileage pay and handling pay.

In CRST's Specialized Transportation division, we have an incredibly low turnover rate and the average driver tenure is 10 years. We also have the best team, so you'll always feel supported. Our top teams earn $480,000 per year!

FLATBED DRIVERS

CRST's owner operators are not afraid to get their hands dirty-they are tough and committed to building on our extensive history that dates back decades. We have mutual trust; they're free to drive how they want. Now, you can be free, too. Choose the lanes and routes that work best for you. Our flatbed freight includes metal products, building construction products, machinery, over-dimensional and overweight freight, like roller coasters.

Boost your potential earnings with CRST Flatbed, known for strength, stability, and success.

We now offer one week flatbed training!

No experience needed to take the one week Flatbed Securement Certification Course. Flatbed contractors can earn up to $325,000/year!"

Benefits
Current average linehaul $3.60/mile
Line Haul Rates - Up to 75% of the linehaul
Load Board
100% of Fuel Surcharge, Detention & Tarping Pay No Forced Dispatch
Choose Your Home Time
Medical, Dental, and Vision Insurance ~~Payments As Low As $425/Week  Late Model Cascadias~~
Payments As Low As $425/Week
Late Model Cascadias


DRYVAN

Check out our team driving opportunities, and get the chance to average $200,000/year as an expedited team, and mentors can earn up to $150,000/year.
Our freight is almost entirely No Touch and Drop and Hook. It's also mostly single pick-up, single delivery, and customer-handled. This means you will spend the majority of your time behind the wheel, earning more money!

40. Once contact is made with a Driver candidate, Abernathy's recruiting team puts them in contact with a recruiter. Abernathy *Cervantes* Dep. at 18:18-24 (EXPEDITED024226). As part of this process, and early on, CRST Trucking's recruiters email (or otherwise provide) all Driver candidates a Lease Purchase Information Packet ("LPIP") prior to the Driver purchasing the Driving Opportunity, ~~Drivers were financially dependent upon and controlled~~and regardless of the division. *Id.* at 88:2-7; 88:18-23. The LPIPs provide information about the Driving Opportunity and are intended by Defendants to be information the Driver candidates would rely on, which they all did. Indeed, CRST International expects the LPIPs, regardless of division, to "provide information of … what the contractor can expect and some specific details" about the program. Gannon Dep. 173:2-8.

41. The LPIP emailed to Kelchner on or about February 23, 2022 (SPEC002290-SPEC002292), made, in pertinent part, the following verbatim representations (emphasis in original):

**Lease Purchase Information Packet**

- ***CRST Specialized Solutions***! We are an elite division of CRST located in Fort Wayne, IN. We have been in business for over 60 years….Our fleet is an Independent Contractor Fleet, we pair you up with your own dispatcher to help you be successful…

- The below pay info is based on a 48-week work year:

  o Solo Truckload Blanketwrap Pay- 2200 -2500 miles Solo per week.
    - **$1.72 cpm average per mile - fluctuates as fuel surcharge changes**….
    - **Average 1099 Gross Revenue of $190,000 per year**

  o Team Truckload Blanketwrap Pay-3500-4200 miles or more per week
    - **$1.81 cpm average per mile - fluctuates as fuel surcharge changes**…
    - **Average 1099 Gross Revenue of $350,000 per year**

- **Lease Purchase Costs - *not including fuel and DEF***

  • We offer 2016-2019 Freightliner Cascadias with auto and manual transmissions (we pick your truck for you; our goal is to get you something that will help you be successful in your LP)….

  • Our lease program is No Money Down, No Credit Check, Walk-Away….

  • Maintenance Program- to give you peace of mind for repairs and maintenance while starting your own business.…

  • SOLO LP costs: $425 - $560 per week for lease payment

  • TEAM LP costs: $910 - $1025 per week for lease payment

42. The LPIP emailed to Hicks in July 2024, in pertinent part, made the following verbatim representations:

**Lease Purchase – Contractor Information Packet.** *Independence and support you need to grow your business*

  • CRST Flatbed Solutions has been an industry leader since 1955, implementing the most profitable program in the business! We are load board driven so that you can oversee your own business!

  • CRST Flatbed Solutions conducts onboarding for the lease purchase program every Monday and Wednesday … CRST Flatbed Solutions will arrange your transportation via Greyhound or rental car and reimburse your fuel cost … We will also provide you with lodging ($0 expense) paid for by CRST Flatbed Solutions. Meals – Breakfast served at hotel and Lunch is catered in daily.

  • LEASE PURCHASE

  • Experienced over-the-road Class-A CDL drivers have the opportunity to join our highly profitable CRST Contractors Lease Purchase Program and work towards ownership of a pre-owned truck. Average CRST Lease Purchase drivers earn six-figure

pay. When you partner with CRST, you will be supported by all of CRST, including our terminals and shops, tools, and optional benefit programs. If you like the idea of owning your own business, we support and want to partner with you.

- WHY LEASE PURCHASE?

- $0 money down

- No credit check

- Low truck payments

- Walk away lease

- **Operation**

- Autonomous Operations – You will have the opportunity to run your business with limited operations support. Access to the load boards, maintenance, safety, load planning, etc. will be your responsibility. This option provides a commission of 75% of the AGR.

- Fleet Management Operations – If you select this option a Fleet Manager will be assigned to your assist and support your business growth. Fleet Managers provide a behind the scenes support level to assist with load planning, back hauls, safety, and maintenance support. In addition to these services, your Fleet Manager is your advocate to support your business growth providing vital operating statistics, recommending operational charges to running behaviors, and assisting with load planning to maximize earnings balanced with appropriate home time. This option provides a commission of 70% of the AGR.

43.     Before and after sending Driver candidates the LPIP, CRST Trucking's recruiters send false and misleading statements via email and communicate the same statements with Driver candidates via telephone. Specifically, CRST Trucking instructs its recruiters, in detail, on how to "sell" the Driving Opportunity and provides them uniform scripts to follow in providing information to Driver candidates. This recruiting strategy was employed on an enterprise-wide basis. For example, in June 2024, CRST Trucking had therecruiting manager Lyndsay Perez Navarro emailed the entire recruiting team on how to "HOW TO SELL IT!" and provided a script describing the aspects of the Driving Opportunity offered for the Specialized division. SPEC002328. The script instructed and authorized CRST Trucking's recruiters to represent to driver candidates, in pertinent part, the following verbatim statements:

- CRST Specialized Solutions is an elite division of CRST

- The top 25% of our solo contractors gross $4200/wk, and net $1800/wk average or

MORE!

- The top 50% of our solo contractors gross $3850/wk, and net $1500/wk average or MORE!

- Teams average 4000-5000 miles weekly. Average weekly gross $8K-$10K.

- Experienced, over-the-road Class-A CDL drivers have the opportunity to join our highly profitable CRST Contractors Lease Purchase Program and work towards ownership of your own pre-owned truck. Average CRST Lease Purchase drivers earn six-figure pay. When you partner with CRST, you will be supported by all of CRST, including our terminals and shops, tools. and optional benefit programs. If you like the idea of owning your own business, we support and want to partner with you.

- WHY LEASE PURCHASE? • $0 money down • No credit check • Low truck payments •Walkaway Lease

44.     The script further provided recruiters with exemplar proformas of income and expenses to discuss with the Driver candidates. *See id.*

45.     Also in June 2024, recruiting manager Perez emailed her team another "HOW TO SELL IT!" script for a different division's (CRST's Flatbed) lease purchase program. SPEC002323, SPEC002326.  Flatbed is within the Expedited division.  Specifically, recruiters therein were instructed and authorized in writing to provide income projections and tout to Driver candidates the following verbatim:

- CRST Flatbed Solutions has been an industry leader since 1955, implementing the most profitable program in the business!

- Currently our contractors are averaging approximately -$3.10/mi + FSC

- Fleet Managers provide a behind the scenes support level to assist with load planning, back hauls, safety, and maintenance support. In addition to those services, your Fleet Manager is your advocate to support your business growth providing vital operating statistics, recommending operational changes to running behaviors, and assisting with load planning to maximize earnings balanced with appropriate home time.

- Experienced, over-the-road Class-A CDL drivers have the opportunity to join our highly profitable CRST Contractors Lease Purchase Program and work towards ownership of your own pre-owned truck.

- Average CRST Lease Purchase drivers earn six-figure pay.

- When you partner with CRST, you will be supported by all of CRST, including our terminals and shops, tools, and optional benefit programs. If you like the idea of owning your own business, we support and want to partner with you.

• WHY LEASE PURCHASE? • $0 money down • No credit check • Low truck payments •Walkaway Lease

46.    The script further provided recruiters with an exemplar proforma of income and expenses to discuss with the Driver candidates. *See id*.

47.    In line with these enterprise-wide recruiting efforts, Hicks received numerous false and misleading statements via email from CRST recruiters, including Margaret McClanahan and Brooke McGivern, on at least on at least October 4 and 8, 2025, November 6, 13, and 20, 2025, and December 11, 18, and 26, 2025, prior to Orientation or the signing of any contract, which included the following verbatim representations that Driver candidates have a right to rely upon (*see* Gannon Dep. 249:23-250:3):

- Driver Benefits
  - High-tech equipment
  - Consistent mileage
  - $105k+ per year
  - Weekly home time, biweekly available
  - Bonus and overtime opportunities
  - Lease purchase options
  - Local/Regional/OTR options

- CDL-A Lease Purchase Flatbed Truck Driver - $0 Down / No Credit Check / Walk Away Lease
  - CRST The Transportation Solution Inc. is offering CDL-A truck drivers a chance to own their truck through our flexible Lease Purchase Program. If you're ready to take control ~~Drivers, because, among other things, CRST Trucking decided the rates drivers will be paid, the customer loads they will transport, and~~ of your career and income, this is your opportunity.
  - CDKL-A Lease Purchase Flatbed Truck Driver Benefits:
    - **$2500 Sign-On Bonus Available**
    - Earn $210,000 - $248,000 per year
    - Earn Up to 73% Revenue + 100% Fuel Surcharge
    - Choose Your Own Loads – Access to a load board for full control
    - Weekly Payroll – Get paid consistently and reliably
    - Flatbed Securement Training program available
    - Benefits are offered through a 3rd Party
      - Optional health insurance offered through True Choices Personal Insurance

48. With the above, from mid-to-late April 2025, CRST Trucking's recruiters, including Jon Brown (based out of Cedar Rapids), spoke with Weche via phone call about the Driving Opportunity. These calls all included the same essential representations: that Weche would make $2500-$3000 per week working for Flatbed; that Drivers were ~~unable to work for others since CRST Trucking had the~~ never in a deficit; that Drivers were never away from home for weeks at a time; that Weche would have consistent mileage, with 3 loads per week; and that Weche would have access to the load board for full control of his schedule.

49. CRST's goal for these advertisements, information packets, and recruiting representations was to get Driver candidates to come to CRST's "orientation" classroom proceedings, which all Drivers did. Once a Driver committed to attend orientation, CRST continued to reinforce Drivers on the benefits of the Driving Opportunity. For example, on April 22, 2025, recruiter Jon Brown sent Weche an email stating: "We are truly glad you selected us as your partner, and we will do all we can to make your business a success … we wish to extend an invitation for you to attend our onboarding and safety orientation."

50. Plaintiffs and Drivers relied on Defendants' false and misleading information and representations and travelled to and attended classroom orientation sessions. Once there, every Driver was subjected to additional false and misleading representations and omissions that culminated in the Driver purchasing the Driving Opportunity. For example, during the orientation, CRST provided Drivers with additional information packets that included, for example, a Driver checklist. The checklist provided to Kelchner (Gannon Dep., Ex. 8) made the following verbatim representations about the opportunity:

- Current average weekly miles for our fleet are 2200-2500.

- Average 1099 Gross Earnings are $190,000 per year (based on 48 weeks in service).

- We offer many additional perks to our ICs such as phone bill $50 monthly credit, 13 free truck/trailer wash per year, tolls 100% paid, Comdata savings of $.18 cents per gallon, etc.

- Our goal is to help you be successful in your lease.

- No money down/no credit check/walk away leases.

51. On information and belief—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—orientation leaders also put various profit, income, and other related representations up on a screen in PowerPoint format for all Driver candidates to see, along with an accompanying explanation that Drivers purchasing the Driving Opportunity could expect the same results. Such PowerPoints tout as "Business 101" and represent that CRST provides consistent freight to Drivers: "Consistency / Stability - Year-Round Contracts XPO, UPS, FedEx, Amazon, Gap, Kohls, Limited, USF." *Cervantes v. CRST Int'l, Inc.*, No. 20-CV-75-CJW-KEM (N.D. Iowa Nov. 18, 2024) ("*Cervantes*"), Dkt. No. 423-44 at 2, 4. The presentations further tout that Drivers can expect "Exponential Profits as Revenue Increases" and provides detailed examples of what can be expected at different levels. *Id.* at 8. All such recruiting efforts were intended to increase hiring rates, which were regularly tracked on an enterprise-wide basis and evaluated alongside established Driver hiring targets. EXPEDITED005792.

52. Via the Driving Opportunity, CRST purported to offer Drivers the opportunity to start their own business by representing, directly or indirectly, that: (1) the Corporate Defendants would secure freight to haul for the Driver [i.e., provide accounts for purchaser's services]; (2) the Drivers would derive income from the opportunity exceeding the price paid; (3) the Corporate Defendants would provide equipment, services, training, as well as operational, managerial, technical, financial guidelines and/or assistance [i.e., a statutorily defined market plan]; and (4) the Driving Opportunity requires an initial investment by the Drivers of over $500.00.

53. The above misrepresentations presented the overall net impression that the Corporate

Defendants were offering an economically viable business opportunity in the form of the Driving Opportunity that would offer Drivers consistent and profitable freight to haul, an income of at least six figures, and that this was the income achieved by average drivers in the program. The representations and/or net impressions of the Driving Opportunity were false and/or misleading. The Driving Opportunity was not designed to help Drivers, like Plaintiffs, be successful and operate their own successful business but was, instead, designed to exploit them to the great financial benefit of the Corporate and Individual Defendants.

54. The information and data proving that Defendants' conduct was in fact false and misleading is and has been within the Defendants' sole and exclusive possession, control and use of and, at all times, unavailable to Plaintiffs and the Class. Specifically, Defendants have all the raw data to determine the true turnover rates, income, and profit/income levels regarding Drivers. On information and belief, the data will show that the turnover rates are extremely high and the profit/income levels for most Drivers are poor and result in most Drivers leaving within a short time due to an inability to survive economically. Once the full data sets are provided in discovery, Plaintiffs will retain experts to analyze the same.

55. At this time, Defendants have produced information in discovery that seemingly support Plaintiffs allegations over material omissions.[8] For example, in April 2024, Hugh Ekberg (then President and CEO of CRST International) sent a slide to Michael Gannon and others providing "Solo Contractor March Quartiles" with the note that "Top 25% [is the] only quartile that indicates contractor retention and business success." EXPEDITED005195, 005203 at 5214. Thus, CRST and its head executives knew that 75% of the solo Drivers analyzed have unsuccessful businesses and are likely to quit. This is omitted information that is and would be material to Driver candidates.

---

[8] Defendants have recently produced significant volumes of financial information that appears to be related to Driver performance and metrics that Plaintiffs are evaluating and attempting to sync up to their specific discovery requests.

19.56. Turnover rates are another metric that Defendants track and that form the basis of Defendants' material omissions. For example, Defendants produced a spreadsheet (EXPEDITED010401) that shows turnover rates for CRST's Expedited and Flatbed (Malone) lease purchase fleets. For Expedited, annualized turnover (i.e. failure) rates were 84%, 80%, and 87% in 2024, 2023, and 2022, respectively. This means that almost the entirety of this fleet terminated in each ~~Drivers' vehicle during the term of the lease and the Drivers were~~ of those years. Obviously, this would be material information for a Driver candidate to know. The Flatbed lease purchase fleet was apparently even worse with annualized turnover rates of 201%, 119% and 132% in 2023 (7 months data), 2022, and 2021, respectively. And in *Cervantes*, Defendants judicially admitted that "The annualized turnover rate in CRST's lease purchase program from 2020 to 2023 was between 90% and 130%." Dkt. No. 449-1 ¶ 213. These turnover rates are clearly material facts concealed from Drivers and are a specific element required to be ~~available for service upon demand of the CRST Trucking.~~ disclosed under BOPA.[9]

57.   ~~CRST Trucking~~ As to net income and average incomes, Plaintiffs have yet to glean much data supporting Defendants' various claims but what they have further supports that material facts were omitted. For example, income metrics for the Flatbed fleet appear to show the bottom 25% of lease purchase driver netted a paltry $ 171.47 per week. EXPEDITED006323. This too would be material information required to be disclosed under BOPA[10] and, in any event, materiality of same is a question of fact.[11]

---

[9] BOPA requires sellers to disclose "(15) A statement including all of the following: (d) The total number of purchasers known to the seller to have failed in the business opportunity." Iowa Code § 551A.3.3.c (15)(d).

[10] BOPA requires sellers to disclose "(13) Any representations made by the seller to the purchaser concerning sales or earnings that may be made from this business opportunity, including, but not limited to the following: (a) The bases or assumptions for any actual, average, projected, or forecasted sales, profits, income, or earnings. (b) The total number of purchasers who, within a period of three years of the date of the disclosure document, purchased a business opportunity involving the product, equipment, supplies, or services being offered to the purchaser. (c) The total number of purchasers who, within three years of the date of the disclosure document, purchased a business opportunity involving the product, equipment, supplies, or services being offered to the purchaser who, to the seller's knowledge, have actually received earnings in the amount or range specified." Iowa Code § 551A.3.3.c (13)(a)-(d).

[11] *In re McLeodUSA Secs. Litig.*, No. C02-0001, 2003 U.S. Dist. LEXIS 27915, at *38 (N.D. Iowa Aug. 7, 2003) ("As recently stated by the Eighth Circuit, materiality is ordinarily a question of fact for the jury."). Also significant is that the

20.58. CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—charged Drivers by way of deductions or set offs against their compensation for purported Workers' Compensation/Occupational insurance premiums and, upon information and belief, CRST Trucking improperly charged the Drivers more than CRST Trucking actually paid for such coverage on their behalf and/or more than competitive market rates because such insurance was provided by its affiliate company, Great Plains Insurance.

21.59. CRST Trucking CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—charged Drivers by way of deductions or set offs against their compensation for various types of other insurance (liability, collision, etc.) and, upon information and belief, CRST Trucking improperly charged the Drivers more than CRST Trucking actually paid for such insurance coverages and/or more than competitive market rates because such insurance was provided by its affiliate company, Great Plains Insurance.

22.60. CRST Trucking CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—charged Drivers by way of deductions or set offs their compensation for tolls and, upon information and belief, CRST Trucking improperly charged the Drivers more than CRST Trucking actually paid for tolls.

23.61. CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—charged Drivers by

Iowa legislature in BOPA has determined that information such as turnover/failure rates, actual income outcomes, and supporting data are material information and must be disclosed to business opportunity purchasers.

way of deductions or set offs against their compensation for fuel and, upon information and belief, CRST Trucking improperly charged the Drivers more than CRST Trucking actually paid for fuel and/or failed to pass along discounts and fuel surcharges collected.

24.62. CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—charged Drivers by way of deductions or set offs against their compensation for fuel tax and, upon information and belief, CRST Trucking improperly charged the Drivers more than CRST Trucking actually paid for fuel tax.

25.63. CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—charged Drivers by way of deductions or set offs against their compensation for Electronic Fund fees (EFS charges) and, upon information and belief, CRST Trucking improperly charged the Drivers more than CRST Trucking actually paid for EFS charges.

26.64. CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith— charged Drivers by way of deductions or set offs against their compensation for truck and trailer maintenance escrows and repairs without authorization, in excessive amounts, and without providing supporting documentation.

27.65. CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—charged Drivers by way of deductions or set offs against their pay miscellaneous expenses without authorization and in excessive amounts.

28.66. CRST Trucking—at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—collected

fuel surcharges from shipping customers which it was supposed to pass along to the Drivers but, upon information and belief, CRST Trucking improperly retained all or part of those surcharges despite the Drivers incurring the cost of fuel.

67. Indeed, despite Defendants' representations that the average Driving Opportunity Driver earns six-figure pay, Plaintiffs regularly found themselves receiving negative paychecks (total deductions and/or set offs exceeded gross earnings). The same was acknowledged in the U.S. Department of Transportation Truck Leasing Task Force's January 2025 report to Congress which discussed the predatory nature of CRST's Driving Opportunity, including that Drivers regularly received "negative paychecks." *See* Kelchner03499 at 03506.

68. Defendants also misleadingly advertised and represented that Plaintiffs and Drivers, through the Driving Opportunity, would become a "business owner" and achieve ownership of a truck. On information and belief, in reality, Drivers rarely complete their lease terms or obtain truck ownership.

69. Defendants also misleadingly advertised and represented that Plaintiffs, and Drivers, would receive late-model trucks giving the net impression that the equipment was reliable. In fact, the Defendants concealed from Drivers that the trucks they would be leased were years-old recycled trucks, with hundreds of thousands of miles, from Defendants' company driver fleet and were highly susceptible to breakdowns and the need for significant ongoing expected and predictable repairs. Defendants passed off the cost of repairs and maintenance to Drivers via per mile charges to all Drivers that were then used to maintain the entire Driver fleet. Not only did Drivers pay for the cost of repairs and maintenance of these used trucks, but they also suffered loss of income whenever the truck was out of commission for needed repairs or maintenance.

70. Drivers, including Plaintiffs, confronted CRST employees about the misrepresentations made during the recruiting process. In late May 2025, Weche reached out to his recruiter, Jon Brown, and called out CRST's misrepresentations, explaining that he was not receiving the salary or control

that was promised during the recruiting process, leaving him to be in constant deficit. Brown explained that he was hearing the same story from other Drivers and that he felt that CRST had lied to him about the offerings through the Driving Opportunity. When Weche asked if there was anyone at CRST Headquarters that he could speak to, Brown represented that "all the good people [in Cedar Rapids] were fired." In early August 2025, Weche also spoke to Rhonda Dorsey in CRST's Retention Department about CRST's misrepresentations. Ms. Dorsey offered Weche no guidance or assistance and, instead, told him that "Flatbed is not for the weak."

71.     No single misrepresentation or omission forms the basis of Plaintiffs' theory of liability. Instead, Defendants' affirmative misrepresentations and omissions built upon one another to conceal from the Drivers the ultimate fact: the Driving Opportunity simply does not provide a realistic chance for a career in the trucking business. Not only was this basic truth concealed, but Defendants concealed the high turnover associated with the Driving Opportunity and that few drivers successfully achieved the buyout via Driving Opportunity earnings. And, on information and belief, Defendants misrepresented the average earnings of the Driving Opportunity.

72.     Under the BOPA, Defendants failed to provide Drivers with a fulsome disclosure document ten days before the execution of any related contracts, including the Lease Agreement. Had Defendants done so, Plaintiffs almost certainly would not have purchased the Driving Opportunity or even attended the classroom orientation. For example, had Defendants provided the required concise "risk factors" disclosures,[12] Drivers would have been aware of the following:

- **Financial Risks**

    - **Operating Expenses**: The Driver is responsible for nearly all expenses, including fuel,

---

[12] BOPA requires sellers to disclose "(23) A section entitled "Risk Factors" containing a series of short concise statements summarizing the principal factors which make this business opportunity a high risk or one of a speculative nature. Each statement shall include a cross-reference to the page on which further information regarding that risk factor can be found in the disclosure document." Iowa Code § 551A.3.3.c (23).

maintenance, permits, licenses, fines, tolls, and taxes.

- **Charge-Backs**: CRST has broad authority to deduct various costs from the Driver's compensation or escrow fund, including cargo damage, fines, and equipment fees.

- **Compensation Limits**: There's no guarantee of minimum loads, revenue, or even consistent use of the Driver's equipment. This makes income unpredictable.

- **Lack of Control and Misclassification:** Despite being labeled as independent contractors, CRST controls nearly all aspects of Drivers' work, including: assigned loads and compensation; truck payments and maintenance vendors; and equipment and insurance costs. This level of control means drivers are likely misclassified and should legally be considered employees, missing out on labor protections and benefits.

- **Financial Instability and Debt:**

  - Drivers frequently earn below minimum wage and/or receive negative paychecks, meaning they owe money to the carrier instead of earning income.

  - Drivers rarely complete lease terms or obtain truck ownership.

  - Drivers are not building equity in the truck until the last lease payment and buyout payment has been made.

  - Escrow Withholding: A portion of the contractor's money is held in escrow to cover liabilities, with limited control over how and when it's returned.

- **Legal and Liability Risks**

  - Indemnification Clause: The Driver must indemnify CRST for many types of claims, including property damage, cargo loss, and personal injury, except where insurance fully covers the claim. This includes legal fees and can persist beyond the termination of the agreement.

  - Limited Liability Caps: While there are caps ($1,500 per occurrence for certain damages), these caps do not apply in all situations, especially if the equipment is not being used on behalf of CRST or if damage involves the Driver's own workers.

  - Worker Responsibility: The Driver must provide, manage, and insure their own drivers if any, who are not CRST employees. Any issues arising from those workers, including legal claims, fall on the contractor.

- **Compliance and Operational Risks**

  - Strict Compliance Requirements: The Driver must follow extensive legal, safety, and customer requirements, including those related to DOT regulations and CRST's internal policies.

- o Equipment Standards: The Driver must maintain equipment to specific standards and bear the cost of inspections and repairs. Drivers are leasing highly used equipment with hundreds of thousands of miles that is a) more likely to require significant ongoing repairs and maintenance and b) put them at financial risk of no income (but continued expenses) during periods of repair or maintenance.

- o Communication System: CRST mandates specific electronic onboard recording equipment, and the contractor pays for installation and use unless otherwise specified.

- **Insurance Burden**

  - o Insurance Requirements: Drivers must obtain and maintain insurance coverages (e.g., liability, cargo, worker's comp, physical damage) and provide proof to CRST.

  - o Responsibility for Uninsured Claims: If the Driver's coverage lapses or is insufficient, CRST can seek recovery from the Driver directly.

- **Termination Risks**

  - o Unilateral Termination Rights: Either party may terminate the agreement, but CRST reserves the right to do so for various reasons, including disqualification of Drivers or noncompliance.

  - o Obligations Post-Termination: The Driver must return CRST's equipment and remove identifying marks at their own expense and may be subject to additional charges if they fail to do so.

- **Net Lease with No Offsets**

  - o This is a "net lease", meaning all payments must be made unconditionally, even if the equipment is damaged, unusable, or in need of repair.

  - o Lessee/Driver cannot withhold rent or offset payments due to CRST not providing enough miles or breakdowns.

- **No Warranties from Lessor**

  - o Lessor alone chooses the truck, and the Driver has no say in the selection,

  - o Trucks are used with many miles, and the Lessor provides no warranties about the equipment's condition, fitness, or performance.

  - o Lessee/Driver accepts the equipment "as-is", placing full risk of defects or performance issues on the lessee.

- **Maintenance Burdens Increase Over Time**

- During the First Warranty/Maintenance Period, the lessor provides a fairly comprehensive warranty/maintenance for a fee.

- During the Second Period, maintenance is reduced to "routine" only, and the lessee/Driver must cover major repairs.

- These costs can potentially run into thousands of dollars out of pocket.

- CRST is not licensed under Iowa law to sell such vehicle warranties.

- **Additional Rent Based on Mileage**

  - Lessee/Driver pays additional rent per mile (both authorized and unauthorized miles) with a quarterly minimum mileage charge, regardless of actual use.

  - Failure to meet minimum mileage still results in a minimum financial obligation (e.g., $2,880 or $2,400/quarter depending on the period).

- **Significant Responsibility for Repairs and Damages**

  - Lessee/Driver bears full responsibility for repairs due to accidents, negligence, theft, vandalism, misuse, or failures to follow maintenance procedures. This includes responsibility for towing, jump-starts, and consumable supplies beyond basic limits.

- **Risk of Large Costs at Termination**

  - Lessee/Driver may be liable for restoration costs at lease end to return the vehicle to "Good Operating Condition," including cleaning, repairs, and missing equipment replacements. These may be deducted from escrow funds or pursued legally if not covered.

- **Binding Personal Guarantee**

  - A personal guaranty means the individual lessee/Driver is personally responsible for all obligations under the lease, even if the business fails (end of agreement).

- **Strict Default and Repossession Terms**

  - Missing a payment by more than 10 days or violating any term can trigger default.

  - Lessor can then terminate the lease, demand full payment, repossess the equipment, and recover additional costs.

  - CRST can repossess the truck without notice, enter private property, and recover attorney's fees and court costs if legal action is required.

  - Any deficiency after resale or re-lease of the truck must be paid by Driver.

- **Additional Insurance Burdens**

  - Lessee/Driver must maintain multiple insurance coverages (e.g., bobtail, physical damage) with specified limits, deductibles, and conditions. Failing to do so results in full liability for related damages and legal costs.

- **Limited Purchase Option**

  - At lease end, the lessee/Driver can buy the equipment, but only at the Stipulated Loss Value—a potentially high price that includes markups and administrative costs.

- **Costly End-of-Lease Obligations**

  - If Driver doesn't buy the truck, he must return it in "Good Operating Condition". CRST can charge for: cleaning and detailing; replacement of parts (e.g., mattress, glass, fire extinguisher); and repairing scratches, dents, missing accessories. These can total thousands of dollars, deducted from any escrow or charged directly.

- **No Termination Protection**

  - Driver cannot terminate the lease early unless CRST agrees.

  - If Driver walks away, CRST may pursue full damages, repossession, and collection.

  - Driver must keep paying even if the truck breaks down, is unusable, or stolen, unless insured properly.

73. Upon information and belief, Defendants ~~have~~ —at the direction and under the control of CRST International, its Board of Directors, and common officers and executives, including Gannon and Smith—have sold in excess of ~~two~~three thousand Driving Opportunities in the class period.

*Cervantes* Case Established Adverse Facts and Inferences Relevant Here.

74. This Court recently presided over the case and trial in *Cervantes v. CRST Int'l, Inc.*, No. 20-CV-75-CJW-KEM (N.D. Iowa Nov. 18, 2024). *Cervantes* was a class action on behalf of lease purchase drivers and alleged they were statutory employees that CRST had misclassified as

independent contractors.[13] In essence, *Cervantes* is the flip side of this case. Here, Plaintiffs contend they were offered a business opportunity that was to be supported, in various ways, by Defendants and that such support and other surrounding circumstances triggered BOPA and the duty to make required disclosures and avoid misleading and deceptive acts in the transaction. Defendants' defenses, supporting evidence, and admissions in *Cervantes* serve to establish liability here.

75. In *Cervantes*, CRST made various judicial admissions[14] regarding the Driving Opportunity that admit to satisfaction of the various elements of BOPA:

- "The evidence at trial will demonstrate that CRST treated the class and collective members in this case (Contractors) fairly *and provided them with a platform that would allow them to build a small business.*" *See Cervantes*, Dkt. No. 401-1 at 7 (italics added). This plainly satisfies the "starting a business" definition of a "business opportunity"[15] under BOPA as well as the marketing plan element. [16]

- "Because the Contractors operated as business partners, and not CRST employees, their operations are not subject to the Fair Labor Standards Act (FLSA) or Iowa Minimum Wage Law (IMWL). *Id*. This admission satisfies the provision of accounts and the marketing plan element of BOPA. Iowa Code §§ 551A.1.2.a.(2), 551A.1.6.

- Defendant CRST has judicially admitted that all Drivers received a Lease Purchase Information Packet and that such contained income representations. *Cervantes*, Dkt. No. 449-1 ¶ 13. This admission satisfies the income representations element of BOPA. Iowa Code § 551A.1.2.a.(4).

---

[13] After trial, this Court found that while it was a close question, the balance of applicable factors weighed in favor of independent contractor status. *Cervantes v. CRST Int'l, Inc.*, No. 20-CV-75-CJW-KEM, 2025 U.S. Dist. LEXIS 150727, (N.D. Iowa July 25, 2025).

[14] *Postscript Enters. v. City of Bridgeton*, 905 F.2d 223, 228 (8th Cir. 1990) (party's statements in a brief and at oral argument were judicial admissions that eliminated necessity for court to consider related arguments).

[15] "'Business opportunity' means an opportunity to start a business according to the terms of a contract between a seller and purchaser in which the purchaser provides an initial investment exceeding five hundred dollars; the seller represents that the seller or a person recommended by the seller is to provide to the purchaser any products, equipment, supplies, materials, or services for the purpose of enabling the purchaser to start the business; and the seller represents, directly or indirectly, orally or in writing, any of the following…" Iowa Code § 551A.1.2.

[16] "'Marketing plan' means advice or training, provided to the purchaser by the seller or a person recommended by the seller, pertaining to the sale of any products, equipment, supplies, or services. The advice or training may include, but is not limited to, preparing or providing any of the following:
a. Promotional literature, brochures, pamphlets, or advertising materials.
b. Training regarding the promotion, operation, or management of the business opportunity.
c. Operational, managerial, technical, or financial guidelines or assistance."
Iowa Code § 551A.1.6.

- Defendant CRST has judicially admitted that the Lease Purchase Information Packets' income projections were updated quarterly. *Cervantes*, Dkt. No. 449-1 ¶ 13. This admission satisfies the income representations element of BOPA. Iowa Code § 551A.1.2.a.(4).

- CRST has judicially admitted that it provides operational assistance to Drivers. *Cervantes*, Dkt. No. 449-1 ¶ 48. This admission also satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- CRST has judicially admitted that "Contractors who entered into lease purchase agreements with Lincoln Sales were responsible for the maintenance and repairs on those trucks and paid a weekly fee for warranty coverage on certain maintenance and repair items." *Cervantes*, Dkt. No. 449-1, ¶ 101. This satisfies the payment element of BOPA and the marketing plan element. Iowa Code §§ 551A.1.2, 551A.1.6.

- "Contractors made numerous investments into their businesses, including investments into International Registration Plan base plates, International Fuel Tax Agreement (IFTA) permits, an electronic on-board recorder (i.e., Qualcomm) device, physical damage insurance, occupational accident insurance, bobtail insurance, cargo insurance, and health insurance and, if applicable, workers' compensation insurance." *Cervantes*, Dkt. No. 449-1 ¶ 134. This satisfies the payment element of BOPA and the marketing plan element. Iowa Code §§ 551A.1.2, 551A.1.6.

- "The annualized turnover rate in CRST's lease purchase program from 2020 to 2023 was between 90% and 130%." *Cervantes*, Dkt. No. 449-1, ¶ 213. This is a material fact concealed from LPP Drivers contractors and an element that was required to be disclosed under BOPA.[17]

  CRST has judicially admitted that it provided a load board and negotiated agreements with brokers to benefit LPP Drivers. *Cervantes*, Dkt. No. 449-1, ¶¶ 241-243. This admission satisfies the provision of accounts and the marketing plan element of BOPA. Iowa Code §§ 551A.1.2.a.(2), 551A.1.6.

76.     CRST executives' testimony before Judge Williams in the *Cervantes* trial also serves

to establish that BOPA applies to the Driving Opportunity:

- A: "[W]e want our fleet managers having conversations with contractors about the viability of their business and what opportunities they have to increase revenue and potentially control costs." *Cervantes*, Trial Tr. Vol. II, 454:15-18 (Nov. 5, 2024). This testimonial admission satisfies the

---

[17] BOPA requires sellers to disclose "(15) A statement including all of the following: (d) The total number of purchasers known to the seller to have failed in the business opportunity." Iowa Code § 551A.3.3.c (15)(d).

marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "And you want them to have, the fleet managers, to have conversations with the planners to assist in the utilization of their fleets?" A: "Yes." *Cervantes*, Trial Tr. Vol. II, 454:19-22 (Nov. 5, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Lisa does a great job providing guidance and coaching to her drivers… [s]he will push on drivers to accept loads when she thinks it is in their best interest, as well as push back on planning when a load is not profitable for her drivers. Is that the kind of thing you expect your fleet managers to do?" A:"Yes, sir." Trial Tr. Vol. V, 1142:19-1143:1 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Would it be fair to say that your lease operators depend on their fleet managers to keep them informed of the trucking industry and to help them figure out how best to be profitable?" A: "I don't think they would depend on them. It's – it's, in my opinion, a very good resource for them to have." Trial Tr. Vol. V, 1143:10-16 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- A: "Any driver manager or fleet manager should be advocating on behalf of their drivers. And it doesn't do anybody any good for company drivers or independent contractors to sit." *Cervantes*, Trial Tr. Vol. II, 439:18-21 (Nov. 5, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "And CRST offers to advance those operating costs with the understanding that you can then recoup it in the next settlement?" A: "That is an option for the contractor, yes." *Cervantes*, Trial Tr. Vol. V, 941:10-13 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Okay. Because, although driver managers and fleet managers are CRST employees, they really are the interface between the lease operators and planning, for the employees and planning?" A: "That's correct." Q: "And they kind of have two hats. They're -- on the one hand, they're trying to increase CRST's bottom line, but they also feel some responsibility for their drivers, correct?" A: "Yes. I think that most of them probably feel more of a connection and responsibility towards their drivers and contractors than the company, but, yes, they absolutely need to take both of those things into consideration." *Cervantes*, Trial Tr. Vol. II, 421:3-16 (Nov. 5, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "The way the lease operator program was set up, let me – I 'll rephrase this. The way the program was set up, contractors could depend on CRST

to advance all of their operating costs and then deduct it out of their earnings for the week, correct?" A: "There are some operational expenses that come out of their pocket. But in terms of advancing against a future settlement, they do have the right to take those advances and use the funds however necessary." *Cervantes*, Trial Tr. Vol. III, 621:7-15 (Nov. 6, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Well, I'm actually meaning this more broadly. The lease payment, drivers don't put any money down for their truck, correct?" A: "That's correct." Q: "And they even have two free weeks without having to make a lease payment? A. I believe that's kind of standard practice, yes." Q: "Okay. And then, thereafter, their lease payment is advanced by CRST to Lincoln Sales and then deducted out of their earnings, week after week after week?" A: "Correct." Q: "Okay. Fuel and fuel taxes are advanced and then deducted out of the earnings?" A: "So the term "advanced," the fuel card essentially acts as a credit card. Is that what you mean by "advanced"?" Q: "Yeah, in the sense that the driver isn't paying money out-of-pocket. If CRST -- it's CRST's credit card, essentially. They're paying for the fuel, and, then, at the end of the week, they deduct it out of the earnings?" A: "The contractor is not required to use the fuel card. So they could -- there are other methods or options for them to pay for their fuel." Q: "Right. Right. I understand that. But if the lease operator wanted to rely on CRST's credit, they could?" A: "In terms of fueling exclusively at stations where they could use the Comdata Card, that is an option available to them." Q: "And paying for permits and licenses, they can rely on CRST's credit and have it deducted out of their weekly earnings?" A: "They have the option to do that." *Cervantes*, Trial Tr. Vol. III, 621:16-622:22 (Nov. 6, 2024). These testimonial admissions satisfy the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "I apologize, Mr. Brueck. I'll slow down. All of the insurance -- insurance coverages that CRST requires the drivers to have, CRST advances the premium and then deducts it week by week from the driver's earnings, correct?" A: "If they elect to use those insurances that we offer as an option, yes." *Cervantes*, Trial Tr. Vol. III, 623:15-21 (Nov. 6, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Okay. And the ICOA actually also provides that if the driver wants it, CRST will advance motel costs, traffic tickets, and tool costs, and deduct it out of the weekly settlement?" A: "Yes, they had the option to advance money." Q: "And in addition to advancing all those operating costs, CRST provides that drivers can obtain a -- a cash advance from CRST against loads that are -- have not yet been paid?" A: "That's I think probably the general term we've been using as "advance." What the contractor does with those cash advances against future settlements is up to them." *Cervantes*, Trial Tr. Vol. III, 624:10-21 (Nov. 6, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code §

551A.1.6.

- Q: "And if a driver has a negative settlement, meaning he didn't earn enough to cover all of the advances he received, including the lease payment, that negative amount CRST carries over on its credit to the next payday, correct?" A: "Yes, in the interest of being a good business partner and helping a contractor get past ~~3 years~~a rough patch, that's correct." Q: "All right. The drivers can, if they need to, depend on CRST's credit to get them over dry times?" A: ""Depend on" is probably not the right word, but it is an option available to them to a point." *Cervantes*, Trial Tr. Vol. III, 625:8-19 (Nov. 6, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- A: "I think that we have an obligation to our contractors to help them be successful, and sometimes that does mean helping them out." *Cervantes*, Trial Tr. Vol. III, 626:3-6 (Nov. 6, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "You see item 7, "Routing and fuel optimization services." You offer that to lease operators. They don't have to take it, but you offer it to them, don't you?" A: "They have the option to pay for the use of our software." *Cervantes*, Trial Tr. Vol. V, 951:14-19 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Do you need a minute - okay. Is the lead driver program where a lease operator can drive with a – train students and earn more money because they have a team then? Is that another selling point for potential CRST applicants?" A: "Yeah. Being a lead driver certainly has its advantages for a lease purchase driver or owner-operator, to run more miles and earn more revenue." *Cervantes*, Trial Tr. Vol. V, 998:17-24 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Right. But however it works, CRST needs to know what fuel was purchased where and when, correct?" A: "To settle with the contractor and if they elected to have us do their fuel tax statements, then, yes, we would need that information." *Cervantes*, Trial Tr. Vol. V, 983:9-13 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "These are the costs that CRST charges if they choose to have CRST advance the base plates, the escrow, the Federal Highway use tax, and all that stuff?" A: ". Correct." *Cervantes*, Trial Tr. Vol. V, 1001:2-5 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- Q: "Okay. I mean, the fleet managers are there to advise and assist the lease operators?" A" "Correct." *Cervantes*, Trial Tr. Vol. V, 1113:17-19

(Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.1.6.

- A: "As the director of the independent contractors, I oversee approximately ten fleet managers and anywhere from one to two managers of operations, also known as ops managers. With that too, general tasks include just P and L, budgeting, financial, market analysis, and then also taking care of our business partners, as far as making sure they stay profitable.". Q: ". And by "business partners," you're talking about the lease operators?"? A: ". Independent contractors, correct." *Cervantes*, Trial Tr. Vol. V, 1080:4-13 (Nov. 8, 2024). This testimonial admission satisfies the marketing plan element of BOPA. Iowa Code § 551A.16.

77. Further relevant admissions were made in *Cervantes* by Defendants' expert, Dr. Chen Song. After reviewing testimonial and documentary evidence and consulting with Defendants' personnel and counsel, Dr. Song opined in her rebuttal expert report (EXPEDITED023766 at 023839-40) that Drivers obtained numerous economic benefits from CRST via the Driving Opportunity (satisfying marketing plan element of BOPA, Iowa Code § 551A.1.6.) including that:

- "Contractors avoid many of the administrative costs and resource constraints that would otherwise be required for Owner Operators to operate their businesses." EXPEDITED023796.

- "CRST acts as the de facto guarantor to cover the customer underpayment or non-payment risk for the Contractors so that they do not face the same risk of non-payment that is inherent of entrepreneurship." EXPEDITED023840.

- "The Lead Driver Program benefits Contractors as they gain access to a labor pool without any recruitment costs. Contractors pay a portion of the trainee co-driver's pay, with the remainder shared by CRST. Using CRST's data, I quantify the overall benefit to Contractors from the lower labor cost through the Lead Driver Program, by calculating the difference between the median mileage pay rate for CRST's company drivers and the per mile deduction from Contractors' pay. I estimate that Contractors have benefitted from lower labor costs totaling $12.5 million during the available data period." EXPEDITED023839 - EXPEDITED023840

- "CRST provides the Contractors with the option to access a line of credit to smooth the impact of Contractors' daily expenses and maintenance costs – many Contractors would have otherwise no means of obtaining credit." EXPEDITED023840.

78. Plaintiffs further seek injunctive, equitable, and other appropriate relief pursuant to

BOPA's broad remedial provisions.[18] As noted, the statute expressly provides standing to injured persons to pursue such relief.

79.     Plaintiffs seek to enjoin Defendants from all forms of advertising and from offering the Driving Opportunity by utilizing false and misleading information as well as without providing BOPA's required disclosures.  As professional truck drivers, Plaintiffs expect to have years of professional driving ahead of them and will constantly be on the lookout for better and improved driving opportunities by reviewing online and social media advertising and recruitment efforts. Plaintiffs are certain that CRST Trucking, as one of the nation's oldest, largest, and most successful carrier enterprises, will continue to advertise and improve its driving opportunity offerings to attract and secure drivers.  Plaintiffs would like to drive and/or consider driving with CRST as Driving Opportunity contractors again in the future but are not confident that they could rely on CRST Trucking's advertising, recruiting, and promotional efforts that its program offerings present a viable economic opportunity or the represented income levels.

80.     Plaintiffs also fully expect that CRST will subject them to Driving Opportunity promotional efforts via public online media (such as job boards and the like) but also directly via email at their known email addresses. Plaintiffs note, for example, that CRST's pattern and practice of recruiting is to barrage even existing Drivers in one division with solicitations to move to a lease-purchase opportunity for a different CRST division.  For example, Kelchner and hundreds of other existing Drivers operating in the Specialized Driving Opportunity were subject to unsolicited email barrages by CRST's recruiting team to join the Driving Opportunity offered by other Divisions along with LPIP's for the various programs, like the following:[19]

---

[18] "In addition to any remedies provided by law, a person injured by a violation of this chapter may bring a civil action and recover damages or obtain other appropriate relief including injunctive or other equitable relief." Iowa Code § 551A.8.4.
[19] *See* SPEC002683.

From: Jon Brown
Sent: Tue 4/25/2023 11:45:13 AM
Subject: CRST % of revenue pay for LP & O/O programs. Record freight rates make it a great time to work for a percentage. (Dry Van)
Received: Tue 4/25/2023 11:45:00 AM
2023 CRST Expedited Owner Operator.pdf
Van Lease Purchase 2023.pdf

CRST Expedited solutions- The Transportation industry's Best Dry Van Lease Purchase Program!

The company is seeking owner operators and experienced drivers interested in lease purchase program opportunities Driver Trainers & Teams wanted. Lease Purchase Contractors Net/Take Home can be in excess of 100K annually. Attached for your review are information packets containing the program details.

To get the process started apply on line today. Same business day processing. 3 day on boarding held in Cedar Rapids, IA starting Monday each week.

Application link- https://intelliapp.driverapponline.com/c/crst?r=Jbrown
contact by phone - 319-390-2805
email contact- jbrown@crst.com
text contact – 319-316-6938

Plaintiffs expect CRST Trucking will subject them to the same type of unsolicited solicitations in the future but are not confident that same will be accurate and truthful.

81. Further, CRST and Plaintiffs and the Class, on the one hand, and CRST and Lincoln Sales on the other, have ongoing contractual relations and potential obligations that survive even after a Driver has left the system. Plaintiffs further seek to enjoin and remedy other CRST Trucking/Lincoln Sales adverse conduct as follows. CRST Trucking and Lincoln Sales advertise, market, and recruit for the Driving Opportunity with the express written representations that the lease is a "walk away" lease. However, the express terms of the leases do not so provide and instead mandate that the Drivers remain responsible for all unpaid lease payments, expenses, taxes, and other items for the stated duration of the lease agreement regardless of whether a Driver is still in the Driving Opportunity or not. In tandem, the ICOA's provide for CRST Trucking the right to collect the same amounts. Plaintiffs seek to enjoin CRST Trucking and Lincoln Sales from enforcing such provisions, seeking to collect such lease and other payments, from adverse credit collection efforts and/or reporting that might arise out of same, and from instituting court actions regarding the same.

82. When Drivers, including Plaintiffs, leave the Driving Opportunity on account of its inability to provide an economically viable and sustainable income, CRST retains and, on information

and belief, regularly exercises the contractual right to deduct from Drivers' pay/and or escrow accounts for allegedly necessary repairs, detailing, reconditioning and other items that are in fact unnecessary and unwarranted. Plaintiffs are concerned that CRST will do this to them and the Class and seek to enjoin this systemic and class-wide fraudulent practice.

83. When Drivers, including Plaintiffs, leave the Driving Opportunity on account of its inability to provide an economically viable and sustainable income, CRST, on information and belief, regularly reports (and/or retains the right to report) that Drivers have "abandoned" their trucks or quit or other derogatory information to various trucking specific reporting agencies (e.g. HireRight, Driver IQ etc.) that collect and publish to carriers such information about the Drivers. When a Driver subsequently applies to carrier for a driving position, these reports are often reviewed negatively by the carrier and Drivers are rejected for positions causing them irreparable injury and damage to reputation. Plaintiffs are concerned that CRST Trucking will do this to them, causing them irreparable injury and damage to reputation. Consequently, Plaintiffs seek to enjoin CRST Trucking from filing such reports against them or the Class arising out of the Driving Opportunity – which, Plaintiffs' and the Classes' participation and purchase in the first instance was secured by the unlawful conduct alleged herein. Plaintiffs further seek an equitable order requiring CRST Trucking to reverse any such reporting made vis-a-vis Class Members.

29. 84. When Drivers, including Plaintiffs, leave the Driving Opportunity on account of its inability to provide an economically viable and sustainable income, CRST Trucking and/or Lincoln Sales, on information and belief, regularly report (and/or retain the right to report) that Drivers have not paid amounts owing and other derogatory information to various credit reporting agencies (e.g. Experian, TransUnion etc.) that collect and publish information about the Drivers. When a Driver subsequently applies for credit, these reports are often reviewed negatively, and Drivers are rejected for credit or required to pay higher rates causing them irreparable injury and damage to reputation. Plaintiffs are concerned that CRST Trucking will do this to them, causing them irreparable injury and

damage to reputation.  Consequently, Plaintiffs seek to enjoin CRST Trucking and/or Lincoln Sales from filing such reports against them or the Class arising out of the Driving Opportunity – which, Plaintiffs' and the Classes' participation and purchase in the first instance was secured by the unlawful conduct alleged herein. Plaintiffs further seek an equitable order requiring Defendants to reverse any adverse credit reporting made vis a vis Class Members.

## CLASS ACTION ALLEGATIONS UNDER FED. R. CIV. P. 23

30. 85. Kelchner seeksPlaintiffs seek to maintain histheir Iowa state law claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  In particular, Kelchner seeksPlaintiffs seek to certify the following Rule 23 Class:

> All current and former Drivers who leased trucks from CRST Lincoln Sales and drove for CRST Trucking in any week within the United States at any time during the period beginning three years prior to the filing of thisthe Original Complaint, (August 23, 2024), and continuing through the resolution of this action.

31. 86. Excluded from the Rule 23 Class are CRST Trucking, CRST Trucking's legal representatives, officers, directors, assigns and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in CRST Trucking; the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

32. 87. Kelchner seeksPlaintiffs seek to serve as a Class RepresentativeRepresentatives for the above-defined Class.

33. 88. Kelchner'sPlaintiffs' Iowa state law claims have been brought and may properly be maintained as a class action under Rule 23 because there is a well-defined community of interest in the litigation and the putative Class is easily ascertainable.

34. 89. Numerosity:  The potential members of the Class are believed to exceed 1,000, and the Class Members are so numerous that joinder of all members is impracticable.

35. 90. Commonality:  There are questions of law and fact common to KelchnerPlaintiffs and

the Class that predominate over any questions affecting only individual members of the Class. Examples of these common questions of law and fact include, without limitation:

   a. Whether CRST Trucking in the offer, sale, and/or operation of the Driving Opportunity violated the Iowa's Business Opportunity Promotions Act (BOPA), Iowa Code §§§ 551A.1 551A.10, et seq., by failing to register and failing to make required disclosures.

   b. Whether CRST Trucking in the offer, sale, and/or operation of the Driving Opportunity violated BOPA by utilizing untrue and misleading advertising prohibited by Iowa Code § 551A.9.2.

   c. Whether CRST Trucking in the offer, sale, and/or operation of the Driving Opportunity violated BOPA's prohibition on misrepresentations, omissions, and misleading conduct under Iowa Code § 551A.9.3 by misrepresenting 1) that Drivers purchasing the Driving Opportunity would have a career opportunity, 2) that the Driving Opportunity would provide a sustained and viable economic opportunity, 3) the amount of income for Drivers would earn, and/or 4) by concealing material facts including the high turnover and failure rates of Drivers, the low average income of Drivers, and the low average driving miles CRST Trucking provided to Drivers, as well as excessive charges/deductions that CRST Trucking would impose on Drivers.

   d. The nature and extent of class-wide injury and the measure of damages for those injuries; and

   e. The nature and extent of injunctive, ancillary, and other equitable relief that may be afforded the class and otherwise to the general public under Iowa Code § 551A.8 (4); and

   f. The proper formula and methodology for calculating restitution, damages and penalties owed to KelchnerPlaintiffs and the Drivers as alleged herein.

36.91. Typicality: ~~Kelchner's~~Plaintiffs' claims are typical of the claims of the Drivers. Defendants' common course of unlawful conduct as alleged herein has caused ~~Kelchner~~Plaintiffs and Drivers to sustain the same or similar injuries and damages. ~~Kelchner's~~Plaintiffs' allegations – both legal and factual – are thereby representative of and co-extensive with the claims of the Drivers.

37.92. Adequacy: ~~Kelchner does~~Plaintiffs do not have any conflicts of interest with members of the Class of Drivers ~~he seeks~~they seek to represent, and ~~Kelchner~~Plaintiffs will prosecute this case vigorously on behalf of the Drivers. ~~Kelchner's~~Plaintiffs' Counsel are competent and experienced in litigating consumer and complex commercial class actions. ~~Kelchner~~Plaintiffs will fairly and adequately represent and protect the interests of the Class ~~he seeks~~they seek to represent.

38.93. Superiority of Class Action: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Drivers is not practicable, and questions of law and fact common to the Class of Drivers predominate over any questions affecting only individual Drivers. Each Driver has been damaged and is entitled to recovery by reason of CRST Trucking's illegal practices and violations of law stated in this complaint. Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

39.94. ~~Kelchner knows~~Plaintiffs know of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

FIRST CLAIM FOR RELIEF

Violation of the Iowa Business Opportunity Promotions Act,
Iowa Code §§§ 551A.~~1 - 551A.10~~ et seq.
(~~Kelchner~~Plaintiffs and the Drivers v. CRST Trucking and Smith)

40.95. ~~Kelchner~~Plaintiffs re-~~alleges~~allege and ~~incorporates~~incorporate the foregoing paragraphs as though fully set forth

herein.

41.96. The Driving Opportunity meets the definitions of "business opportunity" under the Iowa

Business Opportunity Promotions Act, Iowa Code §§§ 551A.~~1  551A.10,~~ et seq., and does not qualify for any exemptions thereunder. Specifically, the Driving Opportunity involved CRST Trucking's provision of product, equipment, supplies, and/or services to the Drivers for the purpose of enabling Drivers to start a business and requiring the Drivers to make payment for same to CRST Trucking and/its affiliates or designee.

~~42.~~97.  CRST Trucking represented to the Drivers the following *disjunctive* elements of the statutory claim that:

   a.   the seller or a person recommended by the seller will provide or assist the purchaser in finding outlets or accounts for the purchaser's products or services (§ 551A.1.2.(a)(2));

   b.   the seller guarantees that the purchaser will derive income from the business which exceeds the price paid to the seller (§ 551A.1.2.(a)(4)); or

   c.   the seller will provide a marketing plan (§ 551A.1.2.(a)(6)).

~~43.~~98.  Defendants CRST Trucking and Lincoln Sales are both "sellers" of "business opportunities" as defined in the Iowa Business Opportunity Promotions Act, Iowa Code §§§ 551A.~~1 551A.10.~~ et seq..

~~44.~~99.  ~~Defendant~~Defendants Smith ~~is~~and Gannon and CRST International are all liable as ~~officer, director~~officers, directors, and/or control ~~person~~persons as pursuant to Iowa Code § 551A.8.2.

~~45.~~100.CRST Trucking and Lincoln Sales have not complied with the disclosure requirements for offering such plans under Iowa Code § 551A.8.3. et seq.

~~46.~~101.The consent of the Drivers to purchase the Driving Opportunity, if any, was obtained through Defendants' failure to comply with the Iowa Business Opportunity Promotions Act, Iowa Code §§§ 551A.~~1 551A.10~~ et seq.

~~47.~~102.In offering for sale and selling the Driving Opportunity defendants CRST Trucking and

Lincoln Sales made the untrue, misleading or deceptive statements and omissions noted above in derogation of the anti-fraud provisions found in Iowa Business Opportunity Promotions Act, Iowa Code §§§ 551A.1 551A.10 et seq.

48.103. The Drivers are also entitled to rescission and damages from Defendants including but not limited to, all monies paid as provided for Iowa Business Opportunity Promotions Act, Iowa Code §§§ 551A.1 551A.10 et seq.

49.104. The Drivers are further entitled to reasonable attorneys' fees, court costs, interest, injunctive and ancillary relief (on behalf of themselves and the general public) under Iowa Business Opportunity Promotions Act, Iowa Code §§§ 551A.1 551A.10 et seq.

## **PRAYER FOR RELIEF**

WHEREFORE, KelchnerPlaintiffs on behalf of himselfthemselves and the Drivers prays for relief as follows:

a. As all Defendants, damages and restitution according to proof at trial for all injuries;

b. For a declaratory judgment that CRST Trucking and Lincoln Sales have violated Iowa law as alleged herein;

c. For preliminary, permanent, and mandatory injunctive, ancillary, and equitable relief designed to prohibit and discourage CRST Trucking, Lincoln Sales, its officers, agents, and all those acting in concert with them from committing in the future those violations of law herein alleged; and to remedy past violations;

d. For an order awarding KelchnerPlaintiffs and the Drivers compensatory damages, including restitution, recovery and/or disgorgement of all money, profits, and other valuable consideration paid for the Driving opportunity, actual damages, and all other sums of money owed to KelchnerPlaintiffs and the Drivers, together with interest on these amounts, according to proof;

e. For an award of reasonable attorneys' fees as provided by Iowa and federal law;

f. For all costs of suit;

g. For interest on any damages and/or penalties awarded, as provided by applicable law; and

h. For such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

~~Kelchner~~Plaintiffs hereby ~~demands~~demand a jury trial on all claims and issues for which ~~Kelchner is~~Plaintiffs are entitled to a

jury.

Date: ~~August 23, 2024~~October 27, 2025        Respectfully Submitted,

**SHINDLER, ANDERSON, GOPLERUD & WEESE P.C.**

/s/ ~~Brian O. Marty~~*J. Barton Goplerud*

J. Barton Goplerud, AT0002983
Brian O. Marty, AT0011622
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel: (515) 223-4567
Fax: (515) 223-8887
goplerud@sagwlaw.com
marty@sagwlaw.com

Elizabeth A. Fegan (*pro hac vice* ~~to be submitted~~))
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: (312~~.~~) 741~~.~~-1019
Fax: (312~~.~~) 264~~.~~-0100
beth@feganscott.com

Michael von Klemperer (*pro hac vice*)
FEGAN SCOTT LLC
1763 Columbia Road NW, Suite 100
Washington, DC 2009
Ph: (202) 921-0002
Fax: (312) 264-0100
mike@feganscott.com

Georgia J. Zacest (*pro hac vice*)

FEGAN SCOTT LLC
708 Main, 10th Floor
Houston, TX 77002
Ph: (830) 212-4042
Fax: (312) 264-0100
georgia@feganscott.com

Robert S. Boulter (*pro hac vice* ~~to be submitted~~))_____ LAW OFFICES OF
ROBERT S. BOULTER 1101 5th Ave #310
San Rafael, CA 94901
Tel: (415) ~~233-7100~~450-5189
rsb@boulter-law.com

Attorneys for ~~Kelchner~~Plaintiffs and the Putative Class