# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| HARLEY KELCHNER, ANTHONY HICKS, DANIEL WECHE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CRST International Holdings LLC, CRST Expedited, Inc., CRST Specialized Transportation, Inc., CRST Lincoln Sales, Inc., John Smith, an individual, and Michael Gannon, an individual.<br><br>Defendants. | CASE NO. 1:24-cv-00082-CJW-KEM<br><br>Honorable Chief Judge C.J. Williams<br><br>Honorable Chief Magistrate Judge Kelly K.E. Mahoney |

## PLAINTIFFS' RESISTANCE TO CORPORATE DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

# TABLE OF CONTENTS

I.    BACKGROUND ................................................................................................... 2

    A.   Procedural Background. ......................................................................... 2

    B.   Defendants' Fraudulent Scheme............................................................ 3

II.   LEGAL STANDARD.......................................................................................... 9

III.  ARGUMENT..................................................................................................... 10

    A.   Plaintiffs' Easily Satisfy Standing For All BOPA Theories Advanced. ................... 10

    B.   Plaintiffs' BOPA Theories are Plead with Particularity. ......................................... 13

    C.   Plaintiffs' Claims Satisfy BOPA's Territorial Requirements. ................................. 16

    D.   Defendants' Preemption Arguments Are Meritless. ................................................ 18

    E.   Plaintiffs Have Standing To Pursue Injunctive Relief Related To Future Threatened Harms From Defendants' "Routine" Practices. ......................................... 27

IV.  CONCLUSION ................................................................................................. 28

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Adams v. Iowa Dep't of Human Servs.*,
871 N.W.2d 703 (Iowa Ct. App. 2015) ....................................................................16

*Bieneman v. Chicago*,
864 F.2d 463 (7th Cir. 1988) ..................................................................................23

*Boyd v. Target Corp.*,
750 F. Supp. 3d 999 (D. Minn. 2024) .....................................................................27

*Cervantes v. CRST Int'l, Inc.*,
No. 20-CV-75-CJW-KEM, 2024 U.S. Dist. LEXIS 94265 (N.D. Iowa May 28, 2024) ...........23

*Cervantes v. CRST Int'l, Inc.*,
No. 20-cv-75, 2025 U.S. Dist. LEXIS 150727 (N.D. Iowa July 25, 2025) ...............................24

*Cipollone v. Liggett Grp., Inc.*,
505 U.S. 504 (1992) ................................................................................................19

*Charas v. Trans World Airlines, Inc.*,
160 F.3d 1259 (9th Cir. 1998) ................................................................................20

*Clark v. State*,
955 N.W.2d 459 (Iowa 2021) .................................................................................25

*Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*,
61 F.3d 639 (8th Cir. 1995) ....................................................................................13

*Costello v. BeavEx, Inc.*,
810 F.3d 1045 (7th Cir. 2016) ........................................................................19, 21, 23

*CRST Specialized in Tousley v. N. Am. Van Lines, Inc.*,
752 F.2d 96 (4th Cir. 1985) ....................................................................................24

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) ................................................................................................20

*DeRoche v. All Am. Bottling Corp.*,
38 F. Supp. 2d 1102 (D. Minn. 1998) .....................................................................19

*Dilts v. Penske Logistics, LLC*,
769 F.3d 637 (9th Cir. 2014) ..................................................................................21

*Dolomite Energy, LLC v. Comm. ex rel. Dir. of the Office of Fin. Insts.*,
   269 S.W.3d 883 (Ky. Ct. App. 2008) ...................................................................16, 17

*Dolphin Kickboxing Co. v. FranChoice, Inc.*,
   No. 19-cv-1477, 2019 U.S. Dist. LEXIS 225252 (D. Minn. Dec. 19, 2019) ...........................16

*Enervations, Inc. v. Minn. Mining & Mfg. Co.*,
   380 F.3d 1066 (8th Cir. 2004) ..................................................................................6

*Eskridge v. HMD Trucking, Inc.*,
   No. 24 CV 12437, 2025 U.S. Dist. LEXIS 103018 (N.D. Ill. May 30, 2025) ..........................22

*Ginsberg v. Northwest, Inc.*,
   653 F.3d 1033 (9th Cir. 2011) ................................................................................20

*Hallman v. Flagship Rest. Grp., LLC*,
   762 F. Supp. 3d 830 (D. Neb. 2025) ........................................................................10

*Jahnke v. Deere & Co.*,
   912 N.W.2d 136 (Iowa 2018) ..................................................................................18

*Kushner v. Beverly Enters., Inc.*,
   317 F.3d 820 (8th Cir. 2003) ......................................................................6, 7, 8, 9

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..............................................................................................11

*Lupian v. Joseph Cory Holdings LLC*,
   905 F.3d 127 (3d Cir. 2018) ..................................................................................19

*McNally v. Kingdom Tr. Co.*,
   No. 5:21-cv-0068, 2022 U.S. Dist. LEXIS 13115 (W.D. Ky. Jan. 25, 2022) ..........................16

*McNaught v. Nolen*,
   76 F.4th 764 (8th Cir. 2023) ..................................................................................10

*Mekhail v. N. Mem'l Health Care*,
   726 F. Supp. 3d 916 (D. Minn. 2024) ..................................................................27, 28

*Morales v. Trans World Airlines*,
   504 U.S. 374 (1992) ........................................................................................19, 20

*Olsen v. Nelnet, Inc.*,
   392 F. Supp. 3d 1006 (D. Neb. 2019) ......................................................................15

Case 1:24-cv-00082-CJW-KEM    Document 127-1    Filed 01/26/26    Page 4 of 37

*Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*,
250 F. Supp. 2d 1151 (W.D. Mo. 2001) ...................................................................26

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank (In re Arctic Express Inc.)*,
636 F.3d 781 (6th Cir. 2011) ...................................................................................24

*Pueblo of Pojoaque v. New Mexico*,
863 F.3d 1226 (10th Cir. 2017) ...............................................................................24

*Roberts v. C.R. England, Inc.*,
318 F.R.D. 457 (D. Utah 2017) ..........................................................................21, 22

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) ...............................................................................19, 20, 21, 22

*S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc*,
697 F.3d 544 (7th Cir. 2012) ...................................................................................20

*Siaci Saint Honore v. M/V GSL Kalliopi*,
No. 21-cv-04301, 2022 U.S. Dist. LEXIS 207365 (D.N.J. Nov. 14, 2022)(1) .........................19

*Sioux Falls D II FGF, LLC v. Courthouse Square, LLP*,
No. CIV 21-4043, 2021 U.S. Dist. LEXIS 238640 (D.S.D. Dec. 14, 2021) ............................14

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ................................................................................................11

*State v. Anderson*,
782 N.W.2d 155 (Iowa 2010) ..................................................................................18

*Thome v. Sayer Law Grp., P.C.*,
567 F. Supp. 3d 1057 (N.D. Iowa 2021) ..............................................................10, 11, 12, 13

*Topchian v. JPMorgan Chase Bank, N.A.*,
760 F.3d 843 (8th Cir. 2014) ...............................................................................9, 10

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...........................................................................................11, 28

*United States ex rel. Benaissa v. Trinity Health*,
963 F.3d 733 (8th Cir. 2020) ...........................................................................13, 14, 15

*United States ex rel. Thayer v. Planned Parenthood of the Heartland*,
765 F.3d 914 (8th Cir. 2014) ...................................................................................13

iv

*United States v. Consumer L. Prot., LLC*,
 No. 4:22 CV 1243, 2024 U.S. Dist. LEXIS 249544 (E.D. Mo. Oct. 18, 2024) .........................15

*Warner v. Wartburg Coll.*,
 No. 21-CV-2029, 2021 U.S. Dist. LEXIS 142458 (N.D. Iowa July 30, 2021) ......................9, 10

*Ye v. GlobalTranz Enters., Inc.*,
 74 F.4th 453 (7th Cir. 2023) ...................................................................................................19

**Statutes**

46 U.S.C. § 11107 ...................................................................................................................26

49 U.S.C § 14102 ...............................................................................................................23, 26

49 U.S.C. § 14501 ..............................................................................................................20, 23

49 U.S.C. § 40101 ...................................................................................................................19

Iowa Code § 551A.1 ...............................................................................................................16

Iowa Code § 551A.1.3 .............................................................................................................23

Iowa Code § 551A.2 ...............................................................................................................16

Iowa Code § 551A.3 ...........................................................................................................10, 12

Iowa Code § 551A.5 ...............................................................................................................11

Iowa Code § 551A.7 ...............................................................................................................11

Iowa Code § 551A.8 ...............................................................................................................27

Iowa Code § 551A.8.1 .............................................................................................................12

Iowa Code § 551A.9 ...............................................................................................................11

S.C. Code Ann. § 39-57-20 .....................................................................................................24

Utah Code Ann. § 13-15-1 .......................................................................................................21

**Rules**

Fed. R. Civ. P. 8 ..................................................................................................................9, 10

Fed. R. Civ. P. 12 .............................................................................................................6, 9, 10

Fed R. Civ. P. 9 ................................................................................................................ *passim*

v

**Other**

49 C.F.R. § 376.1 ...........................................................................................................23

49 C.F.R. § 376.11 ..........................................................................................................27

49 C.F.R. § 376.12 ..........................................................................................................27

vi

The Corporate Defendants' motion to dismiss should be denied. This case concerns a straightforward scheme: Defendants lured Plaintiffs and other drivers into a "lease purchase program" ("Driving Opportunity") through systematic misrepresentations about income potential, mileage availability, and success rates—all while concealing devastating turnover statistics and the economic reality that Drivers routinely earned negative paychecks. Iowa's Business Opportunity Promotions Act ("BOPA") was enacted precisely to prevent such schemes by requiring sellers to make comprehensive disclosures before purchasers commit their livelihoods to a business opportunity. Defendants failed to comply with BOPA and now seek dismissal through a series of meritless arguments.

First, Defendants claim that Plaintiffs lack standing to pursue their failure-to-disclose theory. This argument ignores the concrete financial harm Plaintiffs suffered: they contracted with Defendants, devoted months of their lives to the program, and ultimately were forced to quit when the opportunity proved economically unsustainable—exactly as Defendants' undisclosed data predicted would happen. Had Defendants made the required disclosure, Plaintiffs would not have signed on. These tangible injuries easily satisfy Article III.

Second, Defendants contend Plaintiffs have not plead their fraud claims with particularity. Yet the Amended Complaint spans 48 pages of factual allegations supported by dozens of citations to discovery materials, including Defendants' own admissions and testimony. It identifies specific misrepresentations by named individuals on specific dates through specific channels—from LinkedIn advertisements promising $190,000 annual earnings, to emails from Iowa-based recruiters, to Orientation PowerPoints. The complaint details both the enterprise-wide fraudulent scheme *and* each Plaintiff's individual experience. This exceeds Rule 9(b)'s requirements.

Third, Defendants argue BOPA does not apply because they claim it would have an

extraterritorial effect. But Plaintiffs allege—and the contracts confirm—that the offers originated from Iowa, where Defendants' shared leadership, marketing, and recruiting operations are centralized and directed. Iowa-based recruiters contacted Plaintiffs. Iowa-based executives oversaw the scheme. And the contracts themselves specify that Iowa law governs. There is nothing extraterritorial about Iowa applying its own law to conduct originating in Iowa.

Fourth, Defendants invoke federal preemption, arguing BOPA conflicts with federal trucking regulations. But both the Federal Aviation Administration Authorization Act and the Truth-in-Leasing regulations address different concerns than BOPA and permit concurrent compliance. BOPA is a statute of general application that regulates how businesses offer opportunities to the public—it says nothing about how trucks deliver freight. As the Fourth Circuit held forty years ago in *Tousley v. North American Van Lines*—a case involving the predecessor to CRST Specialized and an identical lease purchase program—BOPA-type statutes complement rather than conflict with federal trucking regulations.

Finally, Defendants contend Plaintiffs lack standing to seek injunctive relief because they no longer work for Defendants. This ignores Plaintiffs' allegations that they would like to drive for Defendants if practices improve, that they remain exposed to Defendants' advertising, and that they face ongoing concrete harms from Defendants' routine practices—including liability for unpaid lease payments, improper deductions, negative reports to trucking agencies, and damage to their credit. Each of Defendants' arguments fails. The motion should be denied in its entirety.

## I.  BACKGROUND

### A.  Procedural Background.

Plaintiff Harley Kelchner, individually and on behalf of all others similarly situated, filed this action on August 23, 2024, against CRST Expedited, Inc. ("Expedited"), CRST Specialized Transportation, Inc. ("Specialized"), CRST Lincoln Sales, Inc. ("Lincoln Sales") and John Smith

for directing and implementing deceptive "lease purchase" Driving Opportunities in violation of the Iowa Business Opportunity Promotions Act ("BOPA"). *See* Dkt. No. 1. All Defendants answered the complaint. Dkt. Nos. 25-27, 55. On September 9, 2025, Defendants filed a Motion for Judgment on the Pleadings or to Strike, making arguments *for the first time* as to particularity and Kelchner's adequacy as a class representative. Dkt. No. 103-1 at 12, 17. Additional Plaintiffs, Daniel Weche and Anthony Hicks, then joined and, collectively, Plaintiffs filed an amended complaint, adding CRST International Holdings LLC ("International") and Michael Gannon as defendants and over *31 pages* of allegations about Defendants' fraudulent scheme, including dozens of citations to, and quotations from, materials obtained in discovery that substantiate Plaintiffs' claims. Dkt. No. 113. Now, International, Expedited, Specialized, and Lincoln Sales (the "Corporate Defendants") move to dismiss. Dkt. No. 120.

**B.     Defendants' Fraudulent Scheme.**

Expedited, Specialized, and Lincoln Sales, are closely held companies—overseen by parent company, International—that operate and function as a common enterprise to induce Drivers to join their Lease Purchase Program and lease trucks from Lincoln Sales (hereinafter "Driving Opportunity"). *See* Dkt. No. 113 ¶¶ 21-32. Gannon, who reports to Smith, is responsible for the oversight and overall success of these subsidiaries, and, together, from Iowa,[1] Defendants direct deceptive advertising and recruitment for the Driving Opportunity. *Id.*

> **1.     Inducing Drivers to Enter the Pipeline through Uniform Online and Recruiter Misrepresentations.**

---

[1] International, Expedited, and Lincoln Sales are Iowa corporations, *id.* ¶¶ 15-16, 18, and Specialized is purportedly headquartered in Indiana, but has been registered to do business in Iowa since at least 2020. *Id.* ¶ 17. The Corporate Defendants share the same registered agent in Iowa and have common officers and directors based in Iowa. *Id.* ¶ 23. Smith and Gannon are both Iowa residents, with primary places of business in Iowa. *Id.* ¶¶ 19-20.

3

To establish a large pipeline for the Driving Opportunity, Defendants rely on a shared method of identifying Drivers through lead referrals. *Id.* ¶ 29. By way of uniform online marketing and advertisements, Defendants make Driver candidates aware of lease purchase driving opportunities across all of CRST's subsidiaries. *Id.* Defendants then pursue such leads through systematic recruiting efforts, whereby CRST's enterprise-wide recruiting team (including a shared group of 10-12 recruiters) determines which subsidiary (e.g., Expedited or Specialized) is a better fit for the Driver or CRST, *id.* ¶¶ 28-29, and entices Driver candidates to come to CRST's in-person Driver Orientation, where Defendants continue to misrepresent the Driving Opportunity, *Id.* ¶ 49. The individuals responsible for leading the "CRST Driving Recruiting Team," including Jennifer Abernathy ("Abernathy"), are historically based in Iowa. *Id.* ¶¶ 28, 30. Abernathy's team includes recruiters who are based in Iowa. *See id.* ¶ 48.

Monitoring the pipeline is a constant focus of Defendants' internal communications, with hires, hiring targets, top sources for recruiting leads, and instructions for third-party recruiters all tracked and evaluated on an enterprise-wide basis. *Id.* ¶ 30. During monthly recruiting calls, Defendants provide staffing updates and share Key Performance Indicators for each subsidiary's recruitment. *Id.* **Abernathy, located in Cedar Rapids, Iowa, coordinates these efforts and reports them directly to Iowa-based Gannon, *id.*, who reports to Iowa-based Smith. *Id.* ¶ 25. Gannon, Smith, and the Corporate Defendants' executives also attend joint strategy and planning meetings regarding the Lease Purchase Program and the contracts that govern the relationship between Drivers and the Defendants. *Id.* ¶ 27.** These contracts all expressly apply Iowa law to the relationship. *See e.g.*, Dkt No. 120-2 at 30.

### 1. Uniform Online Misrepresentations.

Defendants have a large web presence and run hundreds, if not thousands, of nation-wide advertisements across multiple platform**s, including their website at crst.com and job-seeker**

4

**websites like LinkedIn. *Id.* ¶¶ 34, 36-39. These advertisements are the first step in the enterprise-wide recruitment process and are designed to get Driver candidates, like Plaintiffs, to contact CRST, *id.* ¶ 35, and then travel to and attend Orientation, which all Plaintiffs did. *Id.* ¶ 50.**

Defendants' advertisements involve false and misleading representations about the profitability and income to be earned in the Driving Opportunity, as well as the success to be had. *Id.* ¶ 34. Specifically, all advertisements represent that Drivers will have consistent and profitable freight to haul, and that average drivers in the program earned at least six figures. *Id.* ¶ 53. For example, an advertisement for Specialized on LinkedIn contained a pro forma indicating solo Drivers would make up to $190,000 (or $3,654 weekly). *Id.* ¶ 36. Advertisements on CRST's website indicated that Drivers earn "AN AVERAGE OF $215,000/YEAR" (or $4,135 weekly). *Id.* ¶ 39. Although the relevant data is in Defendants' sole possession, *id.* ¶ 54, available income metrics for the Flatbed fleet show that, in fact, the bottom 25% of Drivers netted only <u>$171.47 per week</u>. *Id.* ¶ 57. Indeed, all Plaintiffs regularly received negative paychecks (total deductions and/or set offs exceeded gross earnings)—a reality that was also acknowledged in U.S. Department of Transportation Truck Leasing Task Force's January 2025 report to Congress which discussed the predatory nature of CRST's Driving Opportunity. *Id.* ¶ 67.

These advertisements also conceal material information about the high turnover, low income, short tenures, and other poor outcomes and metrics suffered by those who purchased the Driving Opportunity. *Id*. ¶ 34. In reality, Defendants, including Gannon specifically, were aware that 75% of solo Drivers were unsuccessful and likely to quit. *Id*. ¶ 55. Indeed, as Defendants judicially admitted, the annualized turnover rate in CRST's lease purchase program from 2020 to 2023 was between 90% and 130%. *Id*. ¶ 56. For Expedited, annualized turnover rates were 84%,

80%, and 87% in 2024, 2023, and 2022, respectively. *Id*. Turnover rates were even worse for Flatbed (an Expedited division), reaching 201%, 119%, and 132% in 2023 (7 months data), 2022, and 2021, respectfully. *Id*. This information is concealed from Drivers throughout the recruiting processes. *Id*. ¶¶ 55-57.**Uniform**

### 2. Misrepresentations by Recruiters

After a Driver candidate contacts CRST, Abernathy's recruiting team, based in Iowa, follows up by email or telephone. *Id*. ¶ 40. From this first contact, the recruiting team pushes prospects into the Driving Opportunity through carefully choreographed interactions.

Abernathy's recruiting team instructs recruiters, in detail, how to "sell" the Driving Opportunity and provides them with uniform scripts to follow and verbatim statements to share with Drivers. *Id.* ¶ 43; **Ex. A** (cited at ¶ 43)[2,3] (Specialized recruiting script); **Ex. B** (cited at ¶ 45) (Flatbed recruiting script). These scripts were sent from Specialized's Recruiting Manager, Lyndsay Perez Navarro, to the enterprise-wide recruiting team, including Iowa-based recruiters Brooke McGivern and Jon Brown. *Id.* Recruiters are consistently instructed to state the average weekly miles and pay, including "Teams average 4000-5000 miles weekly," "The top 50% of our solo contractors gross $3850/wk, and net $1500/wk average or MORE!," "[a]verage CRST Lease Purchase drivers earn six-figure pay." *Id.* ¶¶ 43-46. Indeed, on numerous occasions, CRST recruiters, including Iowa-based Brooke McGivern, emailed Hicks similar statements, such as

---

[2] All reference to exhibits herein are exhibits to the Declaration of Michael von Klemperer.

[3] "Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Enervations, Inc. v. Minn. Mining & Mfg. Co*., 380 F.3d 1066, 1069 (8th Cir. 2004) (quotations omitted). Documents necessarily embraced by the pleadings include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc*., 317 F.3d 820, 831 (8th Cir. 2003) (citing *In re Syntex Sec. Litig*., 95 F.3d 922, 926 (9th Cir. 1996)). Each of the exhibits included with this brief is cited and discussed in the Complaint.

"[e]arn $210,000 - $248,000 per year." *Id.* ¶ 47. Likewise, on numerous occasions, Iowa-based recruiter Jon Brown, spoke with Weche, via phone call, about the Driving Opportunity and represented that Weche would make $2500-$3000 per week, have consistent mileage (with 3 loads per week), and have access to the load board for full control of his schedule, in addition to stating that Drivers were never in a deficit or away from home for weeks at a time. *Id.* ¶ 48.

In addition to phone calls and emails, Abernathy's recruiting team, directed from Iowa, distributes uniform misrepresentations to all Driver candidates via Lease Purchase Information Packets ("LPIP"). *Id.* ¶¶ 40, 75 (LPIPs containing income representations were received by *all* Drivers). According to Gannon, these LPIPs are intended to provide information about what a Driver can expect from the Driving Opportunity. *Id.* ¶ 40. As with the initial advertisements, the LPIPs represent that Drivers will have consistent and profitable freight to haul and that average drivers in the program earned at least six figures. For example, the LPIP emailed to Kelchner on February 23, 2022, by Iowa-based Brooke McGivern, represented that Kelchner, as a solo Driver, could expect 2200-2500 miles per week and "be successful," earning $190,000 per year. *Id.* ¶ 41, **Ex. C** (cited at ¶ 41) (LPIP received by Kelchner). Likewise, the LPIP emailed to Hicks in July 2024, also by Brooke McGivern, represented that "[a]verage Lease Purchase drivers earn six-figure pay" through "the most profitable program in the business!" *Id.* ¶ 42; **Ex. D** (cited at ¶ 42) (LPIP received by Hicks). This LPIP contained, *verbatim*, the information that Perez Navarro circulated to the enterprise-wide recruiting team. *See* **Ex. B** (cited at ¶ 45)**.**

Although Defendants claim to update income projections in the LPIPs quarterly, *id.* ¶ 75, they were aware that the LPIPs misrepresented income and turnover statistics but simply refused to share this with Drivers. *See id.* ¶¶ 34, 55-57. The goal of these misrepresentations is to induce Drivers to attend CRST's orientation proceedings. *Id.* ¶ 49. For example, Iowa-based recruiter, Jon

7

Brown, emailed Weche, "We are truly glad you selected us as your partner, and we will do all we can to make your business a success … we wish to extend an invitation for you to attend our onboarding and safety orientation." *Id.*; **Ex. E** (cited at ¶ 49) (Weche's invitation to Orientation).

### 2. Inducing Drivers to Buy the Driving Opportunity through Uniform Misrepresentations in Orientation.

At orientation, which is attended by all Driver candidates, Defendants' representatives continue to make various profit, income, and other related misrepresentations and omissions to ensure Drivers sign contracts for the Driving Opportunity, which all Plaintiffs did. *Id.* ¶ 50. For example, additional information packets are distributed as another source of uniform misrepresentations by Defendants. *Id.* These packets include a "Driver Checklist" which, like so many of Defendants' other written materials about the Driving Opportunity, misrepresents the miles available to Drivers and associated pay to expect. *Id.* For instance, the checklist provided to Kelchner represented that "[c]urrent average weekly miles for our fleet are 2200-2500" and that "[a]verage 1099 Gross Earnings are $190,000 per year." *Id.*; **Ex. F** (cited at ¶ 50) (Driver Checklist received by Kelchner). As noted, all of these representations were false, and Defendants were always aware of the real income, mileage, and turnover statistics.

Orientation leaders also use PowerPoints to display profit and income misrepresentations, along with an accompanying explanation that Driver candidates will earn "Exponential Profits" if they purchase the Driving Opportunity. *Id.* ¶ 51. One such PowerPoint made gross revenue representations of $200,000 to $550,000 depending on the miles driven and suggested that average miles ranged from 2090 to 5748 miles per week (or $3,846.15 to $10,576.92 per week). *Id.*; **Ex. G** (cited at ¶ 51) (Driver Orientation PowerPoint). At no point did CRST provide the broad disclosure that BOPA mandates. *Id.* ¶¶ 4-5, 72. This disclosure would have provided Plaintiffs (and other Drivers) with critical information prior to purchasing the Driving Opportunity,

8

including substantiation for all earning claims and data on the sky-high failure rates for drivers entering the program. *Id.* ¶¶ 4, 56-57 & nn. 9-10, 72. Had they known, Plaintiffs almost certainly would not have signed Defendants' contracts. *Id.* ¶ 72.

Denied the mandatory disclosure, Plaintiffs (and other Drivers) relied on Defendants' misrepresentations to continue the recruiting process and, ultimately, purchase the Driving Opportunity. *Id.* ¶¶ 34-35, 40, 47, 49-50, 52-53. Contrary to promises of consistent mileage and six-figure earnings, Plaintiffs were subject to excessive deductions or setoffs, in addition to costs of repairs and maintenance due to being leased years-old recycled trucks. *Id.* ¶¶ 58-66. As such, Plaintiffs regularly found themselves earning negative paychecks—consistent with the predatory nature of CRST's Driving Opportunity described in the U.S. Department of Transportation Truck Leasing Task Force's January 2025 report to Congress. *Id.* ¶ 67. Unable to make a living or complete their lease terms to become a "business owner," *id.* ¶¶ 68, all Plaintiffs were forced to leave their employment with Defendants, *Id.* ¶¶ 12-14.

## II.     LEGAL STANDARD

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved." *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848-49 (8th Cir. 2014) (cleaned up). A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitle to relief." Fed. R. Civ. P. 8(a)(2). "A party may set out two or more statements of a claim . . . in a single count," and the "the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).

A Rule 12(b)(6) motion tests whether the complaint contains sufficient factual matter to state a claim to relief. *Warner v. Wartburg Coll.*, No. 21-CV-2029, 2021 U.S. Dist. LEXIS 142458,

9

at \*5 (N.D. Iowa July 30, 2021) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[T]he court must accept as true all the factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Id.* at \*4-5 (citing *Simes v. Ark. Judicial Discipline & Disability Comm'n*, 734 F.3d 830, 834 (8th Cir. 2013)).

"The well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules." *Topchian*, 760 F.3d at 848. "Factual allegations alone are what matters," not particular legal theories. *Id.* (quoting *Quinn-Hunt v. Bennett Enters., Inc.*, 122 F. App'x 205, 207 (6th Cir. 2005)); *accord Hallman v. Flagship Rest. Grp., LLC*, 762 F. Supp. 3d 830, 846-47 (D. Neb. 2025). "[A] complaint should not be dismissed. . . if the allegations provide for relief on any possible theory." *Topchian*, 760 F.3d at 848-49 (cleaned up); *accord* Fed. R. Civ. P. 8(d)(2).

Where a defendant challenges standing under Rule 12(b)(1) based on the face of the complaint, "the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Thome v. Sayer Law Grp., P.C.*, 567 F. Supp. 3d 1057, 1064 (N.D. Iowa 2021) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). A plaintiff need only "allege sufficient facts to support a reasonable inference," that he can "satisfy the elements of standing." *McNaught v. Nolen*, 76 F.4th 764, 770 (8th Cir. 2023) (citation omitted).

## III.    ARGUMENT

### A.    Plaintiffs' Easily Satisfy Standing For All BOPA Theories Advanced.

In enacting the Iowa Business Opportunities Promotions Act ("BOPA"), the Iowa Legislature determined that, as a matter of Iowa public policy, the seller of a business opportunity must make a fulsome disclosure to prospective purchasers containing <u>twenty-three categories of information</u> ten days prior to the purchaser's execution of a contract. Iowa Code § 551A.3(1),

10

(3)(c)(1)-(23). Separately, BOPA prohibits misrepresentations and omissions regarding the business opportunity. Iowa Code § 551A.9. The Legislature was so concerned that sellers comply with these provisions that any attempt to waive BOPA's requirements is "contrary to public policy," "void and unenforceable." Iowa Code § 551A.5.

CRST concedes Plaintiffs have standing to pursue their "misrepresentation theories" but contend that Plaintiffs lack standing "to pursue registration or disclosure theories." Mot. at 5-7. Plaintiffs do not advance a "registration-based theory," so much of CRST's argument is moot.[4] Plaintiffs' failure-to-disclose theory easily satisfies the standing requirements.

A plaintiff has standing where he has (1) suffered an "injury in fact," (2) caused by "the conduct complained of," that (3) is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). An injury must be "particularized," i.e., "affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). An injury must also be "concrete," i.e. "real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021). Monetary injuries are tangible and "readily qualify as concrete." *Id.* at 425; *Thome*, 567 F. Supp. 3d at 1077 & n.12. The violation of a right granted by statute can also constitute a concrete injury, even if intangible, "when it poses a harm or risk of real harm identified by [the legislature] and traditionally accepted as the kind of injury required for Article III standing." *Thome*, 567 F. Supp. 3d at 1065.

Here, far from complaining of a "bare procedural violation," as Defendants contend, Mot. at 6, Plaintiffs allege a particularized, concrete, and tangible injury. Defendants failed to make the mandatory disclosure, which would have shown Plaintiffs, among other critical information,

---

[4] To be clear, CRST's failure to register under Iowa Code § 551A.7 is *relevant* to a host of issues, including this Court's personal jurisdiction over Specialized and Defendants' general disregard of BOPA's requirements. But Plaintiffs do not rely on that failure as a standalone theory of liability.

extraordinarily high driver turnover rates and extraordinarily low driver earnings. Dkt. No. 113 ¶¶ 4, 56-57 & nn. 9-10, 72 (providing five-page list of mandatory information not disclosed). Without the disclosure, Plaintiffs then contracted with Defendants, devoting their time, energy, and money driving for them, only to receive the same "negative paychecks" Defendants knew all along Plaintiffs were likely to earn. *E.g. id.* ¶ 67, 70. Consistent with the high turnover rate Defendants knew of but failed to disclose, each Plaintiff was forced to quit when driving for Defendants proved economically unsustainable. Plaintiffs would not have contracted with Defendants had Defendants made the required disclosure. *Id.* ¶ 72. These are the precise types of harms BOPA's disclosure requirement was designed to prevent. Among other relief, Plaintiffs are entitled to recover "all money or other valuable consideration paid for the business opportunity, and for actual damages." Iowa Code § 551A.8.1. A "financial injury" of the sort alleged, is "a concrete, tangible harm sufficient to survive defendant's motion to dismiss." *Thome*, 567 F. Supp. 3d at 1077.

While nothing further is required, Plaintiffs *also* have standing for the *independent* reason that Defendants' violation of the statutory disclosure requirement "poses a harm or risk of real harm identified by [the legislature] and traditionally accepted as the kind of injury required for Article III standing." *Id.* at 1065. This test requires the court to assess the harms BOPA protects against and whether those harms "are conceivably similar" to "traditionally" recognized harms. *Id.* at 1072. By its plain terms, BOPA is designed to protect purchasers of potential business opportunities from unscrupulous sellers. It accomplishes this, as relevant here, through the fulsome disclosure requirement before the execution of a contract. Iowa Code § 551A.3. The closest traditional tort is nondisclosure, which premises liability on a party's failure to disclose material information it is under a duty to disclose before a business transaction is consummated. Restat. 2d of Torts, § 551. Both BOPA and nondisclosure aim to avoid the same harm: entering a

12

disadvantageous business transaction with incomplete or inaccurate information. *Cf. Thome*, 567 F. Supp. 3d at 1074 (finding FDCPA and misrepresentation tort closely related as both "stem from an inequity of knowledge and access to information between" seller and consumer). Accordingly, even if Plaintiffs' injuries were merely the intangible violation of the disclosure requirement and not the resultant financial harms, they would still be sufficiently "concrete" to establish standing. *See id.* at 1075.

### B. Plaintiffs' BOPA Theories are Plead with Particularity.

The main purpose of Rule 9(b) is to "facilitate a defendant's ability to respond and to prepare a defense to charges of fraud." *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995). Although the Corporate Defendants raise purported pleading deficiencies, they are well aware of the factual core of Plaintiffs' claims—indeed, Specialized, Expedited, and Lincoln Sales all answered the original complaint and have been actively litigating this case since August 2024. *See* Dkt. No. 1, 25-27, 55. For that reason alone, Defendants' particularity arguments should be denied.

Even if the Court entertains these arguments, the complaint far exceeds the requirements under Rule 9(b). Under Rule 9(b), "the complaint must identify the 'who, what, where, when, and how' of the alleged fraud." *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917 (8th Cir. 2014). "When a plaintiff alleges that a defendant engaged in a systematic practice or scheme," a plaintiff is not required to "allege specific details of *every* alleged" fraudulent act. *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 739 (8th Cir. 2020). Rather, either (1) "representative examples" or (2) "the particular details of a scheme" plus "reliable indicia" that fraud acts were performed is sufficient. *Id.*

Here, the complaint sets forth, in painstaking detail over 48 pages (and with citations to dozens of documents and transcripts produced in discovery), (1) Defendants' common enterprise

13

and interrelated operations, Dkt. No. 113 ¶¶ 21-32; (2) the ways in which Defendants operate *together*, including with shared leadership, marketing, and recruiting personnel, to entice and ensnare unsuspecting drivers in their fraudulent scheme, *id.* ¶¶ 21-52; and (3) the specific details of each Plaintiff's experience. The complaint is replete with specific misrepresentations to each Plaintiff made by specific individuals on specific dates. *Id.* ¶¶ 41-42, 47-48, 50. Indeed, Plaintiffs specify dates that recruiters spoke with Hicks and what representations they made. *Id.* ¶¶ 42, 47. The same is true for Weche, *id.* ¶¶ 48, 70, and Kelchner. *Id.* ¶¶ 41, 50. Plaintiffs also detail the recruiting process that *all* Drivers (including Plaintiffs) were subject to, and the specific misrepresentations made during each step of the process. *Id.* ¶¶ 34-51, 75. Additionally, Plaintiffs allege how the various advertisements, communications with recruiters, LPIPs, and Orientation materials misrepresented the profitability and income to be earned in the Driving Opportunity, *id.* ¶¶ 34, 52-57, and that Plaintiffs relied on such statements, *id.* ¶ 50, (as Defendants intended), *Id.* ¶¶ 40, 47. While the raw data regarding true turnover rates and profit/income levels are in Defendants' sole possession,[5] Plaintiffs allege—based on available documents—that Defendants knew such representations were false. *Id.* ¶ 53-57. And Plaintiffs' allegations about their experiences in the Driving Opportunity further support this. *See id.* ¶ 67. Not only do such allegations provide the exact detail that Defendants claim is lacking, Dkt. No. 120-1 at 13-15, but they are sufficient, without more, to satisfy Rule 9(b). *See, e.g.*, *Trinity Health*, 963 F.3d at 739.

Ignoring vast swaths of the complaint, Defendants cherry-pick examples to argue that Plaintiffs improperly group the Defendants together. Dkt. No. 120-1 at 15-16. This simply ignores

---

[5] When the facts constituting fraud are peculiarly within the opposing party's knowledge, such allegations may be pleaded on information and belief—and be sufficient under Rule 9(b)—if they are accompanied by a statement of the facts on which the belief is based. *Sioux Falls D II FGF, LLC v. Courthouse Square, LLP*, No. CIV 21-4043, 2021 U.S. Dist. LEXIS 238640, *21-22 (D.S.D. Dec. 14, 2021).

14

the incredible detail Plaintiffs provide throughout the complaint, including the specific experiences of each Plaintiff. Moreover, to the extent Defendants are grouped together in certain allegations, Plaintiffs do so for good reason: Defendants acted jointly and uniformly to effectuate their fraudulent scheme. This included a single board of directors and shared officers in control of and overseeing shared marketing and advertising services. *Id.* ¶ 28. These shared services encompass common telemarketing staff and an enterprise-wide "CRST Driver Recruiting Team" centralized in Iowa, *id.* ¶¶ 25, 28-30, 35, responsible for drafting and disseminating misrepresentations to induce Driver candidates to purchase the Driving Opportunity. *See id.* ¶¶ 43-46. For example, Lease Purchase Information Packets—containing the same material misrepresentations—were distributed to *all* Driver candidates, including for both Specialized and Expedited. *Id.* ¶¶ 40, 41-42, 75. Likewise, uniform recruiting scripts containing misrepresentations were used by both Expedited and Specialized. *Id.* ¶¶ 43-46. And *all* Driver candidates (regardless of Defendant) attended in-person Orientation where they were subject to additional misrepresentations. *Id.* ¶¶ 50-51. Notwithstanding that representative examples and particular details of Defendants' fraudulent scheme satisfy Rule 9(b), Plaintiffs allege specific employees who made each misrepresentation, in what manner, and the date each misrepresentation was made. *See id.* ¶¶ 40-51.

Courts have found similar allegations sufficient. *See Olsen v. Nelnet, Inc.*, 392 F. Supp. 3d 1006, 1019-1020 (D. Neb. 2019) ("[w]hich of the three corporate entities—all functioning under the "Nelnet" banner—actually made the representations, and which specific Nelnet employee was responsible for each such misrepresentation is a matter within Nelnet's corporate knowledge" and unnecessary for Plaintiffs to plead); *see also United States v. Consumer L. Prot., LLC*, No. 4:22 CV 1243, 2024 U.S. Dist. LEXIS 249544, *11-12 (E.D. Mo. Oct. 18, 2024) (finding sufficient allegations that "the corporate Defendants … engaged in a common enterprise to defraud

15

consumers" along with "specific allegations of the scheme that they engaged in.").

Plaintiffs' allegations, which contain sufficient detail for the Corporate Defendants to understand the allegations of fraud made against them, satisfy Rule 9(b).

### C. Plaintiffs' Claims Satisfy BOPA's Territorial Requirements.

The Iowa Business Opportunity Promotions Act applies when, *inter alia*, an "offer to sell is made in [Iowa]," Iowa Code § 551A.2(1)(a).[6] An offer to sell is "made" in Iowa regardless of "whether or not either party is in [Iowa]" when either (a) the "offer originates from [Iowa]" or (b) the "offer is directed by the offeror to [Iowa] and received at the place to which the offer is directed or at a post office in this state in the case of a mailed offer." *Id.* § 551A.2(2)(a-b). The Iowa Legislature expressly provided liability for offers made in Iowa, regardless of the physical location of the offerees or the purchasers. *Id.* § 551A.2(2). This text is "binding" and the court cannot "undermine a policy decision by" the Iowa Legislature—including protecting out-of-state purchasers from conduct originating in Iowa—"by ignoring the plain language of the statute." *Adams v. Iowa Dep't of Human Servs.*, 871 N.W.2d 703, at *15 (Iowa Ct. App. 2015).[7]

The Complaint is replete with allegations to support that the Corporate Defendants' offers originate from Iowa under the plain text of the statute. As a general matter, Plaintiffs allege that the Corporate Defendants operate together, out of Iowa, to direct deceptive advertising and

---

[6] An "Offer" "means an attempt to dispose of a business opportunity for value, or solicitation of an offer to purchase a business opportunity." Iowa Code § 551A.1(7). The "Seller" of a business opportunity includes the "person who sells or offers to sell" the opportunity, and its "agent[s]." Iowa Code § 551A.1(13).

[7] Courts interpreting the same language from other state's comparable statutes have explained that "the focus, based on the plain language of the statute is on the nexus of the conduct—whether the solicitations at issue originated from Minnesota," even if directed toward non-residents. *Dolphin Kickboxing Co. v. FranChoice, Inc.*, No. 19-cv-1477, 2019 U.S. Dist. LEXIS 225252, at *23-24 (D. Minn. Dec. 19, 2019); *accord McNally v. Kingdom Tr. Co.*, No. 5:21-cv-0068, 2022 U.S. Dist. LEXIS 13115, at *18-20 (W.D. Ky. Jan. 25, 2022); *Dolomite Energy, LLC v. Comm. ex rel. Dir. of the Office of Fin. Insts.*, 269 S.W.3d 883, 886-87 (Ky. Ct. App. 2008).

16

recruitment for the Driving Opportunity. Dkt. No. 113 ¶¶ 21-32. International, Expedited, and Lincoln Sales are Iowa corporations, *id.* ¶¶ 15-16, 18, and Specialized has been registered to do business in Iowa since at least 2020. *Id.* ¶ 17. The Corporate Defendants share the same registered agent in Iowa, have common officers and directors based in Iowa, and are overseen by International's board of directors (based in Iowa), which determines enterprise-wide strategy concerning the Business Opportunity. *Id.* ¶¶ 19-20, 23-25. The Corporate Defendants' executives regularly attend joint strategy and planning sessions regarding the Driving Opportunity. *Id.* ¶ 27. Most notably, the Corporate Defendants share advertising, marketing, and recruiting operations focused on inducing Drivers to purchase the Driving Opportunity by way of uniform misrepresentations. *Id.* ¶¶ 35-51. The recruiting team, led by Iowa-based Abernathy, coordinates recruiting across all subsidiaries/affiliates, and Abernathy reports directly to Iowa-based Gannon, who reports to Iowa-based Smith. *Id.* ¶¶ 25, 28-30.

Not only are Defendants' recruiting strategy and practices centralized in Iowa, but specific misrepresentations were made *from* Iowa to induce Plaintiffs to purchase the Driving Opportunity. Indeed, on numerous occasions, Plaintiffs were contacted by Iowa-based recruiters who all misrepresented the profitability and income to be earned in the Driving Opportunity, as well as the success to be had. *Id.* ¶¶ 41-42, 47-48; *see also* **Exs. C-D**. These carefully choreographed interactions ranged from email, *id.* ¶ 47, to phone calls, *id.* ¶ 48, to LPIPs, *id.* ¶¶ 41-42, and were characteristic of the recruiting process that Plaintiffs allege *all* Driver candidates were subject to. *Id.* ¶¶ 34-35, 40, 43, 49-51. All of Plaintiffs' contracts with the Corporate Defendants to purchase the Driving Opportunity also apply Iowa law. *See e.g.*, Dkt No. 120-2 at 30 ("**22. GOVERNING LAW**. This Lease shall in all respects be governed by and construed in accordance with the laws of … *the State of Iowa*, without regard to the choice-of-law rules of Iowa or any other

jurisdiction.") (emphasis added, bold in original). As such, Plaintiffs clearly allege that the offers regarding the Driving Opportunity originated from Iowa, and Corporate Defendants argument that Plaintiffs seek an "extraterritorial application" of BOPA should be disregarded.

The Corporate Defendants' reliance on *Jahnke v. Deere & Co.*, 912 N.W.2d 136 (Iowa 2018) for their 'extraterritorial application' argument is inapt for the reasons noted above. Further, Jahnke actually supports Plaintiffs' argument. In *Jahnke*, a China-based employee of a Chinese subsidiary sued Deere & Co. for discrimination under the Iowa Civil Rights Act ("IRCA"). *Id.* at 138. The Iowa Supreme Court held that the ICRA did not apply to "an employment relationship . . . rooted in China," *id.* at 145, but—as relevant here—stated, "[A] statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it. These rules apply to a statute using general words, such as 'any' or 'all,' in describing the persons or acts to which the statute applies." *Id.* at 142 (quoting *State Sur. Co. v. Lensing*, 249 N.W.2d 608, 612 (Iowa 1977)). Here, as Plaintiffs allege, the Corporate Defendants are an Iowa-based common enterprise[8] that made the subject offers originating in Iowa and applying Iowa law and, therefore, BOPA is "prima facie operative" as to them. There is no 'extraterritorial application' issue here.[9]

> **D.    Defendants' Preemption Arguments Are Meritless.**
>
> > **1.    BOPA Is Not Preempted by the FAAAA.**

---

[8] This common enterprise includes CRST Specialized, an Indiana entity registered to do business in Iowa. As discussed above, Plaintiffs have plausibly alleged that CRST Specialized, along with the other Corporate Defendants, form a common enterprise/joint venture based in Iowa.

[9] Because there is no ambiguity regarding the 'extraterritorial application' issue, the Court does not need to reach the Corporate Defendants' argument regarding strict construction. *See State v. Anderson*, 782 N.W.2d 155, 158 (Iowa 2010) (penal statutes are strictly construed in favor of the defendant only if the statutory language is ambiguous). Notably, the Corporate Defendants do not cite any Iowa law for the apparently-novel proposition that claims under BOPA's civil-remedies provisions are "penal" in nature, the basis of their strict-construction argument.

BOPA is not preempted by the Federal Aviation Administration Authorization Act of 1994 ( "FAAAA").[10] "Preemption is an affirmative defense that the defendant has the burden to prove." *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 130 (3d Cir. 2018). "Courts are reluctant to infer preemption…" *DeRoche v. All Am. Bottling Corp.*, 38 F. Supp. 2d 1102, 1110 (D. Minn. 1998). There are three types of federal preemption: express, field, and conflict. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992). Here, Defendants' assert express and/or conflict preemption.[11] But the FAAAA does not preempt BOPA because BOPA is a generally applicable state law that neither regulates transportation of property nor directly relates to, or has a significant impact on, the prices, routes, or services of a motor carrier.

By way of background, the FAAAA is based upon the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 40101 *et seq*. *Morales v. Trans World Airlines*, 504 U.S. 374, 378-79 (1992).[12] In 1980, Congress passed the Motor Carrier Act, deregulating trucking. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 368 (2008). In 1994, Congress passed the FAAAA, borrowing the preemption clause from the ADA with an additional qualification: "[A] State . . . may not

---

[10] Lincoln Sales, International, and individual defendants Smith and Gannon are not motor carriers under the statute and, therefore, the FAAAA does not apply to them. *Siaci Saint Honore v. M/V GSL Kalliopi*, No. 21cv04301, 2022 U.S. Dist. LEXIS 207365, at *19 (D.N.J. Nov. 14, 2022) (The "FAAAA applies only to motor carriers, brokers of motor carrier services, and freight forwarders. *See* 49 U.S.C. § 14501(c)(1).").

[11] The party invoking preemption must show that a state "enacted or attempted to enforce a law" that "relates to [] rates, routes, or services either by expressly referring to them, or by having a significant economic effect on them." *Ye v. GlobalTranz Enters., Inc.*, 74 F.4th 453, 458 (7th Cir. 2023). The scope of preemption is not limitless. *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1051 (7th Cir. 2016). State laws that affect rates, routes, or services in a "tenuous, remote, or peripheral manner" are not preempted. *Id.* (quoting *Morales*, 504 U.S. at 390).

[12] *Costello*, 810 F.3d at 1051 (["P]re-emption occurs at least where state laws have a*'significant impact*' related to Congress' deregulatory and pre-emption-related objectives." *Rowe v. N.H. Motor Transport. Ass'n*, 552 U.S. 364, 371 (2008) (emphasis added)).

19

enact or enforce a law . . . related to a price, route, or service[13] of any motor carrier . . . *with respect to the transportation of property*." 49 U.S.C. § 14501(c)(1) (emphasis added). The U.S. Supreme Court recognized, this "conspicuous" addition "***massively limits the scope of preemption***." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013) (emphasis added).

The scope of preemption statutes is understood considering their deregulatory purposes. *Morales*, 504 U.S. at 390. For example, a state regulation "that broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public," are generally not preempted. *Rowe*, 552 U.S. at 375. Thus, state laws of general application such as anti-gambling laws, wage laws, safety regulations, zoning laws, laws prohibiting theft, embezzlement, bribery, or racketeering are not preempted even though at some level they may have a downstream effect on the market prices. *See S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc*, 697 F.3d 544, 558 (7th Cir. 2012) ("[N]o one thinks that the ADA or the *FAAAA* preempts these and the many comparable state laws … because their effect on price is too 'remote.' Instead, laws that regulate these *inputs* operate one or more steps away from the moment at which the firm offers its customer a service for a particular price.") (emphasis added).

As the Seventh Circuit Court of Appeals later put it: "[T]here is a relevant distinction for purposes of FAAAA preemption between generally applicable state laws that affect the carrier's relationship with its customers and those that affect the carrier's relationship with its workforce. Laws that affect the way a carrier interacts with its customers fall squarely within the scope of

---

[13] In *Charas v. Trans World Airlines, Inc.*, the Ninth Circuit defined "services" within the ADA preemption context as "such things as the frequency and scheduling of transportation, and the selection of markets to or from which transportation is provided. . . ." 160 F.3d 1259, 1265-66 (9th Cir. 1998). Similarly, in *Ginsberg v. Northwest, Inc.*, the Ninth Circuit rejected ADA preemption of state law claims because they did not "relate to" "services," as they had "nothing to do with schedule, origins, destinations, cargo or mail." 653 F.3d 1033, 1042 (9th Cir. 2011).

FAAAA preemption. Laws that merely govern a carrier's relationship with its workforce, however, are often too tenuously connected to the carrier's relationship with its consumers to warrant preemption. The Supreme Court's preemption decisions do not counsel a different conclusion." *Costello*, 810 F.3d at 1055.[14]

In a case directly on point, the District Court in *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457 (D. Utah 2017) rejected FAAAA preemption of Utah's version of the BOPA – the Utah Business Opportunities Disclosure Act (UBODA), Utah Code Ann. § 13-15-1 et seq. First, the *Roberts* court held that "UBODA is not sufficiently related to the price, route, or service of a motor vehicle carrier. Instead, it is a generally applicable business regulation statute requiring entities engaging in the practice of offering business opportunities in the form of assisted marketing plans to comply with certain reporting and disclosure obligations…. It regulates only the manner in which a motor carrier may offer business opportunities to third parties." *Id.* at 499-500. Applying *Rowe*, 552 U.S. 364 (2008), the *Roberts* court found that "UBODA is properly analogized to generally applicable discrimination, rest break, or wage laws which unavoidably affect drivers and motor carriers but have survived preemption challenges because they bear only a tenuous connection to motor carriers and do not exert a 'significant impact on ... rates, routes, or services.'" *Id.* at 500. The *Roberts* court also rejected FAAAA preemption because the UBODA had nothing to do with the transportation of property. "As applied, the statutory disclosure obligation and any related claims arose *before* Plaintiffs became independent contractors….Because UBODA provides redress for business activities entirely independent of the 'transportation of property,' the

---

[14] *See also Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014) ("[G]enerally applicable background regulations that are several steps removed from prices, routes, or services, such as prevailing wage laws or safety regulations, are not preempted, even if employers must factor those provisions into their decisions about" their prices, routes, and service).

Aviation Act does not preempt its enforcement." *Id.* at 501 (emphasis added).

Without evidence, Defendants complain that complying with the BOPA will (1) "fundamentally restructure how they market, document, and implement [their] capacity-procurement model," (2) "fracture the uniform competitive framework the FAAAA was designed to protect," (3) "directly constrain Defendants' ability to design and offer lease-purchase arrangements on economically viable terms," and (4) force them "to either abandon or materially alter the lease purchase model…" [15]Defs.' MTD at 16-17. Of course, what Defendants mean is that BOPA compliance might possibly impact whether the Business Opportunity is "economically viable" to *them*. But, at most, complying with BOPA could have an indirect "input" effect on CRST's prices. For example, CRST might have to improve the Business Opportunity to attract candidates once the true economics of the program are disclosed. But such an effect is too speculative and tenuous to fall within FAAAA preemption – CRST could choose to pass along costs of the improved program to customers, or it could simply choose to absorb such costs.

As UBODA was found in *Roberts*, BOPA here is a statute of general application that applies to CRST in its capacity as a member of the public. BOPA has nothing to say on how Lease Operators go about delivering freight or performing any other transportation-related activity.

---

[15] *Roberts*, 318 F.R.D. 500 ("And unlike cases where courts reach the opposite result, Defendants have not provided an evidentiary record here that supports the conclusion that compliance would have a 'significant' effect on their prices, routes, or services."); *Eskridge v. HMD Trucking, Inc.*, No. 24 CV 12437, 2025 U.S. Dist. LEXIS 103018, at *10 (N.D. Ill. May 30, 2025) ("It's also not enough to merely gesture to the potential effects of enforcing state law on prices or services, the effect must also be significant. *See Costello*, 810 F.3d at 1056. At this stage, there's insufficient evidence in the record to find preemption as a matter of law. *See id*. (rejecting company's 'parade of horrors' as to costs of complying with various other federal and state laws as a result of enforcement), and *Nationwide Freight Sys., Inc. v. Illinois Com. Comm'n*, 784 F.3d 367, 371 (7th Cir. 2015) (finding that carriers did not establish FAAAA preemption at summary judgment without evidence that document requests imposed by state law affected rates, routes, or services and plaintiffs did not allege that they did).").

Nothing in the BOPA precludes CRST from using as many Lease Operators as it wants, nor does the BOPA impact—in any way (no less, significantly) —CRST's prices, routes or services "*with respect to the transportation of property*." 49 U.S.C. § 14501(c)(1) (emphasis added).

In sum, in passing the FAAAA, Congress did not draft a blank check to the trucking industry protecting them from all state regulation and workplace protections that *might indirectly* impact the cost of doing business.[16] And certainly nothing in FAAAA preemption jurisprudence suggests that it was intended to permit carriers like CRST to foist an unprofitable and misrepresented business opportunity on an unsuspecting public with impunity. Consequently, the Court should deny Defendants' motion.

### 2. BOPA Is Not Preempted by TILA.

Defendants also contend the BOPA is preempted by the federal of the Truth-in-Leasing Act ("TILA"), 49 U.S.C § 14102 et seq., and the implementing regulations, 49 C.F.R. Part 376 et seq. As this Court has recognized, the truth-in-leasing regulations require leases (here, the Independent Contractor Operating Agreement (ICOA)) include certain terms and carriers adhere to such terms.[17] [18]*Cervantes v. CRST Int'l, Inc.*, No. 20-CV-75-CJW-KEM, 2024 U.S. Dist. LEXIS

---

[16] "We do not see, however, how the increased labor cost will have a *significant* impact on the prices that BeavEx offers to its customers. BeavEx has offered no evidence to persuade us differently. *Costello*, 810 F.3d at 1056("What our sister circuits do show is that the effect of a labor law, which regulates the motor carrier as an employer, is often too "remote" to warrant FAAAA preemption.") *Id.* at 1054, *collecting cases*. *See also*, *Bieneman v. Chicago*, 864 F.2d 463, 471 (7th Cir. 1988) ("The Federal Aviation Act does not expressly preempt state damages remedies. To the contrary, § 1106 of the Federal Aviation Act, 49 U.S.C. App. § 1506, provides that 'nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.'").

[17] As noted above, Lincoln Sales, International and the individual defendants are not motor carriers and, therefore, the TIL Regulations cannot preempt claims as to them. "The regulations in this part apply to the following actions by motor carriers registered with the Secretary to transport property" 49 C.F.R. § 376.1.

[18] For clarity, there are two "lease" agreements implicated in this case. The putative classes' vehicle lease agreement with Lincolns Sales is not subject to the TIL regulations. The respective ICOA's

23

94265, at *117-20 (N.D. Iowa May 28, 2024).

Here, Defendants seem to argue for field preemption (BOPA conflicts with the "comprehensive federal leasing scheme…," Defs.' MTD at 18) and/or conflict preemption, which "exists where it is impossible to comply with both federal and state law, or where state law poses an obstacle to congressional objectives." *Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1236 (10th Cir. 2017). On the latter, Defendants seem to argue that BOPA frustrates or stands an obstacle to the scheme implemented by TILA and the TIL regulations. [19]

Remarkably, more than forty years ago, the Fourth Circuit rejected these precise field and conflict preemption arguments involving a lease purchase program seemingly offered by CRST Specialized in *Tousley v. N. Am. Van Lines, Inc.*, 752 F.2d 96 (4th Cir. 1985) in connection with South Carolina's version of the BOPA, the South Carolina Business Opportunity Sales Act, S.C. Code Ann. § 39-57-20.[20] The facts in *Tousley* were virtually identical to those here. "Under this

---

where the putative class "leased back" these trucks to CRST are subject to the TIL Regulations. However, it is also helpful to note here that BOPA is not limited to a single written contract – the statute defines a business opportunity contract as "any agreement between parties which is express or implied, and which is made orally or in writing." Iowa Code § 551A.1.3. Here, the BOPA agreement between the parties is not reflected in a single document but is the entirety of the Defendants' LPP as reflected in the lease agreements with Lincoln Sales, the ICOAs with CRST, the LPP Information Packets, the express and implied agreements created by the various representations about the LPP Defendants made via advertising, recruiting, orientation, and other like information presented to putative class members. As defendants concede, the totality of the Lease Purchase Program offered the class was a "platform" on which to build a small business.

[19] This Court has observed the objectives of the regulations are: "to promote truth-in-leasing—a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers; and to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank (In re Arctic Express Inc.)*, 636 F.3d 781, 795 (6th Cir. 2011) (citation modified)." *Cervantes*, 2025 U.S. Dist. LEXIS 150727, at *64-66.

[20] It appears this case involves recidivism by CRST Specialized and that *Tousley* involved the same basic program presented here. "CRST International, Inc. today announced that it has changed the name of Specialized Transportation, Inc. (STI), which it acquired in 2011, to CRST Specialized Transportation to better fit within the company's brand. The former STI is widely recognized as a

24

scheme, the owner-operator purchases a tractor from North American. North American owns all of the trailers, negotiates hauling agreements, and assigns runs to drivers across the country." *Id.* at 99. Plaintiff Tousley responded to an ad touting an "outstanding opportunity" and "an excellent tractor purchase program" and then attended a seminar where a recruiter made oral and written representations.[21] Tousley then traveled to Fort Wayne, Indiana where he was trained and signed his various contracts. During two years in the program, Tousley "realized considerably less income than the amounts mentioned by the recruiting representative" and sued under the statute. *Id.* at 99-100. The Fourth Circuit rejected the same preemption arguments made here and affirmed that the offering was a "business opportunity" under the statute. *Id*. at 104.[22]

Defendant North American contended that the South Carolina statute was preempted by

---

leading provider of customized supply chain solutions for products that require high touch support, special handling and equipment, and value added on-site services…. STI was formerly the High Value Products/Logistics Division of North American Van Lines, headquartered in Ft. Wayne, Ind." https://www.crst.com/blog/crst-international-inc-renames-itself/.

[21]   "Among other things, North American offered to train Tousley as a truck driver, sell him a truck, finance his purchase of the truck and dispatch him and his truck to places where he would pick up freight for transportation.  The representative stated that Tousley should earn gross income of $ 71,000 a year and, after subtracting the payments on his truck and other expenses, should net between $ 16,000 and $ 19,000 a year." *Tousley*.

[22] As the preemption issues are the same as presented here, CRST Specialized should be precluded from relitigating it.  Collateral estoppel, or issue preclusion, may be used offensively or defensively in successive lawsuits. *Clark v. State*, 955 N.W.2d 459, 465 (Iowa 2021). The following elements are necessary for issue preclusion to apply:

(1) the issue concluded must be identical; (2) the issue must have been raised and litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

Further, Iowa law requires courts to consider two additional factors before a party may use issue preclusion offensively. *Id.* First, the court must ask whether the opposing party had the full and fair opportunity to litigate the issue at hand, and second, whether other circumstances would justify giving the party resisting issue preclusion the opportunity to relitigate the issue. *Id.* Here, all factors point in favor of precluding CRST Specialized from relitigating the preemption issue.

the Interstate Commerce Act and regulations thereunder regulating the leasing of trucks to motor carriers. [23]The *Tousley* Court dispensed with an argument directed to field preemption. "In short, we are not persuaded that the Interstate Commerce Act and the regulations promulgated thereunder express a congressional intent to occupy the field of truck leasing to the exclusion of the state statute involved in this case." *Id.* at 102. Next the Court dispensed with conflict preemption noting "the interaction of the statutes at issue here creates no irreconcilable conflict." *Id*.

The avowed purpose of § 11107 and the regulations is to encourage truth-in-leasing through disclosure at the time of the execution of the lease agreement. The regulation appears to seek to solidify the terms of the agreement to protect the parties operating under it. The Business Opportunity Sales Act, however, regulates the conduct of a seller prior to executing an agreement with a buyer so the buyer may avoid executing an agreement that may be disadvantageous to him.

"The requirements of the South Carolina statute complement the policies of the Interstate Commerce Act. By protecting individuals from being enticed to participate in fly-by-night or more sinister types of business opportunities, the South Carolina statute furthers the truth-in-leasing policy expressed in the Interstate Commerce Act and regulations. In fact, the requirement of disclosure by the party with both complete control of the information and the power to grant the business opportunity facilitates rather than inhibits a true arm's-length transaction." *Id*. at 102-03.

For the reasons stated in *Tousley*, the court should deny Defendants' preemption arguments. BOPA does not stand as an obstacle to the truth in leasing regulation's objectives but rather serves to complement them. Moreover, to the extent Defendants might argue

---

[23] These are the same statute and regulations at issue here. "Section 11107(a) was recodified without substantial change at 49 U.S.C. § 14102(a) as part of the Interstate Commerce Commission Termination Act of 1995. In essence, § 14102(a) was intended to affirm the authority of the ICC, now the STB, to regulate leasing practices in the industry." *Owner-Operator Indep. Drivers Ass'n v. New Prime, Inc.*, 250 F. Supp. 2d 1151, 1158 (W.D. Mo. 2001).

26

"impossibility," the regulatory text alone confirms that compliance with both federal and state law is not physically impossible. Indeed, 49 C.F.R. § 376.11 provides that the truth-in-leasing regulations apply only to circumstances where motor carriers choose to perform transportation in equipment they do not own. 49 C.F.R. § 376.11 ("…the authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: (a) Lease…"). The regulations do not require CRST to submit to the leasing requirements of § 376.12 at all. Rather, disclosures are triggered only when carriers depart from the default of using their own trucks. Thus, "impossibility," if any, is a creature of CRST's own design. And while the TILA regulations may address exploitation in a slightly different way than the BOPA, there is no reason why CRST cannot and should not be able to comply with both.

**E.      Plaintiffs Have Standing To Pursue Injunctive Relief Related To Future Threatened Harms From Defendants' "Routine" Practices.**

The Corporate Defendants argue that Plaintiffs lack standing to pursue injunctive relief because they are no longer no longer employed.  But the Defendants ignore a host of allegations about the risk of harm Plaintiffs still face.

BOPA provides for "injunctive or other equitable relief." Iowa Code § 551A.8(4). Standing to seek injunctive relief requires "a showing that the plaintiff faces a threat of ongoing or future harm." *Boyd v. Target Corp.*, 750 F. Supp. 3d 999, 1031 (D. Minn. 2024) (quoting *Park v. Forest Serv. of U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000)). Where a plaintiff has been deceived once and the defendant's misrepresentations are ongoing, courts have found standing based on the plaintiff's inability to rely on the defendant's advertising in the future. *Id.* at 1032; *accord Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 933 (D. Minn. 2024). This is particularly true where the plaintiff sues under a consumer protection statute, given the "obvious implication of ongoing harm to other consumers" and the risk of rendering the statute "toothless." *Boyd*, 750 F. Supp. 3d at

27

1031; *accord Mekhail*, 726 F. Supp. 3d at 933. Further, the Supreme Court has found that the dissemination of inaccurate or misleading information, including inaccurate credit reporting, constituted concrete harm sufficient to confer standing on the affected plaintiffs. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021).

Here, Plaintiffs would like to drive for Defendants again if their practices improve. Dkt. No. 113 ¶ 79. Plaintiffs are likely to be exposed to Defendants' advertising given their "barrage" advertising tactics, but, absent injunctive relief, Plaintiffs will not be confident that Defendants' advertising is accurate for the reasons discussed throughout the complaint. *Id.* ¶¶ 79-80. Further, Plaintiffs allege that (1) they remain responsible for all unpaid lease payments, expenses, taxes, and other items for the stated duration of the lease agreement regardless of their ongoing employment, *id.* ¶ 81; (2) the Defendants routinely deduct the cost of unnecessary repairs, detailing, and reconditioning from former drivers' pay and/or escrow accounts, *id.* ¶ 82; (3) the Defendants regularly make inaccurate reports to trucking-specific reporting agencies that drivers have "abandoned" their vehicles or quit, which may affect their future employment, *id.* ¶ 83; and (4) the Corporate Defendants regularly make negative reports to credit agencies when drivers are unable to pay certain amounts owing to the economic non-viability of the Driving Opportunity, which may affect their credit, *Id.* ¶ 84. Plaintiffs are highly likely to suffer these concrete harms given the "routine" nature Defendants' practices, absent injunctive relief. Accordingly, Plaintiffs have demonstrated standing to pursue injunctive relief.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Motion to Dismiss be denied in full. To the extent the Court grants any portion of the Motion, Plaintiffs respectfully request that it be without prejudice and that Plaintiffs be granted leave to amend.

Date: January 26, 2026

Respectfully Submitted,

SHINDLER, ANDERSON, GOPLERUD & WEESE P.C.

*/s/ J. Barton Goplerud*
J. Barton Goplerud, AT0002983
Brian O. Marty, AT0011622
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Tel: (515) 223-4567
Fax: (515) 223-8887
goplerud@sagwlaw.com
marty@sagwlaw.com

*/s/ Michael von Klemperer*
Michael von Klemperer (pro hac vice)
FEGAN SCOTT LLC
1763 Columbia Road NW, Suite 100
Washington, DC 2009
Ph: (202) 921-0002
Fax: (312) 264-0100
mike@feganscott.com

Elizabeth A. Fegan (pro hac vice)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor Chicago, IL 60606
Ph: (312) 741-1019
Fax: (312) 264-0100
beth@feganscott.com

Georgia J. Zacest (pro hac vice)
FEGAN SCOTT LLC
708 Main, 10th Floor
Houston, TX 77002
Ph: (830) 212-4042
Fax: (312) 264-0100
georgia@feganscott.com

29

Robert S. Boulter (pro hac vice)
LAW OFFICES OF ROBERT S. BOULTER
1101 5th Ave #310
San Rafael, CA 94901
Tel: (415) 450-5189
rsb@boulter-law.com

*Attorneys for Plaintiffs and the Putative Class*

30